**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| FRED L. PLUMP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:07-cv-01014-MEF-CSC |
| | ) | |
| BOB RILEY, Governor, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendant Bob Riley, Governor of Alabama, for his response in opposition to Plaintiff's Motion for Preliminary Injunction, states as follows:

**INTRODUCTION**

Plaintiff seeks extraordinary injunctive relief that is unsupported by the facts and law, is inappropriate at this stage in the litigation, and is inappropriate without the joinder of additional parties. Plaintiff asks this Court, before a hearing on the merits, to unseat the Governor's appointee, General George F. Bowman, who is African-American, and to permit an election to go forward for Gen. Bowman's seat on the Jefferson County Commission, when that election has no basis under Alabama law. Plaintiff seeks this relief on the grounds that there has been an alleged change in voting procedures pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, even though the most recent vacancy on the Commission was filled by gubernatorial appointment and although the most recent precleared local law contemplates gubernatorial appointment.

There is no valid Alabama law that provides for an election to fill the subject vacancy. Yet, General Bowman will face the voters at the end of his term (if he chooses to run for another term). That being the case, and because this action is different from *Kennedy v. Riley*, 445 F.Supp.2d 133 (M.D. Ala. 2006), Plaintiff cannot show that he is likely to succeed on the merits, that he will suffer irreparable harm, or that an injunction is in the public interest. The relief Plaintiff seeks is inappropriate in any case, but certainly is inappropriate before a hearing on the merits and without the joinder of the Jefferson County Election Commission and General Bowman, the appointed Commissioner.

## FACTS[1]

1.      The general law in Alabama, currently codified at Ala. Code (1975) § 11-3-6, has provided since at least 1852 that vacancies on County Commissions are filled by appointment, originally by appointment of the remaining members.[2] The appointment power was first given to the Governor of Alabama on November 25, 1868, and has remained in the Governor's hands since that date.[3] Because the rule of filling vacancies by appointment existed before the Fifteenth Amendment was adopted in 1870, it cannot possibly have been enacted for the purpose of denying African Americans the franchise.

---

[1] Defendant expects the following facts to be part of the parties' stipulation, which will be filed by January 4, 2008. Should the parties be unable to agree to the following, Defendant expects to offer proof at the hearing scheduled for January 15, 2008, to the extent such proof is possible at this preliminary stage of the litigation.

[2] *See* Code of Alabama (1852) § 698; Code of Alabama (1867) § 826.

[3] *See* Act No. 1868-12; Code of Alabama (1876) § 740; Code of Alabama (1886) § 820; Code of Alabama (1896) § 952; Code of Alabama (1907) § 3307; Code of Alabama (1923) § 6749; Code of Alabama (194), T. 12 § 6; Code of Alabama (1975) § 11-3-6.

2.      The Legislature passed Local Act No. 77-784 on May 25, 1977.  Although there was already a general law providing a means to fill vacancies on County Commissions by gubernatorial appointment, Local Act No. 77-784 purported to establish a local rule that such vacancies in *Jefferson* County would be by special election.  *See* Exhibit A.

3.      Local Act No. 77-784 was precleared by the United States Department of Justice ("DOJ") pursuant to Section 5 of the Voting Rights Act of 1965.

4.      On September 30, 1988, the Alabama Supreme Court ruled that Act No. 85-237, a local law concerning filling vacancies on the Mobile County Commission, was void on grounds that it violated Section 105 of the Constitution of Alabama.  *Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988).  Section 105 provides that "[n]o special, private, or local law . . . shall be enacted in any case which is provided for by a general law."  Ala. Const. Art. IV, § 105.

5.      On March 29, 2001, Chris McNair resigned a seat on the Jefferson County Commission.  That same date, Governor Don Siegelman (D) appointed Reverend Steve Small, Jr., to fill the vacancy.  *See* Exhibit B.

6.      On May 3, 2004, Governor Riley signed into law Act No. 2004-376.  That Act concerned, among other things, residency requirements for Jefferson County Commissioners.  In addition to other changes, Act No. 2004-376 amended regulations concerning the Jefferson County Commission by adding the following language:

> Each commissioner, *if filling a vacancy by appointment*, shall have resided in the district at least one year before appointment and shall reside in the district during his or her tenure.

Act No. 2004-376 (emphasis added).  *See* Exhibit C.

7.      On March 11, 2005, the above-quoted Act No. 2004-376 was precleared by DOJ.  *See* Exhibit D.

8.      On May 14, 2004, the Alabama Legislature passed Act No. 2004-455, purporting to amend the general law, Ala. Code § 11-3-6,[4] to provide as follows:  "*Unless a local law authorizes a special election*, in case of a vacancy [on a County Commission], it shall be filled by appointment of the Governor . . . ."  Act No. 2004-455 was precleared by DOJ.

9.      On November 9, 2005, the Alabama Supreme Court held that Act No. 2004-455 was *prospective only*, and did not "revive" local legislation passed in contravention to Ala. Const. Art. IV, § 105 before May 14, 2004.  *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005).

10.     On August 18, 2006, a three-judge court in the Middle District of Alabama ruled, in the context of a local law applying to Mobile County, that *Stokes v. Noonan* and *Riley v. Kennedy* were subject to the preclearance requirements of Section 5 of the Voting Rights Act.  *Kennedy v. Riley*, 445 F.Supp.2d 1333 (M.D. Ala. 2006) ("[W]e hold that the state court decisions should have been precleared before they were implemented.").  Instead of issuing an injunction, the Court determined that it would grant the State of Alabama 90 days to seek preclearance of the State court decisions construing State law.  *Id.*

11.     While the State of Alabama disagreed with the holding of *Kennedy v.*

---

[4]      Section 11-3-6 was recently repealed by Act No. 2007-488, however, that Act provides for section 11-3-1(b) to provide, in pertinent part, as follows: "Unless a local law authorizes a special election, any vacancy on the county commission shall be filled by appointment by the Governor."  Act No. 2007-488 has not yet been submitted for preclearance, but its passage and preclearance status do not appear to be relevant to this litigation.  In any event, simply changing how a provision is labeled is not a change within the scope of Section 5.

*Riley* and believed it was not proper to require preclearance of judicial decisions, the State sought preclearance. On November 9, 2006, the State of Alabama submitted *Stokes v. Noonan* and *Riley v. Kennedy* to DOJ for preclearance in the context of the contested gubernatorial appointment to the Mobile County Commission.

12.    On January 8, 2007, DOJ interposed an objection to *Stokes v. Noonan* and *Riley v. Kennedy*, thus denying preclearance.

13.    The State of Alabama sought reconsideration, and on March 12, 2007, DOJ declined to withdraw its objection to *Stokes v. Noonan* and *Riley v. Kennedy*.

14.    In October, 2007, Jefferson County Commissioner Larry Langford ("Langford") was declared the winner of the election for the office of Mayor of the City of Birmingham, Alabama.

15.    On October 29, 2007, following the Birmingham mayoral election, the Jefferson County Election Commission adopted a resolution calling for a special election to fill the County Commission Vacancy, "if there is one." *See* Resolution, Attached as Exhibit A to Plaintiff's Original Complaint.

16.    On November 13, 2007, Langford assumed the office of Mayor of the City of Birmingham, Alabama, creating a vacancy on the Jefferson County Commission.

17.    On November 21, 2007, Governor Bob Riley (Defendant) appointed General George F. Bowman to the vacant commission seat.

18.    General Bowman is an African-American, a retired two-star army general, and the son of a Tuskegee airman. He "does not belong to a political party but has voted Democratic in past elections." Barnett Wright, *Governor Riley Appoints Retired General To Replace Larry Langford on Jefferson County Commission*, Birmingham News (Nov.

22, 2007).

19.    Plaintiff filed his original complaint on November 16, 2007.    On November 27, 2007, he filed an amended complaint.    The amended complaint alleges violations of Sections 2 and 5 of the Voting Rights Act, the Equal Protection Clause, the Fifteenth Amendment, and, remarkably, the Thirteenth Amendment's prohibition against slavery.

20.    On December 20, 2007, *The Birmingham News* reported that Plaintiff has qualified as a candidate in the purported February 5, 2008 special election.    Barnett Wright, *Fairfield's Plump Seeks Langford Seat*, Birmingham News (Dec. 20, 2007).


## STANDARD FOR PRELIMINARY INJUNCTION

Plaintiff's burden on his Motion for Preliminary Injunction is well settled:

> Whether to issue a preliminary injunction lies within the sound discretion of the district court. *Frio Ice, S.A. v. Sunfruit, Inc.,* 918 F.2d 154, 159 (11th Cir.1990). The Eleventh Circuit Court of Appeals has established a four-prong test for the district court to apply when determining whether a preliminary injunction should issue. Under this test, the movants must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened harm to the plaintiffs outweighs any harm that the injunction may cause the defendants; and (4) the public interest will not be disserved by the grant of a preliminary injunction. *Id.*

*May v. City of Montgomery, AL*, 504 F.Supp.2d 1235, 1236 (M.D.Ala., 2007).

A plaintiff seeking to enjoin enforcement of a State statute bears a particularly heavy burden. "'[P]reliminary injunctions of legislative enactments -- because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits -- must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by

the other strict legal and equitable principles that restrain courts.'" *Bankwest, Inc. v. Baker,* 324 F.Supp.2d 1333, 1343 (N.D.Ga.2004) (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990)).


