**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

FRED L. PLUMP,                    )
                                 )
          Plaintiff,             )
                                 )
v.                               )    No. 2:07-cv-01014-MEF-CSC
                                 )
BOB RILEY, Governor,             )
                                 )
          Defendant.             )

## DEFENDANT'S NOTICE OF FILING

Defendant Bob Riley, Governor of Alabama, gives notice of filing the Brief for Appellant from the case of *Hon. Bob Riley, Governor, v. Yvonne Kennedy, et al.*, Supreme Court Case No. 07-77, attached hereto as Exhibit A.  The brief was submitted to the United States Supreme Court on this date by Governor Riley in his appeal of *Kennedy v. Riley*, Civil Action No. 2:05cv1100-MHT, Middle District of Alabama.

The arguments and authorities asserted in the attached Brief of Appellant are incorporated herein by reference in opposition to the Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

Of counsel:

Kenneth D. Wallis, II (WAL064)
Chief Legal Advisor
Office of the Governor

Scott L. Rouse (ROU010)
Deputy Legal Advisor
Office of the Governor

ADDRESS OF COUNSEL:
Office of the Governor
State Capitol, Suite NB-05
600 Dexter Avenue
Montgomery, Alabama  36130
(334) 242-7120 Phone
(334) 242-2335 Fax

ken.wallis@governor.state.al.us
scott.rouse@governor.alabama.gov

Troy King (KIN047)
Attorney General

s/ James W. Davis
Margaret L. Fleming (FLE001)
James W. Davis (DAV103)
Assistant Attorneys General

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
11 South Union Street
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Facsimile:  (334) 353-8440
mfleming@ago.state.al.us
jimdavis@ago.state.al.us

**Counsel for the Defendant**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of January, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel: Edward Still, Edward Still Law Firm LLC (Still@votelaw.com), and James U. Blacksher (jblacksher@ns.sympatico.ca).

s/ James W. Davis
James W. Davis (DAV103)

No. 07-77

In the

# 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰

HONORABLE BOB RILEY, as Governor of the State
of Alabama,
*Appellant,*

v.

YVONNE KENNEDY, JAMES BUSKEY and WILLIAM
CLARK,
*Appellees.*

On Appeal from the United States District Court
for the Middle District of Alabama

## BRIEF FOR APPELLANT

TROY KING
*Attorney General*
MARGARET L. FLEMING
JAMES W. DAVIS
MISTY S. FAIRBANKS
*Asst. Attorneys General*
STATE OF ALABAMA
11 South Union Street
Montgomery, AL 36130
(334) 242-7300

KEVIN C. NEWSOM
  *Counsel of Record*
MATTHEW H. LEMBKE
JOHN C. NEIMAN, JR.
SCOTT BURNETT SMITH
JOHN W. REA
ANDREW L. BRASHER
BRADLEY ARANT ROSE
  & WHITE LLP
1819 Fifth Avenue North
Birmingham, AL 35203
knewsom@bradleyarant.com
(205) 521-8803

*Attorneys for Appellant*

January 14, 2008

i

## QUESTIONS PRESENTED

1.   Governor Riley timely appealed from the district court's May 1, 2007 final judgment entering permanent injunctive relief.  The question is whether his decision not to appeal from the district court's August 18, 2006 interlocutory order, which granted declaratory relief but expressly deferred any decision on requested remedies, defeats this Court's jurisdiction.

2.   This case arises under §5 of the Voting Rights Act of 1965, which requires certain States to obtain "preclearance"—permission, in effect—from the federal government before implementing "changes" to voting practices or procedures.  At issue here are two decisions of the Alabama Supreme Court.  In the first of those decisions, *Stokes v. Noonan*, the court invalidated a previously-precleared state statute on race-neutral state constitutional grounds.  In the second decision, *Riley v. Kennedy*, the court declined, again on race-neutral state-law grounds, to revive the void statute.  The question is whether the Alabama Supreme Court's decisions in *Stokes* and *Riley* were "changes" that required federal-government preclearance before becoming effective.

ii

## TABLE OF CONTENTS

QUESTIONS PRESENTED ...............................................i

TABLE OF AUTHORITIES................................................v

OPINIONS BELOW ...........................................................1

JURISDICTION.................................................................1

STATUTES INVOLVED ...................................................1

INTRODUCTION ..............................................................2

STATEMENT OF THE CASE ...........................................3

I.   The Statutory Framework.........................................3

II.  This Case in Historical Context ...............................4

III. Statement of Facts....................................................6

    A.   Alabama Law: 1868 to 1985 ..................................6

    B.   Act No. 85-237 and *Stokes v. Noonan*.................7

    C.   Act No. 2004-455 and *Riley v. Kennedy*..............8

IV.  Procedural History ..................................................9

    A.   The August 18, 2006 Order..................................10

    B.   Preclearance Proceedings ...................................12

    C.   The May 1, 2007 Order........................................12

    D.   The Appeal...........................................................12

iii

ARGUMENT ................................................................17

I.  This Court Has Jurisdiction Under 42 U.S.C.
    §1973c(a). ........................................................17

    A.  Governor Riley Was Not Required To
        Appeal From the District Court's Non-
        Final August 2006 Order. ...................................17

    B.  Governor Riley Has Not Waived His
        Right To Appeal the August 2006 Order...........21

    C.  The Appellees' Position Makes for Bad
        Jurisdictional Policy. ...........................................22

II. The Alabama Supreme Court's Decisions in
    *Stokes v. Noonan* and *Riley v. Kennedy* Were
    Not "Changes" That Required Preclearance
    Under Section 5 of the Voting Rights Act. ...............22

    A.  No Indicator of Statutory Meaning
        Supports the District Court's
        Interpretation of Section 5 To Require
        Preclearance of *Stokes* and *Riley*. .......................24

        1.  There is no basis in Section 5's text
            for requiring preclearance of *Stokes*
            and *Riley*.........................................................26

        2.  There is no basis in Section 5's
            purpose or legislative history for
            requiring preclearance of *Stokes* and
            *Riley*. ..............................................................31

        3.  There is no basis in this Court's
            precedent for requiring preclearance
            of *Stokes* and *Riley*.......................................35

iv

a.    The district court's decision is
contrary to *Abrams v. Johnson.* ..........35

b.    The precedents invoked by the
district court do not support its
decision. ...................................................38

1.    *Perkins* and *Lockhart* ....................38

2.    *Branch* ..............................................43

3.    *Hathorn* ...........................................44

B.    The District Court's Interpretation
Impermissibly Exacerbates the
Federalism Costs Already Imposed by
Section 5. .................................................45

C.    The District Court's Interpretation Is
Unworkable and Unnecessary. ...........................49

III.  Because Under *Young v. Fordice*, Act No. 85-
237 Was Never "In Force or Effect," *Stokes* And
*Riley* Did Not Mark Section 5 "Changes." ...............51

CONCLUSION ..................................................................56

v

# TABLE OF AUTHORITIES

### Cases

*Abrams v. Johnson*
  521 U.S. 74 (1997) ....................................15, 35, 36, 37, 38

*Alaska Dep't of Envtl. Conservation v. EPA*
  540 U.S. 461 (2004) ........................................23, 24, 40, 46

*Beer v. United States*
  425 U.S. 130 (1976) ..........................................................32

*Branch v. Smith*
  538 U.S. 254 (2003) ..............................................35, 38, 43

*Carolina Power & Light Co. v. Dynegy*
  *Mktg. & Trade*
  415 F.3d 354, 358 (4th Cir. 2005) ...................................21

*Caterpillar, Inc. v. Lewis*
  519 U.S. 61 (1996) ............................................................21

*Catlin v. United States*
  324 U.S. 229 (1945) ..........................................................18

*City of Boerne v. Flores*
  521 U.S. 507 (1997) ....................................................16, 48

*City of Lockhart v. United States*
  460 U.S. 125 (1983) ..................................................passim

*City of Monroe v. United States*
  522 U.S. 34 (1997) ............................................................20

*Cohen v. Beneficial Indus. Loan Corp.*
  337 U.S. 541 (1949) ..........................................................17

vi

*Digital Equip. Corp. v. Desktop Direct, Inc.*
  511 U.S. 863 (1994) ........................................................17

*Dougherty County Bd. of Educ. v. White*
  439 U.S. 32 (1978) ...............................................6, 20, 45

*Ex parte James*
  836 So. 2d 813 (Ala. 2002) ..............................................54

*Ex parte Southern Ry.*
  556 So. 2d 1082 (Ala. 1989) ............................................25

*Franklin v. District of Columbia*
  163 F.3d 625 (D.C. Cir. 1998)........................................21

*Georgia v. Ashcroft*
  539 U.S. 461 (2003) ........................................................38

*Georgia v. United States*
  411 U.S. 526 (1973) ........................................................20

*Gonzalez v. Automatic Employees Credit Union*
  419 U.S. 90 (1974) ..........................................................22

*Growe v. Emison*
  507 U.S. 25 (1993) ..........................................................44

*Hathorn v. Lovorn*
  457 U.S. 255 (1982) ...................................................44, 45

*Hayburn's Case*
  2 U.S. (2 Dall.) 409 (1792) ..............................................23

*Liberty Mut. Ins. Co. v. Wetzel*
  424 U.S. 737 (1976) ...................................................19, 21

vii

*Lopez v. Monterey County*
    525 U.S. 266 (1999) ....................................................23, 46

*Lucas v. Bolivar County*
    756 F.2d 1230 (5th Cir. 1985) .........................................20

*Marbury v. Madison*
    5 U.S. (1 Cranch) 137 (1803) ............................................2

*McCain v. Lybrand*
    465 U.S. 236 (1984) .........................................................31

*McDaniel v. Sanchez*
    452 U.S. 130 (1981) .........................................................37

*Miller v. Johnson*
    515 U.S. 900 (1995) ...................................................passim

*Morris v. Gressette*
    432 U.S. 491 (1977) .........................................................30

*Mullaney v. Wilbur*
    421 U.S. 684 (1975) .........................................................46

*NAACP v. Hampton County Election Comm'n*
    470 U.S. 166 (1985) .........................................................55

*New York v. United States*
    505 U.S. 144 (1992) .........................................................47

*Norton v. Shelby County*
    118 U.S. 425 (1886) .........................................................25

*Owasso Indep. Sch. Dist. No. I-011 v. Falvo*
    534 U.S. 426 (2002) .........................................................49

viii

*Perkins v. Matthews*
  400 U.S. 379 (1971) ................................................passim

*Presley v. Etowah County Comm'n*
  502 U.S. 491 (1992) ....................................................27, 45

*Printz v. United States*
  521 U.S. 898 (1997) ..........................................................47

*Raygor v. Regents of the Univ. of Minn.*
  534 U.S. 533 (2002) ..............................................24, 27, 45

*Reno v. Bossier Parish Sch. Bd.*
  520 U.S. 471 (1997) ..........................................................48

*Reno v. Bossier Parish Sch. Bd.*
  528 U.S. 320 (2000) ................................................passim

*Riley v. Kennedy*
  928 So. 2d 1013 (Ala. 2005) ....................................passim

*South Carolina v. Katzenbach*
  383 U.S. 301 (1966) ....................................................31, 48

*Stokes v. Noonan*
  534 So. 2d 237 (Ala. 1988) ......................................passim

*Tennessee v. Lane*
  541 U.S. 509 (2004) ..........................................................48

*United States v. Board of Comm'rs of Sheffield*
  435 U.S. 110 (1978) ....................................................22, 45

*United States v. City of Monroe*
  962 F. Supp. 1501 (M.D. Ga. 1997) ................................20

ix

*United States v. Rutherford*
    442 U.S. 544 (1979) ..........................................................28

*Will v. Michigan Dep't of State Police*
    491 U.S. 58 (1989) ..........................................................20

*Wise v. Lipscomb*
    437 U.S. 535 (1978) ..........................................................44

*Young v. Fordice*
    520 U.S. 273 (1997) ......................16, 27, 51, 52, 53, 54, 55

## Constitutions and Statutes

28 U.S.C. §2101(b) ..........................................................1

Voting Rights Act of 1965,
    42 U.S.C. 1973, *et seq.* ..........................................passim

    Section 2,
        42 U.S.C. §1973(a) ..........................................50

    Section 4,
        42 U.S.C. §1973b..........................................30

    Section 5
        42 U.S.C. 1973c ..........................................passim