## ARGUMENT

### I.    THIS CASE WAS NOT DECIDED BY *KENNEDY V. RILEY*.

The three-judge court's decision in *Kennedy v. Riley*, 445 F.Supp.2d 1333 (M.D. Ala. 2006), which is currently on appeal (Supreme Court Case No. 07-77), does not mandate a similar decision in this case.  Each alleged change in practice, standard or procedure with respect to voting is different, and this case is different from that in *Kennedy v. Riley* in several respects.[5]

Although the local laws are similar in character, this case involves a different local law than the one at issue in *Kennedy v. Riley*.  The local laws were passed separately in different years and apply to different Alabama counties.  *See* Act No. 77-784 (Jefferson County) (attached as Ex. A); Act No. 85-237 (Mobile County).

The history of administration is also different.  The most recent practice (in 2001) in Jefferson County is to fill vacancies by gubernatorial appointment.[6]  When Governor

---

[5] Of course, if the United States Supreme Court holds that State court decisions such as *Stokes v. Noonan* and *Riley v. Kennedy* need not be precleared, then Defendant prevails in this case.  If the Court does not reverse the District Court's decision in *Kennedy v. Riley*, Plaintiff still must prove here that there has been a change within the scope of Section 5 in Jefferson County in order to prevail in this litigation.

[6] Plaintiff may contend that Local Act No. 77-784 was used early in 1982 to fill vacancies by election in Jefferson County.  Defendant does not have sufficient information at this time to know whether there were in fact special elections, or whether Local Act No. 77-784 was the purported authority for any such election.  Even if there were special elections twenty-five years ago to fill Commission vacancies in Jefferson County, the most recent practice remains gubernatorial appointment.  Moreover, to Defendant's knowledge, there has been no such special election to fill a Commission vacancy since the Alabama Supreme Court held, in *Stokes v. Noonan*, that such local legislation violates the Alabama Constitution, or

Don Siegelman (D) appointed Reverend Small to fill a vacancy in 2001, no one called for a special election. In fact, no one seemed to mind at all. Because of the clear pronouncement from the Alabama Supreme Court that a local law providing for special elections was unconstitutional under State law, the Jefferson County Election Commission apparently abandoned any practice of filling such vacancies by special election. Moreover, a subsequent local law for Jefferson County, Act No. 2004-376, gives specific residency requirements for persons filling seats on the Jefferson County Commission *by appointment.* (*See* Ex. C).

The cases are similar, then, but this case is not controlled by the decision in *Kennedy v. Riley*, and of course this Court is not required to follow the decisions of another district court.

## II.    *KENNEDY v. RILEY* WAS WRONGLY DECIDED, AND NEITHER *STOKES v. NOONAN* NOR *RILEY v. KENNEDY* MUST BE PRECLEARED.

With all due respect to the three-judge court that decided *Kennedy v. Riley*, that case was wrongly decided in several respects, and its decision creates federalism questions so severe that it calls into question the constitutionality of Section 5.

Section 5, which requires covered jurisdictions to get the federal government's permission to change a voting standard, practice or procedure, is "an extraordinary departure from the traditional course of relations between the States and the Federal Government." *Presley v. Etowah County Commission*, 502 U.S. 491, 501 (1992). That is already the case when Section 5 is properly construed to prohibit a covered jurisdiction

---

since the Legislature passed Local Act No. 2004-376 (Ex. C), which contemplates gubernatorial appointment and which was precleared by DOJ.

(in certain instances) from changing a practice. The *Kennedy v. Riley* decision went even further, however, by ignoring the invalidity of a State law, thus essentially *requiring* Alabama to adopt a practice of special elections. That decision also went further than Section 5 was intended to go by requiring preclearance of State court decisions where the court is exercising its purely judicial function, thus requiring the Alabama Supreme Court to get the federal government's permission before it can construe a statute or the State Constitution (or, at least, before that construction can have any effect). By extending Section 5 as it did, the *Kennedy v. Riley* court erred, and this Court should not follow that decision.

A.    **An Invalid State Law Cannot Serve as the "Baseline."**

One of the issues this Court must decide is whether there has been a change in a standard, practice, or procedure with respect to voting *in Jefferson County*. Obviously, if there has been no change, there is nothing to preclear.

To decide whether the practice of gubernatorial appointments is a change, the Court must first decide to what prior method it should be compared (the "baseline"). The most recent method actually *used* in Jefferson County (in 2001) was gubernatorial appointment. The last relevant law *precleared* is Local Act No. 2004-376, which clearly contemplates that vacancies will be filled by appointment. If either the 2001 appointment or local Act No. 2004-376 is the baseline, then there is no change, and Section 5 never comes into play.

Another option (which Defendant rejects) is to compare the present method with the prior method of special election, as provided by the invalid local law. However, contrary to what the *Kennedy v. Riley* court held, an invalid State law cannot serve as a

baseline for purposes of Section 5.  It is true that in a covered jurisdiction, preclearance is a *necessary* condition to a state law's enforceability.  That does not, however, mean that preclearance is a *sufficient* condition.  In *Morris v. Gressette*, 432 U.S. 491 (1977), the Supreme Court specifically noted that validity under state law is a necessary prerequisite to application of Section 5:

> Section 5 requires covered jurisdictions to delay implementation of *validly enacted state legislation* until federal authorities have had an opportunity to determine whether that legislation conforms to the Constitution and to the provisions of the Voting Rights Act.

*Id.* at 501-02 (emphasis added).  The Court has also stated that preclearance "does *not* represent approval of the voting change" for all purposes but, rather, "affirms nothing but the absence of" retrogression under Section 5.  *Reno v. Bossier Parrish Sch. Bd.*, 528 U.S. 320, 325 (2000).

Here, the local law providing for special election in Jefferson County (Act No. 77-784) was fatally flawed:  It directly violated a provision of the Alabama Constitution that is not specific to voting, but instead applies to *all* local acts on any subject.  As unconstitutional legislation, Act No. 77-784 was void *ab initio*, and it is as if that local law never existed.[7]  And, although the general law was later amended to allow for local exceptions, that amendment (according to the Alabama Supreme Court in *Riley v. Kennedy*) applied prospectively only, and the invalid law (which was void *ab initio*) was not revived.

The mere fact of preclearance does not insulate a voting law from all State law requirements.  All other laws in Alabama must, for example, be passed by both houses of

---

[7] In Alabama, an unconstitutional law is void *ab initio* – "'in legal contemplation, as inoperative as though it had never been passed.'"  *Ex parte Southern Railway Co.*, 556 So. 2d 1082, 1090 (Ala. 1989) (quoting *Norton v. Shelby County*, 118 U.S. 425, 442 (1886)).

the Legislature, referred to a standing committee, signed by the Governor, have a single subject matter, and meet many other requirements to be valid. So do election laws. If a voting law fails in one of these requirements, but the failure slips by unnoticed (or untested) until after the law is precleared and implemented, it remains unenforceable under State law. Preclearance does not cure the State-law defect, and Section 5 should not be construed to require States to disregard their rules for passing statutes. Such a construction leads to extraordinarily broad results for such a narrow inquiry.

The sensible rule, and the rule that both protects voting rights and respects the role of States in a federal government, is that a practice can serve as a baseline only if it is both precleared *and* valid under State law. Preclearance may remove one obstacle to a law's enforcement, but it does not (and does not even purport to) validate an otherwise invalid State law.[8]

The cases we expect Plaintiff to cite are distinguishable. In *City of Lockhart v. United States*, the Supreme Court held that a Section 5 baseline should be measured by actual practice "regardless of what state law might have required." 460 U.S. 125, 132 (1983). However, the context of *Lockhart* is very different from this case. There, the City of Lockhart elected commissioners in the most recent election by district. The City sought to hold the next election on an *at-large* basis. The City argued that Texas law required *at large* elections and that the prior *district* elections were contrary to Texas law. The Supreme Court held that there was a change that required preclearance because the baseline was *district* elections. *Id.* The Court did not find that the prior *district* elections

---

[8] Defendant's view is consistent with 28 C.F.R. § 51.54(b)(1) (1996), which provides that the baseline shall be "the last *legally enforceable* practice or procedure used by the jurisdiction." (Emphasis added).

were in fact contrary to Texas law, but instead found that the issue was "not entirely

clear" and, in fact, that "[t]here d[id] not appear to be any Texas case law on the subject.

*Id.* at n.6.   Naturally, in those circumstances, the Court did not think it proper for DOJ or

federal courts to "speculat[e] as to state law."   *Id.* at 133 n.8.   Here, though, there is no

need to speculate as to Alabama law:   It is made clear through *Stokes v. Noonan* and

*Kennedy v. Riley*.[9]   Likewise, in *Perkins v. Matthews*, 400 U.S. 379 (1971), there was no

definitive pronouncement by the Mississippi Supreme Court concerning the validity of

the law in question.   Those cases are simply different from this one, because here

Alabama law is clear that the local Act is unconstitutional and void.[10]

---

[9] The Alabama Supreme Court is "the ultimate expositor[]" of Alabama law.  *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).   It has plainly held that local acts of the sort at issue here are invalid when a general law already applies, and that a subsequent amendment to the general law does not revive prior-passed local laws.

[10]   Even though the Jefferson County local act was passed before the Alabama Supreme Court's decision in *Peddycoart v. City of Birmingham*, 354 So. 2d 808 (1978), its fate is no less certain.  In *Peddycoart*, the Alabama Supreme Court noted that some of its prior decisions took a more liberal reading of § 105 of the Alabama Constitution, and held as follows:

> Henceforth when at its enactment legislation is local in its application it will be a local act and subject to all of the constitutional qualifications applicable to it. With regard to legislation heretofore enacted, the validity of which is challenged, this Court will apply the rules which it has heretofore applied in similar cases.