42 U.S.C. §1983 ..........................................................50

Ala. Const. Art. IV, §105..........................................7, 8, 24

Ala. Code §11-3-1(b) ..........................................................2

Ala. Code §11-3-6..........................................................passim

Ala. Code Tit. 12, §6 (1940)..........................................7

x

Ala. Code §6749 (1923)....................................................7

Ala. Code §3307 (1907)....................................................7

Ala. Code §952 (1896)......................................................7

Ala. Code §820 (1886)......................................................7

Ala. Code §740 (1876)......................................................6

Ala. Code §826 (1867)......................................................6

Ala. Code §698 (1852)......................................................6

Ala. Act No. 2006-342......................................................9

Ala. Act No. 2004-455..........................................2, 8, 9, 25

Ala. Act No. 85-237................................................passim

Ala. Act No. 12, §1 (1868) ...............................................6

**Legislative History**

H.R. Rep. No. 109-478, 2006 U.S.C.C.A.N. 618 .............34

S. Rep. No. 109-295 (2006).......................................5, 22, 34

S. Rep. No. 97-417, 1982 U.S.C.C.A.N 177 ......................34

H.R. Rep. No. 97-227 (1981)................................................34

H.R. Rep. No. 94-196 (1975).......................................passim

S. Rep. No. 94-295, 1975 U.S.C.C.A.N. 774 ....................34

H.R. Rep. No. 91-397, 1970 U.S.C.C.A.N. 3277 .............34

xi

H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437 ....4, 33, 34

S. Rep. No. 89-162, 1965 U.S.C.C.A.N. 2508 .............33, 34

111 Cong. Rec. 10,727 (1965)................................................32

111 Cong. Rec. 28,358 (1965)................................................33

**Regulations**

28 C.F.R. §51.2....................................................................29

28 C.F.R. §51.12..................................................................27

28 C.F.R. §51.22..................................................................55

28 C.F.R. §51.42..................................................................22

28 C.F.R. §51.49..................................................................28

46 Fed. Reg. (Jan. 5, 1981) .................................................27

**Rules**

Fed. R. Civ. P. 58....................................................11, 18, 21

**Other Authorities**

S. Issacharoff, P. Karlan & R. Pildes
     *The Law of Democracy* (3d ed. 2007) ......................4, 23

*Moore's Federal Practice* (3d ed. 2007)...........................21

W. Rogers, *et al.*
     *Alabama: The History of a Deep South
     State* (1994).......................................................................6

xii

C. Wright, A. Miller, *et al.*
   *Federal Practice and Procedure* (2d ed. 1992) .....18, 21

U.S. Census Bureau, Voting and Registration in the
   Election of November 2004, Table 4a
   http://www.census.gov/population
   /www/socdemo/voting/cps2004.html (visited Jan.
   10, 2008) ...........................................................................5

U.S. Department of Justice: Civil Rights Division,
   Voting Section, Introduction to Section 5
   http://www.usdoj.gov/crt/voting/sec_5/about.htm
   (visited January 10, 2008).........................................29, 30

1

## OPINIONS BELOW

The three-judge district court's order vacating Governor Riley's appointment of Juan Chastang to fill a vacancy on the Mobile County Commission is reported at *Kennedy v. Riley*, ___ F. Supp. 2d ___, 2007 WL 1284912 (M.D. Ala. May 1, 2007), and reprinted at Jurisdictional Statement Appendix ("J.S. App.") 1a.

The district court's opinion declaring that §5 of the Voting Rights Act of 1965 required preclearance of the two Alabama Supreme Court decisions that led to Chastang's appointment—*Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005)—is reported at *Kennedy v. Riley*, 445 F. Supp. 2d 1333 (M.D. Ala. 2006), and reprinted at J.S. App. 3a. The accompanying judgment is reprinted at J.S. App. 9a.

## JURISDICTION

This Court has jurisdiction under 42 U.S.C. §1973c(a), which provides that any action arising under §5 of the Voting Rights Act "shall be heard and determined by a court of three judges … and any appeal shall lie to the Supreme Court."

As explained below, Governor Riley's appeal was timely. *See* 28 U.S.C. §2101(b). The district court entered final judgment on May 1, 2007. J.A. 6. The Governor noticed his appeal on May 18, 2007, within 60 days of that final judgment. J.A. 7.

## STATUTES INVOLVED

Section 5 of the Voting Rights Act, 42 U.S.C. §1973c, is reprinted at J.S. App. 14a–16a. Relevant provisions of

2

Alabama law are reprinted as follows: Act No. 85-237, at J.A. 114; Act No. 2004-455, at J.A. 115–17; Ala. Code §11-3-6, at J.A. 118;[1] and §11-3-6's predecessors, at J.A. 119–27.

## INTRODUCTION

This case requires the Court to do something it has done many times before—interpret §5 of the Voting Rights Act. This go-round, however, the interpretive question arises in a context altogether unlike any the Court has ever seen. Here, the district court held that §5 required "preclearance" of two decisions of a state supreme court—the first invalidating a state statute on race-neutral state constitutional grounds; and the second refusing, again on race-neutral state-law grounds, to revive the void statute. The district court's sweeping reading of §5 to reach state courts' exercise of their core judicial "duty" to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), works an unprecedented expansion of that statute's already-broad scope. The district court's novel construction—which exacerbates the significant federalism costs exacted by the preclearance process—finds no support in §5's text or history or in this Court's precedent. It should be rejected.

---

[1] Section 11-3-6 was recently recodified (and amended in respects not relevant here) at Ala. Code §11-3-1(b). Because the recodification is not yet in force, we cite to §11-3-6.

3

## STATEMENT OF THE CASE

### I.   The Statutory Framework

Section 5 of the Voting Rights Act requires certain jurisdictions, including the State of Alabama,[2] to obtain federal-government "preclearance"—permission, in effect—before "enact[ing] or seek[ing] to administer" any voting practice that is "different from that in force or effect on" a statutorily-specified coverage date.  42 U.S.C. §1973c(a).  For Alabama and several other States, the coverage date is November 1, 1964.  Other jurisdictions' dates are later—either November 1, 1968, or November 1, 1972.  In §5 parlance, it is a "change" in voting practices that triggers the obligation to obtain preclearance. The question here is whether two decisions of the Alabama Supreme Court constituted §5 "changes."

A covered jurisdiction may seek either administrative preclearance from the U.S. Department of Justice ("DOJ") or judicial preclearance from the U.S. District Court for the District of Columbia.  *Id*.  In either event, federal authorities will conduct what is commonly called a "retrogression" analysis to determine whether the proposed change has the purpose or effect "of denying or abridging the right to vote on account of race or color." *Id*.  If federal authorities deem the change retrogressive, they will forbid its implementation.  If, however, the change is deemed nonretrogressive, it will be precleared for use—subject to the caveat that preclearance will not

---

[2] The fully-covered jurisdictions are Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, and Texas.  The partially-covered jurisdictions are California, Florida, New York, North Carolina, South Dakota, Michigan, New Hampshire, and Virginia.

4

bar a subsequent suit to enjoin the practice on some non-§5 ground. *Id.*

If an individual believes that a covered jurisdiction has enacted or administered an unprecleared change, he or she may sue under §5, in a specially-convened three-judge district court, to enjoin implementation. Review in such "coverage" actions, like this one, is limited to determining (1) whether a §5 change occurred; (2) if so, whether preclearance was obtained; and (3) if not, what remedy should follow. The losing party has a right of direct appeal to this Court.

## II.  This Case in Historical Context

Alabama's distant history with respect to voting rights is not a proud one. In the years leading up to the passage of the Voting Rights Act of 1965, black registration in Alabama was paltry; by 1964, it still languished below 20%. H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2441. As of 1965, there were very few, if any, elected black officials in Alabama. *See* H.R. Rep. No. 94-196, at 7 (1975). And then there was "Bloody Sunday" in Selma, one of the more shameful episodes in American political history. That confrontation on the Edmund Pettus Bridge was, by most accounts, the event that galvanized the Johnson Administration to "propose a more expansive voting rights bill," which "ultimately became the Voting Rights Act of 1965." S. Issacharoff, P. Karlan & R. Pildes, *The Law of Democracy* 461 (3d ed. 2007).

Happily, the political climate in Alabama today is strikingly different from the one that existed circa 1965. Black Alabamians participate actively in the State's political life. At the time of the 2004 election, 72.9% of the voting-age African-Americans in Alabama were regis-

5

tered to vote, and 63.9% turned out. S. Rep. No. 109-295, at 11 (2006). On both counts—registration and turnout—black Alabamians significantly outpaced black voters' national averages of 64.4% and 56.3%, respectively. U.S. Census Bureau, Voting and Registration in the Election of November 2004, Table 4a, http://www.census. gov/population/www/socdemo/voting/cps2004.html (visited Jan. 10, 2008). Indeed, as of 2004, black registration rates in Alabama were higher than 28 of the other 31 States for which the Census Bureau compiled statistics, and black turnout rates in Alabama were higher than 24 of those 31 States. *See id.*

The trajectory of black representation in state and local government is also favorable. Today, there are approximately 750 black elected officials in Alabama. S. Rep. No. 109-295, at 12. Indeed, nearly a quarter of the members currently serving in the Alabama Legislature (34 of 140) and nearly a quarter of all county commissioners (83 of 355) are black. Those percentages square almost precisely with the racial makeup of the State as a whole. Accordingly, although it was certainly once true that the number of black elected officials in Alabama "fell far short of being representative of the number of blacks residing" in the State, H.R. Rep. No. 94-196, at 7, black representation today is nearly proportional.

While the statistics tell a compelling story, more important for present purposes is the fact that this case bears no traces of the Jim Crow era. As discussed in detail below, this case had its genesis in the election of Sam Jones, who is black, to be mayor of Mobile, the third-largest city in Alabama. When Jones vacated his county-commission seat to assume his mayoral responsibilities, Governor Riley appointed Juan Chastang, who is also

6

black, to finish out the term.  It was Chastang's appointment that the appellees sued to prevent, DOJ refused to permit, and the district court then vacated.

The circumstances here, therefore, are not even remotely "suggestive" of racial discrimination.  *Compare, e.g.*, *Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 42 (1978).  Indeed, all indicators—historical and present—point in precisely the opposite direction.

## III. Statement of Facts

### A.  Alabama Law: 1868 to 1985

For nearly 140 years—since long before the enactment of the Voting Rights Act—the general statutory law in Alabama has provided that vacancies on county commissions "shall be filled by appointment by the Governor." Ala. Code §11-3-6.  Section 11-3-6 traces its roots to 1868.  Before then, state law vested the vacancy-filling power in the county commission itself.  *See* Ala. Code §698 (1852); Ala. Code §826 (1867).  On November 25, 1868, only months after ratifying the Fourteenth Amendment, Alabama's Reconstruction Legislature—a body that was dominated by Republicans (126 to the Democrats' 4) and, with 27 black lawmakers, was "the first legislature in Alabama that remotely approached equity in representation"[3]—enacted a law that "authorized and empowered" the Governor "to fill any and all vacancies now existing or which may hereafter exist in the offices of county commissioners."  Act No. 12, §1. That statute was codified in the 1876 Alabama Code, *see* Ala. Code §740 (1876), and then carried forward, essen-

---

[3] W. Rogers, *et al.*, *Alabama: The History of a Deep South State* 249–50 (1994).

7

tially verbatim and without interruption, in every subsequent codification. *See* Ala. Code §820 (1886); Ala. Code §952 (1896); Ala. Code §3307 (1907); Ala. Code §6749 (1923); Ala. Code Tit. 12, §6 (1940); Ala. Code §11-3-6 (1975).[4]

### B. Act No. 85-237 and *Stokes v. Noonan*

In 1985, the Alabama Legislature enacted a "local law," applicable to Mobile County only, which provided that certain vacancies on the Mobile County Commission should be filled through special election. *See* Act No. 85-237 (J.A. 114). DOJ precleared Act No. 85-237, as compliant with §5 of the Voting Rights Act, in June 1985. J.A. 20.