*Id.* at 814.

First of all, the subject of the paragraph referenced above was enactments "based upon population classifications" (for example, a statute that applied only to counties with a population greater than a threshold amount).  *Id.*  The Court had applied different tests at different times to determine whether such an Act was, in fact, a "local" law.  The invalid local act at issue in this case was not based on population, and therefore is not subject to any prior test for whether such acts are local laws or general laws.  Second, any earlier case approving a similar local act was plainly wrongly decided and misread earlier decisions.  In *City Council of Montgomery v. Reese*, 149 Ala. 188, 43 South. 116 (1909), the Alabama Supreme Court held that a local act approving bonds with a 40-year maturity period violated § 105 when there was a general law allowing local jurisdictions to issue bonds with a 30-year maturity period.  *Id.*  However, that decision was misread in *City of Ensley v. Simpson*, 166 Ala. 366, 52 So. 61, 64 (1910).  The *Simpson* court mistakenly assumed that both the local and general laws stipulated 30-year maturity periods, and thus limited the *Reese* decision to cases where the local and general laws were substantially

Moreover, *Perkins* and *Lockhart* are different from this case because the Mississippi and Texas procedures used as the baseline were those frozen in place by the VRA, those procedures that would have been used in elections had they been held on November 1, 1964. In this case, the practice for filling vacancies on the Jefferson County Commission on the coverage date was by gubernatorial appointment, the same (unchanged) procedure challenged by the Plaintiff.

Thus, Jefferson County's Act No. 77-784 is invalid under State law and cannot serve as the baseline. Because that local law is void *ab initio*, the logical comparison point (the baseline) is one of the following: (i) the 2001 gubernatorial appointment; (ii) the rule of gubernatorial appointments provided by precleared local Act No. 2004-376; or (iii) the rule of gubernatorial appointments that existed on November 1, 1964 (Alabama's coverage date) and up until the passage of Act No. 77-784. In any event, there is no "change" here that requires preclearance under Section 5.

**B.    Section 5 Does Not Require Preclearance of a Decision from a State Supreme Court Exercising Its Purely Judicial Function.**

A State court decision, where the court simply interprets State law, is not subject to the preclearance requirements of Section 5. Section 5 applies only when a covered jurisdiction "enact[s] or seek[s] to administer" a change in a voting practice. 42 U.S.C. § 1973c(a). When the Alabama Supreme Court simply applied the Alabama Constitution to a local law, it did not "enact" or "seek to administer" a change. Instead, it was exercising its judicial function of interpreting the law.

---

similar. That misreading was carried into future cases. *See, e.g.*, *Dunn v. Dean*, 196 Ala. 486, 71 So. 709 (1916). It is unthinkable that today, after *Peddycoart* and *Stokes v. Noonan*, that the Alabama Supreme Court would not condemn the Jefferson County local law and apply the clear language of § 105 as enforced in *City Council of Montgomery v. Reese*.

This case might be different if the court decisions at issue had involved an injunction requiring an election, as was the case in *Hathorn v. Lovorn*, 457 U.S. 255 (1982). Or, the court decisions at issue here would be more like an "enactment" if they were similar to the one in *Branch v. Smith*, 538 U.S. 254 (2003), where the state court designed a redistricting plan. In those cases, the Supreme Court held that the State court orders were subject to Section 5, but the orders were much more legislative than judicial in character. This case is not like *Hathorn* or *Branch*, because the State court decisions at issue in this case involve only the application of neutral rules of statutory and constitutional construction that apply to all statutes (not just voting regulations).

While Section 5 already represents a departure from traditional notions of federalism,[11] the departure is increased many times over if a covered jurisdiction is required to preclear standard decisions by its Supreme Court:

- States will have not only to preclear statutes related to voting, but also would have to make additional submissions every time the precleared statute is interpreted by the courts.

---

[11] Section 5 employs "extraordinary burden-shifting procedures," *Reno v. Bossier Parish*, 528 U.S. 320 (2000) ("*Bossier Parish II*"), and, as a result, has been likened to an "administrative receivership," for covered jurisdictions, Samuel Issacharoff, *Is Seection 5 of the Voting Rights Act a Victim of its Own Success?*, 104 Colum. L. Rev. 1710, 1710 (2004). The Court has often noted the "'substantial' federalism costs" exacted by Section 5. *Bossier Parish II*, 528 U.S. at 338 (quoting *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999)). *Cf. Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring) (pointing out that Section 5 requires that which Section 2 and the Fourteenth Amendment forbid); *Lopez*, 525 U.S. at 293-94 (Thomas, J., dissenting) ("The section's interference with state sovereignty is quite drastic--covered States and political subdivisions may not give effect to their policy choices affecting voting without first obtaining the Federal Government's approval"); *U.S. v. Board of Com'rs of Sheffield, Ala.*, 435 U.S. 110, 139 & n.* (1978) (Powell, J., concurring in part and concurring in the judgment) (noting "reservations as to the constitutionality of the Act" grounded in "its selective coverage of certain States only and [] the intrusive preclearance procedure").

- States will have to search for any court decision interpreting any statute or regulation since Section 5 became applicable because, as *Kennedy v. Riley* and this case demonstrate, even a 20-year-old precedent like *Stokes v. Noonan* is subject to challenge for lack of preclearance.

- The search must include lower State court decisions as well.  Logically, the same standard would apply to final lower court decisions that are not appealed or subject to appeal, making the search even more difficult.

- The State will be required to request preclearance of decisions in cases, such as *Stokes v. Noonan*, where the State was not party and had no opportunity to be heard or to shape the decision.

- Although the Justice Department's denial of preclearance allows an executive or legislative department to continue working on policy acceptable to the Department, judicial decisions are not so malleable and should not be subject to ongoing revision.   The effect of a State Court's interpretation of a precleared statute should not be a subject of negotiation with DOJ.

- And, if preclearance is denied (as it was in *Kennedy v. Riley*), then State officials may be placed in the awkward – if not impossible – position of being under competing court decrees.  State executives will be required to ignore an otherwise binding decision from the State's highest court and execute a statute or regulation that violates State law, including the State constitution.

Because of the mischief that will be created by an interpretation of Section 5 that requires States to preclear purely judicial court decisions, this Court should not interpret Section 5 in such a way absent clear language requiring that interpretation.   As the

Supreme Court has held, "[w]hen Congress intends to alter the "usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 544 (2002) (internal quotations omitted). While such intent was made clear when the statute requires preclearance of legislative or executive acts, no such Congressional intent is shown with respect to judicial decisions. Thus, purely judicial decisions of the sort at issue here are not subject to the preclearance requirements of Section 5.

## III.    PLAINTIFF HAS NOT MET HIS BURDEN OF PROOF WITH RESPECT TO THE REQUIRED ELEMENTS OF INJUNCTIVE RELIEF.

### A.    Plaintiff Has Failed To Show That He Is Likely To Prevail On The Merits.

For the reasons stated above, Plaintiff is unlikely to prevail on the merits. There has been no change in voting practices in this case, once the Court uses the proper base-line: either the 2001 gubernatorial appointment, the prior pre-cleared 2004 local law, or the gubernatorial appointment general law that applied on the coverage date and before the passage of the unconstitutional, void Act No. 77-784.

Moreover, also as discussed above, Plaintiff is unlikely to prevail on the merits because the language of Section 5 does not clearly require preclearance of purely judicial court decisions, and to interpret Section 5 in such a way would greatly increase the Voting Rights Act's intrusion into State government and the traditional balance of federalism.

**B.    Plaintiff Has Failed To Show That He Would Be Irreparably Harmed If The Preliminary Injunction Does Not Issue.**

If this Court denies the motion for preliminary injunction, Plaintiff will be represented by an able, Democratic-leaning African-American commissioner who, if he wishes to continue to serve after expiration of his term, must face the voters before serving a second term. *See* Ala. Code (1975) § 11-3-1. Moreover, the election Plaintiff seeks cannot be validly conducted under Alabama law, and so it is difficult to see how he could have a right to participate in that election either as a voter or candidate. In *Kennedy v. Riley*, the plaintiff consented to the continued service of the appointed commissioner until the conclusion of the litigation and until the State had the opportunity to seek preclearance. In this one respect, this case is no different than *Kennedy v. Riley*: There was no "irreparable harm" in *Kennedy v. Riley* (else the plaintiff would have sought an immediate injunction), and there is none here.

Not only does the special election that the Plaintiff seeks fail to comply with State law pursuant to *Stokes v. Noonan* and *Riley v. Kennedy*, but it appears that there is also a deficiency in how the Jefferson County Election Commission adopted the resolution authorizing the election. Act No. 77-784, the very same Act under which Plaintiff travels, provides that the Jefferson County Election Commission shall call an election "[w]ithin seven days from the occurrence of a vacancy." Act 1977-784, sec. 2. The resolution attached as Exhibit A to Plaintiff's initial complaint, however, is dated October 29, 2007, more than seven days *before* a vacancy occurred (if there was a timely subsequent resolution by the Election Commission, Defendant is not aware of that fact). Thus, even if Plaintiff prevailed on his Section 5 claim, forcing Alabama officials to enforce an invalid State law and denying the Alabama Supreme Court the right to

interpret and apply the State constitution, the special election that Plaintiff seeks may still be invalid.