When in the spring of 1987 a vacancy arose on the Mobile County Commission, litigation immediately ensued concerning Act No. 85-237's constitutionality under state law. Claiming that county officials were planning to hold a special election to fill the vacancy, Mobile voter Willie Stokes sued in state court to prevent the election from going forward. Stokes contended, as relevant here, that the 1985 act was inconsistent with Alabama Code §11-3-6 (providing for "appointment by the Governor") and, accordingly, violated §105 of the Alabama Constitution, which states that no "local law … shall be enacted in any case which is provided for by a general law." Ala. Const. Art. IV, §105. The state trial court rejected Stokes' argument and declined to enjoin the special election.

---

[4] These statutes are reproduced at J.A. 118–27.

8

The next day, Stokes appealed to the Alabama Supreme Court. Stokes' request for a stay pending appeal was denied, however, and the election went forward. Sam Jones won, and took office in July 1987. J.A. 27. But on appeal of the trial court's order, the Alabama Supreme Court reversed. It held that the 1985 act "clearly offend[ed]" and was "directly counter" to "the language" of §105. *Stokes v. Noonan*, J.S. App. 18a–19a. The supreme court's decision thus reaffirmed that the authority to fill commission vacancies resided where it had since 1868—with the Governor. The decision, which in essence held that no election should have occurred, left Sam Jones vulnerable to an action to remove him from office. Governor Guy Hunt eliminated that risk by exercising his authority under §11-3-6 to appoint Jones to the post. J.A. 27.

## C. Act No. 2004-455 and *Riley v. Kennedy*

Sixteen years later, in 2004, the Alabama Legislature amended the general law, §11-3-6, to add a proviso, such that county commission vacancies "shall be filled" by gubernatorial appointment "[u]nless a local law authorizes a special election." Act No. 2004-455 (J.A. 116). DOJ precleared Act No. 2004-455 in September 2004. J.A. 21. The next year, the same Sam Jones (still sitting as a commissioner) was elected mayor of Mobile. *Id.* In anticipation of the coming vacancy, Yvonne Kennedy, James Buskey, and William Clark sued in state court, arguing that Act No. 2004-455 had revived the unconstitutional 1985 act, thus requiring a special election to fill the vacancy. *Id.*

Although the state trial court granted the requested relief, the Alabama Supreme Court unanimously re-

9

versed. It rejected any suggestion that Act No. 2004-455 should be applied retroactively to "give effect to" the 1985 act and held, instead, that "the plain language in Act No. 2004-455 … provides for prospective application only." *Riley v. Kennedy*, J.S. App. 29a–30a. Act No. 2004-455, in other words, paved the way for new local laws, but it did not resurrect dead ones. "[C]onsequently," the court concluded, "Governor Riley is authorized to fill the vacancy on the Mobile County Commission by appointment" under the longstanding mandate of §11-3-6. J.S. App. 31a. Governor Riley appointed Juan Chastang to the seat.[5]

## IV. Procedural History

The day after the Alabama Supreme Court denied rehearing, Kennedy, Buskey, and Clark (hereinafter the "appellees") filed this action in federal district court. The basis of their claim, premised on §5 of the Voting Rights Act, was that "the State of Alabama was required, but failed, to preclear two decisions of the Alabama Supreme Court: *Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005)." J.S. App. 3a. The appellees sought a "declaratory judgment" that §5 required preclearance of *Stokes* and *Riley* and, in addition, requested several specific "injunctions," as follows—

- preventing Governor Riley from swearing anyone in to the commission post;

---

[5] In 2006, the Alabama Legislature adopted Act No. 2006-342, which provides that on a going-forward basis, vacancies on the Mobile County Commission will be filled through special election. Motion To Dismiss or Affirm ("M.D.A.") App. 1a.

10

- prohibiting enforcement "of the *Stokes* and *Riley* decisions until they are precleared"; and

- ordering state officials to obtain preclearance within 90 days.

J.A. 11; Doc. 15, pp.7–8; Doc. 20, p.3.

## A.  The August 18, 2006 Order

On August 18, 2006, the three-judge district court issued the first of two key orders in the case.  The court explained that "[i]n reviewing the plaintiffs' §5 claim, we are tasked with the limited purpose of determining '(i) whether a change was covered by §5, (ii) if the change was covered, whether §5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate.'"  J.S. App. 6a (quoting *City of Lockhart v. United States*, 460 U.S. 125, 129 n.3 (1983)).  Because neither *Stokes* nor *Riley* had been precleared, the court said, the "critical inquiries" were "whether these decisions brought about a change covered by §5, and, if so, the appropriate remedy."  *Id.*  In its August 2006 order, the district court answered the first of those "critical inquiries," but not the second.

The district court's analysis of the coverage question—*i.e.*, whether *Stokes* and *Riley* were §5 "changes" requiring preclearance—is spare.  Having initially determined that "a §5 change may be brought about by state court decisions," the court observed that §5 "changes" are "measured by comparing the new challenged practice with the baseline practice, that is, the most recent practice that is both precleared and in force or effect."  J.S. App. 6a–7a.  The court held that "[b]ecause Act No. 85-237 was the most recent pre-

11

cleared practice put into force and effect with the election of [Sam] Jones in 1987, it is the baseline against which we must determine if there was a change." *Id.* at 7a. The district court acknowledged that "the Alabama Supreme Court declared Act No. 85-237 unconstitutional under state law" in *Stokes*, but deemed it significant that *Stokes* was decided "after Act No. 85-237 had been put into effect." *Id.* In any event, the court said, it was "required to determine the baseline 'without regard for [its] legality under state law.'" *Id.* (quoting *Lockhart*, 460 U.S. at 133). The district court thus concluded that because the 1985 act was the baseline and because *Stokes* "invalidat[ed] it" and *Riley* later "refus[ed] to revive" it, "the two decisions constituted changes that should have been precleared before they were implemented." *Id.* at 5a, 7a–8a.

Having resolved the §5 coverage issue, the district court expressly refused (at the appellees' own "suggest[ion]") to address the issue of remedy. *Id.* at 8a. In particular, the court did not "enjoin enforcement of *Stokes v. Noonan* and *Riley v. Kennedy*, or otherwise even consider taking any action regarding the appointment of Juan Chastang to the Mobile County Commission." *Id.* Instead, the court allowed the State 90 days to seek preclearance, and requested Governor Riley "to keep the court informed of what action, if any, the State decides to take" concerning preclearance "and the result of that action." *Id.* at 9a–10a. If the State did not obtain preclearance, the court said, it would "revisit the issue of remedy." *Id.* at 9a. The court then purported to make its order "final" pursuant to Federal Rule of Civil Procedure 58. *Id.* at 10a.

12

### B.  Preclearance Proceedings

The State sought administrative preclearance of *Stokes* and *Riley* (J.A. 30–42), but DOJ objected.  In refusing preclearance, DOJ treated Act No. 85-237 as the relevant baseline; notwithstanding *Stokes* and *Riley*, DOJ concluded that the 1985 act "remains in full force and effect, as it affects voting, was precleared, and was implemented in the 1987 special election cycle."  Motion To Dismiss or Affirm ("M.D.A.") App. 5a.  DOJ later denied (*id*. at 9a–19a) the State's request for reconsideration (J.A. 58–113).[6]

### C.  The May 1, 2007 Order

Following DOJ's refusal to preclear *Stokes* and *Riley*, the appellees reiterated their requests for injunctive relief.  On May 1, 2007, the district court entered a remedy order, thereby addressing the second of the two "critical inquiries" it had flagged in its earlier opinion.  J.S. App. 6a.  The court held that because *Stokes* and *Riley* "were not precleared, Governor Bob Riley's appointment of Juan Chastang to the Mobile County Commission pursuant to these two decisions was unlawful under federal law."  *Id*. at 1a–2a.  Accordingly, the court vacated Chastang's appointment.  *Id*. at 2a.

### D.  The Appeal

On May 18, 2007, Governor Riley noticed his appeal to this Court "from the final Order of the three-judge court vacating his appointment of Juan Chastang to fill a vacancy in the Mobile County Commission, entered in this action on May 1, 2007, and from prior orders, judg-

---

[6] The State has not, at this time, sought judicial preclearance.

13

ments and decrees of the three-judge court upon which the May 1, 2007 Order necessarily relies, specifically including the Judgment entered on August 18, 2006 and the Opinion of the same date."  J.S. App. 11a (citations omitted).

On November 20, 2007, this Court entered an order postponing consideration of jurisdiction "to the hearing of the case on the merits."

## SUMMARY OF ARGUMENT

I.  This Court has jurisdiction over Governor Riley's appeal from the district court's May 2007 final judgment.

A.  The appellees' contention that the district court's August 2006 coverage order was a final judgment that required an immediate appeal is meritless.  That order declared that *Stokes* and *Riley* required §5 preclearance, but it declined to enjoin enforcement of those decisions pending preclearance or to enter any other remedy.  The district court didn't address the remedy issue until May 2007, when it vacated Juan Chastang's appointment.  The fact that the district court labeled its August 2006 order "final" is jurisdictionally irrelevant.

B.  Even if Governor Riley was entitled to appeal from the August 2006 order, he was not obliged to do so.  A party who has a right to an interlocutory appeal may wait and appeal from the final judgment, and that appeal will bring with it all interlocutory orders on which the final judgment is based.

C.  The policy implications of the appellees' jurisdictional position—which would require immediate

14

appeal of every §5 coverage decision—are perverse. Considerations of judicial economy favor a rule that encourages States, upon a finding of §5 coverage, to seek preclearance, not mandatory review in this Court.

II. The Alabama Supreme Court's decisions in *Stokes*, which invalidated Act No. 85-237 on state constitutional grounds, and *Riley*, which declined (again on state-law grounds) to revive it, were not "changes" that required preclearance under §5.

A. The federalism implications of the district court's interpretation—which strips state courts of their autonomy to decide state-law questions by subjecting their decisions to the veto of federal executive-branch officials—are profound. To avoid exacerbating the federalism costs that preclearance imposes, this Court should require some clear indication that the district court's interpretation is correct. There is no such indication.

1. Section 5's text belies the district court's interpretation. By its terms, §5 requires preclearance of any voting practice "different from that in force or effect on November 1, 1964." The practice resulting from *Stokes* and *Riley*—gubernatorial appointment—*was* the practice "in force or effect on November 1, 1964." Moreover, §5 clearly provides that preclearance does not shield a practice from invalidation on other, non-§5 grounds—which is exactly what happened here, when the Alabama Supreme Court nullified and later declined to revive Act No. 85-237's provision for special elections.

2. Evidence of Congress' intent likewise refutes the district court's interpretation. Section 5's purpose was to preclude States from playing a "cat-and-

15

mouse" game with federal authorities—*i.e.*, maneuvering to avoid federal-court decrees enjoining discriminatory voting practices by quickly switching to others. That is not the sort of thing the Alabama Supreme Court did—or was even capable of doing—in *Stokes* and *Riley*. Furthermore, §5's legislative history confirms that Congress was concerned not with state courts' case-bound exercises of judicial review, but rather with States' efforts to alter voting practices by statute or administrative acts.

3. This Court's precedents do not support the district court's decision. The district court's interpretation is contrary to *Abrams v. Johnson*, which held that §5 "cannot be used to freeze in place" an "unconstitutional" practice. 521 U.S. 74, 97 (1997). And the cases on which the district court principally relied—*Perkins v. Matthews*, 400 U.S. 379 (1971), and *City of Lockhart v. United States*, 460 U.S. 125 (1983)—are distinguishable in two critical respects. First, neither involved a state supreme court's authoritative determination of state law. Accordingly, neither justifies an interpretation of §5 that would subject state-court judgments to DOJ superintendence. Second, both turned on whether a state practice was actually "in ... effect" on §5's statutory coverage date—*e.g.*, November 1, 1964. Neither spoke to the question, presented here, whether a state law enacted and precleared *after* 1964 is entitled to §5 "baseline" status even when the state supreme court has authoritatively determined that it is invalid under state law.

B. The clear-statement and constitutional-avoidance doctrines contradict the district court's interpretation, which substantially exacerbates §5's federalism costs in three ways. First, the district court's reading subjects state courts' determinations of state law to

16

review—and revision—by federal executive-branch offi-
cials. Second, because it would require States to "keep
in place … practice[s] held invalid under state law"
(M.D.A. 23), the district court's interpretation implicates
the anti-commandeering principle. Third, because the
record is devoid of any evidence that Congress thought
state-court decisions like *Stokes* and *Riley* pose a serious
threat to voting rights, reading §5 to cover those deci-
sions could render §5, as applied, insufficiently "congru-
ent and proportional" under *City of Boerne v. Flores*, 521
U.S. 507 (1997).