**C.    Plaintiff Has Failed To Show That The Threatened Harm To The Plaintiffs Outweighs Any Harm That The Injunction May Cause The Defendant.**

Assuming there is any harm at all to the Plaintiff if the injunction is not issued, that harm is outweighed by the harm that the injunction would cause Governor Riley (and, incidentally, the State of Alabama for which he serves as the chief executive officer). Governor Riley has the duty to "take care that the laws be faithfully executed." Ala. Const. (1901) Art. V, § 120. If issued, however, the injunction will require Governor Riley to ignore decisions from the Alabama Supreme Court, binding authority from a co-equal branch of State government. If the Voting Rights Act truly calls for a ruling so invasive into traditional concepts of federalism, Plaintiff should at least be required to prove his case in the merits before Governor Riley is placed in such a position. Additional harm can be attributed to the State and to the public at large, and those categories of harm are discussed in the next section.

**D.    Plaintiff Has Failed To Show That The Requested Preliminary Injunction Would Serve The Public Interest.**

The requested injunction is not in the public interest. First, there are legitimate questions surrounding the validity of the called special election. The local law providing for the special election, Act No. 77-784, violates § 105 of the Alabama Constitution, and it appears to have not been complied with in any event. Act No. 77-784 also appears to be inconsistent with subsequent a local law, Act No. 2004-376, which contemplates that vacancies will be filled by appointment and which was precleared by DOJ. Act No. 77-784 is also inconsistent with the last implemented practice, because the most recent

vacancy on the Jefferson County Commission was filled by appointment by a Democratic Governor. There can be no public interest in holding an invalid election, and this Court should not intervene in these matters until a hearing on the merits and until there is a showing that some valid State law provides for the election Plaintiff seeks.

Second, if the Court grants all the preliminary relief that Plaintiff seeks (an order vacating the appointment and prohibiting any interference with the election), what will happen if DOJ later preclears the appointment procedure, or if the Supreme Court reverses in *Kennedy v. Riley*? If the invalid election goes forward but it is later determined that the proper procedure is by appointment, then a second person – whoever wins the invalid special election – will have to be kicked off the Commission. Much better to simply maintain the status quo, as happened in *Kennedy v. Riley*, until this case is finally decided.

Of course, the request for an injunction against any interference with an election that violates state law has its own problems, namely that it exceeds this Court's jurisdiction. Such an injunction would, in essence, be equivalent to an injunction requiring Governor Riley to comply with State law (or the federal court's idea of what State law is). In *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), the Supreme Court held that, under the Eleventh Amendment, federal courts lack the power to order state officials to comply with state law:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* [*v. Jordan*,

> 415 U.S. 651 (1974)] are inapplicable in a suit against state officials on the basis of state law.
>
>          . . .
>          The reasoning of our recent decisions on sovereign immunity thus leads to the conclusion that a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when-as here-the relief sought and ordered has an impact directly on the State itself.

465 U.S. at 106, 117.  We note that the Court in *Kennedy v. Riley* was reluctant to enter an order requiring an election.  The relief order in that case was limited to vacating the appointment.  *See Kennedy v. Riley*, 2007 WL 1284912 (M.D. Ala. May 1, 2007).  At a later status conference, Judge Thompson expressed reluctance to issue such broad relief when State courts could handle the matter but had not yet had the opportunity to do so.  *See* Transcript of In-Court Status Conference, June 20, 2007 (attached as Exhibit E).

That brings up a third reason that the injunction does not serve the public interest.  As stated above, under *Pennhurst*, this Court may not require State officials to conduct an election, but at most could only vacate the appointment.  That means that if the appointment is vacated, where no valid State law provides for an election, the position will remain vacant until the natural expiration of the term.  All that time, the voters in Jefferson County District 1 will not be represented on the Commission.  In addition, *all* voters in Jefferson County have an interest in having a full and operating County Commission with no prolonged vacancies.[12]

Finally, if it is voting rights that are at stake, then the Court should consider the rights of voters outside of one County Commission District.  The voters elect a Governor,

---

[12] Defendant notes that in *Kennedy v. Riley*, while the three-judge court did not order that state officials conduct an election, there was at least, by the time an election was held, a valid state law requiring an election.  The Legislature passed a local law in 2006 (Act No. 2006-342) requiring that commission vacancies in Mobile County be filled by special election, thus avoiding the problems that the earlier local law faced from *Riley v. Kennedy* and *Stokes v. Noonan* .  The Legislature has not entered such a curative local law with respect to Jefferson County, so there is no valid state law requiring elections to fill vacancies in *Jefferson* County.

who under State law has the duty to faithfully execute the laws and to make appointments to fill vacancies on County Commissions.  The voters elect Alabama Supreme Court justices, who have the duty to interpret statutes and the Alabama Constitution.  The voters in 1901 adopted the current Alabama Constitution, and the public at large has an interest in State officials maintaining the ability to ensure that only statutes that satisfy the Constitution are enforced.

To switch commissioners now, when they may have to be switched back, makes no sense.  Instead of a revolving door to the Jefferson County Commission, the public interest is better served by maintaining the status quo until this case is finally decided after a hearing on the merits.

### E.    Preliminary Injunctive Relief Would Be Inappropriate Without Hearing From The Jefferson County Election Commission and General Bowman.

Plaintiff seeks to have an appointed African-American unseated from the Jefferson County Commission.  He also seeks to prevent State officials from "interfering" with an election that is invalid under State law.  However, neither General Bowman nor the Jefferson County Election Commission is before the Court.

Rule 19 permits the joinder of a person who

claims an interest related to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

F.R.C.P. 19(a).  General Bowman and the Election Commission have such interests and should be heard before relief is issued.

## Conclusion

For the foregoing reason, Plaintiff's Motion for Preliminary Injunction should be denied.

Respectfully submitted,

Of counsel:

Troy King (KIN047)
Attorney General

Kenneth D. Wallis, II (WAL064)
Chief Legal Advisor
Office of the Governor

s/ Margaret L. Fleming
Margaret L. Fleming (FLE001)
James W. Davis (DAV103)
Assistant Attorneys General

Scott L. Rouse (ROU010)
Deputy Legal Advisor
Office of the Governor

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
11 South Union Street
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Facsimile:  (334) 353-8440
mfleming@ago.state.al.us
jimdavis@ago.state.al.us

ADDRESS OF COUNSEL:
Office of the Governor
State Capitol, Suite NB-05
600 Dexter Avenue
Montgomery, Alabama  36130
(334) 242-7120 Phone
(334) 242-2335 Fax

**Counsel for the Defendant**

ken.wallis@governor.state.al.us
scott.rouse@governor.alabama.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of December, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel: Edward Still, Edward Still Law Firm LLC (Still@votelaw.com), and James U. Blacksher (jblacksher@ns.sympatico.ca).

s/ Margaret L. Fleming
Margaret L. Fleming (FLE001)

# EXHIBIT A



1351

pality having the required number of inhabitants and whose corporate boundaries lie partly within said county and partly without said county. Any municipality which adopts a resolution and comes under the provisions of this Act, as herein provided, shall thereafter remain under this Act, and may not repeal or rescind such action either by the adoption of a resolution or otherwise."

Section 2. This Act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved May 23, 1977.

Time: 6:00 P.M.

---

Act No. 783                    H. 943—McCluskey, Shoemaker, Dial

AN ACT

To amend Section 2 of Act No. 793, 1975 Regular Session (Acts of 1975, p. 1595), entitled:

"An Act Relating to all counties having populations of not less than 65,000 nor more than 68,000 inhabitants according to the most recent federal decennial census; to provide for an additional secretarial assistant for the office of the district attorney and for the offices of circuit judge of the judicial circuit in which such county lies;" so as to increase the compensation of the secretarial assistants for the office of circuit judge of the judicial circuit in which such county lies.

Be It Enacted by the Legislature of Alabama:

Section 1. Section 2 of Act No. 793, 1975 Regular Session (Acts of 1975, p. 1596) is hereby amended to read as follows:

"Section 2. The compensation of such secretarial assistants for the circuit judges shall be set by the circuit judge at a sum not exceeding $725.00 per month."

Section 2. This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved May 23, 1977.

Time: 6:00 P.M.

---

Act No. 784                              H. 950—Gafford

AN ACT

To provide that when a vacancy occurs on the governing body of

1352

Jefferson County, the Election Commission of Jefferson County shall adopt a resolution providing for a special election, with a run-off election, if necessary, to fill such vacancy; to provide how a person shall become a candidate for the office to be filled; to provide that any person elected to fill a vacancy hereunder shall serve the unexpired term which the person occupying said office when the vacancy occurred would have served if the vacancy had not occurred; to provide that the general laws of the State governing elections shall apply to any election held under the Act, except as the Act otherwise provides; to provide that no person shall be appointed to fill such vacancy; and to repeal Section 145, Title 62, Code of Alabama of 1940, and any other laws or parts of laws in conflict with the Act.