    C. Pragmatic considerations counsel against
extending §5 to judicial decisions like *Stokes* and *Riley*.
The district court's interpretation would open up a Pan-
dora's box of potential challenges to well-settled state-
court precedents. And in light of other remedies avail-
able to address voting-rights violations, there is simply
no need to stretch §5 as the district court did.

    III. There is an additional basis for reversal here.
Under *Young v. Fordice*, 520 U.S. 273 (1997), a State's
temporary misapplication of state law, even if precleared
and actively administered, is deemed never to have been
"in force or effect" and, accordingly, does not become
part of the §5 baseline. Because the first and only at-
tempt to administer Act. No. 85-237—the 1987 election—
occurred under a cloud of litigation from which it never
emerged, the 1985 act was never "in force or effect," and
gubernatorial appointment remained the applicable
baseline. Accordingly, under *Young*, the *Stokes* and *Ri-
ley* decisions did not mark "changes" requiring §5 pre-
clearance.

17

## ARGUMENT

### I.  This Court Has Jurisdiction Under 42 U.S.C. §1973c(a).

The jurisdictional issue here is straightforward, and the answer is clear. Section 5 coverage actions are heard and decided by three-judge district courts, and "any appeal shall lie to the Supreme Court." 42 U.S.C. §1973c(a). Under §1973c(a), this Court has jurisdiction over this appeal from the district court's final judgment. The district court's August 18, 2006 order expressly withheld any ruling on the injunctive relief the appellees had requested. J.S. App. 8a. It wasn't until May 1, 2007, after preclearance was denied and the appellees renewed their remedial requests, that the court addressed the remedy issue and vacated Juan Chastang's appointment. *Id.* at 1a–2a. Governor Riley timely appealed from that final judgment and, in so doing, expressly appealed from all underlying orders, including, specifically, the August 18, 2006 order. *See supra* at 12–13. The appellees' contention that Governor Riley was required to take an earlier appeal is baseless.

### A.  Governor Riley Was Not Required To Appeal From the District Court's Non-Final August 2006 Order.

The appellees do not deny that §1973c(a) gives this Court jurisdiction over appeals from final judgments. Nor do they deny that an appeal from a final judgment properly brings with it all interlocutory decisions made by the district court during the litigation. *See, e.g.*, *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); 15A C. Wright, A. Miller, *et al.*,

18

*Federal Practice and Procedure* §3905.1, at 250 (2d ed. 1992).

Instead, the appellees stake their jurisdictional argument entirely on the proposition that the district court's initial August 2006 declaration of §5 coverage—*i.e.*, that *Stokes* and *Riley* "constituted changes that should have been precleared before they were implemented" (J.S. App. 7a–8a)—was *itself* a final judgment that triggered an obligation to appeal immediately. *See* M.D.A. 11–16. In particular, the appellees assert that the August 2006 order was final because in it the district court "[1] conclusively resolved the merits of the appellees' complaint, [2] ordered the Governor to obtain preclearance, and [3] directed that its order be entered as the final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure." M.D.A. 11. The appellees are wrong on every count.

1. The cornerstone of the appellees' position is their contention that the district court's August 2006 order "made clear that it was 'end[ing] the litigation on the merits.'" M.D.A. 12 (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)). This argument—based on a truncation of a familiar quotation—reveals a fundamental flaw in the appellees' jurisdictional theory. The fact that the district court decided the §5 coverage *issue* does not mean that the court finally decided the *case*. Instead, an appealable final judgment—as the full quote from *Catlin* makes plain—is "one which ends the litigation on the merits *and leaves nothing for the court to do but execute the judgment*." 324 U.S. at 233 (emphasis added). That description does not describe the August 2006 order, which expressly left the remedy question unresolved. Because the order did not "dispos[e] of the whole case"

19

and "adjudicat[e] all rights," it was not an appealable final judgment. *Id.*

The non-finality of the August 2006 order is clear in light of how §5 coverage actions work. The district court's inquiry focuses on three questions: "(i) whether a change was covered by §5, (ii) if the change was covered, whether §5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy is appropriate." *Lockhart*, 460 U.S. at 129 n.3. Because all here agree that neither *Stokes* nor *Riley* was pre-cleared, the district court rightly recognized that the "critical inquiries" were "whether these decisions brought about a change covered by §5, *and, if so, the appropriate remedy*." J.S. App. 6a (emphasis added). The August 2006 order answered yes to the first of those "critical inquiries"—thereby granting the appellees the declaration they sought—but expressly declined to answer the second. Instead, at the appellees' "suggest[ion]," the district court deferred a decision on whether to "enjoin enforcement" of *Stokes* and *Riley* or to "even consider taking any action regarding the appointment of Juan Chastang to the Mobile County Commission." J.S. App. 8a. It was not until the May 2007 judgment that the district court completed its *Lockhart* function by addressing the second of the two "critical inquiries" and entering a remedy order.

The August 2006 order, therefore, was a simple declaration that left the remedy issue open. Had the appellees "sought *only* a declaratory judgment, and no other form of relief," the finality calculus might be different. *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 742 (1976). Like the plaintiffs in *Wetzel*, however, the appellees here "requested an injunction, but did not get one." *Id.* Be-

20

cause the August 2006 order "left unresolved [the appellees'] requests for an injunction" and "disposed of none of [their] prayers for relief," it was not final. *Id.*; *cf. Lucas v. Bolivar County*, 756 F.2d 1230, 1234–35 (5th Cir. 1985) (district-court order was not final where "the court retained jurisdiction, directed that the [redistricting] plan be submitted for preclearance, and neither denied [n]or granted the relief requested").

2. The appellees' jurisdictional argument likewise rests on the mistaken view that the district court "ordered the Governor to obtain preclearance." M.D.A. 11, 13. That is not true. Rather, the court merely "g[a]ve the State 90 days to obtain the necessary preclearance" (J.S. App. 8a) and, in so doing, requested the Governor "to keep [it] informed of what action, *if any*, the State decides to take and the result of that action" (J.S. App. 9a–10a) (emphasis added). The district court thus gave the State an opportunity—not a command—to seek preclearance.

The absence of any injunction in the August 2006 order (or accompanying judgment) suffices to distinguish this case from those upon which the appellees rely. In each of those cases, the district court had enjoined the supposed "changes" pending preclearance. *See City of Monroe v. United States*, 522 U.S. 34 (1997) (per curiam), *rev'g United States v. City of Monroe*, 962 F. Supp. 1501, 1519–20 (M.D. Ga. 1997); *Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 36 (1978); *Georgia v. United States*, 411 U.S. 526, 528 (1973). In any event, this Court has held that "*sub silentio*" exercises of jurisdiction do not give rise to binding jurisdictional precedent. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 63 n.4 (1989). Absent an order enjoining the implemen-

21

tation of *Stokes* and *Riley* pending §5 preclearance, Governor Riley was justified in awaiting final resolution of the proceedings before appealing.

3.   Finally, the appellees emphasize that the district court "directed that its [August 2006] order be entered as the final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure." M.D.A. 11.  But it is hornbook law that merely calling a judgment "final" does not make it so, and the fact that the district court directed entry of its coverage decision under Rule 58 is "jurisdictionally irrelevant."  19 *Moore's Federal Practice* §202.04[2] (3d ed. 2007); *accord, e.g.*, *Wetzel*, 424 U.S. at 741–43; *Carolina Power & Light Co. v. Dynegy Mktg. & Trade*, 415 F.3d 354, 358 (4th Cir. 2005); *Franklin v. District of Columbia*, 163 F.3d 625, 628–30 (D.C. Cir. 1998).

### B.   Governor Riley Has Not Waived His Right To Appeal the August 2006 Order.

Even assuming that Governor Riley *could* have taken an earlier appeal, he was not *obliged* to do so, and his decision to await final judgment did not waive his right to appeal the coverage decision.  Even where an interlocutory appeal is available "as a matter of right, failure to take an available appeal does not of itself waive the right to secure review, on appeal from final judgment, of matters that could have been appealed but were not."  16 Wright & Miller, *supra*, §3921, at 19; *accord Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 74 (1996); 19 *Moore's*, *supra*, §203.10[7][a].  The Governor, therefore, did not waive his objections to the coverage decision by waiting to appeal until after the district court had entered a remedial order.

22

### C. The Appellees' Position Makes for Bad Jurisdictional Policy.

The appellees' position—which would require immediate appeal of every §5 coverage determination, even absent an order enjoining the supposed "changes"—is not only contrary to settled law but also makes no practical sense. Systemic considerations favor a rule that encourages covered jurisdictions, upon a finding of §5 coverage, to seek preclearance, not immediate review in this Court. First, notwithstanding the substantial burdens that preclearance imposes on covered jurisdictions, it is, relative to full-blown appellate review, a streamlined process. *See* 28 C.F.R. §51.42 (presumptive 60-day time-frame for DOJ to interpose an objection). Second, DOJ preclears submitted changes 99% of the time, *see* S. Rep. No. 109-295, at 13–14 (2006), thus mooting the need for direct appeal in many cases. Accordingly, whereas Governor Riley's view is "consonant with the overriding policy" of minimizing this Court's mandatory docket, *Gonzalez v. Automatic Employees Credit Union*, 419 U.S. 90, 98 (1974), the appellees' position frustrates that policy.

The Court should take jurisdiction and decide the important question presented.

### II. The Alabama Supreme Court's Decisions in *Stokes v. Noonan* and *Riley v. Kennedy* Were Not "Changes" That Required Preclearance Under Section 5 of the Voting Rights Act.

By all accounts, §5's preclearance requirement is "one of the most extraordinary remedial provisions in an Act noted for its broad remedies." *United States v. Board of Comm'rs of Sheffield*, 435 U.S. 110, 141 (1978)

23

(Stevens, J., dissenting).  Because it works a "substantial departure … from ordinary concepts of our federal system," and because "its encroachment on state sovereignty is significant and undeniable," §5 must "be read and interpreted with care."  *Id.* (internal quotation marks omitted).  Accordingly, in answering the interpretive question here, this Court should, as it has done before, avoid reading §5 so as to "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts, perhaps to the extent of raising concerns about §5's constitutionality."  *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 336 (2000) ("*Bossier Parish II*") (quoting *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999)).

The federalism implications of the district court's construction—which, in effect, strips state courts of their authority to decide pure state-law questions—are profound.  Surely the average American lawyer would be surprised to learn that a state supreme court's decision invalidating a state statute might be subject to the veto of a federal executive official.  The image of "non-lawyer section 5 analysts"[7] reviewing state supreme courts' authoritative determinations of state law is jarring—a federalism-and-separation-of-powers double-whammy.  *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 n.* (1792); *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 512 (2004) (Kennedy, J., dissenting) (objecting to an interpretation of a federal statute under which "state courts would be subject to being overturned, not just by any agency, but by an agency established by a different sovereign").  But that, to be clear, is exactly what happened here: The Alabama Supreme Court expressly held

---

[7] Issacharoff, Karlan & Pildes, *supra*, at 521.

24

that Act No. 85-237 was unconstitutional, and thus a nullity, on state-law grounds, and later expressly declined, again on state-law grounds, to resurrect it.  DOJ then refused to bless the Alabama Supreme Court's decisions and asserted, instead, that the 1985 act "remains in full force and effect."  M.D.A. App. 5a, 12a.  The district court's interpretation of §5 as authorizing that sort of intrusion substantially "alter[s] the usual constitutional balance between the States and the Federal Government."  *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 543 (2002) (internal quotation marks omitted).

As Justice Kennedy said only recently, "[i]f, by some course of reasoning, state courts must live with the insult that their judgments can be revised by a federal agency, the Court should at least insist upon a clear instruction from Congress."  *Alaska*, 540 U.S. at 513 (dissenting opinion).  Here, there is no such instruction.  All relevant sources—§5's language, its purpose and legislative history, and this Court's §5 jurisprudence—refute the district court's novel interpretation.

## A.  No Indicator of Statutory Meaning Supports the District Court's Interpretation of Section 5 To Require Preclearance of *Stokes* and *Riley*.