*Be It Enacted by the Legislature of Alabama:*

Section 1.  As herein used, the following terms have the meanings hereby ascribed to them:  "the County" means Jefferson County, Alabama; "a vacancy" means a vacancy on the governing body of the County caused by death, resignation, impeachment, or any cause except normal expiration of terms; "first election hereunder" means the first election for which this Act provides to fill a vacancy as distinguished from the run-off election held hereunder, if a run-off election is necessary; "run-off election hereunder" means the run-off election for which this Act provides, if no candidate at the first election hereunder receives a majority of the votes cast; "a County wide election" means any election, whether general, special or primary, including run-off elections, whereat qualified electors throughout the County are entitled to vote and which is held to elect a Federal, State or County officer or to nominate a candidate or candidates, for a Federal, State or County office or offices, to submit one or more questions, including, but not limited to, the question of adopting a proposed amendment to the Constitution of Alabama and the question of whether general obligation bonds, or revenue bonds, of the State or County shall be issued; "a scheduled County wide election" means a County wide election which is scheduled to be held on a date definitely determined when a vacancy occurs; and "the Election Commission" means the Election Commission of the County.

Section 2.  Within seven days from the occurrence of any vacancy the Election Commission, by a majority vote thereof, shall adopt a resolution stating the dates on which the first election hereunder and the run-off election hereunder, if necessary, will be held.  The said dates will be determined as provided for in Sections 3 and 4, below.

Section 3.  If when a vacancy occurs a County wide election is scheduled to be held more than forty days and not more than 180 days from the date whereon the vacancy occurs, the first election hereunder, to fill such vacancy, shall be held on the County wide election date.  If when the vacancy occurs

1353

there is no County wide election scheduled to be held more than forty days and not more than 180 days after the date whereon the vacancy occurs the first election hereunder, to fill the vacancy, shall be held on a date specified by the Election Commission in the resolution, provided for in Section 2, above, which date shall be not less than thirty-three days and not more than forty days from the date on which the resolution is adopted.

Section 4. If when the resolution, provided for in Section 2, above, is adopted, a County wide election is scheduled to be held not less than three weeks and not more than eight weeks from the date on which the resolution provides the first election hereunder shall be held, to fill said vacancy, the run-off election hereunder, if necessary, shall be held on the date on which said County wide election is scheduled to be held. If when the resolution, provided for in Section 2, above, is adopted, there is no County wide election scheduled to be held not less than three weeks and not more than eight weeks from the date on which the resolution provides for the first election hereunder to be held, the resolution shall provide for the run-off election hereunder, if any run-off election is necessary to be held three weeks subsequent to the date on which the first election hereunder will be held to fill the vacancy.

Section 5. Any person elected to fill a vacancy hereunder shall serve the unexpired portion of the term which the person occupying said office when the vacancy occurred would have served if the vacancy had not occurred.

Section 6. The first election hereunder and the run-off election hereunder, if a run-off election is required, shall be held on the dates provided for in the resolution adopted under Section 2, above. The provisions of the election laws governing the registration of voters, equipment at polling places, furnishing of supplies, appointment of election officers, voting and canvassing returns at a general election shall apply to any election held hereunder, except as herein otherwise provided.

Section 7. The failure of the Election Commission to provide for the first election hereunder, or the run-off election hereunder, within seven days from the occurrence of a vacancy shall not terminate the jurisdiction and duty of the Election Commission to provide for such first election or such run-off election.

Section 8. No primary election shall be held to nominate a candidate to fill a vacancy under the provisions of this Act. At any election held under this act no person's name shall appear on the ballot as a candidate for the office to be filled at said election unless such person has filed in the office of the Judge of Probate of the County within the time and in the forms

1354

prescribed below in this Section 8 his statement of candidacy and the petition signed by at least one hundred qualified electors requesting that such person become a candidate for the said office.

Any person desiring to become a candidate at any election hereunder may become such candidate by filing in the office of the Judge of Probate of the County such person's statement in writing of such candidacy, accompanied by such person's affidavit taken and certified by such Judge of Probate, or by a Notary Public, that such person is duly qualified to hold the office for which the person desires to be a candidate. Such statement shall be filed at least twenty-one days before the date set for such election; and shall be in substantially the following form:

"State of Alabama, Jefferson County.

I, the undersigned, being first duly sworn, depose and say that I am a citizen of Jefferson County in Alabama, residing at _____ in said County, that I desire to become a candidate for the office of _____ at the election for said office to be held on the ___ _____ day of _____, and that I am duly qualified to hold said office if elected thereto; I hereby request that my name be printed on the official ballot at said election.

Signed_____

Subscribed and sworn to before me, the undersigned (Probate Judge or Notary Public, as the case may be) on this the _____ day of _____, 19_____.

_____
(Judge of Probate or Notary Public as the case may be)"

Said statement shall be accompanied by a petition signed by at least one hundred persons who shall be qualified to vote at said election, requesting that such person become a candidate for said office at said election. The signers to said petition shall set forth their names in full and their residence addresses, and said petition shall be in substantially the following form:

"We, the undersigned, duly qualified electors of Jefferson County, and residing at the places set opposite our respective names, do hereby request that the name of _____ be placed upon the official ballot as a candidate for the office of _____ at the election for said office to be held in said County on the _____ day of _____. We further state that we know that said _____ possesses the qualifications necessary for said office, and is in our



1355

judgment a fit and proper person to hold said office. Witness our hands on this the ____ day of _____, 19____."

No name shall appear upon said ballot as a candidate for election except the names of such persons as have become candidates according to the provisions as set forth above. If voting machines are used in the County, the names of candidates shall be suitably placed on voting machines.

Section 9. No persons shall be appointed to fill a vacancy. Section 145, Title 62, Code of Alabama of 1940, and all other laws and parts of laws, whether general, local or special in conflict herewith, are hereby repealed to the extent of any such conflict.

Section 10. This Act shall become effective upon its approval by the Governor or its otherwise becoming a law.

Approved May 25, 1977.

Time: 4:30 P.M.

---

Act No. 785

H. 1023—Shelton, Merrill

AN ACT

To provide that any public corporation heretofore or hereafter incorporated and existing under the provisions of Act No. 109, H. 148 of the 1961 Regular Session, as amended, [1961 Acts, p. 134; appearing in Code of Alabama 1940, Recompiled 1958, Title 22, Section 204 (41a)], is authorized and empowered to lease any hospital, building or facility constructed and equipped under the provisions of such act to any public corporation or any non-profit corporation. No rights under the terms of any contract shall be abrogated nor shall any security for the fulfillment of any obligation be jeopardized by the provisions of this act.

Be It Enacted by the Legislature of Alabama:

Section 1. Any public corporation heretofore or hereafter incorporated and existing under the provisions of Act No. 109, H. 148 of the 1961 Regular Session, as amended, [1961 Acts, p. 134; appearing in Code of Alabama 1940, Recompiled 1958, Title 22, Section 204 (41a)], is hereby authorized and empowered to lease any hospital, building or facility constructed and equipped under the provisions of such act to any public corporation or any non-profit corporation. Nothing herein shall be construed to allow the abrogation of the terms of any contract or to jeopardize any security for the fulfillment of any obligation assumed under the provisions of said Act No. 109.

Section 2. The provisions of this act are severable. If

# EXHIBIT B



DON SIEGELMAN
GOVERNOR

STATE CAPITOL
600 DEXTER AVENUE, ROOM N-104
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-0937

OFFICE OF THE GOVERNOR
STATE OF ALABAMA

March 29, 2001

The Reverend Steve Small, Jr.
True Life Baptist Church
True Life Community Development Center
275 Chickasaw Drive
Birmingham, Alabama 35214-3681

Dear Reverend Small:

By this letter, I hereby appoint you to the Jefferson County Commission to fill the vacancy created by the resignation of Chris McNair. Your appointment is effective immediately.

I appreciate your serving in this capacity, and I am confident you will render a valuable service to the citizens of Alabama.

I look forward to working with you.

Sincerely,

Don Siegelman
Governor

DS:JH:oi

cc:    Dannie Shockley
       Karry Fraser

# JEFFERSON COUNTY COMMISSION



**CHRIS McNAIR**
COMMISSIONER OF ENVIRONMENTAL SERVICES
716 North 21st Street, Room 640-A
Birmingham, Alabama 35263-0060
Telephone (205) 325-5504

People Code # _____
Assigned To _____
Assigned By _____
Issue Code _____
Issue Code _____
Other _____



March 28, 2001

Governor Donald Siegelman
State Capital
600 Dexter Avenue
Montgomery, Al 36130-0001

Dear Governor Siegelman:

   I am writing this letter with mixed emotions but I'll persevere.  I have been privileged to serve the people of Jefferson County as a State Legislator, and as a County Commissioner. For this privilege I am very grateful, but the time has come for me to say goodbye, there are personal reasons that are calling me. Therefore, I want to resign on Thursday, March 29th 2001.  I will announce my resignation at approximately 10:20 am at the close of pre-commission meeting.

   Thanks, to all that permitted me to serve.

Respectfully,

Chris McNair

# VITA for STEVE SMALL Jr.

Steve Small.is a native of Wilcox County, a product of Wilcox County School System.
He is graduate of Birmingham Baptist Bible College, he holds a Bachelor of Arts degree
in Religion Education from Miles College and Master's Degree in Counseling from the
University of Alabama in Birmingham. He is Founder and Pastor of the True Life
Baptist Church. Presently attending UAB masters program in Public Administration.

His Civic and Community involvement include:

Vice president of Birmingham Minister's Conference

Board member of Birmingham Baptist Association," Touch of Life Award " recipient.

Member of the 78 West Ministerial Association

Member of Southern Baptist Convention

Member of the National Baptist Convention

Member of the Alabama State Baptist Convention

Executive Director of True Life Community Development Center
      Tutorial Program
       Senior Program
      Summer Camp
      After School Program
      Daycare

Member of The New South Coalition

Board member for Project Impact

Member of Nonprofit Resource Center of Alabama

Served as Site Coordinator (Pratt City) April 8th Tornado

Co-chairman of Interfaith Recovery and Rebuild Committee

Executive Board Member of Unmet Needs Committee

Served on the Special Advisory Board for Gov. Don Siegelman


He is married to the former Annie J. Slater, and loving father to three sons, Steve IV,
Frederick, and Cedric.