In *Stokes v. Noonan*, the Alabama Supreme Court held that Act No. 85-237 "clearly offend[ed]" and was "directly counter" to "the language of [the Alabama] constitution" (J.S. App. 18a–19a), which provides in §105 that no "local law … shall be enacted in any case which is provided for by a general law."  Ala. Const. Art. IV, §105.  Accordingly, the court discharged its "duty" to "declare Act No. 85-237 unconstitutional as violating §105."  J.S.

25

App. 21a. The effect of that "declar[ation]" under Alabama law is clear: The 1985 act was void *ab initio*—"'in legal contemplation, as inoperative as though it had never been passed.'" *Ex parte Southern Ry.*, 556 So. 2d 1082, 1090 (Ala. 1989) (quoting *Norton v. Shelby County*, 118 U.S. 425, 442 (1886)). Seventeen years later, in *Riley v. Kennedy*, the Alabama Supreme Court read "the plain language" of Act No. 2004-455 to apply prospectively only (J.S. App. 30a) and, accordingly, rejected any contention that Act No. 2004-455 revived Act No. 85-237. The question now, as the district court recognized, is whether by "invalidating" the 1985 act in *Stokes* or "refusing to revive" it in *Riley*, the Alabama Supreme Court "changed" state law within the meaning of §5 practice. J.S. App. 5a. It did not.

One prefatory point: Although the district court interpreted §5 as requiring preclearance of both *Stokes* and *Riley*, its determination that "change" had occurred was more about *Stokes* than *Riley*. In striking down Act No. 85-237, *Stokes* held that gubernatorial appointment was the appropriate means under Alabama law of filling vacancies on the Mobile County Commission; *Riley* merely maintained that status quo. Accordingly, if § 5 didn't require preclearance of *Stokes*, then it didn't require preclearance of *Riley*, either.

The district court's conclusion that §5 required preclearance of *Stokes* (and, derivatively, *Riley*) rests on a remarkable premise. In the district court's view, the issuance of a preclearance letter finding a state statute nonretrogressive, and thus compliant with §5, effectively strips state courts of their jurisdiction to consider independent challenges to that statute under state law. Even where, as here, the precleared statute is clearly uncon-

26

stitutional (the district court didn't question the correctness of either *Stokes* or *Riley*, *see* J.S. App. 8a), it is frozen in place as a §5 "baseline." The state courts have no authority—at least absent further federal permission, which here was refused—to remedy the constitutional defect, and the State, as the appellees have acknowledged, "must keep in place a practice held invalid under state law." M.D.A. 23. That cannot possibly be the law. Fortunately, as we will explain, it isn't.

### 1. There is no basis in Section 5's text for requiring preclearance of Stokes and Riley.

The district court did not purport to find any support for its decision in §5's text. And for good reason—there is none to be found. All relevant textual indications contradict the district court's interpretation.

a. Taken at face value, §5's text clearly does not require preclearance of *Stokes* and *Riley*. Section 5 requires Alabama to obtain preclearance of any voting practice "different from that in force or effect *on November 1, 1964*." 42 U.S.C. §1973c(a) (emphasis added). Neither *Stokes* nor *Riley* called for a practice "different from that in force or effect on November 1, 1964." On that date—and, for that matter, for nearly a century leading up to it—Alabama law clearly provided that vacancies on county commissions would be filled by gubernatorial appointment. In *Stokes*, the Alabama Supreme Court held that despite Act No. 85-237 Alabama law remained just as it had been "on November 1, 1964," and that vacancies on the Mobile County Commission should be filled by the Governor. In *Riley*, the court reaffirmed gubernatorial appointment as the appropriate practice.

27

Section 5's text thus provides no support for the district court's decision.

The point here is not to quarrel with dicta in *Presley v. Etowah County Commission*, 502 U.S. 491, 495 (1992), and *Young v. Fordice*, 520 U.S. 273, 281–82 (1997), suggesting that once a change is precleared it "normally need not be cleared again" but, rather, "become[s] part of the baseline standard." *Id.* at 281.  The Court needn't tackle today the thorny question whether §5's language would preclude a state *legislature's* unprecleared return to a November 1, 1964 practice.[8]  The point is simply that because this case arises so far outside the ordinary course of §5 business—a state supreme court's exercise of judicial review having been subjected to DOJ superintendence—one would expect some clear textual warrant for the district court's interpretation.  *See, e.g.*, *Raygor*, 534 U.S. at 543–44.  Here, no such warrant even arguably exists.

b.   Section 5's text also demonstrates that preclearance is *not* conclusive of a post-1964 statute's enforceability.  Indeed, §5 expressly contemplates that a precleared statute remains subject to a post-preclearance challenge on non-§5 grounds—like the one the Alabama Supreme Court sustained in *Stokes*.  It would be odd indeed if, as the district court held, the very possibility that §5 envisions—a court decision invalidating a precleared statute on some non-§5 ground—was itself a "change" that required a fresh approval.

---

[8] DOJ's §5 regulations purport to require preclearance of changes that "return[] to a prior practice or procedure."  28 C.F.R. §51.12.  However, "[t]he issue of the status of changes resulting from orders of State courts is not addressed in" those regulations.  46 Fed. Reg. 870, 872 (Jan. 5, 1981).

28

Section 5's language is clear on this point: It expressly states that neither administrative nor judicial preclearance "shall bar a subsequent action to enjoin enforcement of [a precleared] qualification, prerequisite, standard, practice, or procedure." 42 U.S.C. §1973c(a). This Court has emphasized that this phrase means just what it says—that a state statute or practice "*that satisfies §5* still may be enjoined as unconstitutional." *Bossier Parish II*, 528 U.S. at 339 (internal quotation marks omitted); *see also id.* at 335 (preclearance "does *not* represent approval of the voting change" for all purposes but, rather, "affirms nothing but the absence of" retrogression under §5). Section 5's language is unqualified; a precleared practice remains subject to "a subsequent action to enjoin enforcement." There is no principled basis for engrafting onto that pellucid savings clause a proviso excluding state-law challenges. *See United States v. Rutherford*, 442 U.S. 544, 559 (1979) ("Whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial inference.").

DOJ regulations confirm what §5 itself indicates: "The preclearance by the Attorney General of a voting change does not constitute the certification that the voting change satisfies any other requirement of the law beyond that of Section 5 …." 28 C.F.R. §51.49. There is no warrant for reading that provision—particularly given its use of the universal modifier "any"—implicitly to exclude challenges based on state constitutional provisions, which, no less than federal constitutional provisions (and other sections of the Voting Rights Act), are "requirement[s] of the law."[9]

---

[9] The phrase "any other requirement of the law" cannot be read to mean "any other requirement of" the Voting Rights Act. "Act" is a

29

Finally, to the extent that the unqualified statutory and regulatory language leaves any room for doubt, DOJ practice confirms that precleared state statutes remain subject to subsequent state-law challenges. For starters, when it preclears a change, DOJ uniformly adds a clause disclaiming any intent to pretermit later suits. For example, when DOJ precleared Act No. 85-237, it warned as follows: "[W]e feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar *any subsequent judicial action* to enjoin the enforcement" of a precleared statute. Doc. 14, Exh. C (emphasis added). More pointedly, DOJ's website explicitly says that precleared statutes remain subject to *state*-law challenges:

> A determination by the Attorney General not to object removes the prohibition on enforcement imposed by Section 5. … Although the jurisdiction may then implement that change, *the change remains subject to a challenge on any other grounds.* For example, a redistricting plan may still be challenged in court by the Attorney General as violating Section 2 of the Voting Rights Act, or any other applicable provision of federal law which the Attorney General is authorized to enforce. *Similarly, private individuals with standing may challenge that practice under any*

---

defined term in the regulations, 28 C.F.R. §51.2 ("Act means the Voting Rights Act of 1965 …."), and where the regulations mean to refer to the "Act," they do so expressly.

30

> *applicable provision of state or federal law.*

U.S. Department of Justice: Civil Rights Division, Voting Section, Introduction to Section 5, http://www.usdoj.gov /crt/voting/sec_5/about.htm (visited January 10, 2008) (emphasis added).

All these sources confirm the commonsense proposition that in covered jurisdictions like Alabama, the enforceability of any post-1964 voting practice rests on twin pillars: (1) preclearance and (2) validity under state law. Preclearance, in other words, is a *necessary* condition to enforceability, but not a *sufficient* condition. *See Morris v. Gressette*, 432 U.S. 491, 501–02 (1977) ("Section 5 requires covered jurisdictions to delay implementation of *validly enacted state legislation* until federal authorities have had an opportunity to" review and preclear it. (emphasis added)); H.R. Rep. No. 94-196, at 58 ("*[I]n addition to whatever steps are made necessary by State or local law for a proposed change to become law*, section 5 requires federal approval." (emphasis added)). By making Act No. 85-237's enforceability contingent only on preclearance—and disregarding its authoritatively-adjudicated invalidity under state law—the district court wrongly ignored the second pillar.

c. The Voting Rights Act's structure likewise indicates that preclearance was not required here. The Act's "bailout" provision states that to become eligible for exemption from coverage a jurisdiction must have, among other things, "*repealed* all [unprecleared] changes covered by" §5. 42 U.S.C. §1973b(a)(1)(D) (emphasis added). As a matter of common parlance, "repeal" is a means of undoing a statute or an administra-

31

tive rule, not a court decision.  The district court's view
that state courts' interpretations of state constitutions
constitute §5 "changes"—which must somehow be "re-
pealed" before a State can bail out—creates tension, if
not outright contradiction, within the Voting Rights Act.

### 2. There is no basis in Section 5's purpose or legislative history for requiring preclear-ance of *Stokes and* Riley.

The district court likewise claimed no historical sup-
port for its interpretation of §5 as requiring preclearance
of *Stokes* and *Riley*.  And, again, with good reason—
there is none.  The district court's reading does not mesh
with the concerns that gave rise to §5, and, in fact, it is
contradicted by key portions of the Voting Rights Act's
legislative history.

a.   This Court has repeatedly observed that any de-
termination of §5's proper scope must account for "the
historical experience which it reflects."  *McCain v. Ly-
brand*, 465 U.S. 236, 246 (1984).  That well-documented
"historical experience" reveals that the concerns that
gave rise to §5 had nothing to do with state-court deci-
sions like *Stokes* and *Riley*.  Congress was worried, in-
stead, about state legislative and executive officials, who
had shown a propensity to evade federal-court decrees
by cleverly manipulating voting practices.

In the years leading up to 1965, Congress "repeat-
edly tried to cope with the problem [of voting discrimina-
tion] by facilitating case-by-case litigation" against dis-
criminatory practices.  *South Carolina v. Katzenbach*,
383 U.S. 301, 313 (1966).  That approach proved ineffec-
tive, however, in large part because affected States and
localities "merely switched to discriminatory devices not

32

covered by the federal decrees or … enacted difficult new tests designed to prolong the existing disparity between" white and black voters. *Id.* at 314. Knowing that a number of States "had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees," and "suppos[ing] that these States might try similar maneuvers in the future," Congress enacted §5. *Id.* at 335. Section 5 was Congress' targeted "'response to [the] common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down.'" *Beer v. United States*, 425 U.S. 130, 140 (1976) (quoting H.R. Rep. No. 94-196, at 57–58 (1975)). Section 5, in short, was addressed to covered jurisdictions' "agility"; by enacting §5, "Congress meant to guard against just those discriminatory devices that were as yet untried" because it "did not know what the covered jurisdictions would think up next." *Bossier Parish II*, 528 U.S. at 361, 367 n.14 (Souter, J., dissenting).

Against this backdrop, application of §5's preclearance regime to legislative and executive action fits hand-in-glove. State legislators, registrars, and precinct officials are capable of the sort of "cat and mouse" game that Congress feared. 111 Cong. Rec. 10,727 (1965) (Sen. Tydings). But §5's fit with respect to state-court judicial decisions like *Stokes* and *Riley*—which arose from discrete cases and controversies—is more square peg, round hole. In striking down Act No. 85-237 on state constitutional grounds, and later declining (again on state-law grounds) to revive it, the Alabama Supreme Court demonstrated none of the "agility" with which Congress was concerned. Nor can those ordinary exer-

33

cises of judicial review be described as Alabama's effort
to "think up" anything—let alone anything sinister. The
court was simply deciding the cases brought before it.
Section 5's core purpose of preventing States from "stay-
ing one step ahead" of federal authorities has no applica-
tion here.

b.  Section 5's extensive legislative history confirms
that Congress did not have state-court decisions like
*Stokes* and *Riley* in mind when it constructed the pre-
clearance regime. The House Report accompanying the
1965 Act, in fact, plainly states that §5 "deals with at-
tempts by a [covered] State or political subdivision … to
alter *by statute or administrative acts* voting qualifica-
tions and procedures in effect on November 1, 1964."
H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2457–58
(emphasis added). The Senate Report says the same
thing, verbatim. S. Rep. No. 89-162, 1965 U.S.C.C.A.N.
2508, 2562 (joint views of 12 committee members).