# EXHIBIT C

**ACT No. 2004- _376_**

1    HB357

2    62809-2

3    By Representative Newton (D) (N & P)

4    RFD: Jefferson County Legislation

5    First Read: 10-FEB-04



HB357

```
1
2    ENROLLED, An Act,
3              Relating to Jefferson County; to amend Section 4 of
4    Act No. 97-147, 1997 Regular Session (Acts 1997, p. 188),
5    relating to the residency requirement for members of the
6    county commission; to require residency in the district at
7    least one year before the general election for the office or
8    before an appointment to the office.
9    BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:
10              Section 1. Section 4 of Act No. 97-147, 1997 Regular
11    Session (Acts 1997, p. 188), is amended to read as follows:
12              "Section 4. Each commissioner shall reside have
13    resided in the district at least six months one year before he
14    or she qualifies for office the general election and shall
15    reside in the district during his or her tenure. Each
16    commissioner, if filling a vacancy by appointment, shall have
17    resided in the district at least one year before appointment
18    and shall reside in the district during his or her tenure. The
19    president of the commission shall be elected by the members of
20    the commission and the commission shall assign the duties and
21    jurisdiction of each commissioner."
22              Section 2. This act shall become effective
23    immediately following its passage and approval by the
24    Governor, or its otherwise becoming law.
```

HB357

1

2

3

_____
Speaker of the House of Representatives

4

5

_____
President and Presiding Officer of the Senate

6

7    House of Representatives
8    I hereby certify that the within Act originated in
9    and was passed by the House 30-MAR-04.
10
11                            Greg Pappas
12                            Clerk
13

14
15    _____
16    Senate          27-APR-04                    Passed.
17

APPROVED  5-3-04

TIME  11:10 a m

_____
GOVERNOR

Alabama Secretary Of State
Act Num....: 2004-376
Bill Num...: H-357
Recv'd 05/03/04    02:24pmHMB

# EXHIBIT D



## JEFFERSON COUNTY COMMISSION



LARRY P. LANGFORD, PRESIDENT
MARY M. BUCKELEW
BETTYE FINE COLLINS
SHELIA SMOOT
GARY WHITE

### OFFICE OF COUNTY ATTORNEY

EDWIN A. STRICKLAND
County Attorney

CHARLES S. WAGNER
JEFFREY M. SEWELL
THEODORE A. LAWSON, II
Assistant County Attorneys

280 Courthouse
Birmingham, Alabama 35203
Telephone (205) 325-5688
FAX (205) 325-5840

# M E M O R A N D U M

TO:     Jefferson County Commission
         Honorable Mark Gaines, Probate Judge
         Nell Hunter, Board of Registrars

FROM:   T. A. Lawson, II, Assistant County Attorney

DATE:   March 17, 2005

RE:     Act No. 2004-376

---

On January 12, 2005, we made a submission and request to the United States Department of Justice for preclearance of Act No. 2004-376. Act No. 2004-376 was the act which was passed by the Legislature concerning residency requirements for County Commissioners in Jefferson County. This submission is made in accordance with the Voting Rights Act.

I received a letter dated March 11 from Joseph D. Rich, Chief of the Voting Rights Section of the United States Department of Justice, which states that the Attorney General does not interpose any objection to the amendment.

I have attached a copy of the Act along with a copy of the letter from Mr. Rich.

TAL/khc

Enclosures

pc:   Edwin A. Strickland
       Charles S. Wagner
       Jeffrey M. Sewell
       Charles Campbell



**U.S. Department of Justice**

Civil Rights Division

JDR:JR:SMC:par
DJ 166-012-3
2005-0346

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

March 11, 2005

T. A. Lawson II, Esq.
Assistant County Attorney
280 Jefferson County Courthouse
Birmingham, Alabama  35203

Dear Mr. Lawson:

    This refers to Act No. 2004-376, which clarifies
commissioner residency requirements for Jefferson County,
Alabama, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act, 42 U.S.C. 1973c.  We received your
submission on February 3, 2005.

    The Attorney General does not interpose any objection to the
specified change.  However, we note that Section 5 expressly
provides that the failure of the Attorney General to object does
not bar subsequent litigation to enjoin the enforcement of the
change.  In addition, as authorized by Section 5, we reserve the
right to reexamine this submission if additional information that
would otherwise require an objection comes to our attention
during the remainder of the sixty-day review period.  Procedures
for the Administration of Section 5 of the Voting Rights Act (28
C.F.R. 51.41 and 51.43).

                    Sincerely,

                    Joseph D. Rich
                    Chief, Voting Section

RECEIVED
MAR 1 7 2005
COUNTY ATTORNEY

# EXHIBIT E

1                    IN THE UNITED STATES DISTRICT COURT
                                    FOR
2                    THE MIDDLE DISTRICT OF ALABAMA

3

4

5
YVONNE KENNEDY, et al.
6
        vs.                              CIVIL ACTION NO.
7                                        2:05-CV-1100-MHT
BOB RILEY
8

9

10

11

12

13

14                    IN-COURT STATUS CONFERENCE

15

16

17                    *  *  *  *  *  *  *  *  *  *

18

19

20
BEFORE:          The Hon. Myron H. Thompson
21
HEARD AT:        Montgomery, Alabama
22
HEARD ON:        June 20, 2007
23
APPEARANCES:     Edward Still, Esq.
24               J. Cecil Gardner, Esq.
                 Michael Druhan, Esq.
25               John J. Park, Jr., Esq.

```
 1    WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
      THE HON. MYRON H. THOMPSON ON JUNE 20, 2007 AT THE
 2    UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

 3

 4              THE COURT:  The Court calls the case of

 5    Kennedy versus Riley, civil action number two zero five

 6    C V eleven hundred M. H. T.  We're here on a status

 7    conference with regard to the pending remedial matters.

 8    I'm acting on behalf of the three judge court to conduct

 9    this status conference.  The proceeding will be -- or is

10    being recorded, and the other two judges will review it.

11              I have representing the plaintiffs Mr. still,

12    is that correct?

13              MR. STILL:  Yes, Your Honor.

14              THE COURT:  And Mr. Gardner?

15              MR. GARDNER:  Yes, sir.

16              THE COURT:  And representing the defendants is

17    Mr. Park?

18              MR. PARK:  Yes, Your Honor.

19              THE COURT:  Do you have someone else

20    representing the defendant with you?

21              MR. PARK:  No, Your Honor, we just have

22    somebody at counsel table.

23              THE COURT:  Okay.  And representing Probate

24    Judge DAVIS is --

25              MR. DRUHAN:  Mike Druhan, Your Honor.
```

1         THE COURT:  The first item of concern I will

2    put to the plaintiffs, which actually have a motion to

3    add the probate judge to the case.  Is the thrust of

4    your argument that this Court should act rather than a

5    state court because any order of this Court would not

6    require preclearance?

7         MR. STILL:  Correct, Your Honor.  That is one

8    of our contentions.  We realize that a state court order

9    would have to go through the preclearance, so that would

10   just slow things down again.  So if we get it done by

11   this Court, we don't have to get a preclearance.

12        THE COURT:  Is there any other reason why this

13   Court should act rather than a state court on the relief

14   you've requested?

15        MR. STILL:  Because this Court would be

16   effectuating its own order, Your Honor, and we think

17   it's just as a matter of principle that probably ought

18   to be done by the Court who entered the order.

19        THE COURT:  Is there any reason why the state

20   court couldn't effectuate the relief you request, just

21   as thoroughly as this Court could, other than your

22   concern about preclearance?

23        MR. STILL:  Well there is one additional

24   matter, Your Honor, which is the issue that was raised

25   in Judge Davis' Motion to Intervene, which he's now

1    withdrawn.  But I believe he raised it again in his

2    answer, which is that there is an incompatibility, he

3    says, between a state law and the one that requires some

4    calling on the election, and federal law which requires

5    you to obtain -- excuse me -- to allow enough time for

6    absentee ballots to be sent to soldiers, sailors and

7    overseas --

8         THE COURT:  What's wrong with the state court

9    addressing that, isn't it a court of general

10   jurisdiction?  Can't they address that?

11        MR. STILL:  It is a court of general

12   jurisdiction, and jurisdiction is concurrent with this

13   Court.  This Court has jurisdiction over that issue.

14   And, again, because of the tie to the original case, we

15   believe that it's better for this Court to issue an

16   order.

17        THE COURT:  Other than the tie to the original

18   case in your preclearance concern, is there any reason

19   why a state court can't provide you with all of the

20   relief you want?  Is there anything the state court

21   can't give you that we could?

22        MR. STILL:  Nothing that I can think of at the

23   moment, Your Honor.  It's primarily a matter of time.