Section 5's drafting history provides insight into why
the committee reports explain the statute's scope the
way they do. As originally proposed, §5 (then §8 of S.
1564) addressed only formal legislative acts: It required
preclearance "[w]henever a [covered] State or political
subdivision … shall *enact any law or ordinance* impos-
ing qualifications or procedures for voting different from
those in force and effect on November 1, 1964." 111
Cong. Rec. 28,358 (1965) (emphasis added). In commit-
tee, however, the language was revised to include the
current "enact or seek to administer" formulation, *id.* at
28,359–60, thereby, as the committee reports attest,
reaching attempts to change voting practices "by statute
or administrative acts." Conspicuously missing is any

34

language that would have extended §5's scope to cover court decisions like *Stokes* and *Riley*.

The legislative history accompanying §5's post-1965 reauthorizations is to the same effect: §5 was invariably described as applying to legislative and administrative action. The 1970 House Report, for instance, emphasized the "continuing importance of requiring the submission of new voting laws or regulations" for review under §5; such review, the report stated, would ensure that covered jurisdictions "cannot, by employing changes in legislation, undo or defeat the rights recently won by nonwhite voters." H.R. Rep. No. 91-397, 1970 U.S.C.C.A.N. 3277, 3283–84; *accord, e.g.*, H.R. Rep. No. 94-196, at 58 (§5 applies to "new voting enactment[s]," "law[s] newly enacted by a State legislature"); S. Rep. No. 97-417, at 7, 10, 1982 U.S.C.C.A.N 177, 184, 187 ("new laws"); S. Rep. No. 109-295, at 10 (2006) ("voting laws"). In addition, the innumerable examples of discriminatory conduct to which the legislative history refers as justifying the preclearance mechanism have, so far as we can tell, uniformly involved legislative and executive conduct.[10] Although it is always difficult to prove a negative, we have found no indication in the Voting Rights Act's vast legislative history that Congress ever contemplated §5's application to ordinary exercises of judicial review.

---

[10] *See, e.g.*, H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. at 2442–43, 2447; S. Rep. No. 89-162, 1965 U.S.C.C.A.N. at 2545–46; H.R. Rep. No. 91-397, 1970 U.S.C.C.A.N. at 3283; H.R. Rep. No. 94-196, at 10; S. Rep. No. 94-295, at 17–18, 1975 U.S.C.C.A.N. 774, 783–84; H.R. Rep. No. 97-227, at 4, 13–19 (1981); S. Rep. No. 97-417, at 6, 10–14, 1982 U.S.C.C.A.N. at 182–83, 187–91; H.R. Rep. No. 109-478, at 7, 22–23, 36–43, 2006 U.S.C.C.A.N. 618, 621–22, 631–32, 640–48; S. Rep. No. 109-295, at 14–15.

35

**3.  *There is no basis in this Court's precedent for requiring preclearance of* Stokes *and* Riley.**

The district court purported to ground its novel interpretation of §5 in this Court's precedent. And the citations to *Perkins v. Matthews*, 400 U.S. 379 (1971), *City of Lockhart v. United States*, 460 U.S. 125 (1983), and *Branch v. Smith*, 538 U.S. 254 (2003), might lend the district court's decision an air of plausibility. J.S. App. 6a–7a. But the district court's case-law analysis is strained. The court ignored the clear teaching of the most pertinent of this Court's decisions, and misapplied several others.

**a.  *The district court's decision is contrary to* Abrams v. Johnson.**

The district court's view that §5 operates to freeze unconstitutional practices in place is foreclosed by *Abrams v. Johnson*, 521 U.S. 74 (1997).

*Abrams* arose out of the 1990 census, in which Georgia picked up an extra congressional seat. The state legislature submitted two redistricting plans to DOJ for preclearance. Citing an ACLU-sponsored "max-black" plan, which contained an additional majority-black district, DOJ refused to preclear either of the Legislature's proposals. *Abrams*, 521 U.S. at 80. "[T]o gain preclearance," the legislature adopted a third plan "us[ing] the ACLU's max-black plan as a model." *Id.* DOJ precleared the plan, and the State thereafter implemented it in an election cycle. *Id.* A group of white plaintiffs later filed suit under the Equal Protection Clause, *see id.* at 81, and in *Miller v. Johnson*, 515 U.S. 900 (1995), this

36

Court invalidated Georgia's plan as an unconstitutional racial gerrymander.

On remand, the state legislature deadlocked, and a federal district court ended up drawing its own plan. 521 U.S. at 82. In *Abrams*, this Court considered and rejected a §5 challenge to that plan and, in so doing, addressed in detail the issue of the appropriate §5 baseline (or, as the Court called it there, "benchmark"). *Id.* at 96. Importantly for present purposes, the Court rejected any contention that the plan invalidated in *Miller* could, "constitutional defects and all," serve as the baseline: "Section 5 cannot be used to freeze in place the very aspects of a plan found unconstitutional." *Id.* at 97.

The Alabama Supreme Court's decision in *Stokes* operates the same way here that this Court's decision in *Miller* operated in *Abrams*. In *Abrams*, the plan held unconstitutional in *Miller* could not serve as the §5 baseline even though it had been both precleared and used to conduct elections. So too here, Act No. 85-237, held unconstitutional in *Stokes*, cannot serve as a §5 baseline even though it was precleared and implemented (in a sense, *see infra* Part III) in an election cycle. In neither case can §5 be "used to freeze in place" an unconstitutional practice, thereby requiring a State to act *ultra vires* absent federal permission to stop doing so.

Neither of the appellees' responses to *Abrams* is persuasive. First, they say that *Abrams* is "irrelevant" because the Court there was not specifically addressing the §5 coverage question presented here—namely, "what constitutes a change requiring preclearance under §5." M.D.A. 20. Classic red herring. It is true that the court-drawn plan in *Abrams* was not, under *McDaniel v. San-*

37

*chez*, 452 U.S. 130 (1981), technically subject to preclearance. But it is also undeniable that this Court in *Abrams* subjected the court-drawn plan to a standard §5 retrogression analysis. (It did so pursuant to direction in *McDaniel* itself that court-drawn plans should comply with "the appropriate Section 5 standards." *Id.* at 149.) Key to that §5 retrogression analysis, this Court emphasized, was "fixing on a benchmark." 521 U.S. at 96. And with respect to that critical question, this Court held, in no uncertain terms, that a practice adjudicated to be unconstitutional *cannot* serve as a §5 baseline. *Id.* at 97.

Second, the appellees assert that "*Abrams* addressed only legislative plans that violate the *federal* constitution." M.D.A. 20 (emphasis in original). It is entirely unclear, though, why that should matter. Just as a state statute can be unconstitutional, and thus unenforceable, as a matter of federal law, it can be unconstitutional, and just as unenforceable, as a matter of state law. In an attempt to manufacture a distinction between federal and state constitutional protections, the appellees argue that treating the unconstitutional max-black plan in *Abrams* as a baseline would have "entrench[ed] the unconstitutional practices the Voting Rights Act is designed to root out," whereas "[r]equiring Alabama to temporarily enforce a state statute that violates the state constitution's prohibition against certain forms of local legislation in no way conflicts with the basic purposes of the Voting Rights Act." M.D.A. 20–21. The argument has superficial appeal, but closer inspection reveals that it rests on a faulty premise. The "unconstitutional practice[]" of race-conscious redistricting that doomed the Georgia plan in *Miller* was undertaken *in the name of* the Voting Rights Act—specifically to obtain preclearance—not in spite of it. *See Miller*, 515 U.S. at 921–22.

38

In *Miller* and cases like it, the relationship between §5 and the federal Constitution is unique only in the sense that it is uniquely antagonistic. *See id*. at 927–28; *Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring) ("[C]onsiderations of race that would doom a redistricting plan under the Fourteenth Amendment or §2 seem to be what save it under §5.").

*Abrams* is clear:  A practice authoritatively determined to be "unconstitutional" cannot be "fr[ozen] in place" as a §5 baseline.  The district court's contrary decision cannot stand.

### b.  *The precedents invoked by the district court do not support its decision.*

The district court's decision rests on an adding-up of misreadings of two separate lines of precedent.  In the district court's view, (1) statements in cases like *Perkins v. Matthews* and *City of Lockhart v. United States* that certain voting practices unlawful under state law are nevertheless deemed to be "in force or effect on" a jurisdiction's statutory coverage date, plus (2) statements in cases like *Branch v. Smith* that court decrees can sometimes give rise to Section 5 "changes," equal a conclusion that §5 required preclearance of *Stokes* and *Riley*.  J.S. App. 6a–7a.  But the district court's precedential math doesn't add up.  Even taken together, these two lines of cases do not support the remarkable proposition that §5 requires preclearance of a state court's exercise of its core judicial-review function to invalidate (and later decline to revive) a post-1964 enactment.

1.  *Perkins* and *Lockhart*.  More than anything else, a misunderstanding of *Perkins* and *Lockhart* drove the district court's decision.  The district court considered

39

itself bound to find §5 coverage on the ground (so it thought) that those two decisions require courts to determine the §5 baseline, as a blanket matter, "'without regard for [its] illegality under state law.'" J.S. App. 7a (quoting *Lockhart*, 460 U.S. at 133, and citing *Perkins*, 400 U.S. at 394–95). Given that starting point, the district court found it easy to discount the Alabama Supreme Court's authoritative determination in *Stokes* that Act No. 85-237 violated the Alabama Constitution. *See id*. And indeed, because in the district court's view the 1985 act was locked in as the baseline as soon as it was precleared and "put into force and effect with the election of [Sam] Jones in 1987," *id.*, any court decision, like *Stokes* or *Riley*, that came later and declared the 1985 act not to be the law must have worked a §5 "change" and required DOJ authorization.

The district court's analysis ended wrong because it started wrong. The court simply plucked the without-regard-for-state-law language out of *Perkins* and *Lockhart* without considering whether, in light of the context in which those cases were decided, their logic was transferrable to this one. Closer consideration would have revealed that *Perkins* and *Lockhart*, while perhaps superficially similar to this case, are in fact quite different.

In both *Perkins* and *Lockhart*, the key question was what state voting practices were "in force or effect" on the statutory coverage date: In *Perkins*, as here, that date was November 1, 1964; in *Lockhart*, it was November 1, 1972. Both cases arose (as *Perkins* put it), in the "peculiar context," 400 U.S. at 394, in which covered jurisdictions had, *as of the coverage date*, conducted elections in a manner that arguably violated state law. In *Perkins*, the city of Canton, Mississippi had elected al-

40

dermen by wards, despite an existing statute requiring at-large voting; in *Lockhart*, the city of Lockhart, Texas had used numbered posts to elect commissioners despite uncertainty about its authority under state law to do so. The question in both cases was whether the coverage-date practice, although arguably illegal, was nonetheless part of the baseline. "[B]ased on the plain reading of [§5's] language," *Lockhart*, 460 U.S. at 133, this Court answered yes in both cases: So long as the practice was actually "in force *or* effect on" the applicable coverage date—*i.e.,* so long as it was actually being used by the jurisdiction on that date, regardless of its alleged unlawfulness under state law—then it fixed the statutory baseline, and the jurisdiction could not change it without seeking preclearance. *See id*. at 132–33; *Perkins*, 400 U.S. at 394–95.