24   We are now fifty days since this Court issued its order

25   on May 1st, and we don't have a special election called

```
 1   yet.

 2          THE COURT:  Well you can ask the state court

 3   to set that down.

 4          MR. STILL:  That's right.  We could ask a

 5   state court, but then we have to get preclearance, which

 6   could take up to sixty days.

 7          THE COURT:  Let's talk about that for a

 8   second.  You say a preclearance could take up to sixty

 9   days.  Doesn't the statute which requires preclearance

10   allow more expedited treatment?

11          MR. STILL:  Yes, sir, it does.  But the

12   decision to allow that lesser amount of time is up to

13   the Attorney General's designee, not us.

14          THE COURT:  Right.  But you won't know whether

15   they will allow it until you've asked them.

16          MR. STILL:  That's correct, Your Honor, but we

17   don't have to ask for it at all if this Court will issue

18   an order for us.

19          THE COURT:  Don't you think it would be rather

20   ironic for this Court to act in a way that obviated your

21   need to get preclearance when the thrust of this

22   litigation is to essentially vindicate under the Voting

23   Rights Act?

24          MR. STILL:  I've given up on irony a long time

25   ago, Your Honor.
```

```
 1              THE COURT:  Don't you think it's a rather odd

 2   request for someone who filed a lawsuit essentially

 3   seeking to vindicate their rights under the Voting

 4   Rights Act?

 5              MR. STILL:  I don't think it's that unusual

 6   for us to do that.  We do that in other voting rights

 7   cases that --

 8              THE COURT:  Have you done it for the specific

 9   purpose, though, of I won't say getting around, although

10   that's essentially what it amounts to, the requirements

11   of preclearance in the Voting Rights Act?

12              MR. STILL:  I don't believe I filed a lawsuit

13   for the purpose of getting around --

14              THE COURT:  Even a remedial request for cases

15   as far as that is concerned.

16              MR. STILL:  I'm trying to recall, now, cases

17   in which a three judge court has entered a remedial

18   order that requires some change in state law, other than

19   just going back to what you had before.  We certainly

20   have asked courts to do that in the past in some of my

21   voting rights cases.

22              THE COURT:  I'll be very candid with you.  My

23   concern, and I think I -- the other judges share this

24   concern, is that while this Court clearly does have

25   broad remedial powers, I'm just not sure that this case
```

1   is yet in a posture where those broad remedial powers

2   should be invoked.  That is, where the state courts have

3   not had an opportunity to address all the concerns

4   you've raised here today, where the Attorney General has

5   not been confronted with a request for expedited

6   preclearance of, it could be the two thousand and six

7   act, I believe that's the year, is that correct?

8           MR. STILL:  I think that's right.

9           THE COURT:  Or any required changes to

10  accommodate sailors and soldiers who are out of the

11  country.  Absent some evidence that these other avenues

12  have not been pursued, especially in the context when

13  what you're essentially asking for is a carrying out of

14  essentially what is arguably allowed under State law, I

15  just don't know whether this Court should exercise its

16  authority until that has happened and the Court is

17  confronted with it, that scenario.

18          That is, you sought that relief for whatever

19  reason the state or the defendant or both had failed to

20  act in good faith, or in a timely manner, or both, such

21  as this Court is ready or should be ready to act.

22          MR. STILL:  Well, Your Honor, with regard to

23  the issue raised by the probate judge about the Overseas

24  Americans Voting Act, the proposal the probate judge

25  makes deals with that issue.  And we agree with his

```
 1    resolution of that.

 2           With regard to the other issue, I agree, we

 3    have not yet asked a state court to give us this,

 4    although we filed one and we withdrew it because we

 5    thought it would be more efficient to go through this

 6    Court.

 7           THE COURT:  Let me ask you one follow-up

 8    question, and then I'll get to the defendant.  Has the

 9    two thousand been precleared?

10           MR. STILL:  No, sir, Your Honor.

11           THE COURT:  Do you know why it hasn't?

12           MR. STILL:  The Attorney General of the United

13    States said in its last preclearance letter, or denying

14    rehearing I believe, that the two thousand six act, if

15    it was exactly the same terminology as the previous act,

16    did not need to be precleared.

17           THE COURT:  But is there any reason why just

18    to remove any "if" in the question of the two thousand

19    six act has not been precleared?

20           MR. STILL:  Well I believe the Attorney

21    General of Alabama has probably been relying on the

22    representation of the Attorney General of the United

23    States that it does not need to be precleared.

24           THE COURT:  Well maybe we need to clarify

25    that.
```

```
1              MR. STILL:  It's not our ability, even, to

2    make a submission.  The Attorney General of Alabama or

3    the probate judge of the county has to make that.

4              THE COURT:  Now that's a question I did have.

5    Is there any reason why the probate judge would not

6    accommodate you?

7              MR. STILL:  I know of none, Your Honor.  And

8    the attorney of course is here; we might be able to talk

9    about that.

10             THE COURT:  Have you look at the law on that,

11   where local officials sought preclearance of a law which

12   they're responsible for enforcing?

13             MR. STILL:  Oh, yes, sir.  In fact, the

14   regulation specifically says that a local jurisdiction

15   may make the sufficient, act wise, to the local

16   jurisdiction.

17             THE COURT:  So you see no impediment to the

18   Attorney General, or the probate judge, or both seeking

19   preclearance not only of the two thousand six act to the

20   extent that "if" still hangs over the act, two thousand

21   and six act, or seeking preclearance for any changes

22   that the probate judge might have to affect through a

23   state court order to accommodate these Americans who are

24   overseas.

25             MR. STILL:  I agree that the state and local
```

```
 1   officials are in a position to be able to make that

 2   submission, Your Honor, to the Justice Department.

 3            THE COURT:  So if you were to file a lawsuit

 4   in state court, to the degree that whatever came out of

 5   that court needed preclearance, there is no reason why

 6   all of those things couldn't be put to the Attorney

 7   General for expedited consideration, assuming that you

 8   have some deadlines to be made.

 9            MR. STILL:  And, again, those would be up to

10   the Attorney General of Alabama and/or the probate judge

11   of Mobile County.

12            THE COURT:  And you have no intent to refile

13   the lawsuit?

14            MR. STILL:  Not that I can think of at the

15   moment.  Mr. Gardner may have some comment.  I notice

16   he's been standing to respond to your question.

17            MR. GARDNER:  Judge, I do not know of any

18   impediment to refile that case.

19            THE COURT:  Well I'd like to see it getting

20   refiled as swiftly as possible.

21            MR. GARDNER:  But let me ask one other point.

22   But as Your Honor suggests, it could be done before the

23   sun sets today.  But one other point I would like to

24   make is that it's  my understanding that the Attorney

25   General of Alabama does not intend to seek preclearance.
```

```
 1              THE COURT:  I'll take that up with the
 2   Attorney General.  That may be an issue that could color
 3   how this Court reacts, because you don't want to be in a
 4   posture that you impeded the carrying out of the law of
 5   Alabama as well as federal law, do you?
 6              MR. GARDNER:  Certainly not.
 7              THE COURT:  I'll hear from the defendant.
 8              MR. PARK:  Yes, Your Honor.
 9              THE COURT:  Does the Attorney General, that is
10   the state Attorney General, take the position that the
11   two thousand six act does not need preclearance?
12              MR. PARK:  No, Your Honor.  We've been
13   concerned about the effect of the act when a vacancy
14   would be set to occur.  And that ambiguity has caused us
15   to hold off.
16              We are also concerned that the act sets the
17   sixty to ninety day time schedule, and we believe that's
18   unworkable.
19              THE COURT:  Well putting aside those two
20   issues, every time you have a voting rights act don't
21   you seek preclearance?  I mean even if this case weren't
22   pending you would seek preclearance.  I'm concerned
23   that, and I would think that the Attorney General and
24   the Governor would not want to be in a position where
25   they're consciously not seeking preclearance in order to
```

1    hinder the vindication of certain rights.

2         Now if that were to occur, then the three

3    judge court may have to act.  And I don't think you'd

4    want that.  That sounds like something that would have

5    happened fifty or sixty years ago.  I would think that

6    the Attorney General would come to court and be able to

7    say that, you know, whatever act of the legislature

8    clearly goes to the voting rights has been passed, we

9    expeditiously seek preclearance.

10         MR. PARK:  In the ordinary course, Your Honor,

11   that's exactly what we would do.  We don't regard this

12   as business in the ordinary course.

13         THE COURT:  Is there any reason under the sun

14   why you wouldn't seek preclearance so it's just to make

15   sure the act has been precleared, not only for this case

16   but any other case in the future that arises?

17         MR. PARK:  If -- Under this Court's ruling, if

18   we get it precleared and there is a state court

19   challenge, then the state courts are effectively ousted

20   of jurisdiction because the preclearance operates to

21   preserve that statute.

22         THE COURT:  That's up to the state courts and

23   the Attorney General.  What do you mean, the state

24   courts are ousted of jurisdiction?

25         MR. PARK:  In this case this Court, between

1   this Court and the United States Department of Justice,

2   the decisions in *Stokes v. Noonan* and *Riley versus*

3   *Kennedy* are not enforceable.  State court litigants have

4   the right to challenge acts that affect voting.  They

5   could say they don't comply with the state *Constitution*,

6   and *Stokes v. Noonan* leaves one argument unaddressed.

7   It leaves article or section one oh four twenty-nine,

8   which precludes local special laws that apply to the

9   conduct of elections.

10          A state court litigant might believe that act

11  two thousand six three forty-two violates not only -- or

12  act two -- let me back up.  In *Stokes v. Noonan* the

13  challenger said that act eighty-five two-thirty seven

14  violated the voting act, that's the local portion of it

15  that said Mobile County gets its elections.  It said

16  that section one oh five and section one oh four

17  twenty-nine.  When the Alabama Supreme Court decided the

18  case, it said we're going to address section one oh

19  five, and it held the act unconstitutional and left

20  twenty-four twenty-nine out there unaddressed.  So that

21  argument is out there.