Two critical aspects of *Perkins* and *Lockhart* render their holdings irrelevant here. The first and most obvious distinction is that neither *Perkins* nor *Lockhart* involved, as this case does, a state supreme court's authoritative determination of state law. Indeed, the *Lockhart* Court emphasized that the lawfulness of the numbered-post practice was "not entirely clear" and that, in fact, "[t]here d[id] not appear to be any Texas case law on the subject." *Lockhart*, 460 U.S. at 132 & n.6. Although the unlawfulness of the ward-election practice at issue in *Perkins* might have seemed somewhat clearer, the fact remains that neither decision required, as the district court's interpretation here so conspicuously does, "state courts [to] live with the insult that their judgments can be revised by a federal agency." *Alaska*, 540 U.S. at 513 (Kennedy, J., dissenting). It is one thing to "determine [a §5] baseline 'without regard for [its] legality under state law'" (J.S. App. 7a) in the absence of any definitive

41

pronouncement of what state law is. It is quite another to ignore a state supreme court's binding determination that a supposed baseline (here, Act No. 85-237) is and always has been void as a matter of the State's organic law—or, what amounts to the same thing, to deem the state court's exercise of judicial review a "change" that itself requires DOJ approval.

The second distinction concerns the "peculiar context" in which *Perkins* and *Lockhart* arose. Neither of those cases required a determination, as this case does, whether an unlawful state statute precleared *after* the statutory coverage date is automatically entitled to §5 baseline status. Rather, both cases asked what the applicable practice was *on* the statutory coverage date: In *Perkins*, whether the allegedly unlawful ward-election practice was, in fact, "'in force or effect *on November 1, 1964*,'" 400 U.S. at 394 (quoting §5) (emphasis added); and in *Lockhart*, whether the arguably unlawful numbered-post practice was, in fact, "'in force or effect *on November 1, 19[72]*,'" 460 U.S. at 133 (quoting §5) (emphasis added).

That fact matters for two reasons. Initially, the conclusion that the allegedly unlawful practices in *Perkins* and *Lockhart* became a part of the relevant baseline is much easier to square with §5's language than would be a similar conclusion about Act No. 85-237. Both *Perkins* and *Lockhart* turned on a "plain reading of [§5's] language." *Id.* Here, by contrast, there is no plausible argument that the 1985 act was, in the words of §5, "in force or effect on November 1, 1964." If that statute was ever "in force or effect," it was not until 1985 at the very earliest.

42

Moreover, this contextual reading of *Perkins* and *Lockhart* makes sense.  Congress had good reason in 1965 to freeze into place *all* state practices (even arguably illegal ones) that were then actually "in … effect." As we have explained, §5 was Congress' response to some States' maneuvering to evade federal-court decrees by switching to new voting practices that the decrees did not cover.  *See supra* at 31–33.  The problem was that the target was constantly moving.  Congress in 1965 needed a timeout—an opportunity to freeze the legal landscape as of November 1, 1964, and then to move forward from there.  Allowing States to fudge the practices actually in effect on that date on the (perhaps pretextual) ground that they were contrary to state law would have undermined Congress' program.  States could have shifted their baselines to unknown, perhaps invidious practices—ones that had been neither known to Congress in 1965 nor precleared by DOJ.  To that possibility, *Perkins* and *Lockhart* said no.

But the same logic doesn't hold when, as here, the practice determined to be invalid as a matter of state law is one that was not enacted or implemented until long *after* November 1, 1964.  The Alabama Supreme Court's determination in *Stokes* that Act No. 85-237 was unconstitutional, for example, did not cause Alabama to revert to some unknown or sinister practice.  It instead caused Alabama to revert to the practice (gubernatorial appointment) in effect on Alabama's November 1, 1964 coverage date.  The Alabama Supreme Court's decisions here thus do not even implicate, let alone undermine, the timeout Congress called in 1965.

*Perkins* and *Lockhart* thus stand for nothing more and nothing less than what they say: "The proper com-

43

parison is between the new system and the system actually in place *on November 1, 19[64]*, regardless of what state law might have required." *Lockhart*, 460 U.S. at 132 (emphasis added). What they do not establish is that the invalidity of a *post*-1964 enactment under state law—particularly where, as here, that invalidity has been authoritatively established by the State's highest court—is irrelevant for the purposes of determining whether that practice ought to be considered part of the *post*-1964 baseline.

2. *Branch*. Perhaps in an effort to smooth over the first of the two substantial problems with its reliance on *Perkins* and *Lockhart*—namely, the absence of any authoritative state-court determination of state law—the district court cited *Branch v. Smith* for the proposition that "a §5 change may be brought about by state court decisions." J.S. App. 6a. That statement may be true as far as it goes—but that isn't very far. Neither *Branch* nor any other decision of this Court supports the proposition that state-court decisions like *Stokes* and *Riley*—those reflecting an exercise of judicial-review to invalidate a post-1964 voting practice on state-law grounds, thereby reaffirming the practice in place on the statutory coverage date—constitute §5 "changes."

*Branch* itself is way off the mark. That case involved §5's application to a Mississippi chancery-court decree reapportioning congressional districts. The decree at issue there has nothing in common with the Alabama Supreme Court's decisions in *Stokes* and *Riley*. The chancery court in *Branch* was not exercising a core judicial-review function; it was drawing a redistricting map, *see* 538 U.S. at 258–61, which, whether undertaken by a court or otherwise, is quintessentially a "legislative

44

task," *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (plural-
ity opinion), and a "highly political" one at that, *Growe v.
Emison*, 507 U.S. 25, 33 (1993). It is one thing to require
a State to preclear court decrees that assume the mantle
of the legislature and self-consciously exercise a political
function; it is quite another to require preclearance of
state-court decisions, like *Stokes* or *Riley*, that embody
an exercise of the core judicial duty to say what the law
is.

3. *Hathorn*. Although the district court made noth-
ing of it, the appellees have also cited a footnote from
this Court's decision in *Hathorn v. Lovorn*, 457 U.S. 255
(1982), as support for extending §5 to encompass the
Alabama Supreme Court's decisions here. M.D.A. 18–19.
The district court wisely declined to rely on *Hathorn*,
which is inapposite. That case involved a 1964 Missis-
sippi election statute that, as a result of doubts about its
constitutionality, had never been enforced. Litigation
filed in 1975 culminated in Mississippi Supreme Court
orders excising the unconstitutional portions of the stat-
ute and directing enforcement of the reformulated stat-
ute without §5 preclearance. *See* 457 U.S. at 257–61.

Although the snippet of language the appellees
quote—"[T]he presence of a court decree does not ex-
empt [a] contested change from §5," *id.* at 265 n.16—
might appear to support their cause, that is only because
they wrench it out of context. Key to understanding the
*Hathorn* dictum about "court decree[s]" is the fact that
the Mississippi Supreme Court there had, in two re-
spects, ordered enforcement of an *unprecleared* election
practice. First, although the 1964 statute itself "pre-
date[d] the Voting Rights Act," it had not been made
part of Mississippi's coverage-date baseline because it

45

had never been administered in any way and thus was not, under *Perkins*, "*in fact* 'in force or effect … on November 1, 1964.'" 457 U.S. at 265 n.16. Second, when the Mississippi Supreme Court ordered enforcement of the reformulated statute, it was ordering enforcement of what was effectively a new creation. It makes sense to require §5 preclearance when, as in *Hathorn*, a state court orders implementation of a practice that was neither part of the coverage-date baseline nor subsequently precleared. Federal approval of *some* sort is necessary to an election practice's enforceability, and "if §5 did not encompass th[e *Hathorn*] situation, covered jurisdictions easily could evade the statute by declining to implement new state statutes until ordered to do so by state courts." *Id*. But that logic—which merely prevents States from "laundering" unprecleared practices through the courts—does not translate to the situation here, in which a state court's decision has the effect of simply reaffirming the practice that was "in force or effect on November 1, 1964."

**B. The District Court's Interpretation Impermissibly Exacerbates the Federalism Costs Already Imposed by Section 5.**

Section 5's preclearance mechanism, as this Court and its individual members have repeatedly recognized, is "an extraordinary departure from the traditional course of relations between the States and the Federal Government." *Presley*, 502 U.S. at 500–01; *accord, e.g.*, *Miller*, 515 U.S. at 926; *Dougherty County*, 439 U.S. at 48 (Powell, J., dissenting) (collecting citations). Given that "undeniable" fact, *Sheffield*, 435 U.S. at 141 (Stevens, J., dissenting), established canons counsel interpretive restraint. *See, e.g.*, *Raygor*, 534 U.S. at 543

46

(clear-statement principle); *Miller*, 515 U.S. at 926–27 (constitutional avoidance doctrine). In at least three critical respects, the district court's reading "exacerbate[s] the 'substantial' federalism costs that the preclearance procedure already exacts, perhaps to the extent of raising concerns about §5's constitutionality." *Bossier Parish II*, 528 U.S. at 336 (quoting *Lopez*, 525 U.S. at 282).

1. First, and most obviously, under the district court's interpretation, the Alabama Supreme Court, the "ultimate expositor[]" of Alabama law, *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975), is effectively stripped of its authority to decide pure state-law questions and is required, instead, to obtain the federal government's blessing to exercise that sovereign responsibility. The threat to state courts' judicial independence posed by the district court's interpretation is manifest. "Judges cannot, without sacrificing the autonomy of their office, put onto the scales of justice some predictive judgment about the probability that an administrator might reverse their rulings." *Alaska*, 540 U.S. at 512 (Kennedy, J., dissenting). Moreover, the injury here is particularly acute because state courts in §5 jurisdictions are, on the district court's view, "subject to being overturned, not just by any agency, but by an agency established by a different sovereign." *Id.* Before requiring "state courts [to] live with the insult that their judgments can be revised by a federal agency, the Court should at least insist upon a clear instruction from Congress." *Id.* at 513. As we have shown, there is none here.

2. Second, where, as happened here, DOJ refuses to sign off on a state court's decision, the State is made, as appellees freely and repeatedly admit, to "keep in place a

47

practice held invalid under state law" and thus to do something that flatly violates its own organic law. M.D.A. 23; *accord id.* at 10, 21. The district court's decision thereby effectively allows the federal government to dictate the substance of state law and comes perilously close—if it does not go all the way—to authorizing precisely the sort of "commandeering" of state governmental processes that the Constitution condemns. *See Printz v. United States*, 521 U.S. 898, 925 (1997); *New York v. United States*, 505 U.S. 144, 161 (1992). It is a short step from requiring a State to "enact or enforce" a particular statute (plainly forbidden by *New York* and *Printz*) to requiring a State to *maintain and enforce* a statute that the state supreme court, as the ultimate arbiter of state law, has held is void and, indeed, is not "law" at all. Particularly where, as in Alabama, a law stricken as unconstitutional is deemed to have been void *ab initio*, a federal directive requiring the State to keep and enforce that statute is tantamount to forced reenactment.

To be clear, the affront to state sovereignty is significantly greater here than in the "typical" §5 case, in which a state legislature enacts a new law but DOJ refuses to preclear it, thereby sending the State back to the old law. The difference is between (1) in the typical scenario, forcing a State to keep a law that that it *does not want to have*; and (2) here, forcing a State to keep a law that the ultimate arbiter of state law has definitively determined it *cannot constitutionally have*. The federalism concerns, therefore, are of a different order of magnitude here.

3. Finally, there is reason to believe that if it were interpreted to require preclearance of state-court deci-

48

sions like *Stokes* and *Riley*, §5 would not be "congruent
and proportional," within the meaning of *City of Boerne
v. Flores*, 521 U.S. 507 (1997), to any threat posed to Fif-
teenth Amendments rights in this particular context.
This Court's recent decisions fleshing out the congru-
ence-and-proportionality standard make clear that the
constitutionality of Fourteenth and Fifteenth Amend-
ment enforcement legislation must be determined, not
indiscriminately, but "as it applies to [a particular] class
of cases." *Tennessee v. Lane*, 541 U.S. 509, 530–31
(2004); *see also id.* at 551 (Rehnquist, C.J., dissenting)
(commenting on "as applied analysis"). Here, there is no
indication that Congress, when it enacted §5, had before
it evidence of state courts exercising their judicial-review
authority so as to "stay[] one step ahead of" federal au-
thorities by "maneuver[ing]," "contriving," or
"switch[ing]" to new and discriminatory voting practices.
*See supra* at 33–33.