22          In the ordinary course, we get statutes

23  precleared before state court litigation can be

24  concluded.  And we've seen two decisions -- in the

25  ordinary course of state litigation, we would expect

```
 1   most actions to be held constitutional.  But we have one

 2   of those rare cases where it wasn't constitutional.

 3            THE COURT:  Are you telling me that you think

 4   maybe two thousand and six is unconstitutional?

 5            MR. PARK:  No, Your Honor.  What we're saying

 6   is that we can't preclude some litigant from challenging

 7   it, if they choose to do so.

 8            THE COURT:  So you're going to hold off

 9   preclearance until that time?

10            MR. PARK: No, Your Honor.  We held off

11   preclearance while this litigation was pending because

12   of our concern for when preclearance arose.  If it were

13   to be precleared, then it would be back and the

14   litigation would be dropped.

15            THE COURT:  This litigation -- You have an

16   appeal to this litigation to the Supreme Court.  I don't

17   understand how, whether you seek preclearance of the act

18   two thousand six, affects this litigation one way or

19   another, except if you don't seek preclearance it could

20   be viewed as an effort to frustrate carrying out the

21   order of this Court.  And that would be a serious

22   concern, especially in light of the fact that you had

23   been seeking preclearance of all other acts on an

24   expedited basis within the recent future.  It seems like

25   a single mishap of doubt.
```

1          And that would raise a serious concern for

2    this Court if the Attorney General were consciously

3    dragging his feet so as to prevent the plaintiffs in

4    this case from vindicating their rights under State law,

5    the rights that they have vindicated in this Court.  I

6    can't imagine the Attorney General consciously not --

7          MR. PARK:  Your Honor, we brought our concerns

8    to the Department of Justice.

9          THE COURT:  Right.  Well, if you have concerns

10   that the two thousand -- that was the Court's original

11   concern.  If you have concerns that the two thousand six

12   act has not been adequately precleared or precleared at

13   all, then get a ruling, an expedited ruling from the

14   Attorney General.  That's the only reason I get that the

15   plaintiffs are only here.  They're saying that the

16   Attorney General, or the probate judge, or both are not

17   acting on an expedited basis.  And, you know, as long as

18   the parties are vindicating an expeditious way, their

19   rights under state law and federal law, I don't think

20   there is any reason for this Court to act.

21          However, if the record should show that either

22   or both parties are frustrating that process, then you

23   may have a different scenario to address here.  And I'm

24   hoping that neither side will frustrate that process.  I

25   haven't dealt with frustration on the part of the state

```
 1   for a long time, and you have an act duly enacted by the

 2   Legislature; all it needs to do is to be precleared.

 3   You get a state court judge upon hearing from the

 4   probate judge decides that you need to extend the sixty

 5   days so these overseas citizens can vote, get that

 6   precleared too on an expedited basis.

 7          With those routine everyday processes being

 8   carried out, I see no reason for this Court to lift its

 9   hand.  Now as I said to Mr. Still, the remedial powers

10   are broad, as long as all of the parties are acting in

11   good faith.  And I see no reason for this Court to act.

12          And if it should become clear that either side

13   is not acting in good faith, that is on an expedited

14   basis carrying out the law as they know it to be, then

15   maybe we need to set this down for a hearing --

16          MR. PARK:  Yes, Your Honor.

17          THE COURT:  -- so we can find out what's going

18   on.  But I'm hoping that we don't.  But that lawsuit can

19   be filed in state court, and I understand -- I have been

20   assured by the plaintiffs that it will, I think you said

21   before the sun sets today?

22          MR. GARDNER:  Before the sun sets today, Your

23   Honor.

24          THE COURT:  And the state carries out its

25   responsibility acting expeditiously and in good faith to
```

1   make sure the state laws are precleared as the Voting

2   Rights Act requires, and that if a state court judgment

3   is eventually entered, that judgment is precleared to

4   the extent that it may affect a change, then I think

5   this case is over, unless something else comes up

6   subject to your appeal.

7          Now if your appeal goes through, of course our

8   judgment is over and we're back to the status quo.  But

9   pending that appeal, the remedial authority of this

10  Court remains, and I would think you would want to make

11  sure that rights are vindicated and no one is

12  frustrated.

13         MR. PARK:  Yes, Your Honor.

14         THE COURT:  When can you let us know, I mean

15  all three judges, when the state will seek expedited

16  preclearance for clarification on the two thousand six

17  act, and should there be any new state court judgment

18  coming out of the lawsuit that will be filed today, an

19  assurance from the state that it will seek preclearance

20  to that to the extent there is a change.  Can you keep

21  us informed of that?

22         MR. PARK:  Yes, Your Honor.

23         THE COURT:  Anything else, Counsel?

24         (Whereupon, there was no response.)

25         THE COURT:  Then I will assume the state law

1  will be filed -- the state court lawsuit will be filed

2  before the sun sets today.  I assume the Attorney

3  General will act in good faith to make sure the two

4  thousand six act will be precleared on an expedited

5  basis.  And with that, the state will act in an

6  expeditious way to make sure all changes growing out of

7  this litigation are precleared.  Absent that, I just

8  don't see any reason for this Court to act.

9          MR. GARDNER:  Your Honor, and of course the

10  lawsuit will be filed, but I wonder if I could ask if

11  Your Honor would ask the probate judge why he feels like

12  a lawsuit is necessary.

13          THE COURT:  Well I have a feeling that the

14  probate judge has no problem with the lawsuit being

15  filed in state court.  Do you?

16          MR. DRUHAN:  No, Your Honor.

17          THE COURT:  But when you do that, you withdrew

18  your motion to intervene.

19          MR. DRUHAN:  Yes, sir.

20          THE COURT:  It's the same thing that the Court

21  would --

22          MR. DRUHAN:  We just want some clarity.

23          THE COURT:  You just want clarification,

24  whether it's federal or state.

25          MR. DRUHAN:  Yes, sir.

1          THE COURT:  But I think the first bite on

2    clarification should be taken by the state court.

3          MR. GARDNER:  One further question, Your

4    Honor.

5          THE COURT:  Yes?

6          MR. GARDNER:  When we did file the state court

7    lawsuit originally, there was a suggestion by the

8    probate judge if they would remove it to the Southern

9    District of Alabama.

10          THE COURT:  Well, we'll wait and see if that

11    happens.

12          MR. GARDNER:  What I was getting to was, that

13    I believe that the probate judge felt at that time that

14    they needed federal guidance before they did anything

15    rather than state guidance.

16          THE COURT:  Well, let's see what happens.

17    That's something I have not thought about, I'm not sure

18    that the other judges thought about and I would be very

19    reluctant to speak about it.  But I do know that we are

20    unanimous on this matter should be in state court, and

21    that absent some extraordinary circumstances, that is

22    dragging the feet or failure to act in good faith on

23    both sides, we see no reason for us to act.  And I've

24    worked with the State of Alabama, I can't imagine we

25    would be confronted with the scenario in which the state

1   failed to act.

2          I think both sides should will act

3   expeditiously so this matter can be put to rest.

4          Thank you very much.

5          Oh, let me ask you one other thing.  Mr. Park,

6   do you know of any reason why, to the degree that the

7   probate judge or either some other state official needs

8   to seek preclearance from someone other than the

9   Attorney General to not seek preclearance?

10         MR. PARK:  In the ordinary case, state law is

11  handled by the State Attorney General's Office.  In many

12  instances in local laws we will suggest that those are

13  more properly submitted by the locality.  That doesn't

14  always work because -- sometimes because of lack of the

15  capability on the part of the locality, so we end up

16  picking some of it up.  But we see no reason why the

17  probate judge cannot submit it to its --

18         THE COURT:  Well, in this instance, though,

19  because it is really the Attorney General of state law,

20  I would imagine the Attorney General would be the

21  primary preclearance.  I don't know.

22         But again, to summarize again, state lawsuit

23  will be filed by the end of the day.  If it should come

24  to the Court's attention, I mean all three judges that

25  anyone is frustrated by the carrying out and the pursuit

1    of that state law, vindication of those rights hopefully

2    under State law, you may return to this Court.  That is,

3    I'm assuming, everyone will seek preclearance in an

4    expedited way.

5            And, Mr. Still, you make sure the state is

6    helped in seeking that preclearance.  Can I have your

7    assurance as well?

8            MR. STILL:  Yes, Your Honor.

9            THE COURT:  And the probate judge will not

10   impede the state's pursing expedite in any way the two

11   thousand six act, as well the other cases that may arise

12   out of a state law claim.

13           MR. GARDNER:  No problem at all.

14           THE COURT:  Very good.  Thank you very much.

15   If something else comes out, bring it to the judges of

16   the three court's attention, and maybe all three of us

17   will look at it.

18           (Whereupon, the proceedings were concluded.)

19

20

21

22                   * * * * * * * * * *

23

24

25

1

2                    COURT REPORTER'S CERTIFICATE

3

4            I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter as prepared by me to the best of

7    my ability.

8

9            I further certify that I am not related to any

10   of the parties hereto, nor their counsel, and I have no

11   interest in the outcome of said cause.

12

13           Dated this 20th day of June 2007.

14

15               /s/  Mitchell P. Reisner
                 MITCHELL  P.  REISNER,  CM, CRR,
16               Official US Dist. Court Reporter
                 Registered Professional Reporter
17               Certified   Real-Time   Reporter

18

19

20

21

22

23

24

25