Whether or not the district court's novel reading of
§5 would actually be found to cross any constitutional
line in the final analysis, it certainly raises constitutional
questions and, in any event, substantially ups the feder-
alism ante relative to the more typical §5 scenario. Just
as this Court has refused on federalism grounds to in-
dulge questionable readings of §5 in the past, it should
do so here. *See Bossier Parish II*, 528 U.S. at 336; *Reno
v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997) (re-
jecting interpretation that would "increase further the
serious federalism costs already implicated by §5");
*Miller*, 515 U.S. at 926–27 (rejecting interpretation of §5
that could have presented "troubling and difficult consti-
tutional questions"). What the Court said in *Miller* ap-
plies here as well: The "belief in *Katzenbach* that the
federalism costs exacted by §5 preclearance could be jus-

49

tified by" certain state actors' transparent efforts during the 1960s to perpetuate voting discrimination "does not mean they can be justified in the circumstances of this litigation." *Id.* at 926–27. Because it is not "the manifest purpose" of §5 to freeze in place a post-1964 enactment that the Alabama Supreme Court has held, for reasons altogether unrelated to those that underlie the Voting Rights Act, independently violates the Alabama Constitution, this Court should "hesitate before interpreting the statute to effect such a substantial change in the balance of federalism." *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 432 (2002).

## C. The District Court's Interpretation Is Unworkable and Unnecessary.

Not only is the district court's interpretation contradicted by all relevant indicia of §5's proper scope, and not only does it risk impermissibly exacerbating federalism costs, but it is also supremely impractical and, to boot, altogether unnecessary to protect against racial discrimination.

1. The district court's interpretation—which if adopted by this Court would require, for the first time, preclearance of every state-court decision that affects voting in any way—would open up a Pandora's box of possible challenges and would risk destabilizing the decisional law of all sixteen §5 jurisdictions.[11] As is demonstrated by this litigation, which centers on a 20-year-old case, no decision rendered by any state court in any §5 jurisdiction during the last 40+ years would be safe from attack. Innumerable state-court decisions would become, in an instant, ripe for §5 take-down. This case, of

---

[11] *See supra* note 2.

50

course, proves that the threat is not hypothetical. For
nearly two decades, *Stokes* was thought to be the settled
law of Alabama. Now, both it and *Riley* have (so West-
law says) been "[c]alled into [d]oubt" by the district
court's decision. Under the district court's reading of §5,
state and local officials charged with preclearance re-
sponsibilities would presumably need to scour the re-
porters for every post-1964 court decision that even ar-
guably affects voting and submit *all of them* to DOJ for
preclearance. Alabama's experience in this case indi-
cates that, in all likelihood, some of those decisions—long
assumed to be valid and, perhaps, spawning entire legal
doctrines—wouldn't make the cut. The upheaval in the
decisional law of covered jurisdictions could be stagger-
ing.

2. Moreover, there simply is no overriding *need* to
stretch an already-stretched §5 to reach state-court deci-
sions like those at issue here. Even if what this Court
has called "the extraordinary burden-shifting procedures
of §5" do not apply, *Bossier Parish II*, 528 U.S. at 335,
the full panoply of established remedies for enjoining
discriminatory voting practices remains available. Most
notable among those remedies is §2 of the Voting Rights
Act, which broadly prohibits States and localities from
"impos[ing] or appl[ying]" any "standard, practice, or
procedure" in a manner "which results in a denial or
abridgment of the right" to vote "on account of race or
color." 42 U.S.C. §1973(a). Civil actions under 42 U.S.C.
§1983 to enforce Fourteenth and Fifteenth Amendment
rights continue to provide protection as well. There is,
therefore, no reason to believe that, absent the district
court's unprecedented reading of §5, any plaintiff would
be left without proper recourse.

51

### III. Because Under *Young v. Fordice*, Act No. 85-237 Was Never "In Force or Effect," *Stokes* And *Riley* Did Not Mark Section 5 "Changes."

There is, in addition, an alternative basis for reversal here—one tied more specifically to the unique circumstances of this particular case. Even if §5 could, as a general matter, be read to cover state-court decisions like *Stokes* and *Riley*, *Stokes* and *Riley* themselves would not be covered. The reason is this: Act No. 85-237 was invalidated the first time anyone ever attempted to administer it and, indeed, in the course of litigation that was filed *before* any election was conducted under its provisions. That fact is critical because under this Court's unanimous decision in *Young v. Fordice*, a State's temporary misapplication of state law, even if precleared by DOJ and actively administered, does "not become part of the baseline against which [the Court is] to judge whether future change occurred" under §5. 520 U.S. 273, 283 (1997). On the facts here, Act No. 85-237—and the single election mistakenly conducted under it—cannot be regarded as anything other than a temporary misapplication of Alabama law. The 1985 act's special-election practice, therefore, never became the §5 baseline. Because, instead, gubernatorial appointment remained, as it had since November 1, 1964, the applicable baseline, neither *Stokes* nor *Riley*, both of which merely reaffirmed the propriety of gubernatorial appointments, could have marked "changes" in state practices for §5 purposes.

To serve as a §5 baseline, a voting practice must at least be, in the words of the statute, "in force or effect." 42 U.S.C. §1973c(a). Here, the district court determined that the 1985 act was the appropriate baseline because it

52

had been both precleared and, more importantly for pre-
sent purposes, "put into force and effect with the election
of [Sam] Jones in 1987." J.S. App. 7a. The question is
whether Jones' 1987 election—enveloped as it was by a
cloud of litigation from which it never emerged—can
count as having put the 1985 act into "force or effect"
within the meaning of §5. Under this Court's unanimous
decision in *Young*, it can't.

In *Young*, Mississippi's Secretary of State had ob-
tained DOJ preclearance of, and had actively adminis-
tered, a provisional voter-registration plan designed to
effectuate the National Voter Registration Act. *See* 520
U.S. at 277–78. State officials registered some 4,000 vot-
ers under the plan, but later ceased implementation after
concluding that the state legislature would not ratify it.
*Id.* at 278. State officials then set about the business of
"notify[ing] the 4,000 registrants that they were not," in
fact, "registered to vote in state or local elections." *Id.*
This Court rejected the contention that the provisional
plan was the §5 baseline against which later registration
practices were to be compared; in particular, the Court
reasoned that the plan had never been "in force or ef-
fect" within the meaning of §5. In so holding, the Court
acknowledged, by citation to *Perkins* and *Lockhart*, that
"the simple fact that a voting practice is unlawful under
state law does not show, entirely by itself, that the prac-
tice was never 'in force or effect'" for §5 purposes. *Id.* at
283. After all, the *Young* Court explained, a State
"might maintain in effect for many years" a plan that
"technically, or in one respect or another, violated some
provision of state law." *Id.* But Mississippi's provisional
NVRA plan, the Court explained, was different: When
"taken together," the "circumstances" surrounding the
plan's implementation and prompt abandonment showed

53

that the plan amounted to a temporary misapplication of state law that was never "in force or effect" for §5 purposes. *Id.*

Similar circumstances require reversal here. Act No. 85-237 had not been on the books for "many years," *id.*, when the Alabama Supreme Court decided *Stokes.* Gubernatorial appointment had indisputably been the law from 1868 to 1985. *See supra* at 6–7. The first and only time that anyone ever attempted to put the 1985 act's contrary practice into "force or effect" was in 1987, when the first post-1985 vacancy arose on the Mobile County Commission. But in April 1987, two months *before* any election was to take place, Willie Stokes filed his constitutional challenge to the act. Although the trial court rejected Stokes' challenge and allowed an election to go forward in June 1987, the Alabama Supreme Court thereafter reversed the trial court's decision. In so doing, the Alabama Supreme Court effectively held (albeit not in precisely these words) that the 1985 act, the 1987 election, and the trial court's decision allowing the election to proceed were all "temporary misapplication[s] of state law." *Young*, 520 U.S. at 282. Like the Mississippi officials in *Young*, Mobile County officials "did not intend to administer an unlawful plan"; they proceeded with the election only after the trial court told them (erroneously, as it turns out) that an election was permissible. *Id.* at 283. And like the Mississippi officials, Alabama officials abandoned Act No. 85-237's special-election procedure "as soon as its unlawfulness became apparent, *i.e.*, as soon as it became clear" that it was unconstitutional as a matter of state law. *Id.*

There are no relevant differences between this case and *Young* that would justify a contrary result here. To

54

be sure, this Court in *Young* took note of—and attributed some significance to—the facts that Mississippi's plan had been in place for only 41 days and that no election had been conducted under it. *See id*. Here, it took more than a year for Stokes' challenge to wind its way through the court system, and Mobile County conducted one election during that time. But the relatively short delay and the solitary election can only be chalked up to the vagaries of the litigation process. Stokes filed his challenge at the earliest possible juncture, well before any election was held. The election went forward only because (1) the trial court misapplied Alabama law and (2) it took a year for the Alabama Supreme Court to correct the trial court's error. In light of the Alabama Supreme Court's undisputed role as "the *final* arbiter of Alabama law, with ultimate authority to oversee and rule upon the decisions of the lower State courts," *Ex parte James*, 836 So. 2d 813, 834 (Ala. 2002), this case could not possibly turn on the fortuity that the trial court, which got the first shot at considering the 1985 act's constitutionality, happened to have gotten state law wrong. Nor can this case turn on the fact that it took the Alabama Supreme Court a year, rather than 41 days, to fix the trial court's error. Some modest delay is the price of deliberate decisionmaking and, in any event, is a fact of life in American courts. The dispositive facts here are (1) that the 1987 special election was bracketed by litigation challenging its validity and (2) that it did not survive that challenge. *Cf. Perkins*, 400 U.S. at 400 (Harlan, J., concurring in part and dissenting in part) (reasoning that even a *post*-election challenge "to have [an] election set aside" would prevent an unlawful practice from being "in force or effect").

55

Nor can *Young* be distinguished, as the appellees suggest, on the ground that it merely involved a "*proposed* statute" that "was ultimately never enacted." M.D.A. 21.  As a formal matter, the Mississippi plan was more than a "proposed statute"; Mississippi's Secretary of State had promulgated the plan in an administrative "implementation manual" billed as "Mississippi's plan to administratively implement NVRA."  Br. for the United States at 6, *Young* (No. 95-2031).  Section 5 puts informal administrative rules on the same footing as formal enactments like Act No. 85-237, *see NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 178 (1985), and, indeed, DOJ wouldn't have considered preclearing Mississippi's plan, let alone approved it, if it hadn't been a "final enactment or administrative decision," 28 C.F.R. §51.22 (a).  Moreover, as a practical matter, it is not true, as the appellees put it, that the Mississippi plan was "never born."  M.D.A. 21.  Until the plan was withdrawn, the plan was "born" in every way Act No. 85-237 was (or wasn't).  Mississippi officials submitted the plan to DOJ—which precleared it—and then registered some 4,000 people under its provisions.  What deprived the Mississippi plan of §5 baseline status was not its lack of implementation or treatment as binding law—for it was, in fact, implemented and treated as binding law—but the fact that it was withdrawn as soon as it was determined that the plan was actually *not* "law" at all.  Because that is exactly what happened here, Act No. 85-237 was no more "in force or effect" than was the Mississippi plan at issue in *Young*.

Because, under *Young*, Act No. 85-237 was never "in force or effect" for §5 purposes, its provision for special elections never became part of the baseline for comparing future changes in Alabama law.  For this reason—

56

and independently of the arguments in Part II—*Stokes*
and *Riley*, which merely confirmed the longstanding rule
that vacancies on the Mobile County Commission should
be filled through gubernatorial appointment, did not
mark "changes" in voting practices that required §5 pre-
clearance.

## CONCLUSION

For the foregoing reasons, this Court should take
jurisdiction and reverse the district court's decision.

Respectfully submitted,

TROY KING                        KEVIN C. NEWSOM
*Attorney General*                   *Counsel of Record*
MARGARET L. FLEMING              MATTHEW H. LEMBKE
JAMES W. DAVIS                   JOHN C. NEIMAN, JR.
MISTY S. FAIRBANKS               SCOTT BURNETT SMITH
*Asst. Attorneys General*         JOHN W. REA
STATE OF ALABAMA                 ANDREW L. BRASHER
11 South Union Street            BRADLEY ARANT ROSE
Montgomery, AL 36130                & WHITE LLP
(334) 242-7300                   1819 Fifth Avenue North
                                 Birmingham, AL 35203
                                 knewsom@bradleyarant.com
                                 (205) 521-8803

*Attorneys for Appellant*