## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| FRED L. PLUMP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:07-cv-01014-MEF-CSC |
| | ) | |
| BOB RILEY, Governor, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNOR RILEY'S NOTICE OF FILING PRECLEARANCE SUBMISSION

In conformance with his previously file notice to this Court (doc. 34), Governor Bob Riley, defendant in this action, respectfully gives notice that the attached preclearance submission is being sent to USDOJ today for delivery tomorrow.

Governor Riley does not waive any rights or positions by seeking preclearance, including, but not limited to, those specifically set out herein.   Governor Riley does not waive his arguments raised previously in this action (and the related *Kennedy* litigation) that preclearance is not required on the facts of this case.   In addition, in the event USDOJ has not ruled upon the preclearance submission by April 21, 2008, Governor Riley reserves the right to request that this Court grant additional time for consideration of the preclearance submission.   Governor Riley reserves all rights of appellate review and/or mandamus.

Due to the file size, the preclearance submission will be attached in two segments. Further, due to the size of the submission, hard copies will be provided to the Court.

**Respectfully submitted,**

**Of counsel**:

Kenneth D. Wallis, II (WAL064)
Chief Legal Advisor
Office of the Governor

Scott L. Rouse (ROU010)
Deputy Legal Advisor
Office of the Governor

ADDRESS OF COUNSEL:
Office of the Governor
State Capitol, Suite NB-05
600 Dexter Avenue
Montgomery, Alabama  36130
(334) 242-7120 Phone
(334) 242-2335 Fax

ken.wallis@governor.state.al.us
scott.rouse@governor.alabama.gov

**Troy King (KIN047)**
**Attorney General**

s/  Misty S. Fairbanks
Margaret L. Fleming (FLE001)
James W. Davis (DAV103)
Misty S. Fairbanks (FAI005)
Assistant Attorneys General

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
11 South Union Street
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Facsimile:  (334) 353-8440
mfleming@ago.state.al.us
jimdavis@ago.state.al.us
mfairbanks@ago.state.al.us

**Counsel for the Defendant**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of March, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel:  Edward Still, Edward Still Law Firm LLC (Still@votelaw.com), and James U. Blacksher (jblacksher@ns.sympatico.ca).

s/ Misty S. Fairbanks
Misty S. Fairbanks (FAI005)



STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL

TROY KING
ATTORNEY GENERAL

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, AL  36130
(334) 242-7300
WWW.AGO.STATE.AL.US

March 18, 2008

Chief, Voting Section
Civil Rights Division
Room 7254 - NWB
Department of Justice
1800 G St., N.W.
Washington, DC  20006

RE:    SUBMISSION UNDER SECTION 5 OF THE VOTING RIGHTS ACT OF 1965
       EXPEDITED PRECLEARANCE REQUESTED; APRIL 21, 2008 DEADLINE

Dear Sir:

In accordance with Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, as amended, and pursuant to the adverse decision of a federal court, *see Plump v. Riley*, Case No. 2:07-cv-1014 (M.D. Ala., pending) (3-judge court), we make this submission for preclearance by the Attorney General of the United States.

This submission concerns a change in the manner by which vacancies on the Jefferson County Commission are filled—namely *from* special election *to* gubernatorial appointment.  This change from special election to gubernatorial appointment in Jefferson County is required by two decisions of the Alabama Supreme Court, namely *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), attached hereto as Exhibit A, and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), attached hereto as Exhibit B.  *Stokes v. Noonan* and *Riley v. Kennedy* arose in Mobile County and concern a different local law than the one at issue here; however, they control the Governors' actions in Jefferson County.

If preclearance is not granted by **April 21, 2008**, Governor Riley's appointment of General George F. Bowman to the Jefferson County Commission will be vacated by order of the federal court. *Plump v. Riley*, Case No. 2:07-cv-1014 (M.D. Ala., pending) (3-judge court); *see* Exhibit C (Memorandum Opinion, doc. 28; Judgment, doc. 29); Exhibit D (Order, doc. 32; Amended Judgment, doc. 33). ***Accordingly, we respectfully request expedited consideration of this submission pursuant to 28 C.F.R. § 51.34 and preclearance before April 21, 2008.***

Chief, Voting Section
March 18, 2008
Page 2

### *Introductory Statement*

Alabama's Constitution provides that "No special, private, or local law. . . shall be enacted in any case which is provided for by the general law . . . ." Ala. Const. Art. IV, § 105.[1]

Alabama's general law has long provided for vacancies on county commissions to be filled by appointment. As to "The Court of County Commissioners," the 1852 Code of Alabama provided that "[i]n case of a vacancy, it is to be filled by the court, and the person so appointed holds office for the remainder of the term of the commissioner in whose place he is appointed." Code 1852, § 698. The law was the same when the Revised Code of Alabama was published in 1867. *See* Code 1867, § 826. The appointment authority shifted from the commissioners themselves to the Governor in 1868:

> On November 25, 1868, only months after ratifying the Fourteenth Amendment, Alabama's Reconstruction Legislature—a body that was dominated by Republicans (126 to the Democrats' 4) and, with 27 black lawmakers, was the first legislature in Alabama that remotely approached equity in representation—enacted a law that authorized and empowered *the Governor* to fill any and all vacancies now existing or which may hereafter exist in the offices of county commissioners. Act No. 12, § 1. The statute was codified in the 1876 Alabama Code, *see* Ala. Code § 740 (1876), and then carried forward, essentially verbatim and without interruption, in every subsequent codification. *See* Ala. Code § 820 (1886); Ala. Code § 952 (1896); Ala. Code § 3307 (1907); Ala. Code § 6749 (1923); Ala. Code Tit. 12, § 6 (1940); Ala. Code § 11-3-6 (1975).

*Riley v. Kennedy*, Case No. 07-77 (United States Supreme Court, pending), Brief for Appellant at 6-7 (internal quotation marks and footnotes omitted; emphasis added), attached hereto as Exhibit E.

---

[1] In full, section 105 provides:

> No special, private, or local law, except a law fixing the time of holding courts, shall be enacted in any case which is provided for by a general law, or when the relief sought can be given by any court of this state; and the courts, and not the legislature, shall judge as to whether the matter of said law is provided for by a general law, and as to whether the relief sought can be given by any court; nor shall the legislature indirectly enact any such special, private, or local law by the partial repeal of a general law.

Ala. Const. Art. IV, § 105.

Chief, Voting Section
March 18, 2008
Page 3

Against this background, the Alabama Supreme Court held a local law applicable only to Mobile County, Act No. 85-237, unconstitutional pursuant to Ala. Const. art. IV, § 105, as the local law called for vacancies on the Mobile County Commission to be filled by special election when more than 12 months remained on the term of the vacated seat. *See Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), attached hereto as Exhibit A. In so holding, the Alabama Supreme Court was fulfilling its constitutional responsibilities as the "ultimate expositor[]" of Alabama law. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

In 2004, Act No. 2004-455 of the Alabama Legislature modified the general law, then codified at Ala. Code § 11-3-6 to allow for local laws. As amended, the general law provided: "Unless a local law authorizes a special election, in case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he or she is appointed." *See* Act No. 2004-455; USDOJ File No. 2004-3515.

When a vacancy arose on the Mobile County Commission in 2005, litigation ensued as to whether Act No. 2004-455 somehow revived the unconstitutional local law stricken down in *Stokes v. Noonan*. After briefing and oral argument, the Alabama Supreme Court ruled that Act No. 2004-455 operated prospectively only, such that it authorized the passage of new local laws but did not revive Mobile County's pre-existing, unconstitutional law local. *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), attached hereto as Exhibit B. Again, in so doing, the Alabama Supreme Court was fulfilling its constitutional responsibilities as the "ultimate expositor[]" of Alabama law. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

The losing plaintiffs in the State court litigation then went to federal court arguing that *Riley v. Kennedy* required preclearance. Eventually, they also argued that *Stokes v. Noonan* required preclearance. Over the Governor's strenuous objections, the three-judge federal court ruled that *Stokes v. Noonan* and *Riley v. Kennedy* required preclearance:

> This three-judge court has been convened to consider the claim of plaintiffs Yvonne Kennedy, James Buskey, and William Clark that, under § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, the State of Alabama was required, but failed, to preclear two decisions of the Alabama Supreme Court: *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005). For the reasons that follow, we hold that the state court decisions should have been precleared before they were implemented.

Doc. 22 at 1-2, *Kennedy v. Riley*, Case No. 2:05-cv-1100 (M.D. Ala.), *on appeal to the United States Supreme Court* as *Riley v. Kennedy*, No. 07-77 (United States Supreme Court, pending), attached hereto as Exhibit F.

Chief, Voting Section
March 18, 2008
Page 4

After the *Kennedy* Court ruled that preclearance of the Alabama Supreme Court decisions in *Stokes v. Noonan* and *Riley v. Kennedy* required preclearance before State officials could comply with those decisions, the State of Alabama sought preclearance. *See* Exhibit G. *See* USDOJ File No. 2006-6792. By letter dated January 8, 2007, Wan Kim, then-Assistant Attorney General for the Civil Rights Division at USDOJ, interposed an objection and informed the State that officials should follow the unconstitutional local law, Act No. 85-237. *See* Exhibit H. The State of Alabama sought reconsideration of the objection, *see* Exhibit I, and by letter dated March 12, 2007, USDOJ continued it interpose its objection, *see* Exhibit J.[2] As a result, the *Kennedy* Court vacated Governor Riley's appointment of Juan Chastang, who is African-American, to the Mobile County Commission. Doc. 48, *Kennedy v. Riley*, Case No. 2:05-cv-1100 (M.D. Ala.), *on appeal to the United States Supreme Court* as *Riley v. Kennedy*, No. 07-77 (United States Supreme Court, pending).

Governor Riley has appealed the three-judge court's decision in *Kennedy v. Riley*, Case No. 2:05-cv-1100 (M.D. Ala.), and that appeal is now pending in the United States Supreme Court as Case No. 07-77. Oral argument is scheduled for March 24, 2008.

Through the Solicitor General, the United States has filed a brief opposing Governor Riley's merits argument. *See* Brief of the United States as Amicus Curiae Supporting Appellees in Part, filed on February 20, 2008 in *Riley v. Kennedy*, No. 07-77 (United States Supreme Court, pending). Based on the United States' involvement, familiarity with both the *Kennedy v. Riley* litigation and preclearance proceedings is presumed.

---

[2] Alberto Gonzales was at the helm when USDOJ interposed its objection, despite the fact that, as Texas' Secretary of State, Mr. Gonzales had strenuously argued that preclearance of State Court decisions is not required. Indeed, Mr. Gonzales' submission letter begins: "Please be advised that this submission is being tendered under protest, due solely to the federal court order described below. In tendering this submission, the State of Texas does not waive, but expressly reserves, its right to object to the requirement, if any, that judicial opinions of our State's courts be submitted for preclearance."). *See* Exhibit K at 1 (excerpts from USDOJ File No. 98-1365).

Mr. Gonzales was reacting to the decision in *LULAC of Texas v. Texas*, 995 F.Supp. 719 (W.D. Tex. 1998), which required that a decision of the Texas Supreme Court, namely *State ex rel. Angelini v. Hardberger*, 932 S.W.2d 489 (Tex. 1996), be submitted for preclearance. At the time, the Honorable Thomas R. Phillips was Chief Justice of the Texas Supreme Court, and he has joined with the Honorable Charles Fried, former Associate Justice of the Supreme Judicial Court of Massachusetts, former Solicitor General of the United States, and current Harvard Law School professor, in supporting Governor Riley's position in the United States Supreme Court. *See* Exhibit L (Brief *Amici Curiae* of Former State Court Justices Charles Fried and Thomas R. Phillips in Support of Appellant).

Chief, Voting Section
March 18, 2008
Page 5

Jefferson County, like Mobile County, has a local law that purports to authorize special elections to fill vacancies on the county commission, namely Act No. 77-784. *See* Exhibit M. A vacancy arose on the Jefferson County Commission in November 2007. The incumbent, Larry Langford, was elected Mayor of Birmingham in October 2007 and assumed his new office the next month. "Under a duty to faithfully execute the laws of this State, Governor Riley followed the Alabama Supreme Court rulings and the general law, appointing General George F. Bowman to fill the vacancy." *See* Exhibit N at 2 (Governor Bob Riley's Memorandum of Law in *Working et al. v. Jefferson County Election Commission, et al.*, Case No. 08-cv-900316 (Jefferson County Circuit Court, 2008).).

Litigation ensued in federal court, and then in State court. The federal court litigation, *Plump v. Riley*, Case No. 2:07-cv-1014 (M.D. Ala., pending) (3-judge court), resulted in an adverse decision necessitating this preclearance submission. If preclearance is not granted by **April 21, 2008**, Governor Riley's appointment of Commissioner Bowman, who is African-American, to the Jefferson County Commission will be vacated by order of the federal court. *See* Exhibit C (Memorandum Opinion, doc. 28; Judgment, doc. 29); Exhibit D (Order, doc. 32; Amended Judgment, doc. 33).

As to the nature of the change being submitted, the *Plump v. Riley* court said that it is the Governor's appointment that requires preclearance, regardless of the Alabama Supreme Court decisions that compelled the appointment:

> In *Kennedy*, the claim was raised that the *Stokes* and *Riley* decisions had to be precleared. Of course, the Alabama Supreme Court does not have to preclear any of its interpretations of state law; it is the final word on what state law is. It was rather the power of gubernatorial appointment which was exercised in good faith by [Governor Riley] and which was authorized by state law which had to be precleared for purposes of the Voting Rights Act because it constituted a change in practice under federal law. In this case, as in *Kennedy*, it is the practice of gubernatorial appointment which has been challenged as constituting a change from the precleared practice of special election to fill vacancies.

Exhibit C at 6, n.2; *but see* Doc. 22, *Kennedy v. Riley*, Case No. 2:05-cv-1100 (M.D. Ala.), *on appeal to the United States Supreme Court* as *Riley v. Kennedy*, No. 07-77 (United States Supreme Court, pending), attached hereto as Exhibit F at 1-2 ("This three-judge court has been convened to consider the claim . . . that . . . the State of Alabama was required, but failed, to preclear two decisions of the Alabama Supreme Court . . . . For the reasons that follow, we hold that the state court decisions should have been precleared before they were implemented.").

In the appeal of *Kennedy v. Riley* now pending in the United States Supreme Court, through the Solicitor General, the United States also took the position that it is the Governor's appointment that requires preclearance, not the Court's decisions:

Chief, Voting Section
March 18, 2008
Page 6

> [Governor Riley] incorrectly characterizes the change at issue in
> this case, consistently describing the relevant governmental action as "two
> decisions" of the Alabama Supreme Court. It is not the decisions
> themselves, however, that are subject to Section 5 preclearance. Rather, it
> is the change affecting voting that resulted from the implementation of
> those decisions—namely, the change in the method of filling vacancies on
> the Mobile County Commission from election to appointment.

Brief of the United States as Amicus Curiae Supporting Appellees in Part at 12, filed on
February 20, 2008 in *Riley v. Kennedy*, No. 07-77 (United States Supreme Court,
pending).

In the *Kennedy* litigation, Governor Riley has disagreed with the attempts to
characterize the change at issue as being no more than his "decision":

> The appellees first try to recast this as a routine § 5 case in which the
> Alabama Supreme Court was, at most, only incidentally involved. They
> repeatedly assert that Governor Riley just "decided"—seemingly on his
> own—to fill the commission vacancy by appointment rather than special
> election and, therefore, that this case is no different from any other in
> which a state legislature opts to replace an elected office with an appointed
> one.
>
> . . .
>
> [T]his case has always been about whether § 5 required preclearance of
> the Alabama Supreme Court's decisions. That is how the appellees argued
> the case to the district court. That is how the district court decided the
> case. And that is how DOJ's Voting Section understood the case, too. In
> any event, whatever formalism the appellees might want to introduce now,
> it is clear that the *effect* of the district court's decision is to require
> preclearance of *Stokes* and *Riley*.

*Riley v. Kennedy*, Case No. 07-77 (United States Supreme Court, pending), Reply Brief
for Appellant at 2-4 (citations and parentheticals omitted), attached hereto as Exhibit O.
*See also id.* at 17-18 ("[D]espite having been binding state law for nearly 20 years, the
Alabama Supreme Court's judgment in *Stokes* is no longer worth the paper it is printed
on.").

Similarly, in the Jefferson County litigation in State court, Governor Riley has
taken the position that Jefferson County's local law, Act No. 77-784, is unconstitutional
pursuant to the decisions of the Alabama Supreme Court in *Stokes v. Noonan* and *Riley v.
Kennedy*, and that it is his job, as the chief executive for the State of Alabama, to enforce
the law as construed by Alabama's highest court. *See* Exhibit N at 1-2, 5-13; *id.* at 2

Chief, Voting Section
March 18, 2008
Page 7

("Under a duty to faithfully execute the laws of Alabama, Governor Riley followed the Alabama Supreme Court rulings and the general law, appointing General George F. Bowman to fill the vacancy.").

The State agrees with Governor Riley. Accordingly, under protest and pursuant to the adverse decision of a federal court, we make this submission for preclearance of the change in the manner by which vacancies on the Jefferson County Commission are filled—namely *from* special election *to* gubernatorial appointment—which change is required by two decisions of Alabama's highest court, *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), attached hereto as Exhibit A, and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), attached hereto as Exhibit B.

*In compliance with 28 C.F.R. § 51.27, we submit the following information to the Attorney General:*

*"(a) A copy of any ordinance, enactment, order, or regulation embodying a change affecting voting."*

In accordance with the Alabama Supreme Court's decision in *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), on March 29, 2001, Governor Siegelman appointed The Reverend Steve Small, Jr., to fill a vacancy on the Jefferson County Commission. The Supreme Court's decision in *Stokes v. Noonan* is attached Exhibit A. Governor Siegelman's appointment letter is attached as Exhibit P.

In accordance with the Alabama Supreme Court's decisions in *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), on November 21, 2007, Governor Riley made an appointment to fill a vacancy on the Jefferson County Commission. Governor Riley appointed General George F. Bowman to complete the term of Larry Langford. Commissioner Langford had vacated his seat in order to become Mayor of Birmingham. Governor Riley's appointment was, of course, not a change under any theory as Governor Siegelman had filled the last vacancy on the Jefferson County Commission by appointment. Nonetheless, the Supreme Court's decision in *Stokes v. Noonan* is attached Exhibit A and the Alabama Supreme Court's decision in *Riley v. Kennedy* is attached as Exhibit B. Governor Riley's letter of appointment and his press release concerning Commissioner Bowman's appointment are attached as Exhibit Q.

*"(b) A copy of any ordinance, enactment, order, or regulation embodying the voting practice that is proposed to be repealed, amended, or otherwise changed."*

Act No. 77-784, a local law pertaining only to Jefferson County, is attached as Exhibit M.

Chief, Voting Section
March 18, 2008
Page 8

*"(c) If the change affecting voting either is not readily apparent on the face of the documents provided under paragraphs (a) and (b) of this section or is not embodied in a document, a clear statement of the change explaining the difference between the submitted change and the prior law or practice, or explanatory materials adequate to disclose to the Attorney General the difference between the prior and proposed situation with respect to voting."*

As set out above, the general law in Alabama has long called for gubernatorial appointment in the event of a vacancy on a county commission. Act No. 77-784 is a local law that deviated from that general law, purporting to authorize special elections in the event of a vacancy on the Jefferson County Commission. *See* Exhibit M. A handful of Alabama's 67 counties have similar local laws.[3]

Act No. 77-784 was enforced in 1982. A special election was held on March 2, 1982; Chriss Doss was elected President of the Jefferson County Commission. A second special election was held on April 13, 1982 for the position of Associate Commissioner No. 1. A run-off election was subsequently held on May 4, 1982, and Ray Moore was elected of Associate Commissioner No. 1.

Six years later, the Alabama Supreme Court decided *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988). In accordance with that decision, when another vacancy arose on the Jefferson County Commission, Governor Siegelman appointed The Reverend Steve Small, Jr., to fill the vacancy. *See* Exhibit P. Thus, Governor Siegelman abandoned Act No. 77-784 once its unlawfulness became apparent and the opportunity for abandonment presented itself. The *Stokes v. Noonan* decision is discussed above, and attached hereto as Exhibit A.

A subsequent vacancy arose on the Jefferson County Commission in November 2007. In accordance with the Alabama Supreme Court's decisions in *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), Governor Riley appointed General George F. Bowman to fill the vacancy. *See* Exhibit Q. *Stokes v. Noonan* is attached hereto as Exhibit A, and *Riley v. Kennedy* is attached hereto as Exhibit B; both decisions have been discussed above.

Accordingly, based on the information currently known to this Office, and outlined above, the submitted change is *from* special elections *to* gubernatorial appointments as the method for filling vacancies on the Jefferson County Commission. The appointee serves out the remainder of the term, and must then stand for election if he or she wishes to continue in office. This change from special election to gubernatorial

---

[3]  The other local laws were discussed in the preclearance proceedings arising from the Mobile County litigation, however, this submission is intentionally focusing on the change wrought *in Jefferson County* by the Alabama Supreme Court's decision in *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005).

Chief, Voting Section
March 18, 2008
Page 9

appointment in Jefferson County is required by two decisions of the Alabama Supreme Court, namely *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005). Any failure to preclear the change *from* special elections *to* gubernatorial appointment amounts, as required by the decisions of Alabama's highest court, would amount to no less than the federal executive branch overruling the State judiciary—"a federalism-and-separation-of-powers double-whammy." *Riley v. Kennedy*, Case No. 07-77 (United States Supreme Court, pending), Brief for Appellant at 23 (internal quotation marks and footnotes omitted; emphasis added), attached hereto as Exhibit E. This argument is not new or unique to Alabama; Alberto Gonzales once made the same argument in 1998:

> I trust that the DOJ comprehends the consequences of failing to preclear the Texas Supreme Court decision. In effect, the DOJ will set the stage for a constitutional crisis in our State. The DOJ will place the State in the position of justifying a decision of our Supreme Court, a court **elected** by the citizens of this State. Essentially, the DOJ's intrusive discharge of its duties under Section 5 in this case will render the decision of our highest civil court contingent upon approval by **non-elected** and unaccountable federal officials. The DOJ's application of the Section 5 process has created an infringement, if not outright violation, of the separation of powers doctrine, and it is inconsistent with our democratic process. In this regard, Justice Black's concurring and dissention opinion in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), resonates prophetically:

>> *Section 5 by providing that some of the States cannot pass state laws or adopt state constitutional amendments without first being compelled to **beg** federal authorities to approve their policies, so distorts our constitutional structure of governor as to render any distinction in the Constitution between state and federal power almost meaningless.*

> *Katzenbach* at 358.

Exhibit K at 5 (Letter from Alberto R. Gonzales, Secretary of State, State of Texas to Elizabeth Johnson, Chief, Voting Section, United States Department of Justice).

*"(d) The name, title, address, and telephone number of the person making the submission."*

Troy King, Attorney General, and Misty S. Fairbanks, Assistant Attorney General, State of Alabama, Alabama State House, 11 South Union Street, 3d Floor, Montgomery, Alabama 36130-0152, telephone (334) 353-8674, facsimile (334) 353-8440, e-mail mfairbanks@ago.state.al.us.

Chief, Voting Section
March 18, 2008
Page 10

*"(e) The name of the submitting authority and the name of the jurisdiction responsible for the change, if different."*

   The State of Alabama.

*"(f) If the submission is not from a State or county, the name of the county and State in which the submitting authority is located."*

   Not applicable.

*"(g) Identification of the person or body responsible for making the change and the mode of decision (e.g., act of State legislature, ordinance of city council, administrative decision by registrar)."*

   Gubernatorial appointment, in accordance with interpretations of State law by the Alabama Supreme Court, the "ultimate expositor[]" of Alabama law. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). *See Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), attached hereto as Exhibit A; *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), attached hereto as Exhibit B.

*"(h) A statement identifying the statutory or other authority under which the jurisdiction undertakes the change and a description of the procedures the jurisdiction was required to follow in deciding to undertake the change."*

   In accordance with *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), Exhibit A, Governor Siegelman's 2001 appointment brought Jefferson County into compliance with Alabama's general law. *See* Ala. Code § 11-3-6 (1989) ("In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed.").

   In accordance with the Alabama Supreme Court's decisions in *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), Exhibit A, and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), Exhibit B, on November 21, 2007, Governor Riley continued to ensure that vacancies on the Jefferson County Commission were filled in compliance with State law when he appointed Commissioner Bowman to fill the vacancy created by Larry Langford's resignation.

   The Alabama Constitution provides that "[t]he supreme court shall be the highest court of the state and shall consist of one chief justice and such number of associate justices as may be prescribed by law." Ala. Const. Art. VI, § 140. The Alabama Supreme Court had appellate jurisdiction in *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), pursuant to Ala. Code § 12-2-7 (2006).

Chief, Voting Section
March 18, 2008
Page 11

"(i) The date of adoption of the change affecting voting."

On September 30, 1988, the Alabama Supreme Court decided *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988). *See* Exhibit A.

On March 29, 2001, in accordance with *Stokes v. Noonan*, Governor Siegelman appointed The Reverend Steve Small, Jr., to fill a vacancy on the Jefferson County Commission. *See* Exhibit P. The undersigned is not aware of any earlier appointment to that Commission that occurred following Act No. 77-784.

On November 9, 2005, the Alabama Supreme Court decided *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005). *See* Exhibit B.

On November 21, 2007, Governor Riley appointed Commissioner Bowman to fill a vacancy on the Jefferson County Commission. *See* Exhibit Q. Governor Riley's appointment was, of course, not a change under any theory as Governor Siegelman had filled the last vacancy on the Jefferson County Commission by appointment.

"(j) The date on which the change is to take effect."

The change has already taken effect.

"(k) A statement that the change has not yet been enforced or administered, or an explanation of why such a statement cannot be made."

The change has been enforced. The reasons therefor are apparent on the face of this submission.

"(l) Where the change will affect less than the entire jurisdiction, an explanation of the scope of the change."

The submitted change affects Jefferson County, Alabama.

"(m) A statement of the reasons for the change."

As already discussed, Governor Siegelman and Governor Riley acted in accordance with the decisions of Alabama's highest court, namely the decisions in *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), Exhibit A, and *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), Exhibit B. Those decisions were rendered in the normal course of the judicial business of the Alabama Supreme Court, which is the "ultimate expositor[]" of Alabama law. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). *See also Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

Chief, Voting Section
March 18, 2008
Page 12

"(n) A statement of the anticipated effect of the change on members of racial or language minority groups."

<u>Returning to the general law; limited temporal impact</u>

As previously discussed, the general law in Alabama requires gubernatorial appointments to fill vacancies on county commissions. Act No. 77-784 purported to authorize Jefferson County to deviate from this general law, *see* Exhibit M, and for a time the County did, *see* (c), *supra*.

Since at least Governor Siegelman's 2001 appointment, the practice in Jefferson County has conformed to Alabama's general law. Only a handful of Alabama's 67 counties have local laws similar to the one in Jefferson County.

Pursuant to the general law, Governor Riley has made approximately 30 appointments to fill vacancies county commissions since he took office in January 2003. Indeed, Governor Riley made an appointment to the Pike County Commission, pursuant to the general law, the day the appellees filed their brief in *Riley v. Kennedy*, Case No. 07-77 (United States Supreme Court, pending). *See* Exhibit R ("Governor Riley Appoints Adam Drinkwater to Pike County Commission"). Alabama has approximately 350 county commissioners.

Pursuant to the general law, an appointed commissioner serves for the remainder of the unexpired term and then must stand for election to continue in office. Ala. Code § 11-3-6 (Supp. 2004).[4] A commissioner's term of office is four years.

---

[4]     Act No. 2007-488 further amended the general law. One of the changes made by Act No. 2007-488 was to alter, in many instances, the length of time an appointee would serve. This portion of Act No. 2007-488 has not yet been submitted for preclearance, and Governor Riley is not seeking to enforce that change. *See* Exhibit Q at 1 ¶ 1 ("You will be filling the unexpired term of former Commissioner Larry Langford."). Accordingly, it is not relevant to the present submission.

It should be noted that plaintiffs in the State court litigation have sought to enforce the change in how long an appointee serves. Governor Riley has argued that plaintiffs are not entitled to the relief they seek, *see* Exhibit N at 16-17, and the State agrees. Governor Riley's argument is incorporated herein by reference.

Additionally, on the issue of Act No. 2007-488, some have argued in State court, and will likely argue to USDOJ, that Act No. 2007-488 somehow revived Jefferson County's unconstitutional local law. Governor Riley has taken the position that Act No. 2007-488 did not revive Jefferson County's unconstitutional local law, *see* Exhibit N at 10-13, and the State agrees. Governor Riley's argument is incorporated herein by reference.

Chief, Voting Section
March 18, 2008
Page 13

### *Jefferson County Demographics*

The change herein submitted affects Jefferson County. U.S. Census Bureau statistics for Jefferson County and for the State of Alabama as a whole are attached hereto as Exhibit S. According to the U.S. Census Bureau, in 2006, Jefferson County's population was 56.4% White and 41.3% African American.

### *Jefferson County Commission*

The Jefferson County Commission consists of five districts, with a Commissioner elected from each district. The two gubernatorial appointments of which this Office is aware are Governor Siegelman's appointment of The Reverend Steve Small, Jr. to the District 2 seat and Governor Riley's appointment of General George F. Bowman to the District 1 seat. District 1 and District 2, which are located in inner-city Birmingham, are majority African-American and majority Democrat.

The Reverend Small and General Bowman are both African-American. The Reverend Small was appointed by a Democratic Governor. It has been reported that General Bowman does not belong to a political party. *See* Exhibit T (*Press-Register*, "Gov. Riley defends fundamental principle"). Governor Riley is a Republican.

When he stood for election, The Reverend Small was defeated in the Democratic primary by Sheila Smoot. Commissioner Smoot continues to serve District 2. Commissioner Smoot, like her appointed predecessor, is African-American.

Purporting to act pursuant to the authority of Act No. 77-784, the Jefferson County Election Commission scheduled[5] a special election to fill the vacancy created when Larry Langford became Mayor of Birmingham.[6] *See* Exhibit U (Resolution). That election was held on February 5, 2008, and Commissioner Bowman was a candidate. Due to State court litigation, the results of the February 5 special election have not been canvassed, *see* Exhibit V (Order of the Supreme Court of Alabama on Emergency Motion for Injunction Pending Appeal); however, the unofficial results indicate that William Bell is the choice of the voters in District 1, *see* Exhibit W (*The Birmingham News*, "Birmingham Councilman Bell wins JeffCo Commission Seat").

Each of the candidates in the special election is an African-American male. *See* Exhibit X (*The Birmingham News*, "Kamau Afrika: Activist wants to restore public trust in county government"; *The Birmingham News*, "William Bell: Touts his experience in

---

[5]     The Jefferson County Election Commission electronically submitted the election date for preclearance on November 27, 2007; the Submission ID is 495. USDOJ granted preclearance on January 17, 2008; the file no. is 2007-5846.

[6]     Larry Langford is African-American. Birmingham is Alabama's largest city.

Chief, Voting Section
March 18, 2008
Page 14

seeking JeffCo commission seat"; *The Birmingham News*, "George Bowman: Plan redirects sales tax to sewer debt"; *The Birmingham News*, "Orville Ifill: Cites Knowledge of how system works"; *The Birmingham News*, "Eric Major: Believes past association with officials would help county"; *The Birmingham News*, "Fred Plump: Wants better schools, improved public transportation").

   *"(o) A statement identifying any past or pending litigation concerning the change or related voting practices."*

1.  Governor Siegelman's 2001 appointment and Governor Riley's 2007 appointment are consistent with Alabama State law as interpreted by the State's highest Court, the "ultimate expositor[]" of Alabama law. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). *See Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), attached hereto as Exhibit A; *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005), attached hereto as Exhibit B.

2.  The undersigned is not aware of any litigation concerning Governor Siegelman's 2001 appointment to fill a vacancy on the Jefferson County Commission.

3.  As previously noted, in *Plump v. Riley*, Case No. 2:07-cv-1014 (M.D. Ala., pending) (3-judge court), the plaintiff challenges Governor Riley's authority to appoint Commissioner Bowman absent preclearance. The three-judge federal court agreed with the plaintiff that preclearance was required, and this submission follows. *See* Exhibit C (Memorandum Opinion, doc. 28; Judgment, doc. 29); Exhibit D (Order, doc. 32; Amended Judgment, doc. 33). ***Governor Riley's appointment will be vacated on or about April 21, 2008, if preclearance has not been obtained by that time; accordingly, expedited consideration and preclearance is requested.***

4.  As previously noted, there is also State court litigation concerning the 2007 Jefferson County appointment. In *Working v. Jefferson County Election Commission*, Case No. CV-2008-900316.00 (Jefferson County Circuit Court, 2008), plaintiffs challenged, *inter alia*, the defendants' authority to hold a special election in pursuant to Act No. 77-784 to fill the vacancy on the Jefferson County Commission, and the timing of any such election.[7] The parties and issues have multiplied since the initial complaint was filed; three candidates in the February 2008 election are now parties (Commissioner Bowman, the subject of a *quo*

---

[7]     The Jefferson County Election Commission had issued a Resolution calling for a special election to be held on February 5, 2008, *see* Exhibit U, and ballots were cast on that day. The unofficial results indicate that William Bell received more votes than General Bowman, plaintiff Plump, and the other candidates. *See* Exhibit W; *see also* Exhibit X.

Chief, Voting Section
March 18, 2008
Page 15

*warranto* action; William Bell and Fred Plump).    Additionally, Governor Riley intervened.

On February 14, 2008, the Alabama Supreme Court granted an emergency motion for an injunction preventing the election results from being canvassed.    *In re: Working v. Jefferson County Election Commission*, Case No. _____ (Ala. S.Ct. February 14, 2008).    *See* Exhibit V. [8]    The Court remanded the case to the Circuit Court for a decision on the merits, but said its injunction would remain in place pending further order of the Supreme Court. *Id.*

The litigation proceeded on an expedited schedule in the Circuit Court.    Trial briefs were filed and oral argument was held last week.    *See* Exhibit N (Governor Bob Riley's Memorandum of Law).    *Earlier today*, the Circuit Court ruled that the plaintiffs lacked standing to bring this action.    *See* Exhibit Y at 5-9.    At the direction of the Alabama Supreme Court, the Circuit Court, nevertheless, reached the issue on the merits, and held that Act No. 77-784 is constitutional, *see id.* at 9-13.    The Circuit Court further held that the vacancy created by Larry Langford's resignation is due to be filled pursuant to the February 5, 2008 special election, *see id.* at 14-15.    Accordingly, the Circuit Court has rejected Governor Riley's position.    The Circuit Court stayed its order (which is non-final) pending review in the Alabama Supreme Court.    The Supreme Court's injunction remains in place. *See* Exhibit V; Exhibit Y at 16.

5. As discussed above, *Kennedy v. Riley*, 2:05-cv-1100 (M.D. Ala.) (3-judge court), on appeal as *Riley v. Kennedy*, No. 07-77 (United States Supreme Court), is the Mobile County litigation.    The United States, through the Solicitor General, has appeared as an amicus in the appeal, and so familiarity with these proceedings is presumed.    A preclearance submission was filed as a result of the *Kennedy* litigation, and familiarity with that file is likewise presumed, *see* USDOJ File No. 2006-6792.

*"(p) A statement that the prior practice has been precleared (with the date) or is not subject to the preclearance requirement and a statement that the procedure for the adoption of the change has been precleared (with the date) or is not subject to the preclearance requirement, or an explanation of why such statements cannot be made."*

Act No. 77-784, the local law that purported to authorize special elections, was precleared on August 11, 1977.

---

[8]    Plaintiff filed a petition for mandamus in the Alabama Supreme Court and that petition has not been ruled upon, though it is likely moot in light of the injunction.    *Ex parte Patricia Working and Rick Erdemir*, Case No. 1070650 (Ala. S.Ct.).

Chief, Voting Section
March 18, 2008
Page 16

*"(q) For redistrictings and annexations: the items listed under § 51.28 (a)(1) and (b)(1); for annexations only: the items listed under § 51.28(c)(3)."*

      Not applicable.

*"(r) Other information that the Attorney General determines is required for an evaluation of the purpose or effect of the change. Such information may include items listed in § 51.28 and is most likely to be needed with respect to redistrictings, annexations, and other complex changes. In the interest of time such information should be furnished with the initial submission relating to voting changes of this type. When such information is required, but not provided, the Attorney General shall notify the submitting authority in the manner provided in § 51.37."*

      The Jefferson County Commission website lists varying degrees of information about each Commissioner and includes contact information for each Commissioner. That information is collected as Exhibit Z.

      The information on Commissioner Bowman, who will be ousted from office if preclearance is not obtained by April 21, 2008, begins on page 8 of Exhibit Z. Commissioner Bowman's phone number is (205) 325-5504. His email address is bowmang@jccal.org. Commissioner Bowman has very recently been added to the *Working* litigation as a third-party defendant; he is representing himself.

      Ed Still is counsel in the *Kennedy* litigation, the *Plump* litigation, and the *Working* litigation. During the *Kennedy* preclearance proceedings, Mr. Still provided USDOJ with a written comment on behalf of his clients urging USDOJ to interpose an objection. Mr. Still, and/or his co-counsel in the Jefferson County litigation, James Blacksher, may contact USDOJ about this submission as well. USDOJ may also wish to contact Mr. Still or Mr. Blacksher to obtain to obtain consent to speak to Coach Plump, their client in the *Plump* and *Working* cases. Coach Plump, of course, was a candidate in the February 5 special election. *See* Exhibit X at 12-13.

Ed Still
Suite 201, 2112 11th Avenue South
Birmingham, Alabama 35205
(205) 320-2882
still@votelaw.com

James U. Blacksher
Post Office Box 636
Birmingham, Alabama 35201-0636
(205) 591-7238
jblacksher@ns.sympatico.ca

Chief, Voting Section
March 18, 2008
Page 17

William Bell, who received the most votes on February 5, is a defendant in the *Working* litigation. His counsel are:

Michael K. K. Choy
Margaret Mary Fullmer
HASKELL SLAUGHTER YOUNG & REDIKER, LLC
2001 Park Place North
1400 Park Place Tower
Birmingham, Alabama 35203
mkc@hsy.com        (Choy)
mmf@hsy.com        (Fullmer)

Please direct all correspondence, including the determination letter, to the undersigned Assistant Attorney General.

Sincerely,

TROY KING
Attorney General
By:

Misty S. Fairbanks
Assistant Attorney General


TK:msf
Enclosures

cc. *via* email:   Hon. Kenneth D. Wallis II
                   Chief Legal Advisor
                   Office of the Governor

                   Hon. Jeffrey M. Sewell
                   Jefferson County Attorney's Office

                   Hon. George F. Bowman
                   Commissioner of Health and Human Services
                   Jefferson County Commission



534 So.2d 237
534 So.2d 237
(Cite as: 534 So.2d 237)

Page 1

▷
Stokes v. Noonan
Ala.,1988.

Supreme Court of Alabama.
Willie H. STOKES
v.
Lionel W. "Red" NOONAN, in his capacity as
Judge of the Probate Court of Mobile County, et al.
**86-1082.**

Sept. 30, 1988.

Registered voter of Mobile County brought action contesting constitutionality of local act, which provided for filling of vacancies on Mobile County Commission by special election. The Circuit Court, Mobile County, Edward B. McDermott, J., entered judgment against voter, and voter appealed. The Supreme Court, Beatty, J., held that local act is unconstitutional under state constitutional provision, which states that no local law shall be enacted in any case which is provided by a general law.

Reversed and judgment rendered.

Maddox, J., concurred specially and filed opinion.

Almon, J., concurred in result.

Steagall, J., dissented and filed opinion in which Adams, J., concurred.

West Headnotes

**Counties 104 ☞41**

104 Counties
   104II Government
      104II(C) County Board
         104k41 k. Appointment or Election. Most Cited Cases
Local act, which provides for filling of vacancies on Mobile County Commission by special election where at least 12 months remain on any commis-

sioner's unexpired term is unconstitutional under state constitutional provision, which states that no local law shall be enacted in any case which is provided by a general law; general law provides for filling of vacancies by appointment by Governor. Acts 1985, No. 85-237, § 1 et seq.; Code 1975, § 11-3-6; Const. § 105.

**\*237** W. Gary Hooks, Jr., Mobile, for appellant.
James C. Wood of Simon, Wood and Crane, Mobile, for appellee Lionel W. Noonan.
Michael A. Figures and J. Malcolm Jackson III of Figures, Ludgood & Figures, Mobile, for appellees Leophus Lyde, James Buskey, Frank Seals and Michael A. Figures.
BEATTY, Justice.
The plaintiff, Willie H. Stokes, appeals from a judgment in favor of defendant Lionel W. "Red" Noonan, et al., holding that Act No. 85-237, Acts of Alabama 1985, is valid and constitutional.

Stokes, as a registered voter, taxpayer, and real property owner of Mobile County, filed suit in April 1987 contesting the constitutionality**\*238** of Act No. 85-237, which provides for the filling of vacancies on the Mobile County Commission by a special election when at least 12 months remain on any commissioner's unexpired term:
"Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat has become vacant. Such election shall be held in the manner prescribed by law and the person elected to fill such vacancy shall serve for the remainder of the unexpired term."

Stokes contends that the subject of local Act No. 85-237 is subsumed by a general law, § 11-3-6, Code of 1975, and therefore, under Art. IV, § 105, Constitution 1901, and this Court's decision in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
A
PENGAD 800-631-6989

*Peddycoart v. City of Birmingham,* 354 So.2d 808 (Ala.1978), is unconstitutional.

Section 105, in pertinent part, states: "No special, private, or local law ... shall be enacted in any case which is provided by a general law." Section 11-3-6, Code of 1975, is contained in the chapter pertaining to county commissions and refers to vacancies:

"In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed."

Stokes also contends that Act No. 85-237 violates Art. IV, § 104(29), Constitution of 1901, which states, in pertinent part:"The legislature shall not pass a special, private, or local law in any of the following cases:

"....

"(29) Providing for the conduct of elections or designating places of voting, or changing the boundaries of wards, precincts, or districts, except in the event of organization of new counties, or the changing of the lines of old counties...."

We need not address the plaintiff's attacks under § 104(29) because we are convinced that Act No. 85-237 clearly offends § 105 of the Constitution of 1901.

In *Peddycoart v. City of Birmingham,* 354 So.2d 808 (Ala.1978), this Court explained at length the difference between a local law and a general law, and, applying the literal language of the Constitution of 1901, held that the presence of a general law upon a given subject was *primary,* meaning "that a local law cannot be passed upon that subject." This Court added at 813:

"By constitutional definition a general law is one which applies to the whole state and to each county in the state with the same force as though it had been a valid local law from inception. Its passage is none the less based upon local considerations simply because it has a statewide application, and already having that effect, the constitutional

framers have prohibited the enactment of a local act when the subject is already subsumed by the general statute."

Section 11-3-6 is a statewide statute governing the general subject of filling vacancies on county commissions. Its language is substantially the same as its complementary section that appeared in Ala.Code 1940 as Title 12, § 6. See also Ala.Code 1940, Title 12, § 6 (Recomp.1958).

Act No. 85-237 was approved April 8, 1985. By its terms, it is made applicable only to Mobile County. Hence, when it became law it applied to a political subdivision of the state less than the whole, and thus, it was a local law on the same subject as the previously enacted general law, § 11-3-6; see Constitution of 1901, § 110; *Peddycoart,* 354 So.2d at 814; and, accordingly, it is unconstitutional under § 105. We cannot, therefore, agree with the defendant that the Mobile County Commission, because of statutory history, has always been, and therefore is still, governed by local law. To approve such a proposition here would run directly counter to the language of our constitution. Surely, it cannot be held that the legislature is proscribed from enacting general laws on subjects**239** already covered by local laws, even if by application such local laws are repealed, when the intent of the legislature is clear and it is in this case. See *Buskey v. Mobile County Board of Registrars,* 501 So.2d 447 (Ala.1986).

In *Baldwin County v. Jenkins,* 494 So.2d 584 (Ala.1986), a similar question dealing with the constitutionality of a local act was resolved. In that case, this Court was confronted with two statutes dealing with the election and terms of the office of county commissioners. This Court held that the general statute, Code of 1975, § 11-3-1, as amended, having contained the language, "unless otherwise provided by local law," manifested a legislative intent that the subject it dealt with not be subsumed within it:

"A situation completely opposite and contrary to the one presented here was contemplated and prohibited by the constitutional framers, which is to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

534 So.2d 237
534 So.2d 237
**(Cite as: 534 So.2d 237)**

say that the legislature, by enacting a general law *containing no such provision or exception for contrary local laws,* thereby intended that general law to be *primary* and the subject subsumed entirely by the general law. In that situation, § 105 does operate to prohibit the enactment of contrary local laws. Such is not the case with respect to § 11-3-1 and Act No. 84-639. Because the language of the statute provides for the existence of and prevailing effect of contrary local laws, it must be that the legislature did not intend the subject to be 'subsumed' exclusively within § 11-3-1. That being the case, the co-existence of the general law (§ 11-3-1) and the *contrary* local law (Act No. 84-639) deferred to in the general law, cannot be said to be repugnant to § 105 because 'the constitutional framers have [only] prohibited the enactment of a local act when the subject [as intended by the legislature] is already subsumed by the general statute.' *Peddycoart,* [354 So.2d at 813]."

494 So.2d at 587. (Emphasis in *Jenkins.*)

No such intent is demonstrated by the language of § 11-3-6 regarding filling of vacancies, and that language must be given effect according to its terms. Thus, it is our duty to declare Act No. 85-237 unconstitutional as violating § 105. It follows that the judgment appealed from must be, and it is hereby, reversed, and a judgment rendered declaring that Act unconstitutional.

REVERSED AND JUDGMENT RENDERED.

TORBERT, C.J., and JONES, SHORES and HOUSTON, JJ., concur.
MADDOX, J., concurs specially.
ALMON, J., concurs in the result.
ADAMS and STEAGALL, JJ., dissent.MADDOX, Justice (concurring specially).
I concur completely with the opinion holding that Act No. 86-237 is unconstitutional under § 105, under this Court's decision in *Peddycoart,* cited in the majority opinion.

I do not believe it is necessary to distinguish *Bald-*

*win County v. Jenkins,* 494 So.2d 584 (Ala.1986), which I thought was incorrectly decided, for the reasons I expressed in a dissent in that case; therefore, I concur specially.

STEAGALL, Justice (dissenting).
I respectfully dissent as to the majority opinion's reversal of the trial court's decision that Act No. 85-237 is valid and constitutional.

The Mobile County Commission was created on August 7, 1957, when the Alabama Legislature passed Act No. 181, Acts of Alabama 1957, a local act. The Act created the Mobile County Commission out of the existing board of revenue and road commissioners and provided for the election of its members, those members' terms of office, qualifications for that office, and various other requirements dealing with that body, including the filling of vacancies when they occurred. That Act states specifically:
"Vacancies on the commission shall be filled by appointment by the Governor, but the office of president of the commission*240 shall be filled by the members thereof. Any person appointed to fill a vacancy shall serve the unexpired term, and until his successor is elected and qualified."

Act No. 181, § 2(b), Acts of Alabama 1957, at 234.

The local act being question here, Act No. 85-237, Acts of Alabama 1985, states, in regard to vacancies on the Mobile County Commission:
"Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat has become vacant. Such election shall be held in the manner prescribed by law and the person elected to fill such vacancy shall serve for the remainder of the unexpired term."

Act No. 85-237, Acts of Alabama 1985, at 137.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

534 So.2d 237
534 So.2d 237
**(Cite as: 534 So.2d 237)**

Page 4

This Court has on several occasions upheld trial courts' rulings that a local act amending a local act is not unconstitutional. In *Freeman v. Purvis,* 400 So.2d 389 (Ala.1981), the Court upheld a trial court ruling which found that:

"Act 80-797 passed in the 1980 regular session of the Legislature of Alabama, is a Local Act which amends a local act and is not unconstitutional."

400 So.2d at 390. The Court then stated:"Accordingly, the trial court was correct when it held that Act No. 797 was a local law which amended Act No. 710, a pre-existing local law."

400 So.2d at 392.

Local Act 85-237 is amendatory in nature, affecting the already-existing local legislation, which created the Mobile County Commission and provided for the filling of vacancies.

In *Peddycoart v. City of Birmingham,* 354 So.2d 808 (Ala.1978), we stated, regarding legislation passed before and after that decision:

"Henceforth when at its enactment legislation is local in its application it will be a local act and subject to all of the constitutional qualifications applicable to it. With regard to legislation heretofore enacted, the validity of which is challenged, this Court will apply the rules which it has heretofore applied in similar cases."

354 So.2d at 814.

The effect of this passage was to say that the new standard established in *Peddycoart* as to the constitutionality of local legislation would be applied only prospectively. *Ex parte Bracewell,* 407 So.2d 845 (Ala.1979), *reversed on other grounds,* 457 U.S. 1114, 102 S.Ct. 2920, 73 L.Ed.2d 1325 (1982). Where, as here, we are looking at legislation enacted prior to *Peddycoart* but amended afterwards, this Court is required to apply the law as it stood before *Peddycoart.* That law can be found in the case of *Johnson v. State ex rel. City of Birming-*

*ham,* 245 Ala. 499, 17 So.2d 662 (1944):

"Sec. 105 of the Constitution is not construed to inhibit local legislation on a subject not prohibited by the Constitution, merely because the local law is different, and works a partial repeal of a general law."

245 Ala. at 503, 17 So.2d at 664, citing *Talley v. Webster,* 225 Ala. 384, 143 So. 555 (1932). This Court, in *Talley v. Webster,* in determining whether a statute violated Section 105 of the Constitution, stated:"We need not review the numerous cases construing this section. Suffice it to say it does not inhibit the passage of local laws on subjects, not prohibited by Section 104, merely because such local law is different, and works a partial repeal of the general law of the state in the territory af- fected."

225 Ala. at 385, 143 So. at 555.

In the case of *Norris v. Seibels,* 353 So.2d 1165 (Ala.1977), this Court reversed a judgment of the Alabama Court of Civil Appeals and held that a showing of specific legislative intent was necessary to effect any such repeal:

*241 "This general statute cannot be repealed by implication found in the local statute unless the legislative intent to effect such a repeal is clearly manifested."

353 So.2d at 1167. This Court held that the language used in the questioned local statute contained no express repeal of the general statute. However, such is not the case here. Section 3 of Act 85-237, Acts of Alabama 1985, demonstrates a specific legislative intent by expressly repealing "[a]ll laws or parts of laws which are in conflict with this act."

Because I believe that Act 85-237, a local act, is amendatory in nature and therefore that the law to be applied is that existing prior to our decision in *Peddycoart,* supra, I believe the trial court's judgment should be affirmed.

ADAMS, J., concurs.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

534 So.2d 237
534 So.2d 237
**(Cite as: 534 So.2d 237)**

Ala.,1988.
Stokes v. Noonan
534 So.2d 237

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

928 So.2d 1013
928 So.2d 1013
**(Cite as: 928 So.2d 1013)**

Page 1

▷
Riley v. Kennedy
Ala.,2005.

Supreme Court of Alabama.
Bob RILEY, as Governor of Alabama
v.
Yvonne KENNEDY et al.
**1050087.**

Nov. 9, 2005.
Rehearing Denied Nov. 15, 2005.

**Background:** Voters brought action for a declaratory judgment that special election, rather than gubernatorial appointment, was required to fill vacancy on the Mobile County Commission. The Circuit Court, Montgomery County, No. CV-05-2432,Eugene W. Reese, J., required a special election. Governor appealed.

**Holding:** The Supreme Court, Stuart, J., held that statute which required governor to fill vacancy on county commission, unless local law authorized special election, applied prospectively, not retroactively, and, therefore, did not revive unconstitutional local act requiring vacancy to be filled by special election.

Reversed and remanded.

Woodall, J., concurred in the result.

West Headnotes

**[1] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
            30k893 Cases Triable in Appellate Court
               30k893(1) k. In General. Most

Cited Cases
Supreme Court reviews de novo a trial court's interpretation of a statute, because only a question of law is presented.

**[2] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
            30k893 Cases Triable in Appellate Court
               30k893(1) k. In General. Most
Cited Cases
Where the facts of a case are essentially undisputed, the Supreme Court must determine whether the trial court misapplied the law to the undisputed facts, applying a de novo standard of review.

**[3] Counties 104 ☞39**

104 Counties
   104II Government
      104II(C) County Board
         104k39 k. Constitutional and Statutory
Provisions. Most Cited Cases
Statute that required governor to fill vacancy on county commission, unless local law authorized special election, applied prospectively, not retroactively, and therefore did not revive unconstitutional local act requiring vacancy in Mobile County Commission to be filled by special election; plain language provided for prospective application, and preamble stated intent to authorize legislature by local law to provide for the manner of filling vacancies in the office of the county commission. Const. Art. 4, § 105; Code 1975, § 11-3-6; Acts 1985, No. 85-237, § 1; Acts 2004, No. 04-455, § 1.

**\*1014** Troy King, atty. gen., Kevin C. Newsom, deputy atty. gen., and John J. Park, Jr., and Charles B. Campbell, asst. attys. gen., for appellant.
J. Cecil Gardner of Gardner, Middlebrooks, Gib-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
B
PENGAD 800-631-6989

928 So.2d 1013
928 So.2d 1013
(Cite as: 928 So.2d 1013)

bons, Kittrell, Olsen, Walker & Hill, P.C., Mobile; and James H. Anderson of Beers, Anderson, Jackson, Patty & Van Heest, P.C., Montgomery, for appellees.

STUART, Justice.

Bob Riley, in his official capacity as Governor of Alabama, appeals a judgment of the Montgomery Circuit Court holding that a vacancy on the Mobile County Commission should be filled by a special election. We reverse and remand.

*Facts*

In an election held on September 13, 2005, Sam Jones, the county commissioner for district 1, Mobile County Commission, was elected to the office of mayor of the City of Mobile. On September 19, 2005, Yvonne Kennedy, James Buskey, and William Clark, registered voters in Mobile County and residents of district 1 (hereinafter referred to collectively as "Kennedy"), filed a pleading in the Montgomery Circuit Court containing the following: a complaint seeking a declaration as to whether Alabama law requires the vacancy in the district 1 seat on the County Commission to be filled by a special election; a petition for a writ of mandamus directing Don Davis, probate judge of Mobile County to conduct such a special election to fill the district 1 seat; and a request for an injunction prohibiting Governor Riley and the other defendants FN1 from acting to the contrary.

> FN1. In addition to naming Governor Riley as a defendant, the complaint also named Don Davis, in his official capacity as probate judge of Mobile County; the Mobile County Commission; and Stephen Nodine and Mike Dean, in their official capacities as members of the Mobile County Commission. Governor Riley is the only defendant who appealed.

*1015 According to the complaint, Governor Riley, through his legal advisers, had made public statements indicating that he would fill by appointment the vacancy created when Jones resigned his seat on the County Commission to assume the office of mayor. Kennedy averred that Governor Riley could not make such an appointment, because, she argued, Act No. 85-237, Ala. Acts 1985, requires that "a special election be held to fill the vacancy, and, if a special election is not held, [Kennedy] and other similarly situated registered voters of the County of Mobile will be disenfranchised and denied the opportunity to vote for a candidate of their choice to fill the vacancy mentioned."

Governor Riley answered the complaint, asserting that he is authorized by general law to fill the vacancy and that Act No. 85-237, Ala. Acts 1985, relied on by Kennedy, was declared unconstitutional by this Court in *Stokes v. Noonan,* 534 So.2d 237 (Ala.1988). Act No. 85-237, he argues, is therefore void, and it was not revived, as Kennedy argues, by the legislature's subsequent enactment of Act No. 2004-455, Ala. Acts 2004, amending § 11-3-6, Ala.Code 1975.

On September 29, 2005, after hearing argument by counsel, the Montgomery Circuit Court, apparently giving a field of operation to Act No. 85-237, Ala. Acts 1985, held that the vacancy on the Mobile County Commission must be filled by a special election rather than by appointment by the Governor. On October 3, 2005, Sam Jones, the commissioner for district 1, resigned to assume the office of mayor of the City of Mobile. On October 11, 2005, Governor Riley appealed.

*Standard of Review*

[1][2] " 'This court reviews de novo a trial court's interpretation of a statute, because only a question of law is presented.' *Scott Bridge Co. v. Wright,* 883 So.2d 1221, 1223 (Ala.2003). Where, as here, the facts of a case are essentially undisputed, this Court must determine whether the trial court misapplied the law to the undisputed facts, applying a de novo standard of review. *Carter v. City of Haleyville,* 669 So.2d 812, 815 (Ala.1995)."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

928 So.2d 1013
928 So.2d 1013
**(Cite as: 928 So.2d 1013)**

*Continental Nat'l Indem. Co. v. Fields,* 926 So.2d 1033, 1034-35 (Ala.2005).

## Discussion

[3] Governor Riley contends that Act No. 2004-455, Ala. Acts 2004, amending § 11-3-6, Ala.Code 1975, did not revive Act No. 85-237, Ala. Acts 1985, which this Court had held unconstitutional, see *Stokes v. Noonan,* and that, therefore, the trial court erred in declaring that the vacancy on the Mobile County Commission created by Jones's resignation should be filled by a special election.FN2

> FN2. We review this issue only as presented by these facts and by the parties' arguments regarding these facts; we do not address any other possible impediments that may exist to the constitutionality or enforceability of Act No. 85-237.

In *Stokes,* this Court addressed the constitutionality of Act No. 85-237, which provided that vacancies on the Mobile County Commission would be filled by a special election when at least 12 months remained on the unexpired term of any commissioner. The registered voter challenging Act No. 85-237 in *Stokes* argued that Act No. 85-237, a local act, was subsumed by a general law, § 11-3-6, Ala.Code 1975, and, consequently, was unconstitutional under Art. IV, § 105, Alabama Constitution 1901.

Act No. 85-237 provided:
**\*1016** " 'Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat has become vacant. Such election shall be held in the manner prescribed by law and the person elected to fill such vacancy shall serve for the remainder of the unexpired term.' "

534 So.2d at 238. We held that Act No. 85-237, applicable only to Mobile County, constituted a local law on the same subject as the previously enacted general law. We then considered § 11-3-6, Ala.Code 1975, which appears in Chapter 3, Title 11, of the Alabama Code pertaining to county commissions. It provided at the time we decided *Stokes:* " 'In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed.' " 534 So.2d at 238. We recognized that § 11-3-6 is clearly a general law, a statewide statute addressing the filling of vacancies on county commissions throughout the State, and that the legislature did not in the language of § 11-3-6, Ala.Code 1975, manifest an intent to except the local law from the general law. Therefore, we held that Act No. 85-237 was contrary to § 11-3-6, Ala.Code 1975, and, consequently, that it violated Art. IV, § 105, Alabama Constitution 1901, which provides, in pertinent part: "No special, private, or local law ... shall be enacted in any case which is provided for by a general law." We reasoned that because the legislature did not in § 11-3-6, Ala.Code 1975, manifest an intent to except the local law from the general law, the contrary local law, in that case Act No. 85-237, must defer to the general law, § 11-3-6, Ala.Code 1975, and, consequently, we held, Act No. 85-237 violated Art. IV, § 105, Alabama Constitution 1901.

On May 14, 2004, Governor Riley approved Act No. 2004-455 and it became effective. Act No. 2004-455 amends § 11-3-6, Ala.Code 1975, to read as follows: "Unless a local law authorizes a special election, in case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he or she is appointed."

Kennedy argues that Act No. 2004-455, which amended § 11-3-6, Ala.Code 1975, manifests an intent by the legislature to cure the impediment to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enforceability this Court found as to Act No. 85-237 and to now give effect to that Act and that, consequently, a special election is the proper procedure by which to fill the vacancy created on the Mobile County Commission by Jones's resignation. We cannot agree with that conclusion because the language of Act No. 2004-455 does not clearly so indicate.

This Court has consistently held that
" 'statutes are to be prospective only, unless clearly indicated by the legislature. Retrospective legislation is not favored by the courts, and statutes will not be construed as retrospective unless the language used in the enactment of the statute is so clear that there is no other possible construction. *Sutherland Stat. Const.,* § 41.04 (4th ed 1984).'
"*Dennis v. Pendley,* 518 So.2d 688, 690 (Ala.1987)."

*Gotcher v. Teague,* 583 So.2d 267, 268 (Ala.1991). Moreover, although curative statutes are "of necessity" retroactive, **\*1017***Horton v. Carter,* 253 Ala. 325, 328, 45 So.2d 10, 12 (1950), even they are subject to the same rule of statutory construction, i.e., they will not be construed as retroactive unless the intent of the legislature that the statute have such retroactive effect is clearly expressed. The act under consideration in *Horton* expressly provided: "This Act shall be deemed retroactive in its effect upon its passage and approval by the Governor or upon its otherwise becoming a law." 253 Ala. at 328, 45 So.2d at 12. On numerous other occasions the legislature has demonstrated its ability to provide expressly for retroactive effect when enacting curative legislation. See, *e.g.,*§ 34-8-28(h), Ala.Code 1975 ("The provisions of this amendatory section are remedial and curative and shall be retroactive to January 1, 1998."); § 11-50-16(c), Ala.Code 1975 ("The provisions of this section shall be curative and retroactive ...."); § 11-43-80(d), Ala.Code 1975 ("The provisions of this section shall be curative and retroactive ...."); and Act No. 2001-891, § 5, Ala. Acts 2001 ("It is the intent of the Legislature that this act be con-

strued as retroactive and curative.").

Here, the plain language in Act No. 2004-455, amending § 11-3-6, Ala.Code 1975, provides for prospective application only, and that language must be given effect according to its terms. Nothing in the language in Act No. 2004-455 demonstrates an intent by the legislature that the amendment of § 11-3-6 apply retroactively. The argument that Act No. 2004-455 applies prospectively only is further supported by the preamble of the Act, which provides that the purpose of the Act is "[t]o amend Section 11-3-6 of the Code of Alabama 1975, relating to county commissions, *to authorize the Legislature by local law to provide for the manner of filling vacancies in the office of the county commission.*" (Emphasis added.) The language "to authorize the Legislature ... to provide" the means by which vacancies on the county commission are to be filled further indicates an intention by the legislature that the Act is to be prospectively applied. Therefore, we hold that Act No. 2004-455 applies prospectively only; consequently, Governor Riley is authorized to fill the vacancy on the Mobile County Commission by appointment.

### Conclusion

Based on the foregoing, we conclude that the trial court erred in holding that the vacancy on the Mobile County Commission should be filled by a special election. Its judgment so holding is, therefore, reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

NABERS, C.J., and SEE, LYONS, HARWOOD, SMITH, BOLIN, and PARKER, JJ., concur.
WOODALL, J., concurs in the result.
Ala.,2005.
Riley v. Kennedy
928 So.2d 1013

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FRED L. PLUMP,                          )
                                        )
    Plaintiff,                      )
                                        )
    v.                              )        CASE NO. 2:07cv1014-MEF
                                        )                 (WO)
HONORABLE BOB RILEY, as                 )
Governor of the State of                )
Alabama,                                )
                                        )
    Defendant.                      )

Before Rosemary Barkett, Circuit Judge, Mark E. Fuller, Chief District Judge, and W. Harold
Albritton, District Judge.

## MEMORANDUM OPINION

Per curiam:

### I. FACTS AND PROCEDURAL HISTORY

      This three-judge court has been convened to consider the claim of Fred L. Plump that,

under § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, the State of

Alabama was required, but failed, to preclear Defendant Governor Bob Riley's authority to

appoint a person to a vacancy on the Jefferson County Commission. The Plaintiff has asked the

court to enter a declaratory judgment that Defendant Governor Riley's authority to appoint a

person to fill a vacancy on the Jefferson County Commission must be precleared. The Plaintiff

has further asked the court to enjoin the appointment by the Defendant of General George F.

Bowman to the Jefferson County Commission, and to enjoin the Defendant from interfering with

the election to fill the vacancy in the District 1 seat on the Jefferson County Commission which



is scheduled for February 5, 2008. For the reasons to be discussed below, we find that the

Plaintiff is entitled to only declaratory relief.

This case is being decided against the backdrop of a similar case arising out of a different

county in Alabama. In *Kennedy v. Riley*, 2:05cv1100-MHT (M.D. Ala.) (three-judge court), a

separate three-judge court recently was asked to vacate the gubernatorial appointment of a person

to a vacancy on the Mobile County Commission. The three-judge court in that case granted the

plaintiffs' requested relief, finding that the appointment had been made pursuant to decisions by

the Alabama Supreme Court which constituted changes in procedure which had not been

precleared and, therefore, violated the Voting Rights Act. *See Kennedy v. Riley*, 445 F. Supp. 2d

1333 (M.D. Ala. 2006) (three-judge court).

The facts of the instant case are substantially similar to those of the *Kennedy* case. The

beginning point in both cases is an Alabama statute of general application which provides that a

vacancy in a county commission shall be filled by appointment by the Governor. *See Alabama

Code* § 11-3-6. Subsequent to the passage of that statute, local laws were passed by the Alabama

legislature and precleared by the U.S. Attorney General which provided that in certain

circumstances special elections would be held to fill vacancies on the county commissions in

both Mobile and Jefferson County. In Jefferson County, that Act was No. 77-784, while in

Mobile County, it was Act No. 85-237.

At the evidentiary hearing held in this case on January 15, 2008, the Plaintiff adequately

established that in 1982 two vacancies on the Jefferson County Commission were filled by

special election pursuant to the selection process outlined in Act No. 77-784. Similarly, an

2

election was held in 1987 pursuant to Act No. 85-237 to fill a vacancy on the Mobile County

Commission.

In *Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), the Alabama Supreme Court held that,

because Act No. 85-237, which applied in Mobile County, was a local statute and because it

conflicted with and was subsumed by another state law of general application, it violated the

Alabama Constitution. The State did not submit *Stokes* for preclearance.

In 2001, a vacancy on the Jefferson County Commission was filled by appointment by

then-Governor Siegelman rather than by special election, presumably because of *Stokes*.

In 2004, the Alabama Legislature passed Act No. 2004-455, amending Ala. Code § 11-3-

6 expressly to allow local laws to make exceptions to the general rule of filling vacancies by

gubernatorial appointments. The U.S. Attorney General precleared Act No. 2004-455.

In *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005), the Alabama Supreme Court rejected

claims that Act No. 2004-455 revived Act No. 85-237 and held that Act No. 2004-455 applied

only prospectively. Relying on *Riley* and *Stokes*, the Governor made an appointment to the

vacated position on the Mobile County Commission. As with *Stokes*, the State did not submit

*Riley* for preclearance.

A group of plaintiffs then filed a lawsuit in federal court claiming that the appointment by

the Governor pursuant to *Riley* and the earlier decision in *Stokes* could not be enforced without

first being precleared. The three-judge court agreed. *Kennedy*, 445 F. Supp. 2d at 1334.

In November 2006, the Governor submitted the *Stokes* and *Riley* decisions for

preclearance, but the U.S. Attorney General did not preclear the decisions. The three-judge court

case, *Kennedy,* was appealed to the U.S. Supreme Court and is currently pending on appeal.

3

On October 29, 2007, following the election of County Commissioner Larry Langford as Mayor of the City of Birmingham, the Jefferson County Election Commission ordered a special election to be held on February 5, 2008 to fill the vacancy which would exist on the Commission upon the assumption by Commissioner Langford of the office of Mayor.

On November 13, 2007, the vacancy was created when Commissioner Langford assumed the office of Mayor. On November 16, 2007, the Plaintiff, who has qualified to run for the vacant office in the February 5, 2008 special election, filed the instant case. On November 21, 2007, Governor Riley appointed General Bowman to fill the vacancy on the Jefferson County Commission.

## II. DISCUSSION

### A. Plaintiff's Request for Declaratory Judgment

The Plaintiff urges this court to conclude, based largely on *Kennedy*, that Defendant Governor Riley's power to appoint persons to fill vacancies on the Jefferson County Commission is a change in procedure which has not been precleared.

Section 5 of the Voting Rights Act provides that a covered jurisdiction, such as Alabama, "may not implement any change in a voting 'qualification, prerequisite, standard, practice, or procedure' unless it first obtains either administrative preclearance of that change from the Attorney General or judicial preclearance from the District Court for the District of Columbia." *Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 478 (1997) (quoting 42 U.S.C. § 1973c).

In determining § 5 issues, a court must consider (i) whether there are voting qualifications, prerequisites, standards, practices, or procedures that are different from "those in existence before they were adopted," *Presley v. Etowah County Comm'n*, 502 U.S. 491, 495

4

(1992)-that is, whether a change was covered by § 5,[1] (ii) if the change was covered, whether §

5's approval requirements are satisfied, and (iii) if the requirements are not satisfied, what remedy

is appropriate. *City of Lockhart v. United States*, 460 U.S. 125, 129 n.3 (1983).

As stated above, the three-judge court in *Kennedy* reasoned that because Act No. 85-237,

which provided for special elections in Mobile County, established a precleared practice which

was put into force and effect with the holding of a special election in 1987, it was the baseline to

use in determining whether gubernatorial appointment was a change requiring preclearance.

*Kennedy*, 445 F. Supp. 2d at 1336. Because *Stokes* invalidated Act No. 85-237 and the *Riley*

court refused to revive Act No. 85-237, the two decisions constituted changes in existing,

precleared practice or procedure with respect to voting that should have been precleared before

they were implemented. *Id.*

We are persuaded to follow the reasoning of *Kennedy* in this case. Of course, this case is

not identical to *Kennedy*. In particular, the Plaintiff does not concede that *Stokes* invalidated Act

No. 77-784, which applies only to Jefferson County, since *Stokes* was decided with respect to a

---

1.    The court in *Presley* explained this inquiry to mean that it is only "[a]bsent
relevant intervening changes, [that] the Act requires" comparison with practices in existence on
November 1, 1964. *Presley*, 502 U.S. at 495; *see also Lake v. State Bd. of Elections of N.C.*, 798
F. Supp. 1199, 1205 (M.D. N.C. 1992)(three-judge court); *Villegas v. Dallas Indep. Sch. Dist.*,
No. 30cv858R, 2003 WL 22573921, at *5 & n.9 (N.D. Tex. Oct. 17, 2003) (citing *Presley* and
stating the inquiry is whether the practice is "different from the one in force on the date § 5 took
effect or (if applicable) different from the one that earlier received preclearance?"); *cf. NAACP,
DeKalb County Chapter v. Georgia,* 494 F. Supp. 668, 677 (N.D. Ga. 1980) (three-judge court)
(rejecting interpretation of Voting Rights Act where "a covered state or subdivision thereof could
amend its laws concerning voting and receive the Attorney General's approval, then change its
laws back to the way they were before, avoiding federal preclearance . . . .").

Mobile County local law. That is a question of purely state law not before this court. We are

required to determine the baseline "without regard for [its] legality under state law." *Lockhart*,

460 U.S. at 132-33 (relying on *Perkins v. Matthews*, 400 U.S. 379, 394-95 (1971)).[2]

The practice of special election in Jefferson County was established by Act No. 77-784

and was precleared. That practice was used, or put into force and effect, when special elections

were held pursuant to that Act in 1982.[3] The gubernatorial appointment power exercised

thereafter was, therefore, a change in practice covered under the Voting Rights Act which must

be precleared.

The court emphasizes that whether Act No. 77-784 is, in fact, unconstitutional under state

law, and whether positions on the Jefferson County Commission must be filled by special

election or gubernatorial appointment under state law, are questions we do not reach and this

opinion should not be understood in any way as reaching. We conclude only that the authority of

the Governor to appoint persons to fill vacancies on the Jefferson County Commission is a

---

2.     In *Kennedy*, the claim was raised that the *Stokes* and *Riley* decisions had to be
precleared. Of course, the Alabama Supreme Court does not have to preclear any of its
interpretations of state law; it is the final word on what state law is. It was rather the power of
gubernatorial appointment which was exercised in good faith by the Defendant and which was
authorized by state law which had to be precleared for purposes of the Voting Rights Act because
it constituted a change in practice under federal law. In this case, as in *Kennedy*, it is the practice
of gubernatorial appointment which has been challenged as constituting a change from the
precleared practice of special election to fill vacancies.

3.     The court does not agree with the characterization by the Defendant of this
practice having been abandoned within the meaning of *Young v. Fordice*, 520 U.S. 273 (1997).
In *Young*, the Court reasoned that the state officials abandoned the state law practice just as soon
as it became clear that it would not be enacted by the state legislature, and the practice was only
in effect for a short period of time. *See Young*, 520 U.S. at 282-83. Here, the practice of special
election was enacted in 1977, used in 1982, and, assuming arguably that it was invalidated, not
invalidated until 1988.

6

change in practice which must be precleared, and that the Plaintiff is entitled to declaratory relief to that effect.[4]

### B. Plaintiff's Request for a Preliminary Injunction

_____This court acknowledges that, generally speaking, if changes in voting practice subject to § 5 have not been precleared, a plaintiff is entitled to an injunction prohibiting the implementation of those changed practices. *Clark v. Roemer*, 500 U.S. 646, 653 (1991). In this case, however, the change has already been implemented, so enjoining the Defendant from making the appointment is not an appropriate form of relief. Similarly, although the Plaintiff asks this court to enjoin the Defendant from interfering with the election to be held on February 5, 2008, the determination by this court that the exercise of gubernatorial appointment power is a change which must be precleared under the Voting Rights Act does not give this court authority to prevent the Defendant from challenging, on state law grounds, the validity of the election. Therefore, this court concludes that the Plaintiff's requested preliminary and permanent injunctions are due to be denied.

### C. Form of Relief

_____The next remedial issue before the court, therefore, is whether this court should order the seat on the Jefferson County Commission vacated at this time, or whether the court should give the Defendant the opportunity to seek preclearance of the gubernatorial appointment power. As

---

4.    In the Amended Complaint the Plaintiff also seeks a declaratory judgment that the Election Commission of Jefferson County has the authority to call a special election for District 1 of the Jefferson County Commission. That determination is outside of the province of this three-judge court. There is no claim before the court to determine the status of any authority pursuant to which such election might be held for purposes of the Voting Rights Act, and the validity of such an election under state law is not before this court.

noted above, this case involves a situation where the changed practice has already been implemented. The Supreme Court has determined that where a practice has already been implemented, it might be appropriate for a district court "to afford local officials an opportunity to seek federal approval before" ordering relief. *Lopez v. Monterey County, Cal.*, 519 U.S. 9, 20-21 (1996) (citing *Perkins v. Matthews*, 400 U.S. 379 (1971); *Berry v. Doles*, 438 U.S. 190 (1978) (per curiam)). Under that authority, this court determines that the proper course of action is for this court to allow the Defendant time in which to either (1) seek preclearance under the Voting Rights Act of the authority of the Defendant to fill a vacancy on the Jefferson County Commission by appointment, or (2) advise the court that he intends to appeal this decision. Should preclearance not be obtained to validate the gubernatorial appointment of General George F. Bowman to the Jefferson County Commission, the necessity for preclearance dictates that the appointee must be removed, as he would be serving as a Commissioner of Jefferson County in violation of federal law.

This court being mindful that the substantially-similar *Kennedy* decision is currently pending before the U.S. Supreme Court, the court will enter final judgment in this case to allow for a prompt appeal, if that is desired, and for the possibility of consolidation on appeal of this case with *Kennedy*, should the U.S. Supreme Court wish to consider the two cases together.

Accordingly, it is hereby ORDERED as follows:

1. The Plaintiff's request for declaratory judgment is GRANTED and this court declares that Governor Riley's authority to appoint a person to fill a vacancy on the Jefferson County Commission must be precleared.

2. The Plaintiff's request for injunctive relief is DENIED.

_____3. The Defendant is given until February 5, 2008 to file with the court a notice that he

either intends to appeal or intends to seek preclearance. In the event that the Defendant does not

notify the court on or before February 5, 2008 that he intends to seek preclearance, the seat

currently occupied by General George F. Bowman shall be vacated on that date without further

order of this court. If the Defendant notifies the court on or before February 5, 2008 that he

intends to seek preclearance, he will be given a total of 90 days to obtain preclearance. If

preclearance is not obtained from either the U.S. Attorney General or the U.S. District Court for

the District of Columbia within 90 days, then the appointment of General George F. Bowman to

the Jefferson County Commission shall be vacated without further order of this court.

An appropriate judgment will be entered.

Done this the22nd day of January, 2008.

/s/ Rosemary Barkett_____
UNITED STATES CIRCUIT JUDGE

/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE

/s/ W. Harold Albritton_____
UNITED STATES DISTRICT JUDGE

9

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| FRED L. PLUMP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:07cv1014-MEF |
| | ) | (WO) |
| HONORABLE BOB RILEY, as | ) | |
| Governor of the State of | ) | |
| Alabama, | ) | |
| | ) | |
| Defendant. | ) | |

Before Rosemary Barkett, Circuit Judge, Mark E. Fuller, Chief District Judge, and W. Harold
Albritton, District Judge.

## JUDGMENT

In accordance with the Memorandum Opinion entered this date, it is the FINAL

JUDGMENT of the court that:

(1) Declaratory Judgment is entered in favor of the Plaintiff Fred L. Plump and against

Defendant Governor Bob Riley.

(2) The Defendant has 90 days from the date of this order to obtain preclearance in

accordance with § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c.

a. If the Defendant chooses not to seek preclearance, but instead to immediately appeal

this Judgment, the Defendant shall so notify this court in writing on or before February 5, 2008.

In the absence of such notification, the Jefferson County Commission seat currently occupied by

General George F. Bowman shall be vacated on that date without further order of this court.

b. If the Defendant chooses to seek preclearance, he shall so notify the court in writing on

or before February 5, 2008. In that event, if preclearance is not obtained by 90 days from the

date of this Judgment, the Jefferson County Commission seat currently occupied by General

George F. Bowman shall be vacated on that date without further order of this court.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final

judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure so that appeal may be

taken and the case consolidated with *Kennedy v. Riley*, 07-77, if the U.S. Supreme Court deems

consolidation appropriate.

Done this the22nd day of January, 2008.


/s/ Rosemary Barkett
UNITED STATES CIRCUIT JUDGE


/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE


/s/ W. Harold Albritton
UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FRED L. PLUMP,                          )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )   CASE NO.  2:07cv1014-MEF
                                        )            (WO)
HONORABLE BOB RILEY, as                 )
Governor of the State of                )
Alabama,                                )
                                        )
        Defendant.                      )

Before Rosemary Barkett, Circuit Judge, Mark E. Fuller, Chief District Judge, and W. Harold
Albritton, District Judge.

## ORDER

Upon consideration of the Plaintiff's Motion to Amend Judgment (Doc. #30), filed on

January 23, 2008, and the Defendant's Response, filed on January 24, 2008, and in view of the

apparent confusion over the intent of this court's original Judgment, the Motion is ORDERED

GRANTED to the limited extent that the court clarifies its previous Judgment as follows:

The Jefferson County Commission seat currently occupied by General George F.

Bowman will be vacated without further order of this court on the following dates and under the

following three contingencies:

1. If the Defendant chooses to appeal this court's January 22, 2008 Memorandum

Opinion and Judgment, the Defendant shall notify the court on or before February 5, 2008 of that

decision and the seat will be vacated on February 5, 2008 without further order of the court.

2. If the Defendant notifies the court on or before February 5, 2008 that he chooses to

seek preclearance, then the seat will be vacated only if preclearance is not obtained by 90 days


EXHIBIT
D

from the date of this court's January 22, 2008 Memorandum Opinion and Judgment.

    3. If the Defendant fails to notify the court on or before February 5, 2008 of which action

he chooses to take, the seat will be vacated on February 5, 2008.

    All other provisions of the original Judgment shall remain unchanged.

    An appropriate Amended Judgment will be entered.

    DONE this 25th day of January, 2008.


                          /s/ Rosemary Barkett
                          UNITED STATES CIRCUIT JUDGE


                          /s/ Mark E. Fuller
                          CHIEF UNITED STATES DISTRICT JUDGE


                          /s/ W. Harold Albritton
                          UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FRED L. PLUMP,                      )
                                    )
    Plaintiff,                      )
                                    )
    v.                              )        CASE NO. 2:07cv1014-MEF
                                    )                 (WO)
HONORABLE BOB RILEY, as             )
Governor of the State of            )
Alabama,                            )
                                    )
    Defendant.                      )

Before Rosemary Barkett, Circuit Judge, Mark E. Fuller, Chief District Judge, and W. Harold
Albritton, District Judge.

## **AMENDED JUDGMENT**

    In accordance with the Memorandum Opinion entered on January 22, 2008, it is the

FINAL JUDGMENT of the court that:

    (1) Declaratory Judgment is entered in favor of the Plaintiff Fred L. Plump and against

Defendant Governor Bob Riley.

    (2) The Defendant has 90 days from the date of the original Judgment, January 22, 2008,

to obtain preclearance in accordance with § 5 of the Voting Rights Act of 1965, as amended, 42

U.S.C. § 1973c.

    a. If the Defendant chooses not to seek preclearance, but instead to immediately appeal

this Judgment, the Defendant shall so notify this court in writing on or before February 5, 2008.

If the Defendant notifies the court on or before February 5, 2008 that he intends to appeal, the

Jefferson County Commission seat currently occupied by General George F. Bowman shall be

vacated on February 5, 2008 without further order of this court.

b.  If the Defendant chooses to seek preclearance, he shall so notify the court in writing on or before February 5, 2008.  In that event, if preclearance is not obtained by 90 days from the date of the original Judgment, the Jefferson County Commission seat currently occupied by General George F. Bowman shall be vacated 90 days from January 22, 2008 without further order of this court.

c.  If the Defendant does not notify the court on or before February 5, 2008 which action he chooses to take, the Jefferson County Commission seat currently occupied by General George F. Bowman shall be vacated on February 5, 2008 without further order of this court.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure so that appeal may be taken and the case consolidated with *Kennedy v. Riley*, 07-77, if the U.S. Supreme Court deems consolidation appropriate.

Done this the 25th day of January, 2008.


/s/ Rosemary Barkett
UNITED STATES CIRCUIT JUDGE


/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE


/s/ W. Harold Albritton
UNITED STATES DISTRICT JUDGE

No. 07-77

In the

𝕾upreme 𝕮ourt of the 𝖀nited 𝕾tates

HONORABLE BOB RILEY, as Governor of the State
of Alabama,
*Appellant,*

v.

YVONNE KENNEDY, JAMES BUSKEY and WILLIAM
CLARK,
*Appellees.*

On Appeal from the United States District Court
for the Middle District of Alabama

## BRIEF FOR APPELLANT

TROY KING
*Attorney General*
MARGARET L. FLEMING
JAMES W. DAVIS
MISTY S. FAIRBANKS
*Asst. Attorneys General*
STATE OF ALABAMA
11 South Union Street
Montgomery, AL 36130
(334) 242-7300

KEVIN C. NEWSOM
  *Counsel of Record*
MATTHEW H. LEMBKE
JOHN C. NEIMAN, JR.
SCOTT BURNETT SMITH
JOHN W. REA
ANDREW L. BRASHER
BRADLEY ARANT ROSE
  & WHITE LLP
1819 Fifth Avenue North
Birmingham, AL 35203
knewsom@bradleyarant.com
(205) 521-8803

*Attorneys for Appellant*

January 14, 2008

PENGAD 800-631-6989    EXHIBIT
E

i

## QUESTIONS PRESENTED

1. Governor Riley timely appealed from the district court's May 1, 2007 final judgment entering permanent injunctive relief. The question is whether his decision not to appeal from the district court's August 18, 2006 interlocutory order, which granted declaratory relief but expressly deferred any decision on requested remedies, defeats this Court's jurisdiction.

2. This case arises under §5 of the Voting Rights Act of 1965, which requires certain States to obtain "pre-clearance"—permission, in effect—from the federal government before implementing "changes" to voting practices or procedures. At issue here are two decisions of the Alabama Supreme Court. In the first of those decisions, *Stokes v. Noonan*, the court invalidated a previously-precleared state statute on race-neutral state constitutional grounds. In the second decision, *Riley v. Kennedy*, the court declined, again on race-neutral state-law grounds, to revive the void statute. The question is whether the Alabama Supreme Court's decisions in *Stokes* and *Riley* were "changes" that required federal-government preclearance before becoming effective.

ii

## TABLE OF CONTENTS

QUESTIONS PRESENTED .............................................i

TABLE OF AUTHORITIES..............................................v

OPINIONS BELOW.............................................................1

JURISDICTION....................................................................1

STATUTES INVOLVED....................................................1

INTRODUCTION .................................................................2

STATEMENT OF THE CASE...........................................3

I.   The Statutory Framework............................................3

II.  This Case in Historical Context..................................4

III. Statement of Facts........................................................6

    A.   Alabama Law: 1868 to 1985 ...................................6

    B.   Act No. 85-237 and *Stokes v. Noonan*..................7

    C.   Act No. 2004-455 and *Riley v. Kennedy*..............8

IV. Procedural History .......................................................9

    A.   The August 18, 2006 Order...................................10

    B.   Preclearance Proceedings ....................................12

    C.   The May 1, 2007 Order.........................................12

    D.   The Appeal..............................................................12

iii

ARGUMENT....................................................................17

I.  This Court Has Jurisdiction Under 42 U.S.C.
    §1973c(a). ...............................................................17

    A.  Governor Riley Was Not Required To
        Appeal From the District Court's Non-
        Final August 2006 Order. ...................................17

    B.  Governor Riley Has Not Waived His
        Right To Appeal the August 2006 Order...........21

    C.  The Appellees' Position Makes for Bad
        Jurisdictional Policy. ...........................................22

II. The Alabama Supreme Court's Decisions in
    *Stokes v. Noonan* and *Riley v. Kennedy* Were
    Not "Changes" That Required Preclearance
    Under Section 5 of the Voting Rights Act. ...............22

    A.  No Indicator of Statutory Meaning
        Supports the District Court's
        Interpretation of Section 5 To Require
        Preclearance of *Stokes* and *Riley*. ......................24

        1.  There is no basis in Section 5's text
            for requiring preclearance of *Stokes*
            and *Riley*.......................................................26

        2.  There is no basis in Section 5's
            purpose or legislative history for
            requiring preclearance of *Stokes* and
            *Riley*. ...............................................................31

        3.  There is no basis in this Court's
            precedent for requiring preclearance
            of *Stokes* and *Riley*.........................................35

iv

    a.  The district court's decision is contrary to *Abrams v. Johnson.* ..........35

    b.  The precedents invoked by the district court do not support its decision. ....................................................38

        1.  *Perkins* and *Lockhart* ....................38

        2.  *Branch*..............................................43

        3.  *Hathorn*...........................................44

  B.  The District Court's Interpretation Impermissibly Exacerbates the Federalism Costs Already Imposed by Section 5. ................................................................45

  C.  The District Court's Interpretation Is Unworkable and Unnecessary. ...........................49

III. Because Under *Young v. Fordice*, Act No. 85-237 Was Never "In Force or Effect," *Stokes* And *Riley* Did Not Mark Section 5 "Changes." ...............51

CONCLUSION ..................................................................56

v

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Johnson*
    521 U.S. 74 (1997) ....................................15, 35, 36, 37, 38

*Alaska Dep't of Envtl. Conservation v. EPA*
    540 U.S. 461 (2004) ......................................23, 24, 40, 46

*Beer v. United States*
    425 U.S. 130 (1976) ...........................................................32

*Branch v. Smith*
    538 U.S. 254 (2003) .............................................35, 38, 43

*Carolina Power & Light Co. v. Dynegy*
    *Mktg. & Trade*
    415 F.3d 354, 358 (4th Cir. 2005) ...................................21

*Caterpillar, Inc. v. Lewis*
    519 U.S. 61 (1996) ............................................................21

*Catlin v. United States*
    324 U.S. 229 (1945) ..........................................................18

*City of Boerne v. Flores*
    521 U.S. 507 (1997) ....................................................16, 48

*City of Lockhart v. United States*
    460 U.S. 125 (1983) ...................................................passim

*City of Monroe v. United States*
    522 U.S. 34 (1997) ............................................................20

*Cohen v. Beneficial Indus. Loan Corp.*
    337 U.S. 541 (1949) ..........................................................17

vi

*Digital Equip. Corp. v. Desktop Direct, Inc.*
    511 U.S. 863 (1994) .......................................................... 17

*Dougherty County Bd. of Educ. v. White*
    439 U.S. 32 (1978) .................................................. 6, 20, 45

*Ex parte James*
    836 So. 2d 813 (Ala. 2002) .............................................. 54

*Ex parte Southern Ry.*
    556 So. 2d 1082 (Ala. 1989) ............................................ 25

*Franklin v. District of Columbia*
    163 F.3d 625 (D.C. Cir. 1998) ......................................... 21

*Georgia v. Ashcroft*
    539 U.S. 461 (2003) ......................................................... 38

*Georgia v. United States*
    411 U.S. 526 (1973) ......................................................... 20

*Gonzalez v. Automatic Employees Credit Union*
    419 U.S. 90 (1974) ........................................................... 22

*Growe v. Emison*
    507 U.S. 25 (1993) ........................................................... 44

*Hathorn v. Lovorn*
    457 U.S. 255 (1982) .................................................. 44, 45

*Hayburn's Case*
    2 U.S. (2 Dall.) 409 (1792) ............................................. 23

*Liberty Mut. Ins. Co. v. Wetzel*
    424 U.S. 737 (1976) .................................................. 19, 21

vii

*Lopez v. Monterey County*
  525 U.S. 266 (1999) ....................................................23, 46

*Lucas v. Bolivar County*
  756 F.2d 1230 (5th Cir. 1985) .........................................20

*Marbury v. Madison*
  5 U.S. (1 Cranch) 137 (1803) ............................................2

*McCain v. Lybrand*
  465 U.S. 236 (1984) ......................................................31

*McDaniel v. Sanchez*
  452 U.S. 130 (1981) ......................................................37

*Miller v. Johnson*
  515 U.S. 900 (1995) ...............................................passim

*Morris v. Gressette*
  432 U.S. 491 (1977) ......................................................30

*Mullaney v. Wilbur*
  421 U.S. 684 (1975) ......................................................46

*NAACP v. Hampton County Election Comm'n*
  470 U.S. 166 (1985) ......................................................55

*New York v. United States*
  505 U.S. 144 (1992) ......................................................47

*Norton v. Shelby County*
  118 U.S. 425 (1886) ......................................................25

*Owasso Indep. Sch. Dist. No. I-011 v. Falvo*
  534 U.S. 426 (2002) ......................................................49

viii

*Perkins v. Matthews*
　　400 U.S. 379 (1971) .................................................passim

*Presley v. Etowah County Comm'n*
　　502 U.S. 491 (1992) .................................................27, 45

*Printz v. United States*
　　521 U.S. 898 (1997) .........................................................47

*Raygor v. Regents of the Univ. of Minn.*
　　534 U.S. 533 (2002) .............................................24, 27, 45

*Reno v. Bossier Parish Sch. Bd.*
　　520 U.S. 471 (1997) .........................................................48

*Reno v. Bossier Parish Sch. Bd.*
　　528 U.S. 320 (2000) .................................................passim

*Riley v. Kennedy*
　　928 So. 2d 1013 (Ala. 2005) .....................................passim

*South Carolina v. Katzenbach*
　　383 U.S. 301 (1966) .................................................31, 48

*Stokes v. Noonan*
　　534 So. 2d 237 (Ala. 1988) .......................................passim

*Tennessee v. Lane*
　　541 U.S. 509 (2004) .........................................................48

*United States v. Board of Comm'rs of Sheffield*
　　435 U.S. 110 (1978) .................................................22, 45

*United States v. City of Monroe*
　　962 F. Supp. 1501 (M.D. Ga. 1997) ................................20

ix

*United States v. Rutherford*
   442 U.S. 544 (1979) ...........................................................28

*Will v. Michigan Dep't of State Police*
   491 U.S. 58 (1989) .............................................................20

*Wise v. Lipscomb*
   437 U.S. 535 (1978) ...........................................................44

*Young v. Fordice*
   520 U.S. 273 (1997) .....................16, 27, 51, 52, 53, 54, 55

**Constitutions and Statutes**

28 U.S.C. §2101(b) ...................................................................1

Voting Rights Act of 1965,
   42 U.S.C. 1973, *et seq.* ............................................passim

   Section 2,
      42 U.S.C. §1973(a) ......................................................50

   Section 4,
      42 U.S.C. §1973b.........................................................30

   Section 5
      42 U.S.C. 1973c....................................................passim

42 U.S.C. §1983 ....................................................................50

Ala. Const. Art. IV, §105.............................................7, 8, 24

Ala. Code §11-3-1(b) ...............................................................2

Ala. Code §11-3-6.........................................................passim

Ala. Code Tit. 12, §6 (1940).....................................................7

x

Ala. Code §6749 (1923)............................................................7

Ala. Code §3307 (1907)............................................................7

Ala. Code §952 (1896)..............................................................7

Ala. Code §820 (1886)..............................................................7

Ala. Code §740 (1876)..............................................................6

Ala. Code §826 (1867)..............................................................6

Ala. Code §698 (1852)..............................................................6

Ala. Act No. 2006-342..............................................................9

Ala. Act No. 2004-455.................................................2, 8, 9, 25

Ala. Act No. 85-237..........................................................passim

Ala. Act No. 12, §1 (1868) .....................................................6

## Legislative History

H.R. Rep. No. 109-478, 2006 U.S.C.C.A.N. 618 ..............34

S. Rep. No. 109-295 (2006).........................................5, 22, 34

S. Rep. No. 97-417, 1982 U.S.C.C.A.N 177 ......................34

H.R. Rep. No. 97-227 (1981)................................................34

H.R. Rep. No. 94-196 (1975).........................................passim

S. Rep. No. 94-295, 1975 U.S.C.C.A.N. 774 .....................34

H.R. Rep. No. 91-397, 1970 U.S.C.C.A.N. 3277 ..............34

xi

H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437 ....4, 33, 34

S. Rep. No. 89-162, 1965 U.S.C.C.A.N. 2508 .............33, 34

111 Cong. Rec. 10,727 (1965)...............................................32

111 Cong. Rec. 28,358 (1965)...............................................33

**Regulations**

28 C.F.R. §51.2....................................................................29

28 C.F.R. §51.12..................................................................27

28 C.F.R. §51.22..................................................................55

28 C.F.R. §51.42..................................................................22

28 C.F.R. §51.49..................................................................28

46 Fed. Reg. (Jan. 5, 1981) ................................................27

**Rules**

Fed. R. Civ. P. 58....................................................11, 18, 21

**Other Authorities**

S. Issacharoff, P. Karlan & R. Pildes
  *The Law of Democracy* (3d ed. 2007) ......................4, 23

*Moore's Federal Practice* (3d ed. 2007)............................21

W. Rogers, *et al.*
  *Alabama: The History of a Deep South
  State* (1994).......................................................................6

xii

C. Wright, A. Miller, *et al.*
  *Federal Practice and Procedure* (2d ed. 1992) .....18, 21

U.S. Census Bureau, Voting and Registration in the
  Election of November 2004, Table 4a
  http://www.census.gov/population
  /www/socdemo/voting/cps2004.html (visited Jan.
  10, 2008) ...........................................................................5

U.S. Department of Justice: Civil Rights Division,
  Voting Section, Introduction to Section 5
  http://www.usdoj.gov/crt/voting/sec_5/about.htm
  (visited January 10, 2008).........................................29, 30

1

## OPINIONS BELOW

The three-judge district court's order vacating Governor Riley's appointment of Juan Chastang to fill a vacancy on the Mobile County Commission is reported at *Kennedy v. Riley*, ___ F. Supp. 2d ___, 2007 WL 1284912 (M.D. Ala. May 1, 2007), and reprinted at Jurisdictional Statement Appendix ("J.S. App.") 1a.

The district court's opinion declaring that §5 of the Voting Rights Act of 1965 required preclearance of the two Alabama Supreme Court decisions that led to Chastang's appointment—*Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005)—is reported at *Kennedy v. Riley*, 445 F. Supp. 2d 1333 (M.D. Ala. 2006), and reprinted at J.S. App. 3a. The accompanying judgment is reprinted at J.S. App. 9a.

## JURISDICTION

This Court has jurisdiction under 42 U.S.C. §1973c(a), which provides that any action arising under §5 of the Voting Rights Act "shall be heard and determined by a court of three judges ... and any appeal shall lie to the Supreme Court."

As explained below, Governor Riley's appeal was timely. *See* 28 U.S.C. §2101(b). The district court entered final judgment on May 1, 2007. J.A. 6. The Governor noticed his appeal on May 18, 2007, within 60 days of that final judgment. J.A. 7.

## STATUTES INVOLVED

Section 5 of the Voting Rights Act, 42 U.S.C. §1973c, is reprinted at J.S. App. 14a–16a. Relevant provisions of

2

Alabama law are reprinted as follows: Act No. 85-237, at J.A. 114; Act No. 2004-455, at J.A. 115–17; Ala. Code §11-3-6, at J.A. 118;[1] and §11-3-6's predecessors, at J.A. 119–27.

## INTRODUCTION

This case requires the Court to do something it has done many times before—interpret §5 of the Voting Rights Act. This go-round, however, the interpretive question arises in a context altogether unlike any the Court has ever seen. Here, the district court held that §5 required "preclearance" of two decisions of a state supreme court—the first invalidating a state statute on race-neutral state constitutional grounds; and the second refusing, again on race-neutral state-law grounds, to revive the void statute. The district court's sweeping reading of §5 to reach state courts' exercise of their core judicial "duty" to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), works an unprecedented expansion of that statute's already-broad scope. The district court's novel construction—which exacerbates the significant federalism costs exacted by the preclearance process—finds no support in §5's text or history or in this Court's precedent. It should be rejected.

---

[1] Section 11-3-6 was recently recodified (and amended in respects not relevant here) at Ala. Code §11-3-1(b). Because the recodification is not yet in force, we cite to §11-3-6.

3

## STATEMENT OF THE CASE

### I.  The Statutory Framework

Section 5 of the Voting Rights Act requires certain
jurisdictions, including the State of Alabama,[2] to obtain
federal-government "preclearance"—permission, in ef-
fect—before "enact[ing] or seek[ing] to administer" any
voting practice that is "different from that in force or ef-
fect on" a statutorily-specified coverage date.  42 U.S.C.
§1973c(a).  For Alabama and several other States, the
coverage date is November 1, 1964.  Other jurisdictions'
dates are later—either November 1, 1968, or November
1, 1972.  In §5 parlance, it is a "change" in voting prac-
tices that triggers the obligation to obtain preclearance.
The question here is whether two decisions of the Ala-
bama Supreme Court constituted §5 "changes."

A covered jurisdiction may seek either administra-
tive preclearance from the U.S. Department of Justice
("DOJ") or judicial preclearance from the U.S. District
Court for the District of Columbia.  *Id.*  In either event,
federal authorities will conduct what is commonly called
a "retrogression" analysis to determine whether the
proposed change has the purpose or effect "of denying or
abridging the right to vote on account of race or color."
*Id.*  If federal authorities deem the change retrogressive,
they will forbid its implementation.  If, however, the
change is deemed nonretrogressive, it will be precleared
for use—subject to the caveat that preclearance will not

---

[2] The fully-covered jurisdictions are Alabama, Alaska, Arizona,
Georgia, Louisiana, Mississippi, South Carolina, and Texas.  The
partially-covered jurisdictions are California, Florida, New York,
North Carolina, South Dakota, Michigan, New Hampshire, and Vir-
ginia.

4

bar a subsequent suit to enjoin the practice on some non-§5 ground. *Id.*

If an individual believes that a covered jurisdiction has enacted or administered an unprecleared change, he or she may sue under §5, in a specially-convened three-judge district court, to enjoin implementation. Review in such "coverage" actions, like this one, is limited to determining (1) whether a §5 change occurred; (2) if so, whether preclearance was obtained; and (3) if not, what remedy should follow. The losing party has a right of direct appeal to this Court.

## II. This Case in Historical Context

Alabama's distant history with respect to voting rights is not a proud one. In the years leading up to the passage of the Voting Rights Act of 1965, black registration in Alabama was paltry; by 1964, it still languished below 20%. H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2441. As of 1965, there were very few, if any, elected black officials in Alabama. *See* H.R. Rep. No. 94-196, at 7 (1975). And then there was "Bloody Sunday" in Selma, one of the more shameful episodes in American political history. That confrontation on the Edmund Pettus Bridge was, by most accounts, the event that galvanized the Johnson Administration to "propose a more expansive voting rights bill," which "ultimately became the Voting Rights Act of 1965." S. Issacharoff, P. Karlan & R. Pildes, *The Law of Democracy* 461 (3d ed. 2007).

Happily, the political climate in Alabama today is strikingly different from the one that existed circa 1965. Black Alabamians participate actively in the State's political life. At the time of the 2004 election, 72.9% of the voting-age African-Americans in Alabama were regis-

5

tered to vote, and 63.9% turned out. S. Rep. No. 109-295, at 11 (2006). On both counts—registration and turn-out—black Alabamians significantly outpaced black vot-ers' national averages of 64.4% and 56.3%, respectively. U.S. Census Bureau, Voting and Registration in the Election of November 2004, Table 4a, http://www.census. gov/population/www/socdemo/voting/cps2004.html (vis-ited Jan. 10, 2008). Indeed, as of 2004, black registration rates in Alabama were higher than 28 of the other 31 States for which the Census Bureau compiled statistics, and black turnout rates in Alabama were higher than 24 of those 31 States. *See id.*

The trajectory of black representation in state and local government is also favorable. Today, there are ap-proximately 750 black elected officials in Alabama. S. Rep. No. 109-295, at 12. Indeed, nearly a quarter of the members currently serving in the Alabama Legislature (34 of 140) and nearly a quarter of all county commis-sioners (83 of 355) are black. Those percentages square almost precisely with the racial makeup of the State as a whole. Accordingly, although it was certainly once true that the number of black elected officials in Alabama "fell far short of being representative of the number of blacks residing" in the State, H.R. Rep. No. 94-196, at 7, black representation today is nearly proportional.

While the statistics tell a compelling story, more im-portant for present purposes is the fact that this case bears no traces of the Jim Crow era. As discussed in de-tail below, this case had its genesis in the election of Sam Jones, who is black, to be mayor of Mobile, the third-largest city in Alabama. When Jones vacated his county-commission seat to assume his mayoral responsibilities, Governor Riley appointed Juan Chastang, who is also

6

black, to finish out the term. It was Chastang's appointment that the appellees sued to prevent, DOJ refused to permit, and the district court then vacated.

The circumstances here, therefore, are not even remotely "suggestive" of racial discrimination. *Compare, e.g., Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 42 (1978). Indeed, all indicators—historical and present—point in precisely the opposite direction.

## III. Statement of Facts

### A. Alabama Law: 1868 to 1985

For nearly 140 years—since long before the enactment of the Voting Rights Act—the general statutory law in Alabama has provided that vacancies on county commissions "shall be filled by appointment by the Governor." Ala. Code §11-3-6. Section 11-3-6 traces its roots to 1868. Before then, state law vested the vacancy-filling power in the county commission itself. *See* Ala. Code §698 (1852); Ala. Code §826 (1867). On November 25, 1868, only months after ratifying the Fourteenth Amendment, Alabama's Reconstruction Legislature—a body that was dominated by Republicans (126 to the Democrats' 4) and, with 27 black lawmakers, was "the first legislature in Alabama that remotely approached equity in representation"[3]—enacted a law that "authorized and empowered" the Governor "to fill any and all vacancies now existing or which may hereafter exist in the offices of county commissioners." Act No. 12, §1. That statute was codified in the 1876 Alabama Code, *see* Ala. Code §740 (1876), and then carried forward, essen-

---

[3] W. Rogers, *et al.*, *Alabama: The History of a Deep South State* 249–50 (1994).

7

tially verbatim and without interruption, in every subsequent codification. *See* Ala. Code §820 (1886); Ala. Code §952 (1896); Ala. Code §3307 (1907); Ala. Code §6749 (1923); Ala. Code Tit. 12, §6 (1940); Ala. Code §11-3-6 (1975).[4]

### B.  Act No. 85-237 and *Stokes v. Noonan*

In 1985, the Alabama Legislature enacted a "local law," applicable to Mobile County only, which provided that certain vacancies on the Mobile County Commission should be filled through special election. *See* Act No. 85-237 (J.A. 114). DOJ precleared Act No. 85-237, as compliant with §5 of the Voting Rights Act, in June 1985. J.A. 20.

When in the spring of 1987 a vacancy arose on the Mobile County Commission, litigation immediately ensued concerning Act No. 85-237's constitutionality under state law. Claiming that county officials were planning to hold a special election to fill the vacancy, Mobile voter Willie Stokes sued in state court to prevent the election from going forward. Stokes contended, as relevant here, that the 1985 act was inconsistent with Alabama Code §11-3-6 (providing for "appointment by the Governor") and, accordingly, violated §105 of the Alabama Constitution, which states that no "local law ... shall be enacted in any case which is provided for by a general law." Ala. Const. Art. IV, §105. The state trial court rejected Stokes' argument and declined to enjoin the special election.

---

[4] These statutes are reproduced at J.A. 118–27.

8

The next day, Stokes appealed to the Alabama Supreme Court. Stokes' request for a stay pending appeal was denied, however, and the election went forward. Sam Jones won, and took office in July 1987. J.A. 27. But on appeal of the trial court's order, the Alabama Supreme Court reversed. It held that the 1985 act "clearly offend[ed]" and was "directly counter" to "the language" of §105. *Stokes v. Noonan*, J.S. App. 18a–19a. The supreme court's decision thus reaffirmed that the authority to fill commission vacancies resided where it had since 1868—with the Governor. The decision, which in essence held that no election should have occurred, left Sam Jones vulnerable to an action to remove him from office. Governor Guy Hunt eliminated that risk by exercising his authority under §11-3-6 to appoint Jones to the post. J.A. 27.

## C. Act No. 2004-455 and *Riley v. Kennedy*

Sixteen years later, in 2004, the Alabama Legislature amended the general law, §11-3-6, to add a proviso, such that county commission vacancies "shall be filled" by gubernatorial appointment "[u]nless a local law authorizes a special election." Act No. 2004-455 (J.A. 116). DOJ precleared Act No. 2004-455 in September 2004. J.A. 21. The next year, the same Sam Jones (still sitting as a commissioner) was elected mayor of Mobile. *Id.* In anticipation of the coming vacancy, Yvonne Kennedy, James Buskey, and William Clark sued in state court, arguing that Act No. 2004-455 had revived the unconstitutional 1985 act, thus requiring a special election to fill the vacancy. *Id.*

Although the state trial court granted the requested relief, the Alabama Supreme Court unanimously re-

9

versed. It rejected any suggestion that Act No. 2004-455 should be applied retroactively to "give effect to" the 1985 act and held, instead, that "the plain language in Act No. 2004-455 … provides for prospective application only." *Riley v. Kennedy*, J.S. App. 29a–30a. Act No. 2004-455, in other words, paved the way for new local laws, but it did not resurrect dead ones. "[C]onsequently," the court concluded, "Governor Riley is authorized to fill the vacancy on the Mobile County Commission by appointment" under the longstanding mandate of §11-3-6. J.S. App. 31a. Governor Riley appointed Juan Chastang to the seat.[5]

## IV. Procedural History

The day after the Alabama Supreme Court denied rehearing, Kennedy, Buskey, and Clark (hereinafter the "appellees") filed this action in federal district court. The basis of their claim, premised on §5 of the Voting Rights Act, was that "the State of Alabama was required, but failed, to preclear two decisions of the Alabama Supreme Court: *Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005)." J.S. App. 3a. The appellees sought a "declaratory judgment" that §5 required preclearance of *Stokes* and *Riley* and, in addition, requested several specific "injunctions," as follows—

- preventing Governor Riley from swearing anyone in to the commission post;

---

[5] In 2006, the Alabama Legislature adopted Act No. 2006-342, which provides that on a going-forward basis, vacancies on the Mobile County Commission will be filled through special election. Motion To Dismiss or Affirm ("M.D.A.") App. 1a.

10

- prohibiting enforcement "of the *Stokes* and *Riley* decisions until they are precleared"; and

- ordering state officials to obtain preclearance within 90 days.

J.A. 11; Doc. 15, pp.7–8; Doc. 20, p.3.

### A. The August 18, 2006 Order

On August 18, 2006, the three-judge district court issued the first of two key orders in the case. The court explained that "[i]n reviewing the plaintiffs' §5 claim, we are tasked with the limited purpose of determining '(i) whether a change was covered by §5, (ii) if the change was covered, whether §5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate.'" J.S. App. 6a (quoting *City of Lockhart v. United States*, 460 U.S. 125, 129 n.3 (1983)). Because neither *Stokes* nor *Riley* had been precleared, the court said, the "critical inquiries" were "whether these decisions brought about a change covered by §5, and, if so, the appropriate remedy." *Id.* In its August 2006 order, the district court answered the first of those "critical inquiries," but not the second.

The district court's analysis of the coverage question—*i.e.*, whether *Stokes* and *Riley* were §5 "changes" requiring preclearance—is spare. Having initially determined that "a §5 change may be brought about by state court decisions," the court observed that §5 "changes" are "measured by comparing the new challenged practice with the baseline practice, that is, the most recent practice that is both precleared and in force or effect." J.S. App. 6a–7a. The court held that "[b]ecause Act No. 85-237 was the most recent pre-

11

cleared practice put into force and effect with the election of [Sam] Jones in 1987, it is the baseline against which we must determine if there was a change." *Id.* at 7a. The district court acknowledged that "the Alabama Supreme Court declared Act No. 85-237 unconstitutional under state law" in *Stokes*, but deemed it significant that *Stokes* was decided "after Act No. 85-237 had been put into effect." *Id.* In any event, the court said, it was "required to determine the baseline 'without regard for [its] legality under state law.'" *Id.* (quoting *Lockhart*, 460 U.S. at 133). The district court thus concluded that because the 1985 act was the baseline and because *Stokes* "invalidat[ed] it" and *Riley* later "refus[ed] to revive" it, "the two decisions constituted changes that should have been precleared before they were implemented." *Id.* at 5a, 7a–8a.

Having resolved the §5 coverage issue, the district court expressly refused (at the appellees' own "suggest[ion]") to address the issue of remedy. *Id.* at 8a. In particular, the court did not "enjoin enforcement of *Stokes v. Noonan* and *Riley v. Kennedy*, or otherwise even consider taking any action regarding the appointment of Juan Chastang to the Mobile County Commission." *Id.* Instead, the court allowed the State 90 days to seek preclearance, and requested Governor Riley "to keep the court informed of what action, if any, the State decides to take" concerning preclearance "and the result of that action." *Id.* at 9a–10a. If the State did not obtain preclearance, the court said, it would "revisit the issue of remedy." *Id.* at 9a. The court then purported to make its order "final" pursuant to Federal Rule of Civil Procedure 58. *Id.* at 10a.

12

## B. Preclearance Proceedings

The State sought administrative preclearance of *Stokes* and *Riley* (J.A. 30–42), but DOJ objected. In refusing preclearance, DOJ treated Act No. 85-237 as the relevant baseline; notwithstanding *Stokes* and *Riley*, DOJ concluded that the 1985 act "remains in full force and effect, as it affects voting, was precleared, and was implemented in the 1987 special election cycle." Motion To Dismiss or Affirm ("M.D.A.") App. 5a. DOJ later denied (*id.* at 9a–19a) the State's request for reconsideration (J.A. 58–113).[6]

## C. The May 1, 2007 Order

Following DOJ's refusal to preclear *Stokes* and *Riley*, the appellees reiterated their requests for injunctive relief. On May 1, 2007, the district court entered a remedy order, thereby addressing the second of the two "critical inquiries" it had flagged in its earlier opinion. J.S. App. 6a. The court held that because *Stokes* and *Riley* "were not precleared, Governor Bob Riley's appointment of Juan Chastang to the Mobile County Commission pursuant to these two decisions was unlawful under federal law." *Id.* at 1a–2a. Accordingly, the court vacated Chastang's appointment. *Id.* at 2a.

## D. The Appeal

On May 18, 2007, Governor Riley noticed his appeal to this Court "from the final Order of the three-judge court vacating his appointment of Juan Chastang to fill a vacancy in the Mobile County Commission, entered in this action on May 1, 2007, and from prior orders, judg-

---

[6] The State has not, at this time, sought judicial preclearance.

13

ments and decrees of the three-judge court upon which the May 1, 2007 Order necessarily relies, specifically including the Judgment entered on August 18, 2006 and the Opinion of the same date." J.S. App. 11a (citations omitted).

On November 20, 2007, this Court entered an order postponing consideration of jurisdiction "to the hearing of the case on the merits."

## SUMMARY OF ARGUMENT

I.   This Court has jurisdiction over Governor Riley's appeal from the district court's May 2007 final judgment.

A.   The appellees' contention that the district court's August 2006 coverage order was a final judgment that required an immediate appeal is meritless. That order declared that *Stokes* and *Riley* required §5 preclearance, but it declined to enjoin enforcement of those decisions pending preclearance or to enter any other remedy. The district court didn't address the remedy issue until May 2007, when it vacated Juan Chastang's appointment. The fact that the district court labeled its August 2006 order "final" is jurisdictionally irrelevant.

B.   Even if Governor Riley was entitled to appeal from the August 2006 order, he was not obliged to do so. A party who has a right to an interlocutory appeal may wait and appeal from the final judgment, and that appeal will bring with it all interlocutory orders on which the final judgment is based.

C.   The policy implications of the appellees' jurisdictional position—which would require immediate

14

appeal of every §5 coverage decision—are perverse. Considerations of judicial economy favor a rule that encourages States, upon a finding of §5 coverage, to seek preclearance, not mandatory review in this Court.

II. The Alabama Supreme Court's decisions in *Stokes*, which invalidated Act No. 85-237 on state constitutional grounds, and *Riley*, which declined (again on state-law grounds) to revive it, were not "changes" that required preclearance under §5.

A. The federalism implications of the district court's interpretation—which strips state courts of their autonomy to decide state-law questions by subjecting their decisions to the veto of federal executive-branch officials—are profound. To avoid exacerbating the federalism costs that preclearance imposes, this Court should require some clear indication that the district court's interpretation is correct. There is no such indication.

1. Section 5's text belies the district court's interpretation. By its terms, §5 requires preclearance of any voting practice "different from that in force or effect on November 1, 1964." The practice resulting from *Stokes* and *Riley*—gubernatorial appointment—*was* the practice "in force or effect on November 1, 1964." Moreover, §5 clearly provides that preclearance does not shield a practice from invalidation on other, non-§5 grounds—which is exactly what happened here, when the Alabama Supreme Court nullified and later declined to revive Act No. 85-237's provision for special elections.

2. Evidence of Congress' intent likewise refutes the district court's interpretation. Section 5's purpose was to preclude States from playing a "cat-and-

15

mouse" game with federal authorities—*i.e.*, maneuvering to avoid federal-court decrees enjoining discriminatory voting practices by quickly switching to others. That is not the sort of thing the Alabama Supreme Court did— or was even capable of doing—in *Stokes* and *Riley*. Furthermore, §5's legislative history confirms that Congress was concerned not with state courts' case-bound exercises of judicial review, but rather with States' efforts to alter voting practices by statute or administrative acts.

3. This Court's precedents do not support the district court's decision. The district court's interpretation is contrary to *Abrams v. Johnson*, which held that §5 "cannot be used to freeze in place" an "unconstitutional" practice. 521 U.S. 74, 97 (1997). And the cases on which the district court principally relied—*Perkins v. Matthews*, 400 U.S. 379 (1971), and *City of Lockhart v. United States*, 460 U.S. 125 (1983)—are distinguishable in two critical respects. First, neither involved a state supreme court's authoritative determination of state law. Accordingly, neither justifies an interpretation of §5 that would subject state-court judgments to DOJ superintendence. Second, both turned on whether a state practice was actually "in ... effect" on §5's statutory coverage date—*e.g.*, November 1, 1964. Neither spoke to the question, presented here, whether a state law enacted and precleared *after* 1964 is entitled to §5 "baseline" status even when the state supreme court has authoritatively determined that it is invalid under state law.

B. The clear-statement and constitutional-avoidance doctrines contradict the district court's interpretation, which substantially exacerbates §5's federalism costs in three ways. First, the district court's reading subjects state courts' determinations of state law to

16

review—and revision—by federal executive-branch offi-
cials. Second, because it would require States to "keep
in place … practice[s] held invalid under state law"
(M.D.A. 23), the district court's interpretation implicates
the anti-commandeering principle. Third, because the
record is devoid of any evidence that Congress thought
state-court decisions like *Stokes* and *Riley* pose a serious
threat to voting rights, reading §5 to cover those deci-
sions could render §5, as applied, insufficiently "congru-
ent and proportional" under *City of Boerne v. Flores*, 521
U.S. 507 (1997).

     C. Pragmatic considerations counsel against
extending §5 to judicial decisions like *Stokes* and *Riley*.
The district court's interpretation would open up a Pan-
dora's box of potential challenges to well-settled state-
court precedents. And in light of other remedies avail-
able to address voting-rights violations, there is simply
no need to stretch §5 as the district court did.

     III. There is an additional basis for reversal here.
Under *Young v. Fordice*, 520 U.S. 273 (1997), a State's
temporary misapplication of state law, even if precleared
and actively administered, is deemed never to have been
"in force or effect" and, accordingly, does not become
part of the §5 baseline. Because the first and only at-
tempt to administer Act. No. 85-237—the 1987 election—
occurred under a cloud of litigation from which it never
emerged, the 1985 act was never "in force or effect," and
gubernatorial appointment remained the applicable
baseline. Accordingly, under *Young*, the *Stokes* and *Ri-
ley* decisions did not mark "changes" requiring §5 pre-
clearance.

17

## ARGUMENT

### I. This Court Has Jurisdiction Under 42 U.S.C. §1973c(a).

The jurisdictional issue here is straightforward, and the answer is clear. Section 5 coverage actions are heard and decided by three-judge district courts, and "any appeal shall lie to the Supreme Court." 42 U.S.C. §1973c(a). Under §1973c(a), this Court has jurisdiction over this appeal from the district court's final judgment. The district court's August 18, 2006 order expressly withheld any ruling on the injunctive relief the appellees had requested. J.S. App. 8a. It wasn't until May 1, 2007, after preclearance was denied and the appellees renewed their remedial requests, that the court addressed the remedy issue and vacated Juan Chastang's appointment. *Id.* at 1a–2a. Governor Riley timely appealed from that final judgment and, in so doing, expressly appealed from all underlying orders, including, specifically, the August 18, 2006 order. *See supra* at 12–13. The appellees' contention that Governor Riley was required to take an earlier appeal is baseless.

### A. Governor Riley Was Not Required To Appeal From the District Court's Non-Final August 2006 Order.

The appellees do not deny that §1973c(a) gives this Court jurisdiction over appeals from final judgments. Nor do they deny that an appeal from a final judgment properly brings with it all interlocutory decisions made by the district court during the litigation. *See, e.g., Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); 15A C. Wright, A. Miller, *et al.*,

18

*Federal Practice and Procedure* §3905.1, at 250 (2d ed. 1992).

Instead, the appellees stake their jurisdictional argument entirely on the proposition that the district court's initial August 2006 declaration of §5 coverage—*i.e.*, that *Stokes* and *Riley* "constituted changes that should have been precleared before they were implemented" (J.S. App. 7a–8a)—was *itself* a final judgment that triggered an obligation to appeal immediately. *See* M.D.A. 11–16. In particular, the appellees assert that the August 2006 order was final because in it the district court "[1] conclusively resolved the merits of the appellees' complaint, [2] ordered the Governor to obtain preclearance, and [3] directed that its order be entered as the final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure." M.D.A. 11. The appellees are wrong on every count.

1. The cornerstone of the appellees' position is their contention that the district court's August 2006 order "made clear that it was 'end[ing] the litigation on the merits.'" M.D.A. 12 (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)). This argument—based on a truncation of a familiar quotation—reveals a fundamental flaw in the appellees' jurisdictional theory. The fact that the district court decided the §5 coverage *issue* does not mean that the court finally decided the *case*. Instead, an appealable final judgment—as the full quote from *Catlin* makes plain—is "one which ends the litigation on the merits *and leaves nothing for the court to do but execute the judgment*." 324 U.S. at 233 (emphasis added). That description does not describe the August 2006 order, which expressly left the remedy question unresolved. Because the order did not "dispos[e] of the whole case"

19

and "adjudicat[e] all rights," it was not an appealable final judgment. *Id.*

The non-finality of the August 2006 order is clear in light of how §5 coverage actions work. The district court's inquiry focuses on three questions: "(i) whether a change was covered by §5, (ii) if the change was covered, whether §5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy is appropriate." *Lockhart*, 460 U.S. at 129 n.3. Because all here agree that neither *Stokes* nor *Riley* was pre-cleared, the district court rightly recognized that the "critical inquiries" were "whether these decisions brought about a change covered by §5, *and, if so, the appropriate remedy*." J.S. App. 6a (emphasis added). The August 2006 order answered yes to the first of those "critical inquiries"—thereby granting the appellees the declaration they sought—but expressly declined to answer the second. Instead, at the appellees' "suggest[ion]," the district court deferred a decision on whether to "enjoin enforcement" of *Stokes* and *Riley* or to "even consider taking any action regarding the appointment of Juan Chastang to the Mobile County Commission." J.S. App. 8a. It was not until the May 2007 judgment that the district court completed its *Lockhart* function by addressing the second of the two "critical inquiries" and entering a remedy order.

The August 2006 order, therefore, was a simple declaration that left the remedy issue open. Had the appellees "sought *only* a declaratory judgment, and no other form of relief," the finality calculus might be different. *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 742 (1976). Like the plaintiffs in *Wetzel*, however, the appellees here "requested an injunction, but did not get one." *Id.* Be-

20

cause the August 2006 order "left unresolved [the appellees'] requests for an injunction" and "disposed of none of [their] prayers for relief," it was not final. *Id.*; *cf. Lucas v. Bolivar County*, 756 F.2d 1230, 1234–35 (5th Cir. 1985) (district-court order was not final where "the court retained jurisdiction, directed that the [redistricting] plan be submitted for preclearance, and neither denied [n]or granted the relief requested").

2. The appellees' jurisdictional argument likewise rests on the mistaken view that the district court "ordered the Governor to obtain preclearance." M.D.A. 11, 13. That is not true. Rather, the court merely "g[a]ve the State 90 days to obtain the necessary preclearance" (J.S. App. 8a) and, in so doing, requested the Governor "to keep [it] informed of what action, *if any*, the State decides to take and the result of that action" (J.S. App. 9a–10a) (emphasis added). The district court thus gave the State an opportunity—not a command—to seek preclearance.

The absence of any injunction in the August 2006 order (or accompanying judgment) suffices to distinguish this case from those upon which the appellees rely. In each of those cases, the district court had enjoined the supposed "changes" pending preclearance. *See City of Monroe v. United States*, 522 U.S. 34 (1997) (per curiam), *rev'g United States v. City of Monroe*, 962 F. Supp. 1501, 1519–20 (M.D. Ga. 1997); *Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 36 (1978); *Georgia v. United States*, 411 U.S. 526, 528 (1973). In any event, this Court has held that "*sub silentio*" exercises of jurisdiction do not give rise to binding jurisdictional precedent. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 63 n.4 (1989). Absent an order enjoining the implemen-

21

tation of *Stokes* and *Riley* pending §5 preclearance, Governor Riley was justified in awaiting final resolution of the proceedings before appealing.

3. Finally, the appellees emphasize that the district court "directed that its [August 2006] order be entered as the final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure." M.D.A. 11. But it is hornbook law that merely calling a judgment "final" does not make it so, and the fact that the district court directed entry of its coverage decision under Rule 58 is "jurisdictionally irrelevant." 19 *Moore's Federal Practice* §202.04[2] (3d ed. 2007); *accord, e.g., Wetzel*, 424 U.S. at 741–43; *Carolina Power & Light Co. v. Dynegy Mktg. & Trade*, 415 F.3d 354, 358 (4th Cir. 2005); *Franklin v. District of Columbia*, 163 F.3d 625, 628–30 (D.C. Cir. 1998).

## B. Governor Riley Has Not Waived His Right To Appeal the August 2006 Order.

Even assuming that Governor Riley *could* have taken an earlier appeal, he was not *obliged* to do so, and his decision to await final judgment did not waive his right to appeal the coverage decision. Even where an interlocutory appeal is available "as a matter of right, failure to take an available appeal does not of itself waive the right to secure review, on appeal from final judgment, of matters that could have been appealed but were not." 16 Wright & Miller, *supra*, §3921, at 19; *accord Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 74 (1996); 19 *Moore's*, *supra*, §203.10[7][a]. The Governor, therefore, did not waive his objections to the coverage decision by waiting to appeal until after the district court had entered a remedial order.

22

## C. The Appellees' Position Makes for Bad Juris-
## dictional Policy.

The appellees' position—which would require imme-
diate appeal of every §5 coverage determination, even
absent an order enjoining the supposed "changes"—is
not only contrary to settled law but also makes no practi-
cal sense. Systemic considerations favor a rule that en-
courages covered jurisdictions, upon a finding of §5 cov-
erage, to seek preclearance, not immediate review in this
Court. First, notwithstanding the substantial burdens
that preclearance imposes on covered jurisdictions, it is,
relative to full-blown appellate review, a streamlined
process. *See* 28 C.F.R. §51.42 (presumptive 60-day time-
frame for DOJ to interpose an objection). Second, DOJ
preclears submitted changes 99% of the time, *see* S. Rep.
No. 109-295, at 13–14 (2006), thus mooting the need for
direct appeal in many cases. Accordingly, whereas Gov-
ernor Riley's view is "consonant with the overriding pol-
icy" of minimizing this Court's mandatory docket, *Gon-
zalez v. Automatic Employees Credit Union*, 419 U.S.
90, 98 (1974), the appellees' position frustrates that pol-
icy.

The Court should take jurisdiction and decide the
important question presented.

## II. The Alabama Supreme Court's Decisions in
## *Stokes v. Noonan* and *Riley v. Kennedy* Were Not
## "Changes" That Required Preclearance Under
## Section 5 of the Voting Rights Act.

By all accounts, §5's preclearance requirement is
"one of the most extraordinary remedial provisions in an
Act noted for its broad remedies." *United States v.
Board of Comm'rs of Sheffield*, 435 U.S. 110, 141 (1978)

23

(Stevens, J., dissenting). Because it works a "substantial departure ... from ordinary concepts of our federal system," and because "its encroachment on state sovereignty is significant and undeniable," §5 must "be read and interpreted with care." *Id.* (internal quotation marks omitted). Accordingly, in answering the interpretive question here, this Court should, as it has done before, avoid reading §5 so as to "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts, perhaps to the extent of raising concerns about §5's constitutionality." *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 336 (2000) ("*Bossier Parish II*") (quoting *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999)).

The federalism implications of the district court's construction—which, in effect, strips state courts of their authority to decide pure state-law questions—are profound. Surely the average American lawyer would be surprised to learn that a state supreme court's decision invalidating a state statute might be subject to the veto of a federal executive official. The image of "non-lawyer section 5 analysts"[7] reviewing state supreme courts' authoritative determinations of state law is jarring—a federalism-and-separation-of-powers double-whammy. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 n.* (1792); *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 512 (2004) (Kennedy, J., dissenting) (objecting to an interpretation of a federal statute under which "state courts would be subject to being overturned, not just by any agency, but by an agency established by a different sovereign"). But that, to be clear, is exactly what happened here: The Alabama Supreme Court expressly held

---

[7] Issacharoff, Karlan & Pildes, *supra*, at 521.

24

that Act No. 85-237 was unconstitutional, and thus a nullity, on state-law grounds, and later expressly declined, again on state-law grounds, to resurrect it. DOJ then refused to bless the Alabama Supreme Court's decisions and asserted, instead, that the 1985 act "remains in full force and effect." M.D.A. App. 5a, 12a. The district court's interpretation of §5 as authorizing that sort of intrusion substantially "alter[s] the usual constitutional balance between the States and the Federal Government." *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 543 (2002) (internal quotation marks omitted).

As Justice Kennedy said only recently, "[i]f, by some course of reasoning, state courts must live with the insult that their judgments can be revised by a federal agency, the Court should at least insist upon a clear instruction from Congress." *Alaska*, 540 U.S. at 513 (dissenting opinion). Here, there is no such instruction. All relevant sources—§5's language, its purpose and legislative history, and this Court's §5 jurisprudence—refute the district court's novel interpretation.

### A. No Indicator of Statutory Meaning Supports the District Court's Interpretation of Section 5 To Require Preclearance of *Stokes* and *Riley*.

In *Stokes v. Noonan*, the Alabama Supreme Court held that Act No. 85-237 "clearly offend[ed]" and was "directly counter" to "the language of [the Alabama] constitution" (J.S. App. 18a–19a), which provides in §105 that no "local law … shall be enacted in any case which is provided for by a general law." Ala. Const. Art. IV, §105. Accordingly, the court discharged its "duty" to "declare Act No. 85-237 unconstitutional as violating §105." J.S.

25

App. 21a.  The effect of that "declar[ation]" under Alabama law is clear:  The 1985 act was void *ab initio*—"'in legal contemplation, as inoperative as though it had never been passed.'"  *Ex parte Southern Ry.*, 556 So. 2d 1082, 1090 (Ala. 1989) (quoting *Norton v. Shelby County*, 118 U.S. 425, 442 (1886)).  Seventeen years later, in *Riley v. Kennedy*, the Alabama Supreme Court read "the plain language" of Act No. 2004-455 to apply prospectively only (J.S. App. 30a) and, accordingly, rejected any contention that Act No. 2004-455 revived Act No. 85-237.  The question now, as the district court recognized, is whether by "invalidating" the 1985 act in *Stokes* or "refusing to revive" it in *Riley*, the Alabama Supreme Court "changed" state law within the meaning of §5 practice.  J.S. App. 5a.  It did not.

One prefatory point:  Although the district court interpreted §5 as requiring preclearance of both *Stokes* and *Riley*, its determination that "change" had occurred was more about *Stokes* than *Riley*.  In striking down Act No. 85-237, *Stokes* held that gubernatorial appointment was the appropriate means under Alabama law of filling vacancies on the Mobile County Commission; *Riley* merely maintained that status quo.  Accordingly, if § 5 didn't require preclearance of *Stokes*, then it didn't require preclearance of *Riley*, either.

The district court's conclusion that §5 required preclearance of *Stokes* (and, derivatively, *Riley*) rests on a remarkable premise.  In the district court's view, the issuance of a preclearance letter finding a state statute nonretrogressive, and thus compliant with §5, effectively strips state courts of their jurisdiction to consider independent challenges to that statute under state law.  Even where, as here, the precleared statute is clearly uncon-

26

stitutional (the district court didn't question the correctness of either *Stokes* or *Riley*, *see* J.S. App. 8a), it is frozen in place as a §5 "baseline." The state courts have no authority—at least absent further federal permission, which here was refused—to remedy the constitutional defect, and the State, as the appellees have acknowledged, "must keep in place a practice held invalid under state law." M.D.A. 23. That cannot possibly be the law. Fortunately, as we will explain, it isn't.

### 1. There is no basis in Section 5's text for requiring preclearance of Stokes and Riley.

The district court did not purport to find any support for its decision in §5's text. And for good reason—there is none to be found. All relevant textual indications contradict the district court's interpretation.

a. Taken at face value, §5's text clearly does not require preclearance of *Stokes* and *Riley*. Section 5 requires Alabama to obtain preclearance of any voting practice "different from that in force or effect *on November 1, 1964*." 42 U.S.C. §1973c(a) (emphasis added). Neither *Stokes* nor *Riley* called for a practice "different from that in force or effect on November 1, 1964." On that date—and, for that matter, for nearly a century leading up to it—Alabama law clearly provided that vacancies on county commissions would be filled by gubernatorial appointment. In *Stokes*, the Alabama Supreme Court held that despite Act No. 85-237 Alabama law remained just as it had been "on November 1, 1964," and that vacancies on the Mobile County Commission should be filled by the Governor. In *Riley*, the court reaffirmed gubernatorial appointment as the appropriate practice.

27

Section 5's text thus provides no support for the district court's decision.

The point here is not to quarrel with dicta in *Presley v. Etowah County Commission*, 502 U.S. 491, 495 (1992), and *Young v. Fordice*, 520 U.S. 273, 281–82 (1997), suggesting that once a change is precleared it "normally need not be cleared again" but, rather, "become[s] part of the baseline standard." *Id.* at 281. The Court needn't tackle today the thorny question whether §5's language would preclude a state *legislature's* unprecleared return to a November 1, 1964 practice.[8] The point is simply that because this case arises so far outside the ordinary course of §5 business—a state supreme court's exercise of judicial review having been subjected to DOJ superintendence—one would expect some clear textual warrant for the district court's interpretation. *See, e.g., Raygor*, 534 U.S. at 543–44. Here, no such warrant even arguably exists.

b. Section 5's text also demonstrates that preclearance is *not* conclusive of a post-1964 statute's enforceability. Indeed, §5 expressly contemplates that a precleared statute remains subject to a post-preclearance challenge on non-§5 grounds—like the one the Alabama Supreme Court sustained in *Stokes*. It would be odd indeed if, as the district court held, the very possibility that §5 envisions—a court decision invalidating a precleared statute on some non-§5 ground—was itself a "change" that required a fresh approval.

---

[8] DOJ's §5 regulations purport to require preclearance of changes that "return[] to a prior practice or procedure." 28 C.F.R. §51.12. However, "[t]he issue of the status of changes resulting from orders of State courts is not addressed in" those regulations. 46 Fed. Reg. 870, 872 (Jan. 5, 1981).

28

Section 5's language is clear on this point: It expressly states that neither administrative nor judicial preclearance "shall bar a subsequent action to enjoin enforcement of [a precleared] qualification, prerequisite, standard, practice, or procedure." 42 U.S.C. §1973c(a). This Court has emphasized that this phrase means just what it says—that a state statute or practice *"that satisfies §5* still may be enjoined as unconstitutional." *Bossier Parish II*, 528 U.S. at 339 (internal quotation marks omitted); *see also id.* at 335 (preclearance "does *not* represent approval of the voting change" for all purposes but, rather, "affirms nothing but the absence of" retrogression under §5). Section 5's language is unqualified; a precleared practice remains subject to "a subsequent action to enjoin enforcement." There is no principled basis for engrafting onto that pellucid savings clause a proviso excluding state-law challenges. *See United States v. Rutherford*, 442 U.S. 544, 559 (1979) ("Whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial inference.").

DOJ regulations confirm what §5 itself indicates: "The preclearance by the Attorney General of a voting change does not constitute the certification that the voting change satisfies any other requirement of the law beyond that of Section 5 ...." 28 C.F.R. §51.49. There is no warrant for reading that provision—particularly given its use of the universal modifier "any"—implicitly to exclude challenges based on state constitutional provisions, which, no less than federal constitutional provisions (and other sections of the Voting Rights Act), are "requirement[s] of the law."[9]

_____

[9] The phrase "any other requirement of the law" cannot be read to mean "any other requirement of" the Voting Rights Act. "Act" is a

29

Finally, to the extent that the unqualified statutory and regulatory language leaves any room for doubt, DOJ practice confirms that precleared state statutes remain subject to subsequent state-law challenges. For starters, when it preclears a change, DOJ uniformly adds a clause disclaiming any intent to pretermit later suits. For example, when DOJ precleared Act No. 85-237, it warned as follows: "[W]e feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar *any subsequent judicial action* to enjoin the enforcement" of a precleared statute. Doc. 14, Exh. C (emphasis added). More pointedly, DOJ's website explicitly says that precleared statutes remain subject to *state*-law challenges:

> A determination by the Attorney General not to object removes the prohibition on enforcement imposed by Section 5. … Although the jurisdiction may then implement that change, *the change remains subject to a challenge on any other grounds.* For example, a redistricting plan may still be challenged in court by the Attorney General as violating Section 2 of the Voting Rights Act, or any other applicable provision of federal law which the Attorney General is authorized to enforce. *Similarly, private individuals with standing may challenge that practice under any*

---

defined term in the regulations, 28 C.F.R. §51.2 ("Act means the Voting Rights Act of 1965 ...."), and where the regulations mean to refer to the "Act," they do so expressly.

30

> *applicable provision of state or federal law.*

U.S. Department of Justice: Civil Rights Division, Voting Section, Introduction to Section 5, http://www.usdoj.gov /crt/voting/sec_5/about.htm (visited January 10, 2008) (emphasis added).

All these sources confirm the commonsense proposition that in covered jurisdictions like Alabama, the enforceability of any post-1964 voting practice rests on twin pillars: (1) preclearance and (2) validity under state law. Preclearance, in other words, is a *necessary* condition to enforceability, but not a *sufficient* condition. *See Morris v. Gressette*, 432 U.S. 491, 501–02 (1977) ("Section 5 requires covered jurisdictions to delay implementation of *validly enacted state legislation* until federal authorities have had an opportunity to" review and preclear it. (emphasis added)); H.R. Rep. No. 94-196, at 58 ("*[I]n addition to whatever steps are made necessary by State or local law for a proposed change to become law,* section 5 requires federal approval." (emphasis added)). By making Act No. 85-237's enforceability contingent only on preclearance—and disregarding its authoritatively-adjudicated invalidity under state law—the district court wrongly ignored the second pillar.

c. The Voting Rights Act's structure likewise indicates that preclearance was not required here. The Act's "bailout" provision states that to become eligible for exemption from coverage a jurisdiction must have, among other things, "*repealed* all [unprecleared] changes covered by" §5. 42 U.S.C. §1973b(a)(1)(D) (emphasis added). As a matter of common parlance, "repeal" is a means of undoing a statute or an administra-

31

tive rule, not a court decision. The district court's view
that state courts' interpretations of state constitutions
constitute §5 "changes"—which must somehow be "re-
pealed" before a State can bail out—creates tension, if
not outright contradiction, within the Voting Rights Act.

### 2. There is no basis in Section 5's purpose or legislative history for requiring preclearance of Stokes and Riley.

The district court likewise claimed no historical sup-
port for its interpretation of §5 as requiring preclearance
of *Stokes* and *Riley*. And, again, with good reason—
there is none. The district court's reading does not mesh
with the concerns that gave rise to §5, and, in fact, it is
contradicted by key portions of the Voting Rights Act's
legislative history.

a. This Court has repeatedly observed that any de-
termination of §5's proper scope must account for "the
historical experience which it reflects." *McCain v. Ly-
brand*, 465 U.S. 236, 246 (1984). That well-documented
"historical experience" reveals that the concerns that
gave rise to §5 had nothing to do with state-court deci-
sions like *Stokes* and *Riley*. Congress was worried, in-
stead, about state legislative and executive officials, who
had shown a propensity to evade federal-court decrees
by cleverly manipulating voting practices.

In the years leading up to 1965, Congress "repeat-
edly tried to cope with the problem [of voting discrimina-
tion] by facilitating case-by-case litigation" against dis-
criminatory practices. *South Carolina v. Katzenbach*,
383 U.S. 301, 313 (1966). That approach proved ineffec-
tive, however, in large part because affected States and
localities "merely switched to discriminatory devices not

32

covered by the federal decrees or ... enacted difficult
new tests designed to prolong the existing disparity be-
tween" white and black voters. *Id.* at 314. Knowing that
a number of States "had resorted to the extraordinary
stratagem of contriving new rules of various kinds for
the sole purpose of perpetuating voting discrimination in
the face of adverse federal court decrees," and "sup-
pos[ing] that these States might try similar maneuvers
in the future," Congress enacted §5. *Id.* at 335. Section
5 was Congress' targeted "'response to [the] common
practice in some jurisdictions of staying one step ahead
of the federal courts by passing new discriminatory vot-
ing laws as soon as the old ones had been struck down.'"
*Beer v. United States*, 425 U.S. 130, 140 (1976) (quoting
H.R. Rep. No. 94-196, at 57–58 (1975)). Section 5, in
short, was addressed to covered jurisdictions' "agility";
by enacting §5, "Congress meant to guard against just
those discriminatory devices that were as yet untried"
because it "did not know what the covered jurisdictions
would think up next." *Bossier Parish II*, 528 U.S. at 361,
367 n.14 (Souter, J., dissenting).

Against this backdrop, application of §5's preclear-
ance regime to legislative and executive action fits hand-
in-glove. State legislators, registrars, and precinct offi-
cials are capable of the sort of "cat and mouse" game
that Congress feared. 111 Cong. Rec. 10,727 (1965) (Sen.
Tydings). But §5's fit with respect to state-court judicial
decisions like *Stokes* and *Riley*—which arose from dis-
crete cases and controversies—is more square peg,
round hole. In striking down Act No. 85-237 on state
constitutional grounds, and later declining (again on
state-law grounds) to revive it, the Alabama Supreme
Court demonstrated none of the "agility" with which
Congress was concerned. Nor can those ordinary exer-

33

cises of judicial review be described as Alabama's effort to "think up" anything—let alone anything sinister. The court was simply deciding the cases brought before it. Section 5's core purpose of preventing States from "staying one step ahead" of federal authorities has no application here.

b.  Section 5's extensive legislative history confirms that Congress did not have state-court decisions like *Stokes* and *Riley* in mind when it constructed the pre-clearance regime. The House Report accompanying the 1965 Act, in fact, plainly states that §5 "deals with attempts by a [covered] State or political subdivision … to alter *by statute or administrative acts* voting qualifications and procedures in effect on November 1, 1964." H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2457–58 (emphasis added).  The Senate Report says the same thing, verbatim.  S. Rep. No. 89-162, 1965 U.S.C.C.A.N. 2508, 2562 (joint views of 12 committee members).

Section 5's drafting history provides insight into why the committee reports explain the statute's scope the way they do.  As originally proposed, §5 (then §8 of S. 1564) addressed only formal legislative acts: It required preclearance "[w]henever a [covered] State or political subdivision … shall *enact any law or ordinance* imposing qualifications or procedures for voting different from those in force and effect on November 1, 1964." 111 Cong. Rec. 28,358 (1965) (emphasis added).  In committee, however, the language was revised to include the current "enact or seek to administer" formulation, *id.* at 28,359–60, thereby, as the committee reports attest, reaching attempts to change voting practices "by statute or administrative acts."  Conspicuously missing is any

34

language that would have extended §5's scope to cover court decisions like *Stokes* and *Riley*.

The legislative history accompanying §5's post-1965 reauthorizations is to the same effect: §5 was invariably described as applying to legislative and administrative action. The 1970 House Report, for instance, emphasized the "continuing importance of requiring the submission of new voting laws or regulations" for review under §5; such review, the report stated, would ensure that covered jurisdictions "cannot, by employing changes in legislation, undo or defeat the rights recently won by nonwhite voters." H.R. Rep. No. 91-397, 1970 U.S.C.C.A.N. 3277, 3283–84; *accord, e.g.*, H.R. Rep. No. 94-196, at 58 (§5 applies to "new voting enactment[s]," "law[s] newly enacted by a State legislature"); S. Rep. No. 97-417, at 7, 10, 1982 U.S.C.C.A.N 177, 184, 187 ("new laws"); S. Rep. No. 109-295, at 10 (2006) ("voting laws"). In addition, the innumerable examples of discriminatory conduct to which the legislative history refers as justifying the preclearance mechanism have, so far as we can tell, uniformly involved legislative and executive conduct.[10] Although it is always difficult to prove a negative, we have found no indication in the Voting Rights Act's vast legislative history that Congress ever contemplated §5's application to ordinary exercises of judicial review.

---

[10] *See, e.g.*, H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. at 2442–43, 2447; S. Rep. No. 89-162, 1965 U.S.C.C.A.N. at 2545–46; H.R. Rep. No. 91-397, 1970 U.S.C.C.A.N. at 3283; H.R. Rep. No. 94-196, at 10; S. Rep. No. 94-295, at 17–18, 1975 U.S.C.C.A.N. 774, 783–84; H.R. Rep. No. 97-227, at 4, 13–19 (1981); S. Rep. No. 97-417, at 6, 10–14, 1982 U.S.C.C.A.N. at 182–83, 187–91; H.R. Rep. No. 109-478, at 7, 22–23, 36–43, 2006 U.S.C.C.A.N. 618, 621–22, 631–32, 640–48; S. Rep. No. 109-295, at 14–15.

35

### 3. There is no basis in this Court's precedent for requiring preclearance of Stokes *and* Riley.

The district court purported to ground its novel interpretation of §5 in this Court's precedent. And the citations to *Perkins v. Matthews*, 400 U.S. 379 (1971), *City of Lockhart v. United States*, 460 U.S. 125 (1983), and *Branch v. Smith*, 538 U.S. 254 (2003), might lend the district court's decision an air of plausibility. J.S. App. 6a–7a. But the district court's case-law analysis is strained. The court ignored the clear teaching of the most pertinent of this Court's decisions, and misapplied several others.

### a. The district court's decision is contrary to Abrams v. Johnson.

The district court's view that §5 operates to freeze unconstitutional practices in place is foreclosed by *Abrams v. Johnson*, 521 U.S. 74 (1997).

*Abrams* arose out of the 1990 census, in which Georgia picked up an extra congressional seat. The state legislature submitted two redistricting plans to DOJ for preclearance. Citing an ACLU-sponsored "max-black" plan, which contained an additional majority-black district, DOJ refused to preclear either of the Legislature's proposals. *Abrams*, 521 U.S. at 80. "[T]o gain preclearance," the legislature adopted a third plan "us[ing] the ACLU's max-black plan as a model." *Id.* DOJ precleared the plan, and the State thereafter implemented it in an election cycle. *Id.* A group of white plaintiffs later filed suit under the Equal Protection Clause, *see id.* at 81, and in *Miller v. Johnson*, 515 U.S. 900 (1995), this

36

Court invalidated Georgia's plan as an unconstitutional racial gerrymander.

On remand, the state legislature deadlocked, and a federal district court ended up drawing its own plan. 521 U.S. at 82. In *Abrams*, this Court considered and rejected a §5 challenge to that plan and, in so doing, addressed in detail the issue of the appropriate §5 baseline (or, as the Court called it there, "benchmark"). *Id.* at 96. Importantly for present purposes, the Court rejected any contention that the plan invalidated in *Miller* could, "constitutional defects and all," serve as the baseline: "Section 5 cannot be used to freeze in place the very aspects of a plan found unconstitutional." *Id.* at 97.

The Alabama Supreme Court's decision in *Stokes* operates the same way here that this Court's decision in *Miller* operated in *Abrams*. In *Abrams*, the plan held unconstitutional in *Miller* could not serve as the §5 baseline even though it had been both precleared and used to conduct elections. So too here, Act No. 85-237, held unconstitutional in *Stokes*, cannot serve as a §5 baseline even though it was precleared and implemented (in a sense, *see infra* Part III) in an election cycle. In neither case can §5 be "used to freeze in place" an unconstitutional practice, thereby requiring a State to act *ultra vires* absent federal permission to stop doing so.

Neither of the appellees' responses to *Abrams* is persuasive. First, they say that *Abrams* is "irrelevant" because the Court there was not specifically addressing the §5 coverage question presented here—namely, "what constitutes a change requiring preclearance under §5." M.D.A. 20. Classic red herring. It is true that the court-drawn plan in *Abrams* was not, under *McDaniel v. San-*

37

*chez*, 452 U.S. 130 (1981), technically subject to preclearance. But it is also undeniable that this Court in *Abrams* subjected the court-drawn plan to a standard §5 retrogression analysis. (It did so pursuant to direction in *McDaniel* itself that court-drawn plans should comply with "the appropriate Section 5 standards." *Id.* at 149.) Key to that §5 retrogression analysis, this Court emphasized, was "fixing on a benchmark." 521 U.S. at 96. And with respect to that critical question, this Court held, in no uncertain terms, that a practice adjudicated to be unconstitutional *cannot* serve as a §5 baseline. *Id.* at 97.

Second, the appellees assert that "*Abrams* addressed only legislative plans that violate the *federal* constitution." M.D.A. 20 (emphasis in original). It is entirely unclear, though, why that should matter. Just as a state statute can be unconstitutional, and thus unenforceable, as a matter of federal law, it can be unconstitutional, and just as unenforceable, as a matter of state law. In an attempt to manufacture a distinction between federal and state constitutional protections, the appellees argue that treating the unconstitutional max-black plan in *Abrams* as a baseline would have "entrench[ed] the unconstitutional practices the Voting Rights Act is designed to root out," whereas "[r]equiring Alabama to temporarily enforce a state statute that violates the state constitution's prohibition against certain forms of local legislation in no way conflicts with the basic purposes of the Voting Rights Act." M.D.A. 20–21. The argument has superficial appeal, but closer inspection reveals that it rests on a faulty premise. The "unconstitutional practice[]" of race-conscious redistricting that doomed the Georgia plan in *Miller* was undertaken *in the name of* the Voting Rights Act—specifically to obtain preclearance—not in spite of it. *See Miller*, 515 U.S. at 921–22.

38

In *Miller* and cases like it, the relationship between §5 and the federal Constitution is unique only in the sense that it is uniquely antagonistic. *See id.* at 927–28; *Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring) ("[C]onsiderations of race that would doom a redistricting plan under the Fourteenth Amendment or §2 seem to be what save it under §5.").

*Abrams* is clear: A practice authoritatively determined to be "unconstitutional" cannot be "fr[ozen] in place" as a §5 baseline. The district court's contrary decision cannot stand.

### b. The precedents invoked by the district court do not support its decision.

The district court's decision rests on an adding-up of misreadings of two separate lines of precedent. In the district court's view, (1) statements in cases like *Perkins v. Matthews* and *City of Lockhart v. United States* that certain voting practices unlawful under state law are nevertheless deemed to be "in force or effect on" a jurisdiction's statutory coverage date, plus (2) statements in cases like *Branch v. Smith* that court decrees can sometimes give rise to Section 5 "changes," equal a conclusion that §5 required preclearance of *Stokes* and *Riley*. J.S. App. 6a–7a. But the district court's precedential math doesn't add up. Even taken together, these two lines of cases do not support the remarkable proposition that §5 requires preclearance of a state court's exercise of its core judicial-review function to invalidate (and later decline to revive) a post-1964 enactment.

1. *Perkins* and *Lockhart*. More than anything else, a misunderstanding of *Perkins* and *Lockhart* drove the district court's decision. The district court considered

39

itself bound to find §5 coverage on the ground (so it thought) that those two decisions require courts to determine the §5 baseline, as a blanket matter, "'without regard for [its] illegality under state law.'" J.S. App. 7a (quoting *Lockhart*, 460 U.S. at 133, and citing *Perkins*, 400 U.S. at 394–95). Given that starting point, the district court found it easy to discount the Alabama Supreme Court's authoritative determination in *Stokes* that Act No. 85-237 violated the Alabama Constitution. *See id.* And indeed, because in the district court's view the 1985 act was locked in as the baseline as soon as it was precleared and "put into force and effect with the election of [Sam] Jones in 1987," *id.*, any court decision, like *Stokes* or *Riley*, that came later and declared the 1985 act not to be the law must have worked a §5 "change" and required DOJ authorization.

The district court's analysis ended wrong because it started wrong. The court simply plucked the without-regard-for-state-law language out of *Perkins* and *Lockhart* without considering whether, in light of the context in which those cases were decided, their logic was transferrable to this one. Closer consideration would have revealed that *Perkins* and *Lockhart*, while perhaps superficially similar to this case, are in fact quite different.

In both *Perkins* and *Lockhart*, the key question was what state voting practices were "in force or effect" on the statutory coverage date: In *Perkins*, as here, that date was November 1, 1964; in *Lockhart*, it was November 1, 1972. Both cases arose (as *Perkins* put it), in the "peculiar context," 400 U.S. at 394, in which covered jurisdictions had, *as of the coverage date*, conducted elections in a manner that arguably violated state law. In *Perkins*, the city of Canton, Mississippi had elected al-

40

dermen by wards, despite an existing statute requiring at-large voting; in *Lockhart*, the city of Lockhart, Texas had used numbered posts to elect commissioners despite uncertainty about its authority under state law to do so. The question in both cases was whether the coverage-date practice, although arguably illegal, was nonetheless part of the baseline. "[B]ased on the plain reading of [§5's] language," *Lockhart*, 460 U.S. at 133, this Court answered yes in both cases: So long as the practice was actually "in force *or* effect on" the applicable coverage date—*i.e.*, so long as it was actually being used by the jurisdiction on that date, regardless of its alleged unlawfulness under state law—then it fixed the statutory baseline, and the jurisdiction could not change it without seeking preclearance. *See id.* at 132–33; *Perkins*, 400 U.S. at 394–95.

Two critical aspects of *Perkins* and *Lockhart* render their holdings irrelevant here. The first and most obvious distinction is that neither *Perkins* nor *Lockhart* involved, as this case does, a state supreme court's authoritative determination of state law. Indeed, the *Lockhart* Court emphasized that the lawfulness of the numbered-post practice was "not entirely clear" and that, in fact, "[t]here d[id] not appear to be any Texas case law on the subject." *Lockhart*, 460 U.S. at 132 & n.6. Although the unlawfulness of the ward-election practice at issue in *Perkins* might have seemed somewhat clearer, the fact remains that neither decision required, as the district court's interpretation here so conspicuously does, "state courts [to] live with the insult that their judgments can be revised by a federal agency." *Alaska*, 540 U.S. at 513 (Kennedy, J., dissenting). It is one thing to "determine [a §5] baseline 'without regard for [its] legality under state law'" (J.S. App. 7a) in the absence of any definitive

41

pronouncement of what state law is.  It is quite another to ignore a state supreme court's binding determination that a supposed baseline (here, Act No. 85-237) is and always has been void as a matter of the State's organic law—or, what amounts to the same thing, to deem the state court's exercise of judicial review a "change" that itself requires DOJ approval.

The second distinction concerns the "peculiar context" in which *Perkins* and *Lockhart* arose.  Neither of those cases required a determination, as this case does, whether an unlawful state statute precleared *after* the statutory coverage date is automatically entitled to §5 baseline status.  Rather, both cases asked what the applicable practice was *on* the statutory coverage date:  In *Perkins*, whether the allegedly unlawful ward-election practice was, in fact, "'in force or effect *on November 1, 1964*,'" 400 U.S. at 394 (quoting §5) (emphasis added); and in *Lockhart*, whether the arguably unlawful numbered-post practice was, in fact, "'in force or effect *on November 1, 19[72]*,'" 460 U.S. at 133 (quoting §5) (emphasis added).

That fact matters for two reasons.  Initially, the conclusion that the allegedly unlawful practices in *Perkins* and *Lockhart* became a part of the relevant baseline is much easier to square with §5's language than would be a similar conclusion about Act No. 85-237.  Both *Perkins* and *Lockhart* turned on a "plain reading of [§5's] language."  *Id.*  Here, by contrast, there is no plausible argument that the 1985 act was, in the words of §5, "in force or effect on November 1, 1964."  If that statute was ever "in force or effect," it was not until 1985 at the very earliest.

42

Moreover, this contextual reading of *Perkins* and *Lockhart* makes sense. Congress had good reason in 1965 to freeze into place *all* state practices (even arguably illegal ones) that were then actually "in … effect." As we have explained, §5 was Congress' response to some States' maneuvering to evade federal-court decrees by switching to new voting practices that the decrees did not cover. *See supra* at 31–33. The problem was that the target was constantly moving. Congress in 1965 needed a timeout—an opportunity to freeze the legal landscape as of November 1, 1964, and then to move forward from there. Allowing States to fudge the practices actually in effect on that date on the (perhaps pretextual) ground that they were contrary to state law would have undermined Congress' program. States could have shifted their baselines to unknown, perhaps invidious practices—ones that had been neither known to Congress in 1965 nor precleared by DOJ. To that possibility, *Perkins* and *Lockhart* said no.

But the same logic doesn't hold when, as here, the practice determined to be invalid as a matter of state law is one that was not enacted or implemented until long *after* November 1, 1964. The Alabama Supreme Court's determination in *Stokes* that Act No. 85-237 was unconstitutional, for example, did not cause Alabama to revert to some unknown or sinister practice. It instead caused Alabama to revert to the practice (gubernatorial appointment) in effect on Alabama's November 1, 1964 coverage date. The Alabama Supreme Court's decisions here thus do not even implicate, let alone undermine, the timeout Congress called in 1965.

*Perkins* and *Lockhart* thus stand for nothing more and nothing less than what they say: "The proper com-

43

parison is between the new system and the system actually in place *on November 1, 19[64]*, regardless of what state law might have required." *Lockhart*, 460 U.S. at 132 (emphasis added). What they do not establish is that the invalidity of a *post*-1964 enactment under state law—particularly where, as here, that invalidity has been authoritatively established by the State's highest court—is irrelevant for the purposes of determining whether that practice ought to be considered part of the *post*-1964 baseline.

2. *Branch.* Perhaps in an effort to smooth over the first of the two substantial problems with its reliance on *Perkins* and *Lockhart*—namely, the absence of any authoritative state-court determination of state law—the district court cited *Branch v. Smith* for the proposition that "a §5 change may be brought about by state court decisions." J.S. App. 6a. That statement may be true as far as it goes—but that isn't very far. Neither *Branch* nor any other decision of this Court supports the proposition that state-court decisions like *Stokes* and *Riley*—those reflecting an exercise of judicial-review to invalidate a post-1964 voting practice on state-law grounds, thereby reaffirming the practice in place on the statutory coverage date—constitute §5 "changes."

*Branch* itself is way off the mark. That case involved §5's application to a Mississippi chancery-court decree reapportioning congressional districts. The decree at issue there has nothing in common with the Alabama Supreme Court's decisions in *Stokes* and *Riley*. The chancery court in *Branch* was not exercising a core judicial-review function; it was drawing a redistricting map, *see* 538 U.S. at 258–61, which, whether undertaken by a court or otherwise, is quintessentially a "legislative

44

task," *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (plurality opinion), and a "highly political" one at that, *Growe v. Emison*, 507 U.S. 25, 33 (1993). It is one thing to require a State to preclear court decrees that assume the mantle of the legislature and self-consciously exercise a political function; it is quite another to require preclearance of state-court decisions, like *Stokes* or *Riley*, that embody an exercise of the core judicial duty to say what the law is.

3. *Hathorn.* Although the district court made nothing of it, the appellees have also cited a footnote from this Court's decision in *Hathorn v. Lovorn*, 457 U.S. 255 (1982), as support for extending §5 to encompass the Alabama Supreme Court's decisions here. M.D.A. 18–19. The district court wisely declined to rely on *Hathorn*, which is inapposite. That case involved a 1964 Mississippi election statute that, as a result of doubts about its constitutionality, had never been enforced. Litigation filed in 1975 culminated in Mississippi Supreme Court orders excising the unconstitutional portions of the statute and directing enforcement of the reformulated statute without §5 preclearance. *See* 457 U.S. at 257–61.

Although the snippet of language the appellees quote—"[T]he presence of a court decree does not exempt [a] contested change from §5," *id.* at 265 n.16—might appear to support their cause, that is only because they wrench it out of context. Key to understanding the *Hathorn* dictum about "court decree[s]" is the fact that the Mississippi Supreme Court there had, in two respects, ordered enforcement of an *unprecleared* election practice. First, although the 1964 statute itself "predate[d] the Voting Rights Act," it had not been made part of Mississippi's coverage-date baseline because it

45

had never been administered in any way and thus was not, under *Perkins*, "*in fact* 'in force or effect ... on November 1, 1964.'" 457 U.S. at 265 n.16. Second, when the Mississippi Supreme Court ordered enforcement of the reformulated statute, it was ordering enforcement of what was effectively a new creation. It makes sense to require §5 preclearance when, as in *Hathorn*, a state court orders implementation of a practice that was neither part of the coverage-date baseline nor subsequently precleared. Federal approval of *some* sort is necessary to an election practice's enforceability, and "if §5 did not encompass th[e *Hathorn*] situation, covered jurisdictions easily could evade the statute by declining to implement new state statutes until ordered to do so by state courts." *Id.* But that logic—which merely prevents States from "laundering" unprecleared practices through the courts—does not translate to the situation here, in which a state court's decision has the effect of simply reaffirming the practice that was "in force or effect on November 1, 1964."

## B. The District Court's Interpretation Impermissibly Exacerbates the Federalism Costs Already Imposed by Section 5.

Section 5's preclearance mechanism, as this Court and its individual members have repeatedly recognized, is "an extraordinary departure from the traditional course of relations between the States and the Federal Government." *Presley*, 502 U.S. at 500–01; *accord, e.g.*, *Miller*, 515 U.S. at 926; *Dougherty County*, 439 U.S. at 48 (Powell, J., dissenting) (collecting citations). Given that "undeniable" fact, *Sheffield*, 435 U.S. at 141 (Stevens, J., dissenting), established canons counsel interpretive restraint. *See, e.g., Raygor*, 534 U.S. at 543

46

(clear-statement principle); *Miller*, 515 U.S. at 926–27 (constitutional avoidance doctrine). In at least three critical respects, the district court's reading "exacerbate[s] the 'substantial' federalism costs that the preclearance procedure already exacts, perhaps to the extent of raising concerns about §5's constitutionality." *Bossier Parish II*, 528 U.S. at 336 (quoting *Lopez*, 525 U.S. at 282).

1.  First, and most obviously, under the district court's interpretation, the Alabama Supreme Court, the "ultimate expositor[]" of Alabama law, *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975), is effectively stripped of its authority to decide pure state-law questions and is required, instead, to obtain the federal government's blessing to exercise that sovereign responsibility. The threat to state courts' judicial independence posed by the district court's interpretation is manifest. "Judges cannot, without sacrificing the autonomy of their office, put onto the scales of justice some predictive judgment about the probability that an administrator might reverse their rulings." *Alaska*, 540 U.S. at 512 (Kennedy, J., dissenting). Moreover, the injury here is particularly acute because state courts in §5 jurisdictions are, on the district court's view, "subject to being overturned, not just by any agency, but by an agency established by a different sovereign." *Id.* Before requiring "state courts [to] live with the insult that their judgments can be revised by a federal agency, the Court should at least insist upon a clear instruction from Congress." *Id.* at 513. As we have shown, there is none here.

2.  Second, where, as happened here, DOJ refuses to sign off on a state court's decision, the State is made, as appellees freely and repeatedly admit, to "keep in place a

47

practice held invalid under state law" and thus to do
something that flatly violates its own organic law.
M.D.A. 23; *accord id.* at 10, 21. The district court's deci-
sion thereby effectively allows the federal government to
dictate the substance of state law and comes perilously
close—if it does not go all the way—to authorizing pre-
cisely the sort of "commandeering" of state governmen-
tal processes that the Constitution condemns. *See
Printz v. United States*, 521 U.S. 898, 925 (1997); *New
York v. United States*, 505 U.S. 144, 161 (1992). It is a
short step from requiring a State to "enact or enforce" a
particular statute (plainly forbidden by *New York* and
*Printz*) to requiring a State to *maintain and enforce* a
statute that the state supreme court, as the ultimate ar-
biter of state law, has held is void and, indeed, is not
"law" at all. Particularly where, as in Alabama, a law
stricken as unconstitutional is deemed to have been void
*ab initio*, a federal directive requiring the State to keep
and enforce that statute is tantamount to forced reen-
actment.

To be clear, the affront to state sovereignty is sig-
nificantly greater here than in the "typical" §5 case, in
which a state legislature enacts a new law but DOJ re-
fuses to preclear it, thereby sending the State back to
the old law. The difference is between (1) in the typical
scenario, forcing a State to keep a law that that it *does
not want to have*; and (2) here, forcing a State to keep a
law that the ultimate arbiter of state law has definitively
determined it *cannot constitutionally have*. The federal-
ism concerns, therefore, are of a different order of mag-
nitude here.

3. Finally, there is reason to believe that if it were
interpreted to require preclearance of state-court deci-

48

sions like *Stokes* and *Riley*, §5 would not be "congruent and proportional," within the meaning of *City of Boerne v. Flores*, 521 U.S. 507 (1997), to any threat posed to Fifteenth Amendments rights in this particular context. This Court's recent decisions fleshing out the congruence-and-proportionality standard make clear that the constitutionality of Fourteenth and Fifteenth Amendment enforcement legislation must be determined, not indiscriminately, but "as it applies to [a particular] class of cases." *Tennessee v. Lane*, 541 U.S. 509, 530–31 (2004); *see also id.* at 551 (Rehnquist, C.J., dissenting) (commenting on "as applied analysis"). Here, there is no indication that Congress, when it enacted §5, had before it evidence of state courts exercising their judicial-review authority so as to "stay[] one step ahead of" federal authorities by "maneuver[ing]," "contriving," or "switch[ing]" to new and discriminatory voting practices. *See supra* at 33–33.

Whether or not the district court's novel reading of §5 would actually be found to cross any constitutional line in the final analysis, it certainly raises constitutional questions and, in any event, substantially ups the federalism ante relative to the more typical §5 scenario. Just as this Court has refused on federalism grounds to indulge questionable readings of §5 in the past, it should do so here. *See Bossier Parish II*, 528 U.S. at 336; *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997) (rejecting interpretation that would "increase further the serious federalism costs already implicated by §5"); *Miller*, 515 U.S. at 926–27 (rejecting interpretation of §5 that could have presented "troubling and difficult constitutional questions"). What the Court said in *Miller* applies here as well: The "belief in *Katzenbach* that the federalism costs exacted by §5 preclearance could be jus-

49

tified by" certain state actors' transparent efforts during
the 1960s to perpetuate voting discrimination "does not
mean they can be justified in the circumstances of this
litigation." *Id.* at 926–27. Because it is not "the manifest
purpose" of §5 to freeze in place a post-1964 enactment
that the Alabama Supreme Court has held, for reasons
altogether unrelated to those that underlie the Voting
Rights Act, independently violates the Alabama Consti-
tution, this Court should "hesitate before interpreting
the statute to effect such a substantial change in the bal-
ance of federalism." *Owasso Indep. Sch. Dist. No. I-011
v. Falvo*, 534 U.S. 426, 432 (2002).

## C. The District Court's Interpretation Is Un-
workable and Unnecessary.

Not only is the district court's interpretation contra-
dicted by all relevant indicia of §5's proper scope, and not
only does it risk impermissibly exacerbating federalism
costs, but it is also supremely impractical and, to boot,
altogether unnecessary to protect against racial dis-
crimination.

1. The district court's interpretation—which if
adopted by this Court would require, for the first time,
preclearance of every state-court decision that affects
voting in any way—would open up a Pandora's box of
possible challenges and would risk destabilizing the deci-
sional law of all sixteen §5 jurisdictions.[11] As is demon-
strated by this litigation, which centers on a 20-year-old
case, no decision rendered by any state court in any §5
jurisdiction during the last 40+ years would be safe from
attack. Innumerable state-court decisions would be-
come, in an instant, ripe for §5 take-down. This case, of

---

[11] *See supra* note 2.

50

course, proves that the threat is not hypothetical. For nearly two decades, *Stokes* was thought to be the settled law of Alabama. Now, both it and *Riley* have (so West-law says) been "[c]alled into [d]oubt" by the district court's decision. Under the district court's reading of §5, state and local officials charged with preclearance responsibilities would presumably need to scour the reporters for every post-1964 court decision that even arguably affects voting and submit *all of them* to DOJ for preclearance. Alabama's experience in this case indicates that, in all likelihood, some of those decisions—long assumed to be valid and, perhaps, spawning entire legal doctrines—wouldn't make the cut. The upheaval in the decisional law of covered jurisdictions could be staggering.

2.  Moreover, there simply is no overriding *need* to stretch an already-stretched §5 to reach state-court decisions like those at issue here. Even if what this Court has called "the extraordinary burden-shifting procedures of §5" do not apply, *Bossier Parish II*, 528 U.S. at 335, the full panoply of established remedies for enjoining discriminatory voting practices remains available. Most notable among those remedies is §2 of the Voting Rights Act, which broadly prohibits States and localities from "impos[ing] or appl[ying]" any "standard, practice, or procedure" in a manner "which results in a denial or abridgment of the right" to vote "on account of race or color." 42 U.S.C. §1973(a). Civil actions under 42 U.S.C. §1983 to enforce Fourteenth and Fifteenth Amendment rights continue to provide protection as well. There is, therefore, no reason to believe that, absent the district court's unprecedented reading of §5, any plaintiff would be left without proper recourse.

51

### III. Because Under *Young v. Fordice*, Act No. 85-237 Was Never "In Force or Effect," *Stokes* And *Riley* Did Not Mark Section 5 "Changes."

There is, in addition, an alternative basis for reversal here—one tied more specifically to the unique circumstances of this particular case. Even if §5 could, as a general matter, be read to cover state-court decisions like *Stokes* and *Riley*, *Stokes* and *Riley* themselves would not be covered. The reason is this: Act No. 85-237 was invalidated the first time anyone ever attempted to administer it and, indeed, in the course of litigation that was filed *before* any election was conducted under its provisions. That fact is critical because under this Court's unanimous decision in *Young v. Fordice*, a State's temporary misapplication of state law, even if precleared by DOJ and actively administered, does "not become part of the baseline against which [the Court is] to judge whether future change occurred" under §5. 520 U.S. 273, 283 (1997). On the facts here, Act No. 85-237— and the single election mistakenly conducted under it— cannot be regarded as anything other than a temporary misapplication of Alabama law. The 1985 act's special-election practice, therefore, never became the §5 baseline. Because, instead, gubernatorial appointment remained, as it had since November 1, 1964, the applicable baseline, neither *Stokes* nor *Riley*, both of which merely reaffirmed the propriety of gubernatorial appointments, could have marked "changes" in state practices for §5 purposes.

To serve as a §5 baseline, a voting practice must at least be, in the words of the statute, "in force or effect." 42 U.S.C. §1973c(a). Here, the district court determined that the 1985 act was the appropriate baseline because it

52

had been both precleared and, more importantly for pre-
sent purposes, "put into force and effect with the election
of [Sam] Jones in 1987." J.S. App. 7a. The question is
whether Jones' 1987 election—enveloped as it was by a
cloud of litigation from which it never emerged—can
count as having put the 1985 act into "force or effect"
within the meaning of §5. Under this Court's unanimous
decision in *Young*, it can't.

In *Young*, Mississippi's Secretary of State had ob-
tained DOJ preclearance of, and had actively adminis-
tered, a provisional voter-registration plan designed to
effectuate the National Voter Registration Act. *See* 520
U.S. at 277–78. State officials registered some 4,000 vot-
ers under the plan, but later ceased implementation after
concluding that the state legislature would not ratify it.
*Id.* at 278. State officials then set about the business of
"notify[ing] the 4,000 registrants that they were not," in
fact, "registered to vote in state or local elections." *Id.*
This Court rejected the contention that the provisional
plan was the §5 baseline against which later registration
practices were to be compared; in particular, the Court
reasoned that the plan had never been "in force or ef-
fect" within the meaning of §5. In so holding, the Court
acknowledged, by citation to *Perkins* and *Lockhart*, that
"the simple fact that a voting practice is unlawful under
state law does not show, entirely by itself, that the prac-
tice was never 'in force or effect'" for §5 purposes. *Id.* at
283. After all, the *Young* Court explained, a State
"might maintain in effect for many years" a plan that
"technically, or in one respect or another, violated some
provision of state law." *Id.* But Mississippi's provisional
NVRA plan, the Court explained, was different: When
"taken together," the "circumstances" surrounding the
plan's implementation and prompt abandonment showed

53

that the plan amounted to a temporary misapplication of state law that was never "in force or effect" for §5 purposes. *Id.*

Similar circumstances require reversal here. Act No. 85-237 had not been on the books for "many years," *id.*, when the Alabama Supreme Court decided *Stokes*. Gubernatorial appointment had indisputably been the law from 1868 to 1985. *See supra* at 6–7. The first and only time that anyone ever attempted to put the 1985 act's contrary practice into "force or effect" was in 1987, when the first post-1985 vacancy arose on the Mobile County Commission. But in April 1987, two months *before* any election was to take place, Willie Stokes filed his constitutional challenge to the act. Although the trial court rejected Stokes' challenge and allowed an election to go forward in June 1987, the Alabama Supreme Court thereafter reversed the trial court's decision. In so doing, the Alabama Supreme Court effectively held (albeit not in precisely these words) that the 1985 act, the 1987 election, and the trial court's decision allowing the election to proceed were all "temporary misapplication[s] of state law." *Young,* 520 U.S. at 282. Like the Mississippi officials in *Young,* Mobile County officials "did not intend to administer an unlawful plan"; they proceeded with the election only after the trial court told them (erroneously, as it turns out) that an election was permissible. *Id.* at 283. And like the Mississippi officials, Alabama officials abandoned Act No. 85-237's special-election procedure "as soon as its unlawfulness became apparent, *i.e.,* as soon as it became clear" that it was unconstitutional as a matter of state law. *Id.*

There are no relevant differences between this case and *Young* that would justify a contrary result here. To

54

be sure, this Court in *Young* took note of—and attributed some significance to—the facts that Mississippi's plan had been in place for only 41 days and that no election had been conducted under it. *See id.* Here, it took more than a year for Stokes' challenge to wind its way through the court system, and Mobile County conducted one election during that time. But the relatively short delay and the solitary election can only be chalked up to the vagaries of the litigation process. Stokes filed his challenge at the earliest possible juncture, well before any election was held. The election went forward only because (1) the trial court misapplied Alabama law and (2) it took a year for the Alabama Supreme Court to correct the trial court's error. In light of the Alabama Supreme Court's undisputed role as "the *final* arbiter of Alabama law, with ultimate authority to oversee and rule upon the decisions of the lower State courts," *Ex parte James*, 836 So. 2d 813, 834 (Ala. 2002), this case could not possibly turn on the fortuity that the trial court, which got the first shot at considering the 1985 act's constitutionality, happened to have gotten state law wrong. Nor can this case turn on the fact that it took the Alabama Supreme Court a year, rather than 41 days, to fix the trial court's error. Some modest delay is the price of deliberate decisionmaking and, in any event, is a fact of life in American courts. The dispositive facts here are (1) that the 1987 special election was bracketed by litigation challenging its validity and (2) that it did not survive that challenge. *Cf. Perkins*, 400 U.S. at 400 (Harlan, J., concurring in part and dissenting in part) (reasoning that even a *post*-election challenge "to have [an] election set aside" would prevent an unlawful practice from being "in force or effect").

55

Nor can *Young* be distinguished, as the appellees suggest, on the ground that it merely involved a *"proposed* statute" that "was ultimately never enacted." M.D.A. 21. As a formal matter, the Mississippi plan was more than a "proposed statute"; Mississippi's Secretary of State had promulgated the plan in an administrative "implementation manual" billed as "Mississippi's plan to administratively implement NVRA." Br. for the United States at 6, *Young* (No. 95-2031). Section 5 puts informal administrative rules on the same footing as formal enactments like Act No. 85-237, *see NAACP v. Hampton County Election Comm'n,* 470 U.S. 166, 178 (1985), and, indeed, DOJ wouldn't have considered preclearing Mississippi's plan, let alone approved it, if it hadn't been a "final enactment or administrative decision," 28 C.F.R. §51.22 (a). Moreover, as a practical matter, it is not true, as the appellees put it, that the Mississippi plan was "never born." M.D.A. 21. Until the plan was withdrawn, the plan was "born" in every way Act No. 85-237 was (or wasn't). Mississippi officials submitted the plan to DOJ—which precleared it—and then registered some 4,000 people under its provisions. What deprived the Mississippi plan of §5 baseline status was not its lack of implementation or treatment as binding law—for it was, in fact, implemented and treated as binding law—but the fact that it was withdrawn as soon as it was determined that the plan was actually *not* "law" at all. Because that is exactly what happened here, Act No. 85-237 was no more "in force or effect" than was the Mississippi plan at issue in *Young.*

Because, under *Young,* Act No. 85-237 was never "in force or effect" for §5 purposes, its provision for special elections never became part of the baseline for comparing future changes in Alabama law. For this reason—

56

and independently of the arguments in Part II—*Stokes* and *Riley,* which merely confirmed the longstanding rule that vacancies on the Mobile County Commission should be filled through gubernatorial appointment, did not mark "changes" in voting practices that required §5 pre-clearance.

## CONCLUSION

For the foregoing reasons, this Court should take jurisdiction and reverse the district court's decision.

Respectfully submitted,

TROY KING
*Attorney General*
MARGARET L. FLEMING
JAMES W. DAVIS
MISTY S. FAIRBANKS
*Asst. Attorneys General*
STATE OF ALABAMA
11 South Union Street
Montgomery, AL 36130
(334) 242-7300

KEVIN C. NEWSOM
   *Counsel of Record*
MATTHEW H. LEMBKE
JOHN C. NEIMAN, JR.
SCOTT BURNETT SMITH
JOHN W. REA
ANDREW L. BRASHER
BRADLEY ARANT ROSE
   & WHITE LLP
1819 Fifth Avenue North
Birmingham, AL 35203
knewsom@bradleyarant.com
(205) 521-8803

*Attorneys for Appellant*

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| YVONNE KENNEDY, JAMES<br>BUSKEY & WILLIAM CLARK, | )<br>)<br>) | |
|     Plaintiffs, | )<br>) | CIVIL ACTION NO. |
|     v. | )<br>) | 2:05cv1100-MHT<br>(WO) |
| HONORABLE BOB RILEY, as<br>Governor of the State of<br>Alabama, | )<br>)<br>) | |
|     Defendant. | )<br>) | |

Before Stanley Marcus, Circuit Judge, Myron H. Thompson, District Judge, and W. Harold Albritton, Senior District Judge.

### OPINION

Myron H. Thompson, District Judge:

This three-judge court has been convened to consider the claim of plaintiffs Yvonne Kennedy, James Buskey, and William Clark that, under § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, the State of Alabama was required, but failed, to preclear two decisions of the Alabama Supreme Court: Stokes v. Noonan, 534 So.2d


EXHIBIT
F

237 (Ala. 1988), and <u>Riley v. Kennedy</u>, 928 So.2d 1013 (Ala. 2005). For the reasons that follow, we hold that the state court decisions should have been precleared before they were implemented.

## I.

A brief chronology of the events leading up to the challenge to these two state court decisions is helpful:

<u>April through June 1985</u>: Act No. 85-237, a local law providing, in certain circumstances, for a special election to fill vacancies on the Mobile County Commission, was enacted and, shortly thereafter, precleared by the United States Attorney General.[1] Prior

---

1. Act No. 85-237 states that:

    "Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat
    (continued...)

2

to Act No. 85-237, such vacancies were filled by gubernatorial appointment.

June and July 1987: Pursuant to Act No. 85-237, a special election was held to fill a vacancy on the Mobile County Commission. Sam Jones won and assumed office.

September and October 1988: In Stokes v. Noonan, the Alabama Supreme Court held that, because Act No. 85-237 was a local statute and because it conflicted with and was subsumed by another state law of general application, it violated the Alabama Constitution. The governor then appointed Jones to the Mobile County Commission seat to which he was previously elected. The State did not submit Stokes v. Noonan for preclearance.

May through September 2004: The Alabama Legislature passed Act No. 2004-455 expressly to allow local laws to make exceptions to the general rule of filling vacancies

---

1. (...continued)
   has become vacant...."

Act of Apr. 8, 1985, No. 85-237, 1985 Ala. Acts 137.

3

by gubernatorial appointments.[2]    The United States
Attorney General precleared Act No. 2004-455.

September and October 2005: Jones was elected Mayor
of Mobile and vacated his Mobile County Commission
position.

November 2005: In Riley v. Kennedy, the Alabama
Supreme Court rejected claims that Act No. 2004-455
revived Act No. 85-237 and that, as a result, Act. No.
85-237 now required that the vacancy on the Mobile County
Commission be filled by special election rather than by
gubernatorial appointment; the court held that Act No.
2004-455 applied only prospectively.    Relying on Riley v.
Kennedy, the governor appointed Juan Chastang to the
vacated position on the Mobile County Commission.    As

---

    2.  Act No. 2004-455 amended the general law, Ala.
Code § 11-3-6, to read as follows:

> "Unless a local law authorizes a special
> election, in case of a vacancy, it shall
> be filled by appointment by the
> governor, and the person so appointed
> shall hold office for the remainder of
> the term of the commissioner in whose
> place he or she is appointed."

with <u>Stokes v. Noonan</u>, the State did not submit <u>Riley v.</u> <u>Kennedy</u> for preclearance.

The plaintiffs then filed this lawsuit claiming that <u>Riley v. Kennedy</u> and the earlier decision in <u>Stokes v.</u> <u>Noonan</u> could not be implemented without first being precleared.

## II.

The thrust of the plaintiffs' argument is that, because Act No. 85-237 was precleared and enforced, <u>Stokes v. Noonan</u> (the decision invalidating it) and <u>Riley v. Kennedy</u> (the later decision refusing to revive, and therefore, to enforce it) should not have been implemented without first being precleared.

## A.

Section 5 of the Voting Rights Act requires certain States, such as Alabama, to obtain preclearance from the Attorney General of the United States or the United

5

States District Court for the District of Columbia when they "or [their] political subdivision[s] ... enact or seek to administer any ... standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." 42 U.S.C. § 1973c. Generally, a change from an elected to an appointed office requires preclearance, Allen v. State Bd. of Elections, 393 U.S. 544, 569-70 (1969), and a § 5 change may be brought about by state court decisions. Branch v. Smith, 538 U.S. 254, 262 (2003).

"The State may preclear a voting change in one of two ways: it may obtain a declaratory judgment in the United States District Court for the District of Columbia, or it may submit the change to the Attorney General of the United States for approval. If the Attorney General approves the change, or fails to register an objection to the change within 60 days, the change is precleared." Boxx v. Bennett, 50 F. Supp.2d 1219, 1223 (M.D. Ala. 1999) (three-judge court).

6

In reviewing the plaintiffs' § 5 claim, we are tasked with the limited purpose of determining "(i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate." City of Lockhart v. United States, 460 U.S. 125, 129 n.3 (1983). Because it is undisputed that Stokes v. Noonan and Riley v. Kennedy were not precleared, the critical inquiries for this court are whether these decisions brought about a change covered by § 5, and, if so, the appropriate remedy.

In determining whether a change covered by § 5 occurred, we must first determine if there was, in fact, a change. Changes are measured by comparing the new challenged practice with the baseline practice, that is, the most recent practice that is both precleared and in force or effect. Abrams v. Johnson, 521 U.S. 74, 96-97 (1997) (citing 28 CFR § 51.54); Gresham v. Harris, 695 F.

7

Supp. 1179, 1183 (N.D. Ga. 1988) (three-judge court),

aff'd sub nom. Poole v. Gresham, 495 U.S. 954 (1990).

Here, the parties dispute what constitutes the baseline practice. The plaintiffs argue that the baseline is Act No. 85-237, which provided for the filling of the vacancy on the Mobile County Commission by special election; they maintain that Stokes v. Noonan and Riley v. Kennedy were changes because the former invalidated the Act and the latter still refused to enforce it. The State responds that the baseline could not be Act No. 85-237 because the Alabama Supreme Court declared it unconstitutional; the State posits that Stokes v. Noonan and Riley v. Kennedy did not reflect a change but were rather a mere reaffirmation of the correct scope of the governor's preexisting appointment power under Alabama general law.

We think the plaintiffs have the better argument. Because Act No. 85-237 was the most recent precleared practice put into force and effect with the election of

8

Jones in 1987, it is the baseline against which we must determine if there was a change. To be sure, the Alabama Supreme Court declared Act No. 85-237 unconstitutional under state law; this was, however, after Act No. 85-237 had been put into effect. We are required to determine the baseline "without regard for [its] legality under state law." Lockhart, 460 U.S. at 133 (relying on Perkins v. Matthews, 400 U.S. 379, 394-395 (1971)).

We therefore hold that, because Act No. 85-237 is the baseline and because Stokes v. Noonan invalidated Act No. 85-237 and Riley v. Kennedy held that Act No. 85-237 was not rendered enforceable by Act No. 2004-455, the two decisions constituted changes that should have been precleared before they were implemented. In reaching this holding, we emphasize that we are in no way disputing the rulings of the Supreme Court of Alabama, the reasoning underlying the rulings in these two cases, or that the governors acted in accordance with state law in making the appointments. Indeed, this court does not

have jurisdiction to address such purely state-law questions. Whether Act No. 85-237 is, in fact, unconstitutional under state law and whether positions on the Mobile County Commission must be filled by special election or gubernatorial appointment are state-law questions we do not reach and should not be understood in any way as reaching; our holding today does not in any way undermine these two decisions under state law. We merely hold that federal law requires that they be precleared before they are implemented.

B.

The plaintiffs suggest that rather than enjoin enforcement of <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u>, or otherwise even consider taking any action regarding the appointment of Juan Chastang to the Mobile County Commission, we should give the State 90 days to obtain the necessary preclearance. We agree.

An appropriate judgment will be entered.

Done this the 18th day of August, 2006.


_____/s/ Stanley Marcus_____
UNITED STATES CIRCUIT JUDGE


____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE


_____/s/ W. Harold Albritton___
SENIOR UNITED STATES DISTRICT JUDGE



STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL

TROY KING
ATTORNEY GENERAL

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, AL 36130
(334) 242-7300
WWW.AGO.STATE.AL.US

November 9, 2006

Chief, Voting Section
Civil Rights Division
Room 7254 - NWB
Department of Justice
1800 G St., N.W.
Washington, DC 20006

RE:    **Submission under Section 5 of the Voting Rights Act of 1965
Expedited Consideration Requested**

Dear Sir:

In accordance with Section 5 of the Voting Rights Act of 1965, 42 U.S.C.
§ 1973c, we make this submission for preclearance by the Attorney General of the United
States. This submission concerns two decisions of the Supreme Court of Alabama that
concern the method of filling vacancies on the Mobile County Commission. Those
decisions are Riley v. Kennedy, 928 So. 2d 1013 (Ala. 2005), and Stokes v. Noonan, 534
So. 2d 237 (Ala 1988).

We request expedited consideration of this submission, which is made pursuant to
the order of a three-judge federal district court. See Kennedy v. Riley, 445 F. Supp. 2d
1333 (M.D.Ala. 2006) (three-judge court). In its judgment, the court allowed the State 90
days to obtain preclearance. That 90-day period expires on or about November 16, 2006,
and the State contemplates asking the court for an extension if no action has been taken
by that date. In the time between the entry of the judgment and this submission, the State
considered whether to appeal from the judgment and responded to the Kennedy plaintiffs'
request for attorneys' fees. In addition, the undersigned, who had handled this case in
both state and federal court, moved to Northern Virginia, wrote two appellees' briefs, an
appellant's initial brief and reply brief, and consulted with the office in Montgomery on
other issues.

As noted above, this submission relates to the method of filling vacancies on the
Mobile County Commission. Before the effective date of the Voting Rights Act in
Alabama, November 1, 1964, general law provided that vacancies on county

EXHIBIT
G
PERIGO/IO 000-631-0999

Chief, Voting Section
November 9, 2006
Page 2

commissions, including the Mobile County Commission, would be filled through gubernatorial appointment. That general law was codified at § 11-3-6, Code of Alabama (1989). In 1985, the Legislature passed a local law, Act No. 85-237, which provided that vacancies on the Mobile County Commission would be filled by a special election. By letter dated June 17, 1985, the State was advised that the Attorney General of the United States had no objection to the proposed change.

In 1987, a vacancy in one of the seats on the Mobile County Commission occurred. In April of that year, Willie Stokes filed suit in the Circuit Court of Mobile County attacking the constitutionality of Act No. 85-237. The Circuit Court denied relief, and the vacancy was filled by special election. Stokes appealed, though, and, in a decision issued on September 30, 1988, the Supreme Court of Alabama reversed the judgment of the Circuit Court. In Stokes v. Noonan, the court declared Act No. 85-237 unconstitutional because it violated § 105 of the Constitution of Alabama (1901). Section 105 prohibits the enactment of a local law "in any case which is provided by a general law."

The Alabama Supreme Court's ruling created a vexing issue of state law. Without a valid election, the incumbent had no right to hold the office and was vulnerable to an action in quo warranto. Then-Governor Guy Hunt solved the problem by exercising his power of appointment to appoint the person who had been elected.

In 2004, the Alabama Legislature amended the general law, § 11-3-6, passing Act No. 2004-455. As amended, the statute provided that vacancies on county commissions would be filled by gubernatorial appointment "[u]nless a local law authorizes a special election." Ala. Code § 11-3-6 (Supp. 2004). By letter dated September 28, 2004, the State was advised that the Attorney General had no objection to the proposed change.

No vacancy on the Mobile County Commission arose until September 2005, when Sam Jones, an incumbent commissioner, was elected Mayor of Mobile. With the vacancy, the method of filling it became a bone of contention. Some contended that the vacancy was to be filled through a special election, pointing to Act 85-237 and arguing that it had been revived by Act No. 2004-455. Others contended that, with the declaration that Act No. 85-237 was unconstitutional in Stokes v. Noonan, the vacancy was to be filled by gubernatorial appointment pursuant to the general law.

Three plaintiffs, Yvonne Kennedy, James Buskey, and William Clark filed suit in the Circuit Court of Montgomery County seeking declaratory and injunctive relief. They sought a declaration that the vacancy was due to be filled through a special election and an injunction directing the probate judge to conduct one. Governor Riley, who was named as a defendant, responded by contending that, with the declaration that Act 85-237 was unconstitutional in Stokes v. Noonan, he was empowered to fill the vacancy by appointment. The Circuit Court ruled in favor of the plaintiffs, and Governor Riley appealed.

Chief, Voting Section
November 9, 2006
Page 3

Even though the appeal was expedited, the local election officials had to move quickly and asked the Attorney General of the United States to preclear a special election calendar that included a primary election on November 22, 2005, a run-off election on December 13, 2005, and a general election on January 3, 2006. The local election officials needed the approval of the Attorney General of the United States in order to start the election machinery. By letter dated October 25, 2005, the Attorney General of Alabama suggested that the Attorney General of the United States withhold action on the submittal pending the outcome of the litigation in state court. The Attorney General of Alabama pointed out that the proceedings in the Supreme Court of Alabama had been expedited and that withholding action was consistent with 48 C.F.R. § 51.22 (2004). The Attorney General of the United States declined to withhold action and interposed no objection to the proposed special election.

As the Attorney General of Alabama suggested might happen, the Supreme Court of Alabama reversed the judgment of the Circuit Court. Riley v. Kennedy, 928 So.2d 1013 (Ala. 2005). The court held that Act No. 2004-455 did not operate retroactively so as to revive Act No. 85-237. With that ruling, there was no state law basis for the proposed special election. Governor Riley proceeded to appoint Juan Chastang, an African-American, to fill the vacancy. The Attorney General of Alabama advised the Attorney General of the United States of the ruling in Riley v. Kennedy and stated that the vacancy would be filled by gubernatorial appointment.

The plaintiffs then filed suit in federal district court asserting that Stokes v Noonan and Riley v. Kennedy were changes in voting law that had to be precleared to be enforceable. Governor Riley contested the lawsuit. In his briefing, Governor Riley noted that requiring preclearance of decisions made in the course of the ordinary appellate process that invalidated precleared changes were not changes in voting. Rather, any state statute must be valid as a matter of state law, not just precleared, to be enforceable. Preclearance does not speak to validity under state law. Moreover, preclearance cannot speak to validity under state law without raising grave constitutional questions. The three-judge court agreed with the plaintiffs and directed the State to seek preclearance of these decisions.

Without waiving its objections, the State requests that the Attorney General preclear the decisions of the Supreme Court of Alabama in Stokes v. Noonan and Riley v. Kennedy.

In compliance with 28 C.F.R. § 51.27, we submit the following information to the Attorney General:

*"(a) A copy of any ordinance, enactment, order, or regulation embodying a change affecting voting."*

Without conceding that either decision represents a change that must be precleared, a copy of the Alabama Supreme Court's decision in Riley v. Kennedy is

Chief, Voting Section
November 9, 2006
Page 4

included as Exhibit A-1. A copy of the Alabama Supreme Court's decision in <u>Stokes v.</u>
<u>Noonan</u> is included as Exhibit A-2.

"(b) A copy of any ordinance, enactment, order, or regulation embodying the voting
practice that is proposed to be repealed, amended, or otherwise changed."

A copy of Act No. 85-237, which was declared unconstitutional in <u>Stokes v.</u>
<u>Noonan</u>, is included as Exhibit B-1. A copy of Act No. 2004-455, which was held not to
be retroactive in <u>Riley v. Kennedy</u>, is included as Exhibit B-2. A copy of § 11-3-6 is
included as Exhibit B-3.

"(c) If the change affecting voting either is not readily apparent on the face of the
documents provided under paragraphs (a) and (b) of this section or is not embodied in a
document, a clear statement of the change explaining the difference between the
submitted change and the prior law or practice, or explanatory materials adequate to
disclose to the Attorney General the difference between the prior and proposed situation
with respect to voting."

Without conceding that either decision represents a change requiring
preclearance, the decisions and the context set forth above adequately identify the chain
of events.

"(d) The name, title, address, and telephone number of the person making the
submission."

Troy King, Attorney General, John J. Park, Jr., Special Assistant Attorney
General, and Misty S. Fairbanks, Assistant Attorney General, State of Alabama, Alabama
State House, 11 South Union Street, 3d Floor, Montgomery, Alabama 36130-0152, Jack
can be reached at 334-242-7997, and Misty at 334-353-8674; both share the same
facsimile, which is 334-353-8440; and e-mail jpark@ago.state.al.us and
mfairbanks@ago.state.al.us.

"(e) The name of the submitting authority and the name of the jurisdiction responsible for
the change, if different."

The State of Alabama.

"(f) If the submission is not from a State or county, the name of the county and State in
which the submitting authority is located."

Not applicable.

Chief, Voting Section
November 9, 2006
Page 5

*"(g) Identification of the person or body responsible for making the change and the mode of decision (e.g., act of State legislature, ordinance of city council, administrative decision by registrar)."*

The Supreme Court of Alabama.

*"(h) A statement identifying the statutory or other authority under which the jurisdiction undertakes the change and a description of the procedures the jurisdiction was required to follow in deciding to undertake the change."*

The Supreme Court of Alabama has appellate jurisdiction over cases originating in the Circuit Courts of Alabama. <u>See</u> § 12-2-7, Code of Alabama (2006). The court had jurisdiction over the cases that resulted in the decisions in <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u>.

*"(i) The date of adoption of the change affecting voting."*

Without conceding that either decision represents a change, the Alabama Supreme Court issued its decision in <u>Riley v. Kennedy</u> on November 9, 2005, and the decision in <u>Stokes v. Noonan</u> on September 30, 1988. The decision in <u>Riley v. Kennedy</u> was given effect insofar as the election that was to fill the vacancy in question, which was scheduled, has not taken place, and Juan Chastang was appointed to fill the vacancy. The decision in <u>Stokes v. Noonan</u> may have been given effect. After Act No. 85-237 was precleared, and before the Alabama Supreme Court decided <u>Stokes v. Noonan</u>, there was a vacancy on the Mobile County Commission that was filled by special election. After the decision in <u>Stokes v. Noonan</u> came down, there was no state-law basis for the special election. Then-Governor Hunt resolved the vexing state-law question by appointing the person who had been elected in the special election and was serving to the position. The issue was vexing because, after <u>Stokes v. Noonan</u>, that commissioner had no state-law entitlement to serve and would have been vulnerable to an action <u>in quo warranto</u>.

*"(j) The date on which the change is to take effect."*

The State incorporates the response in subparagraph (i) by reference.

*"(k) A statement that the change has not yet been enforced or administered, or an explanation of why such a statement cannot be made."*

The State incorporates the response in subparagraph (i) by reference.

Chief, Voting Section
November 9, 2006
Page 6

"(l) Where the change will affect less than the entire jurisdiction, an explanation of the scope of the change."

Without conceding that there has been a change, the scope is limited to Mobile County. More particularly, the change affects only the Mobile County Commission, not any other elected body or office in Mobile County.

"(m) A statement of the reasons for the change."

Without conceding that there has been a change, the change results from litigation in the state courts. Both decisions involve the application of generally-applicable, race-neutral principles of law.

In Stokes v. Noonan, the Supreme Court of Alabama held that Act No. 85-237 was unconstitutional because it violated § 105 of the Alabama Constitution in that it was a local law enacted in a case "provided by general law." The decision in Stokes was an application of the court's holding in Peddycoart v. City of Birmingham, 354 So. 2d 808 (Ala. 1978). There, the court held that the presence of a general law had primary effect such that "a local law cannot be passed upon the subject." 354 So. 2d at 813.

In Riley v. Kennedy, the Supreme Court of Alabama applied race-neutral generally applicable principles of statutory construction relating to retroactivity of legislation. As the court noted, under Alabama law, "statutes are to be prospective only, unless clearly indicated by the legislature." 928 So. 2d at 1016 (quoting Gotcher v. Teague, 583 So. 2d 267, 268 (Ala. 1991)). It concluded that the "plain language" of Act No. 2004-455 and the Act's preamble provide "for prospective application only." 928 So. 2d at 1017.

"(n) A statement of the anticipated effect of the change on members of racial or language minority groups."

Without conceding that there has been a change, the immediate effect is to fill the vacancy on the Mobile County Commission by gubernatorial appointment rather than by special election. The vacancy at issue is in a majority-black commission district, but the change affects all of the seats on the Mobile County Commission. That body has three seats, two of which are in majority-white districts. Furthermore, Juan Chastang, the person whom Governor Riley appointed to fill the vacancy, is an African-American. As a result, Governor Riley believes that politics, not race, is at issue in this submission; if he had appointed the "right" African-American, there would be no complaint.

Chief, Voting Section
November 9, 2006
Page 7

"(o) A statement identifying any past or pending litigation concerning the change or related voting practices."

Plainly, this submission is the product of litigation. A three-judge federal district court rejected the State's contention that there was no change and directed the State to seek preclearance. Likewise, the decisions in <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u>, which are the subject of this submission, are the product of litigation. Those decisions speak for themselves and, indeed, are the only word on the subject that is relevant.

"(p) A statement that the prior practice has been precleared (with the date) or is not subject to the preclearance requirement and a statement that the procedure for the adoption of the change has been precleared (with the date) or is not subject to the preclearance requirement, or an explanation of why such statements cannot be made."

In the judgment of the State of Alabama, these decisions, which are based on generally-applicable, race-neutral principles of law, are not subject to preclearance. Before a state statute that affects voting can become effective, it must not only be precleared but must also be valid as a matter of state law. Preclearance cannot make a state law valid; it makes a valid state law enforceable.

The State of Alabama notes further that the three-judge court's order puts it in a difficult position. The State agrees that, when statutes make changes that affect voting, they must be precleared. Nothing, however, immunizes those statutes from challenge under state law, and the preclearance of a statute cannot pretermit the State's litigation process. This is particularly the case where race-neutral, generally applicable principles of law are applied. If either the State or the Attorney General of the United States act before litigation is filed or before it is final, there is a risk that the same work will have to be done twice. The second review should not proceed on the basis that any previous review, of something else in any event, was correct.

Section 11-3-6, the general law, does not require preclearance because it was enacted before November 1, 1964. Act No. 82-237 was precleared by letter dated June 17, 1985. Act No. 2004-455 was precleared by letter dated September 28, 2004.

"(q) For redistrictings and annexations: the items listed under § 51.28 (a)(1) and (b)(1); for annexations only: the items listed under § 51.28(c)(3)."

Not applicable.

"(r) Other information that the Attorney General determines is required for an evaluation of the purpose or effect of the change. Such information may include items listed in § 51.28 and is most likely to be needed with respect to redistrictings, annexations, and other complex changes. In the interest of time such information should be furnished with the initial submission relating to voting changes of this type. When such

Chief, Voting Section
November 9, 2006
Page 8

*information is required, but not provided, the Attorney General shall notify the submitting authority in the manner provided in § 51.37."*

The Kennedy Plaintiffs are African-American members of the Alabama House of Representatives. They can be contacted at:

Yvonne Kennedy                           James E. Buskey
351 North Broad Street                   2207 Barretts Lane
Mobile, AL 36603                         Mobile, AL 36617
(251) 690-6418                           (251) 457-7928 (h)
                                         (251) 208-5480 (delegation)

William Clark
711 South Atmore Avenue
Prichard, AL 36612
(251) 438-1533 (b)
(251) 208-5480 (delegation)

The Kennedy Plaintiffs were represented by Ed Still, 2112 11th Avenue South, Suite 201, Birmingham, AL 35205, (205) 320-2882, and Cecil Gardner and Vance McCrary of Gardner, Middlebrooks, Gibbons & Kittrell, Post Office Drawer 3103, Mobile, AL 36652, (215) 433-8100.

Juan Chastang, an African-American whom Governor Riley appointed, can be contacted at 1503 Chantague Street, Mobile, AL 36603, 251-574-1000 (o). Mr. Chastang's profile can be accessed through the website for the Mobile County Commission, www.mobilecounty.org.

For further information, please contact Jack Park or Misty Fairbanks. Please direct all correspondence, including the determination letter, to them.

Sincerely,

TROY KING
Attorney General
By:

*Jack Park*

John J. Park, Jr.
Assistant Attorney General

TK:JJP
Enclosures

Westlaw.

928 So.2d 1013
928 So.2d 1013                                                          Page 1
(Cite as: 928 So.2d 1013)

▷

Supreme Court of Alabama.
Bob RILEY, as Governor of Alabama
v.
Yvonne KENNEDY et al.
1050087.

Nov. 9, 2005.
Rehearing Denied Nov. 15, 2005.

**Background:** Voters brought action for a
declaratory judgment that special election, rather than
gubernatorial appointment, was required to fill
vacancy on the Mobile County Commission. The
Circuit Court, Montgomery County, No. CV-05-
2432, Eugene W. Reese, J., required a special
election. Governor appealed.

**Holding:** The Supreme Court, Stuart, J., held that
statute which required governor to fill vacancy on
county commission, unless local law authorized
special election, applied prospectively, not
retroactively, and, therefore, did not revive
unconstitutional local act requiring vacancy to be
filled by special election.
Reversed and remanded.

Woodall, J., concurred in the result.

West Headnotes

**[1] Appeal and Error** ⮑893(1)
30k893(1)
Supreme Court reviews de novo a trial court's
interpretation of a statute, because only a question of
law is presented.

**[2] Appeal and Error** ⮑893(1)
30k893(1)
Where the facts of a case are essentially undisputed,
the Supreme Court must determine whether the trial
court misapplied the law to the undisputed facts,
applying a de novo standard of review.

**[3] Counties** ⮑39
104k39
Statute that required governor to fill vacancy on
county commission, unless local law authorized
special election, applied prospectively, not
retroactively, and therefore did not revive
unconstitutional local act requiring vacancy in

Mobile County Commission to be filled by special
election; plain language provided for prospective
application, and preamble stated intent to authorize
legislature by local law to provide for the manner of
filling vacancies in the office of the county
commission. Const. Art. 4, § 105; Code 1975, §
11-3-6; Acts 1985, No. 85-237, § 1; Acts 2004, No.
04-455, § 1.
*1014 Troy King, atty. gen., Kevin C. Newsom,
deputy atty. gen., and John J. Park, Jr., and Charles
B. Campbell, asst. attys. gen., for appellant.

J. Cecil Gardner of Gardner, Middlebrooks,
Gibbons, Kittrell, Olsen, Walker & Hill, P.C.,
Mobile; and James H. Anderson of Beers, Anderson,
Jackson, Patty & Van Heest, P.C., Montgomery, for
appellees.

STUART, Justice.

Bob Riley, in his official capacity as Governor of
Alabama, appeals a judgment of the Montgomery
Circuit Court holding that a vacancy on the Mobile
County Commission should be filled by a special
election. We reverse and remand.

*Facts*
In an election held on September 13, 2005, Sam
Jones, the county commissioner for district 1, Mobile
County Commission, was elected to the office of
mayor of the City of Mobile. On September 19,
2005, Yvonne Kennedy, James Buskey, and William
Clark, registered voters in Mobile County and
residents of district 1 (hereinafter referred to
collectively as "Kennedy"), filed a pleading in the
Montgomery Circuit Court containing the following:
a complaint seeking a declaration as to whether
Alabama law requires the vacancy in the district 1
seat on the County Commission to be filled by a
special election; a petition for a writ of mandamus
directing Don Davis, probate judge of Mobile County
to conduct such a special election to fill the district 1
seat; and a request for an injunction prohibiting
Governor Riley and the other defendants [FN1] from
acting to the contrary.

> FN1. In addition to naming Governor Riley
> as a defendant, the complaint also named
> Don Davis, in his official capacity as
> probate judge of Mobile County; the
> Mobile County Commission; and Stephen

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



928 So.2d 1013
928 So.2d 1013
(Cite as: 928 So.2d 1013)

Page 2

Nodine and Mike Dean, in their official capacities as members of the Mobile County Commission. Governor Riley is the only defendant who appealed.

*1015 According to the complaint, Governor Riley, through his legal advisers, had made public statements indicating that he would fill by appointment the vacancy created when Jones resigned his seat on the County Commission to assume the office of mayor. Kennedy averred that Governor Riley could not make such an appointment, because, she argued, Act No. 85-237, Ala. Acts 1985, requires that "a special election be held to fill the vacancy, and, if a special election is not held, [Kennedy] and other similarly situated registered voters of the County of Mobile will be disenfranchised and denied the opportunity to vote for a candidate of their choice to fill the vacancy mentioned."

Governor Riley answered the complaint, asserting that he is authorized by general law to fill the vacancy and that Act No. 85-237, Ala. Acts 1985, relied on by Kennedy, was declared unconstitutional by this Court in _Stokes v. Noonan_, 534 So.2d 237 (Ala.1988). Act No. 85-237, he argues, is therefore void, and it was not revived, as Kennedy argues, by the legislature's subsequent enactment of Act No. 2004-455, Ala. Acts 2004, amending § 11-3-6, Ala.Code 1975.

On September 29, 2005, after hearing argument by counsel, the Montgomery Circuit Court, apparently giving a field of operation to Act No. 85-237, Ala. Acts 1985, held that the vacancy on the Mobile County Commission must be filled by a special election rather than by appointment by the Governor. On October 3, 2005, Sam Jones, the commissioner for district 1, resigned to assume the office of mayor of the City of Mobile. On October 11, 2005, Governor Riley appealed.

### Standard of Review

[1][2] " 'This court reviews de novo a trial court's interpretation of a statute, because only a question of law is presented.' _Scott Bridge Co. v. Wright_, 883 So.2d 1221, 1223 (Ala.2003). Where, as here, the facts of a case are essentially undisputed, this Court must determine whether the trial court misapplied the law to the undisputed facts, applying a de novo standard of review. _Carter v. City of Haleyville_, 669 So.2d 812, 815 (Ala.1995)."
_Continental Nat'l Indem. Co. v. Fields_, 926 So.2d 1033, 1034-35 (Ala.2005).

### Discussion

[3] Governor Riley contends that Act No. 2004-455, Ala. Acts 2004, amending § 11-3-6, Ala.Code 1975, did not revive Act No. 85-237, Ala. Acts 1985, which this Court had held unconstitutional, see _Stokes v. Noonan_, and that, therefore, the trial court erred in declaring that the vacancy on the Mobile County Commission created by Jones's resignation should be filled by a special election. [FN2]

> FN2. We review this issue only as presented by these facts and by the parties' arguments regarding these facts; we do not address any other possible impediments that may exist to the constitutionality or enforceability of Act No. 85-237.

In _Stokes_, this Court addressed the constitutionality of Act No. 85-237, which provided that vacancies on the Mobile County Commission would be filled by a special election when at least 12 months remained on the unexpired term of any commissioner. The registered voter challenging Act No. 85-237 in _Stokes_ argued that Act No. 85-237, a local act, was subsumed by a general law, § 11-3-6, Ala.Code 1975, and, consequently, was unconstitutional under Art. IV, § 105, Alabama Constitution 1901.

Act No. 85-237 provided:
*1016 " 'Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat has become vacant. Such election shall be held in the manner prescribed by law and the person elected to fill such vacancy shall serve for the remainder of the unexpired term.' "
534 So.2d at 238. We held that Act No. 85-237, applicable only to Mobile County, constituted a local law on the same subject as the previously enacted general law. We then considered § 11-3-6, Ala.Code 1975, which appears in Chapter 3, Title 11, of the Alabama Code pertaining to county commissions. It provided at the time we decided _Stokes:_ " 'In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed.' " 534 So.2d at 238. We recognized that § 11-3-6 is clearly a general law, a statewide statute addressing the filling of vacancies on county commissions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

928 So.2d 1013
928 So.2d 1013
(Cite as: 928 So.2d 1013)

Page 3

throughout the State, and that the legislature did not in the language of § 11-3-6, Ala.Code 1975, manifest an intent to except the local law from the general law. Therefore, we held that Act No. 85-237 was contrary to § 11-3-6, Ala.Code 1975, and, consequently, that it violated Art. IV, § 105, Alabama Constitution 1901, which provides, in pertinent part: "No special, private, or local law ... shall be enacted in any case which is provided for by a general law." We reasoned that because the legislature did not in § 11-3-6, Ala.Code 1975, manifest an intent to except the local law from the general law, the contrary local law, in that case Act No. 85-237, must defer to the general law, § 11-3-6, Ala.Code 1975, and, consequently, we held, Act No. 85-237 violated Art. IV, § 105, Alabama Constitution 1901.

On May 14, 2004, Governor Riley approved Act No. 2004-455 and it became effective. Act No. 2004-455 amends § 11-3-6, Ala.Code 1975, to read as follows: "Unless a local law authorizes a special election, in case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he or she is appointed."

Kennedy argues that Act No. 2004-455, which amended § 11-3-6, Ala.Code 1975, manifests an intent by the legislature to cure the impediment to the enforceability this Court found as to Act No. 85-237 and to now give effect to that Act and that, consequently, a special election is the proper procedure by which to fill the vacancy created on the Mobile County Commission by Jones's resignation. We cannot agree with that conclusion because the language of Act No. 2004-455 does not clearly so indicate.

This Court has consistently held that

" 'statutes are to be prospective only, unless clearly indicated by the legislature. Retrospective legislation is not favored by the courts, and statutes will not be construed as retrospective unless the language used in the enactment of the statute is so clear that there is no other possible construction. *Sutherland Stat. Const.,* § 41.04 (4th ed 1984).'

"*Dennis v. Pendley,* 518 So.2d 688, 690 (Ala.1987)."

*Gotcher v. Teague,* 583 So.2d 267, 268 (Ala.1991). Moreover, although curative statutes are "of necessity" retroactive, *1017*Horton v. Carter,* 253 Ala. 325, 328, 45 So.2d 10, 12 (1950), even they are subject to the same rule of statutory construction, i.e., they will not be construed as retroactive unless the

intent of the legislature that the statute have such retroactive effect is clearly expressed. The act under consideration in *Horton* expressly provided: "This Act shall be deemed retroactive in its effect upon its passage and approval by the Governor or upon its otherwise becoming a law." 253 Ala. at 328, 45 So.2d at 12. On numerous other occasions the legislature has demonstrated its ability to provide expressly for retroactive effect when enacting curative legislation. See, e.g., § 34-8-28(h), Ala.Code 1975 ("The provisions of this amendatory section are remedial and curative and shall be retroactive to January 1, 1998."); § 11-50-16(c), Ala.Code 1975 ("The provisions of this section shall be curative and retroactive ...."); § 11-43-80(d), Ala.Code 1975 ("The provisions of this section shall be curative and retroactive ...."); and Act No. 2001-891, § 5, Ala. Acts 2001 ("It is the intent of the Legislature that this act be construed as retroactive and curative.").

Here, the plain language in Act No. 2004-455, amending § 11-3-6, Ala.Code 1975, provides for prospective application only, and that language must be given effect according to its terms. Nothing in the language in Act No. 2004-455 demonstrates an intent by the legislature that the amendment of § 11-3-6 apply retroactively. The argument that Act No. 2004-455 applies prospectively only is further supported by the preamble of the Act, which provides that the purpose of the Act is "[t]o amend Section 11-3-6 of the Code of Alabama 1975, relating to county commissions, *to authorize the Legislature by local law to provide for the manner of filling vacancies in the office of the county commission.*" (Emphasis added.) The language "to authorize the Legislature ... to provide" the means by which vacancies on the county commission are to be filled further indicates an intention by the legislature that the Act is to be prospectively applied. Therefore, we hold that Act No. 2004-455 applies prospectively only; consequently, Governor Riley is authorized to fill the vacancy on the Mobile County Commission by appointment.

### Conclusion

Based on the foregoing, we conclude that the trial court erred in holding that the vacancy on the Mobile County Commission should be filled by a special election. Its judgment so holding is, therefore, reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

928 So.2d 1013
928 So.2d 1013
**(Cite as: 928 So.2d 1013)**

Page 4

NABERS, C.J., and SEE, LYONS, HARWOOD,
SMITH, BOLIN, and PARKER, JJ., concur.

WOODALL, J., concurs in the result.

928 So.2d 1013

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

534 So.2d 237
534 So.2d 237
(Cite as: 534 So.2d 237)

Page 1

▷          Supreme Court of Alabama.
                Willie H. STOKES
                        v.
Lionel W. "Red" NOONAN, in his capacity as Judge
        of the Probate Court of Mobile
                County, et al.
                  86-1082.

              Sept. 30, 1988.

Registered voter of Mobile County brought action
contesting constitutionality of local act, which
provided for filling of vacancies on Mobile County
Commission by special election. The Circuit Court,
Mobile County, Edward B. McDermott, J., entered
judgment against voter, and voter appealed. The
Supreme Court, Beatty, J., held that local act is
unconstitutional under state constitutional provision,
which states that no local law shall be enacted in any
case which is provided by a general law.

Reversed and judgment rendered.

Maddox, J., concurred specially and filed opinion.

Almon, J., concurred in result.

Steagall, J., dissented and filed opinion in which
Adams, J., concurred.

              West Headnotes

Counties ⬤━41
104k41
Local act, which provides for filling of vacancies on
Mobile County Commission by special election
where at least 12 months remain on any
commissioner's unexpired term is unconstitutional
under state constitutional provision, which states that
no local law shall be enacted in any case which is
provided by a general law; general law provides for
filling of vacancies by appointment by Governor.
Acts 1985, No. 85-237, § 1 et seq.; Code 1975, §
11-3-6; Const. § 105.
*237 W. Gary Hooks, Jr., Mobile, for appellant.

James C. Wood of Simon, Wood and Crane, Mobile,
for appellee Lionel W. Noonan.

Michael A. Figures and J. Malcolm Jackson III of
Figures, Ludgood & Figures, Mobile, for appellees
Leophus Lyde, James Buskey, Frank Seals and
Michael A. Figures.

BEATTY, Justice.

The plaintiff, Willie H. Stokes, appeals from a
judgment in favor of defendant Lionel W. "Red"
Noonan, et al., holding that Act No. 85-237, Acts of
Alabama 1985, is valid and constitutional.

Stokes, as a registered voter, taxpayer, and real
property owner of Mobile County, filed suit in April
1987 contesting the constitutionality *238 of Act No.
85-237, which provides for the filling of vacancies on
the Mobile County Commission by a special election
when at least 12 months remain on any
commissioner's unexpired term:
    "Whenever a vacancy occurs in any seat on the
    Mobile County Commission with twelve months or
    more remaining on the term of the vacant seat, the
    judge of probate shall immediately make
    provisions for a special election to fill such
    vacancy with such election to be held no sooner
    than sixty days and no later than ninety days after
    such seat has become vacant. Such election shall
    be held in the manner prescribed by law and the
    person elected to fill such vacancy shall serve for
    the remainder of the unexpired term."

Stokes contends that the subject of local Act No. 85-
237 is subsumed by a general law, § 11-3-6, Code of
1975, and therefore, under Art. IV, § 105,
Constitution 1901, and this Court's decision in
Peddycoart v. City of Birmingham, 354 So.2d 808
(Ala.1978), is unconstitutional.

Section 105, in pertinent part, states: "No special,
private, or local law ... shall be enacted in any case
which is provided by a general law." Section 11-3-6,
Code of 1975, is contained in the chapter pertaining
to county commissions and refers to vacancies:
    "In case of a vacancy, it shall be filled by
    appointment by the governor, and the person so
    appointed shall hold office for the remainder of the
    term of the commissioner in whose place he is
    appointed."

Stokes also contends that Act No. 85-237 violates
Art. IV, § 104(29), Constitution of 1901, which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


EXHIBIT
A-2

534 So.2d 237
534 So.2d 237
(Cite as: 534 So.2d 237)

Page 2

states, in pertinent part:

"The legislature shall not pass a special, private, or local law in any of the following cases:

"....

"(29) Providing for the conduct of elections or designating places of voting, or changing the boundaries of wards, precincts, or districts, except in the event of organization of new counties, or the changing of the lines of old counties...."

We need not address the plaintiff's attacks under § 104(29) because we are convinced that Act No. 85-237 clearly offends § 105 of the Constitution of 1901.

In _Peddycoart v. City of Birmingham_, 354 So.2d 808 (Ala.1978), this Court explained at length the difference between a local law and a general law, and, applying the literal language of the Constitution of 1901, held that the presence of a general law upon a given subject was _primary_, meaning "that a local law cannot be passed upon that subject." This Court added at 813:

"By constitutional definition a general law is one which applies to the whole state and to each county in the state with the same force as though it had been a valid local law from inception. Its passage is none the less based upon local considerations simply because it has a statewide application, and already having that effect, the constitutional framers have prohibited the enactment of a local act when the subject is already subsumed by the general statute."

Section 11-3-6 is a statewide statute governing the general subject of filling vacancies on county commissions. Its language is substantially the same as its complementary section that appeared in Ala.Code 1940 as Title 12, § 6. See also Ala.Code 1940, Title 12, § 6 (Recomp.1958).

Act No. 85-237 was approved April 8, 1985. By its terms, it is made applicable only to Mobile County. Hence, when it became law it applied to a political subdivision of the state less than the whole, and thus, it was a local law on the same subject as the previously enacted general law, § 11-3- 6; see Constitution of 1901, § 110; _Peddycoart_, 354 So.2d at 814; and, accordingly, it is unconstitutional under § 105. We cannot, therefore, agree with the defendant that the Mobile County Commission, because of statutory history, has always been, and therefore is still, governed by local law. To approve such a proposition here would run directly counter to the language of our constitution. Surely, it cannot be held that the legislature is proscribed from enacting general laws on subjects *239 already covered by local laws, even if by application such local laws are repealed, when the intent of the legislature is clear—and it is in this case. See _Buskey v. Mobile County Board of Registrars_, 501 So.2d 447 (Ala.1986).

In _Baldwin County v. Jenkins_, 494 So.2d 584 (Ala.1986), a similar question dealing with the constitutionality of a local act was resolved. In that case, this Court was confronted with two statutes dealing with the election and terms of the office of county commissioners. This Court held that the general statute, Code of 1975, § 11-3-1, as amended, having contained the language, "unless otherwise provided by local law," manifested a legislative intent that the subject it dealt with not be subsumed within it:

"A situation completely opposite and contrary to the one presented here was contemplated and prohibited by the constitutional framers, which is to say that the legislature, by enacting a general law _containing no such provision or exception for contrary local laws_, thereby intended that general law to be _primary_ and the subject subsumed entirely by the general law. In that situation, § 105 does operate to prohibit the enactment of contrary local laws. Such is not the case with respect to § 11-3-1 and Act No. 84-639. Because the language of the statute provides for the existence of and prevailing effect of contrary local laws, it must be that the legislature did not intend the subject to be 'subsumed' exclusively within § 11-3-1. That being the case, the co-existence of the general law (§ 11-3-1) and the _contrary_ local law (Act No. 84-639) deferred to in the general law, cannot be said to be repugnant to § 105 because 'the constitutional framers have [only] prohibited the enactment of a local act when the subject [as intended by the legislature] is already subsumed by the general statute.' _Peddycoart_, [354 So.2d at 813]."

494 So.2d at 587. (Emphasis in _Jenkins_.)

No such intent is demonstrated by the language of § 11-3-6 regarding filling of vacancies, and that language must be given effect according to its terms. Thus, it is our duty to declare Act No. 85-237 unconstitutional as violating § 105. It follows that the judgment appealed from must be, and it is hereby, reversed, and a judgment rendered declaring that Act unconstitutional.

REVERSED AND JUDGMENT RENDERED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

534 So.2d 237
534 So.2d 237
**(Cite as: 534 So.2d 237)**

Page 3

TORBERT, C.J., and JONES, SHORES and HOUSTON, JJ., concur.

MADDOX, J., concurs specially.

ALMON, J., concurs in the result.

ADAMS and STEAGALL, JJ., dissent.

MADDOX, Justice (concurring specially).

I concur completely with the opinion holding that Act No. 86-237 is unconstitutional under § 105, under this Court's decision in *Peddycoart*, cited in the majority opinion.

I do not believe it is necessary to distinguish *Baldwin County v. Jenkins, 494 So.2d 584 (Ala.1986)*, which I thought was incorrectly decided, for the reasons I expressed in a dissent in that case; therefore, I concur specially.

STEAGALL, Justice (dissenting).

I respectfully dissent as to the majority opinion's reversal of the trial court's decision that Act No. 85-237 is valid and constitutional.

The Mobile County Commission was created on August 7, 1957, when the Alabama Legislature passed Act No. 181, Acts of Alabama 1957, a local act.    The Act created the Mobile County Commission out of the existing board of revenue and road commissioners and provided for the election of its members, those members' terms of office, qualifications for that office, and various other requirements dealing with that body, including the filling of vacancies when they occurred. That Act states specifically:
  "Vacancies on the commission shall be filled by appointment by the Governor, but the office of president of the commission *240 shall be filled by the members thereof.  Any person appointed to fill a vacancy shall serve the unexpired term, and until his successor is elected and qualified."

Act No. 181, § 2(b), Acts of Alabama 1957, at 234.

The local act being question here, Act No. 85-237, Acts of Alabama 1985, states, in regard to vacancies on the Mobile County Commission:
  "Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the

judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat has become vacant.  Such election shall be held in the manner prescribed by law and the person elected to fill such vacancy shall serve for the remainder of the unexpired term."

Act No. 85-237, Acts of Alabama 1985, at 137.

This Court has on several occasions upheld trial courts' rulings that a local act amending a local act is not unconstitutional.    In *Freeman v. Purvis, 400 So.2d 389 (Ala.1981)*, the Court upheld a trial court ruling which found that:
  "Act 80-797 passed in the 1980 regular session of the Legislature of Alabama, is a Local Act which amends a local act and is not unconstitutional."

400 So.2d at 390.    The Court then stated:
  "Accordingly, the trial court was correct when it held that Act No. 797 was a local law which amended Act No. 710, a pre-existing local law."

400 So.2d at 392.

Local Act 85-237 is amendatory in nature, affecting the already-existing local legislation, which created the Mobile County Commission and provided for the filling of vacancies.

In *Peddycoart v. City of Birmingham, 354 So.2d 808 (Ala.1978)*, we stated, regarding legislation passed before and after that decision:
  "Henceforth when at its enactment legislation is local in its application it will be a local act and subject to all of the constitutional qualifications applicable to it.    With regard to legislation heretofore enacted, the validity of which is challenged, this Court will apply the rules which it has heretofore applied in similar cases."

354 So.2d at 814.

The effect of this passage was to say that the new standard established in *Peddycoart* as to the constitutionality of local legislation would be applied only prospectively. *Ex parte Bracewell, 407 So.2d 845 (Ala.1979)*, *reversed on other grounds, 457 U.S. 1114, 102 S.Ct. 2920, 73 L.Ed.2d 1325 (1982)*. Where, as here, we are looking at legislation enacted prior to *Peddycoart* but amended afterwards, this Court is required to apply the law as it stood before *Peddycoart*.    That law can be found in the case of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

534 So.2d 237
534 So.2d 237
**(Cite as: 534 So.2d 237)**

Page 4

*Johnson v. State ex rel. City of Birmingham,* 245 Ala.
499, 17 So.2d 662 (1944):
>   "Sec. 105 of the Constitution is not construed to
>   inhibit local legislation on a subject not prohibited
>   by the Constitution, merely because the local law is
>   different, and works a partial repeal of a general
>   law."

245 Ala. at 503, 17 So.2d at 664, citing *Talley v.*
*Webster,* 225 Ala. 384, 143 So. 555 (1932).    This
Court, in *Talley v. Webster,* in determining whether a
statute violated Section 105 of the Constitution,
stated:
>   "We need not review the numerous cases
>   construing this section.    Suffice it to say it does
>   not inhibit the passage of local laws on subjects,
>   not prohibited by Section 104, merely because such
>   local law is different, and works a partial repeal of
>   the general law of the state in the territory
>   affected."

225 Ala. at 385, 143 So. at 555.

In the case of *Norris v. Seibels,* 353 So.2d 1165
(Ala.1977), this Court reversed a judgment of the
Alabama Court of Civil Appeals and held that a
showing of specific legislative intent was necessary
to effect any such repeal:
>   *241 "This general statute cannot be repealed by
>   implication found in the local statute unless the
>   legislative intent to effect such a repeal is clearly
>   manifested."

353 So.2d at 1167.    This Court held that the
language used in the questioned local statute
contained no express repeal of the general statute.
However, such is not the case here.    Section 3 of Act
85-237, Acts of Alabama 1985, demonstrates a
specific legislative intent by expressly repealing "[a]ll
laws or parts of laws which are in conflict with this
act."

Because I believe that Act 85-237, a local act, is
amendatory in nature and therefore that the law to be
applied is that existing prior to our decision in
*Peddycoart,* supra, I believe the trial court's judgment
should be affirmed.

ADAMS, J., concurs.

534 So.2d 237

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137.

that the Board of Managers is authorized, in the case of Jessie James White, to waive compliance with the provision of law requiring all applications for extraordinary disability to be made within twelve (12) months after the accident resulting in such disability and requiring that such pensions be granted only within twelve (12) months after the accident resulting in such disability and the Board of Managers shall have the authority to award said extraordinary pension to Jessie James White if, in the sole judgment of the Board of Managers, such pension is required.

**Section 2.** This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved April 8, 1985

Time: 4:00 P.M.

———

Act No. 85-237                    S. 262—Senator Figures

### AN ACT

Relating to Mobile County; prescribing procedure for filling certain vacancies on the county commission.

*Be It Enacted by the Legislature of Alabama:*

**Section 1.** Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat has become vacant. Such election shall be held in the manner prescribed by law and the person elected to fill such vacancy shall serve for the remainder of the unexpired term.

**Section 2.** The provisions of this act are severable. If any part of the act is declared invalid or unconstitutional, such declaration shall not affect the part which remains.

**Section 3.** All laws or parts of laws which conflict with this act are hereby repealed.

**Section 4.** This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved April 8, 1985

Time: 4:00 P.M.



1

**Each Probate Judge, Sheriff, District Court Clerk, the
Clerk and Register of the Circuit Court, County Commission
Chairman and Municipal Clerk is required by law to
preserve this slip or pamphlet in a book kept in his office
until the Act is published in permanent form.**

# ALABAMA LAW

### (Regular Session, 2004)

———————

Act No. 2004-455                          S. 331 – Senator Holley

### AN ACT

To amend Section 11-3-6 of the Code of Alabama 1975, relating to county
commissions, to authorize the Legislature by local law to provide for the manner of
filling vacancies in the office of county commissioner.

*Be It Enacted by the Legislature of Alabama:*

**Section 1.**   Section 11-3-6 of the Code of Alabama 1975, is
amended to read as follows:

"§11-3-6.

"Unless a local law authorizes a special election, in case of a
vacancy, it shall be filled by appointment by the governor, and the
person so appointed shall hold office for the remainder of the term
of the commissioner in whose place he or she is appointed."

**Section 2.**   This act shall become effective immediately
following its passage and approval by the Governor, or its otherwise
becoming law.

Approved May 14, 2004

Time: 11:15 A.M.

I hereby certify that the foregoing copy of an Act of the
Legislature of Alabama has been compared with the enrolled Act
and it is a true and correct copy thereof.

Given under my hand this 18th day of May, 2004.

McDOWELL LEE
Secretary of Senate


EXHIBIT
B.2

Case 2:07-cv-01014-MEF-CSC    Document 38-2    Filed 03/18/2008    Page 140 of 184
Page 1 of 2
Case 2:05-cv-01100-MHT-DRB    Document 30    Filed 11/09/2006    Page 20 of 21

Westlaw.

Ala.Code 1975 § 11-3-6

C
Code of Alabama Currentness
  Title 11. Counties and Municipal Corporations. (Refs & Annos)
    Subtitle 1. Provisions Applicable to Counties Only. (Refs & Annos)
      ⌐⌐ Chapter 3. County Commission. (Refs & Annos)
        ⌐⌐ Article 1. General Provisions. (Refs & Annos)

          → § 11-3-6. Vacancies.

Unless a local law authorizes a special election, in case of a vacancy, it shall be filled by appointment by the Governor. and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he or she is appointed.

(Code 1852, § 698; Code 1867, § 826; Code 1876, § 740; Code 1886, § 820; Code 1896, § 952; Code 1907, § 3307; Code 1923, § 6749; Code 1940, T. 12, § 6; Act 2004-455, p. 809, § 1.)

HISTORY

Amendment notes:

The 2004 amendment, effective May 14, 2004, substituted "Unless a local law authorizes a special election, in" for "In", and inserted "or she".

LIBRARY REFERENCES

  20 C.J.S. Counties, § 75.

CASENOTES

  1. Local law governing filling vacancies on county commissions held unconstitutional

**Local law governing filling vacancies on county commissions held unconstitutional.** As this section is a statewide statute governing the general subject of filling vacancies on county commissions, and Act No. 85-237 was a local law on same subject as this section, Act No. 85-237 would be held unconstitutional under Ala. Const., Art. IV, § 105. Stokes v. Noonan, 534 So.2d 237 (Ala.1988).

  2. Miscellaneous

**Statute that required Governor to fill vacancy on county commission,** unless local law authorized special election, applied prospectively, not retroactively, and therefore did not revive unconstitutional local act requiring vacancy in Mobile County Commission to be filled by special election; plain language provided for prospective application, and preamble stated intent to authorize Legislature by local law to provide for the manner of filling vacancies in the office of the county commission. Riley v. Kennedy, 2005 WL 2995136 (Ala.2005). Counties⟐ 39

Ala. Code 1975 § 11-3-6, **AL ST § 11-3-6**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Page 2

Ala.Code 1975 § 11-3-6

Current through End of 2006 Regular Session.

Copr © 2006 by State of Alabama. All rights reserved.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JAN - 8 2007

Mr. Troy King
Attorney General

Mr. John J. Park, Jr.
Assistant Attorney General
State of Alabama
Alabama State House
11 South Union Street
Montgomery, Alabama 36130

Dear Messrs. King and Park:

This letter refers to the change in method of selection for filling vacancies on the Mobile County Commission from special election to gubernatorial appointment in Mobile County, Alabama, pursuant to decisions of the Alabama Supreme Court in *Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005), submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, as amended. This matter arises from an order entered on August 18, 2006, by a three-judge panel in *Kennedy v. Riley*, 445 F. Supp. 2d 1333 (M.D. Ala. 2006), ruling that the State of Alabama submit the two decisions for preclearance under Section 5. We received your submission on November 9, 2006.

We have carefully considered the information you have provided, as well as census data, comments, and information from other interested parties. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race. *Georgia v. United States*, 411 U.S. 526 (1973). *See also* Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. § 51.52. "A change affecting voting is considered to have a discriminatory effect under Section 5 if it will lead to a retrogression in the position of members of a racial or language minority group (*i.e.*, will make members of such a group worse off than they had been before the change) with respect to their opportunity to exercise the electoral franchise effectively." 28 C.F.R. § 51.54(a) (citing *Beer v. United States*, 425 U.S. 130, 140-42 (1976)).

Pursuant to Act No. 85-237, a vacancy on the Mobile County Commission is to be filled through popular election by the voters within the relevant single-member district. That statute was precleared by the Attorney General under Section 5 on June 17, 1985 (File No. 1985-1645),



EXHIBIT
H

-2-

and was first implemented in a 1987 District 1 special election. Pursuant to decision of the Alabama Supreme Court in *Stokes v. Noonan*, that method of filling vacancies was changed from election by the voters of the district to appointment by the Governor of Alabama in 1988, and reaffirmed by *Riley v. Kennedy* in 2005.

Pursuant to the decision of the three-judge federal panel in *Kennedy v. Riley*, the State has submitted the changes effected by *Stokes v. Noonan* and *Riley v. Kennedy* for review under Section 5 of the Voting Rights Act. Additionally, we understand that Alabama law has changed, legislatively reversing the decision in these cases and restoring the authority to fill vacancies to the voters themselves for future elections. This is the effect of Act No. 2006-342, which was signed by the Governor on April 12, 2006, and which would govern all future vacancies. The question before us, therefore, is limited to whether the change effected by *Stokes v. Noonan* and *Riley v. Kennedy* will lead to impermissible retrogression, caused by the appointment, rather than election, of an individual to fill a vacancy on the Mobile County Commission for a term expiring in 2008.

In evaluating whether a change affecting voting will lead to impermissible retrogression, the Attorney General compares the submitted change to the practice or procedure in effect at the time of the submission. 28 C.F.R. § 51.54(a). In light of your submission, we note that a change brought about by a state court decision is subject to Section 5. *Branch v. Smith*, 538 U.S. 254, 262 (2003). A practice or procedure that is not legally enforceable under Section 5 cannot serve as a benchmark; the comparison is with the last legally enforceable practice or procedure used by the jurisdiction. *Id.* Changes that are not precleared are not enforceable. 42 U.S.C. § 1973c; *Hathorn v. Lovorn*, 457 U.S. 255, 269 (1982); *Clark v. Roemer*, 500 U.S. 646, 652 (1991). Because the changes pursuant to *Stokes* and *Riley* were never precleared, they cannot serve as the benchmark. *See Kennedy*, 445 F. Supp. 2d at 1336, (citing *Abrams v. Johnson*, 521 U.S. 74, 96-97 (1997)); *Gresham v. Harris,* 695 F.Supp. 1179, 1183 (N.D. Ga. 1988) (three-judge court), *aff'd sub nom. Poole v. Gresham*, 495 U.S. 954 (1990). The benchmark is determined without regard to its legality under state law. *Kennedy,* 445 F. Supp 2d at 1336 (citing *City of Lockhart v. United States*, 460 U.S. 125, 132-133 (1983)); *Perkins v. Matthews*, 400 U.S. 379, 394-95 (1971).

Thus, the last precleared procedure for filling vacancies in the Mobile County Commission that was in force or effect was the special election method set forth in Act No. 85-237. *Kennedy*, 445 F. Supp. 2d at 1336. This Act remains in full force and effect, as it affects voting, was precleared, and was implemented in the 1987 special election cycle. *See Young v. Fordice*, 520 U.S. 273, 282-83 (1997); *Lockhart*, 460 U.S. at 132-33. It is therefore the benchmark against which we measure the proposed change to fill vacancies by appointment of the Governor of Alabama.

The measurement is straightforward. As a result of litigation under the Voting Rights Act, Mobile County is governed by the three-member Mobile County Commission, the members of which are elected from single-member districts. *Brown v. Moore*, Civ. Act. No. 75-298-P

-3-

(S.D. Ala. 1976) (unpublished opinion). One of the single-member districts, District 1, is over sixty-three percent African-American in population and registered voters. The African-American voters of District 1 enjoy the opportunity to elect minority candidates of their choice to the County Commission; indeed, they enjoyed it in the 1987 special election in which Act 85-237 was first implemented. There is no dispute that the change would transfer this electoral power to a state official elected by a statewide constituency whose racial make-up and electoral choices regularly differ from those of the voters of District 1. Attorneys General have on at least ten occasions previously interposed objections to changes in method of selection from election to appointment in Alabama and elsewhere. For instance, in 1971, the Attorney General objected to Act No. 2445 of the Alabama Legislature, which changed the method of selection of judges of Justice of the Peace Courts in Alabama from election to appointment. Letter of David L. Norman, Assistant Attorney General, Civil Rights Division, to Hon. William J. Baxley, Attorney General, State of Alabama, Dec. 26, 1973.

The transfer of electoral power effected by *Stokes v. Noonan* and *Riley v. Kennedy* appears to diminish the opportunity of minority voters to elect a representative of their choice to the Mobile County Commission. We have received no indication that the voters of District 1 would have selected the particular individual selected by the Governor. Under these circumstances, the State has failed to carry its burden of proof that the change is not retrogressive. On behalf of the Attorney General, therefore, I must interpose an objection to the change in method of selection for vacancies occurring on the Mobile County Commission from special election to gubernatorial appointment.

We note that under Section 5, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. *See* 28 C.F.R. § 51.44. In addition, you may request that the Attorney General reconsider the objection. *See* 28 C.F.R. § 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the method of selection for vacancies on the Mobile County Commission by gubernatorial appointment will continue to be legally unenforceable as a matter of federal law. *Clark v. Roemer*, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

We also have been advised, as suggested above, that the State has, in essence, re-enacted the provisions of Act No. 85-237 in Act No. 2006-342, which similarly provides that future vacancies on the Mobile County Commission will be filled by special election. To the extent that Act No. 2006-342 does not change the voting practices and procedures set forth in Act No. 85-237, it need not be submitted for Section 5 review. We respectfully request your advice as to whether changes covered by Section 5 are contained in the 2006 law. In the meantime, special elections may be held pursuant to Act No. 85-237.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Alabama plans to take concerning this matter. If you have any

-4-

questions, please call Robert Lowell (202-514-3539), an attorney in the Voting Section. Because this matter has been the subject of pending litigation in *Kennedy v. Riley*, we are serving copies of this letter by facsimile transmission to the Court and counsel of record.

Sincerely,

Wan J. Kim
Assistant Attorney General



STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL

TROY KING
ATTORNEY GENERAL

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, AL 36130
(334) 242-7300
WWW.AGO.STATE.AL.US

January 30, 2007

Honorable Alberto R. Gonzales
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

    RE:    **Request for reconsideration pursuant to 28 C.F.R. § 51.45**

Dear General Gonzales:

    By letter dated January 8, 2007, Assistant Attorney General Wan J. Kim, exercising the authority delegated to him, *see* 28 C.F.R. § 51.3, interposed an objection to the State of Alabama's enforcement of two decisions of the Alabama Supreme Court, Stokes v. Noonan, 534 So. 2d 237 (Ala. 1988), and Riley v. Kennedy, 928 So. 2d 1013 (Ala. 2005). Pursuant to 28 C.F.R. § 51.45, I request reconsideration of the objection.

    As I will explain below, these two decisions by the State's highest court were based on generally-applicable, race-neutral principles. Those principles, which were fairly and properly applied, happened to have been applied in the context of election issues, specifically how vacancies on the Mobile County Commission will be filled. By its objection letter, the United States Department of Justice (USDOJ) has essentially declared that Justice Department preclearance supplants the State's Constitution to the extent that, if a law is precleared and later found to be violative of the State Constitution, the preclearance would prevail and leave in effect that otherwise unconstitutional law. This objection, therefore, in essence would override the decisions of the State's highest court and order that Alabama revert to following a law that was declared unconstitutional in Stokes v. Noonan, that was found not to have been revived in Riley v. Kennedy, and that has been very briefly enforced only once. As the State has made clear in its submission letter, denying preclearance is an affront to the State's sovereignty and federalism itself, and it invites chaos in State governmental functioning. In contrast, granting preclearance demonstrates respect for the State's judiciary and for its Legislature. In other words, as I will show, the State has provided the right way to solve the problem, but USDOJ will not let it proceed.



EXHIBIT
I

Request for Reconsideration
January 30, 2007
Page 2

In this letter, I will set forth the relevant facts necessary for a proper understanding of the question presented to USDOJ. Then, I will explain why preclearance can and should be granted.[1]

## BACKGROUND

The State's submission relates to the method of filling vacancies on county commissions. The two decisions submitted for preclearance, Riley v. Kennedy, 928 So. 2d 1013 (Ala. 2005), and Stokes v. Noonan, 534 So. 2d 237 (Ala. 1988), each specifically deal with the Mobile County Commission, though these decisions of the Alabama Supreme Court, like all other decisions of that Court, are applicable throughout the State. To understand the decisions, however, we must necessarily focus, to some extent, on the Mobile County Commission.

### Code of 1852 to Code of 1940—General Law

As to "The Court of County Commissioners," the 1852 Code of Alabama provided that "[i]n case of a vacancy, it is to be filled by the court, and the person so appointed holds office for the remainder of the term of the commissioner in whose place he is appointed." Code 1852, § 698. The law was the same when the Revised Code of Alabama was published in 1867. See Code 1867, § 826.

By 1876, a change had occurred: the Governor rather that the Court of County Commissioners would make the appointment to fill any vacancy. Code 1876, § 740 ("In case of a vacancy, it is to be filled by the governor, and the person so appointed holds office for the remainder of the term of the commissioner in whose place he is appointed."). A notation in the 1876 Code suggests that the change dated back to November 25, 1868. The Codes of 1886, 1896, 1907, 1923 and 1940 each continued to provide that "[i]n case of a vacancy, it is to be filled by the governor, and the person so appointed holds office for the remainder of the term of the commissioner in whose place he is appointed." Code 1886, § 820; Code 1896, § 952; Code 1907, § 3307; Code 1923, § 6749; Code 1940, T.12, § 6.

---

[1]    Other interested parties submitted comments to USDOJ to consider in deciding whether to preclear Riley v. Kennedy and Stokes v. Noonan. Additionally USDOJ solicited input from certain individuals. The comments and input may have created confusion and thereby contributed to a misunderstanding of the change submitted for preclearance and the relevant facts. In this letter, I will endeavor to clear up the confusion and to restate the scope of the change in a way that will make it clear that the objection is due to be withdrawn.

Request for Reconsideration
January 30, 2007
Page 3

## Act No. 181, 1957 Regular Session—Creation of Mobile County Commission: Gubernatorial Appointment

In August 1957, Act No. 181 of the 1957 Regular Session of the Alabama Legislature was enacted. Pursuant to Act No. 181, the Mobile County Commission was to come into existence in January 1961 to replace the then-existing board of revenue and road commissioners. Section 2 of Act No. 181 concerned how commissioners were selected and how any vacancies were to be filled. It provided that the commissioners were to be elected to four-year terms and that "Vacancies on the commission shall be filled by appointment by the Governor, but the office of president of the commission shall be filled by the members thereof. Any person appointed to fill a vacancy shall serve the unexpired term, and until his successor is elected and qualified." Act No. 181 § 2(b), 1957 Regular Session of the Alabama Legislature.

## The Voting Rights Act of 1965

On August 6, 1965, the Voting Rights Act of 1965 was enacted. Pursuant to that Act, Alabama is a covered jurisdiction for Section 5 purposes. By its terms, Section 5 prohibits certain States and localities, including Alabama, from "enact[ing] or seek[ing] to administer any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting different from that in force or effect" on the "applicable date," unless the jurisdiction obtains preclearance. 42 U.S.C. § 1973c.

Alabama's "applicable date" is November 1, 1964. On that date, vacancies on county commissions, including the Mobile County Commission, were filled by gubernatorial appointment.

## Ala. Code § 11-3-6—Alabama General Law: Gubernatorial Appointment

Ten years passed and the Code of Alabama 1975 was published. The general law concerning vacancies on county commissions that was previously codified at Code 1940, T.12, § 6 was recodified as Ala. Code § 11-3-6. Over the years, there apparently were minor changes in the wording, as, in the 1989 Supplement, Ala. Code § 11-3-6 provided: "In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed." Ala. Code § 11-3-6 (1989); cf. Code 1940, T.12, § 6 ("In case of a vacancy, it is to be filled by the governor, and the person so appointed holds office for the remainder of the term of the commissioner in whose place he is appointed.").

## Act No. 85-237—Local Law: Special Election

Another ten years passed, and the law continued to be that vacancies on the Mobile County Commission were to be filled by gubernatorial appointment. Against this background, Act No. 85-237 was enacted on April 8, 1985. Act No. 85-237 was a local Act. in that it applied only to Mobile County and not to the State as a whole.

Request for Reconsideration
January 30, 2007
Page 4

In pertinent part, Act No. 85-237 provided as follows:

Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat has become vacant. Such election shall be held in the manner prescribed by law and the person elected to fill such vacancy shall serve the remainder of the unexpired term.

Act No. 1985-237.

On April 15, 1985, one week after Act No. 85-237 was enacted, the State of Alabama routinely submitted the new Act for review pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. The submission was brief, and it apparently considered only Act No. 181 of the 1957 Alabama Legislature, which had created the Mobile County Commission, and not the generally applicable law then codified at Ala. Code § 11-3-6 or the Alabama Supreme Court's decision in Peddycoart v. City of Birmingham, 354 So.2d 808 (Ala.1978).[2] In paragraph (b), the submission explained:

By the Act under which the Mobile County Commission was created, Act No. 181, 1957 Regular Session of the Alabama Legislature (a copy of which is enclosed), a vacancy in the office of County Commissioner was filled by appointment of the Governor. (See Section 2(b) of Act NO. 188 [sic]). Under Act No. 85-237 such vacancies will be filled by calling a special election.

Submission letter, 1 (April 15, 1985). In paragraph (k), the submission reiterated that the "[c]hange will affect how a vacancy in the Office of County Commissioner of Mobile County is filled." Id. at 2. By letter dated June 17, 1985, the State was advised that the Attorney General had no objection.

---

[2] This statement is intended as one of fact and not blame. Alabama passes a great many general and local laws that fall within the scope of Section 5 review. Over the years, the task of locating, understanding, explaining, and submitting the general laws, and sometimes the local laws, has fallen on lawyers within the Attorney General's Office, who must complete these tasks in addition to their regular duties. Additionally, over the years, the standard for these submissions has risen, though never more so than with the federal court's decision in Kennedy v. Riley, 445 F.Supp.2d 1333 (M.D.Ala. 2006) (three-judge court), discussed below. Prior to that decision, the State had sought to describe the change wrought by the law, as best as that could be ascertained at the time of the submission, and that proved challenging enough as will be seen. The State generally did not anticipate challenges to the changes under State law, unless litigation was already pending or had been threatened. Now, under Kennedy v. Riley, it might well be necessary to test the constitutionality and general soundness of any change under State law before that change can be submitted for Section 5 review.

Request for Reconsideration
January 30, 2007
Page 5

## Stokes v. Noonan

The first time that Act No. 1985-237 was ever to be implemented, that is, the first time that a vacancy on the Mobile County Commission was ever to be filled by a special election, Act No. 1985-237 was challenged in State court and found to be unconstitutional. See Stokes v. Noonan, 534 So. 2d 237 (Ala. 1988).

In 1987, just two years after the enactment of Act No. 1985-237, a vacancy occurred in one of the seats on the Mobile County Commission. In April of that year, Willie H. Stokes, a voter in Mobile County, filed suit against Lionel W. "Red" Noonan, in his official capacity as the Probate Judge for Mobile County. The lawsuit was filed in the Circuit Court of Mobile County. The Circuit Court denied relief, and the vacancy was filled by special election. Samuel L. Jones, who is African-American, won the election, but the lawsuit was not over.

On appeal, in a decision dated September 30, 1988, the Alabama Supreme Court agreed with Plaintiff Stokes that Act No. 85-237 was unconstitutional. The Court explained the constitutional arguments and its holding as follows[3]:

> Stokes contends that the subject of local Act No. 85-237 is subsumed by a general law, § 11-3-6, Code of 1975, and therefore, under Art. IV, § 105, Constitution 1901, and this Court's decision in Peddycoart v. City of Birmingham, 354 So.2d 808 (Ala.1978), is unconstitutional.

> Section 105, in pertinent part, states: "No special, private, or local law . . . shall be enacted in any case which is provided by a general law." Section 11-3-6, Code of 1975, is contained in the chapter pertaining to county commissions and refers to vacancies:

> "In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed."

> Stokes also contends that Act No. 85-237 violates Art. IV, § 104(29), Constitution of 1901, which states, in pertinent part:

> "The legislature shall not pass a special, private, or local law in any of the following cases:

> " . . . .

---

[3]    While lengthy block quotes are generally disfavored, I think it important not to simply assert that the Alabama Supreme Court was relying on generally-applicable, race-neutral principles, but to affirmatively demonstrate that fact by reproducing the Court's reasoning.

Request for Reconsideration
January 30, 2007
Page 6

"(29) Providing for the conduct of elections or designating places of voting, or changing the boundaries of wards, precincts, or districts, except in the event of organization of new counties, or the changing of the lines of old counties. . . ."

We need not address the plaintiff's attacks under § 104(29) because we are convinced that Act No. 85-237 clearly offends § 105 of the Constitution of 1901.

In <u>Peddycoart v. City of Birmingham</u>, 354 So.2d 808 (Ala.1978), this Court explained at length the difference between a local law and a general law, and, applying the literal language of the Constitution of 1901, held that the presence of a general law upon a given subject was primary, meaning "that a local law cannot be passed upon that subject." This Court added at 813:

"By constitutional definition a general law is one which applies to the whole state and to each county in the state with the same force as though it had been a valid local law from inception. Its passage is none the less based upon local considerations simply because it has a statewide application, and already having that effect, the constitutional framers have prohibited the enactment of a local act when the subject is already subsumed by the general statute."

Section 11-3-6 is a statewide statute governing the general subject of filling vacancies on county commissions. Its language is substantially the same as its complementary section that appeared in Ala. Code 1940 as Title 12, § 6. See also Ala. Code 1940, Title 12, § 6 (Recomp.1958).

Act No. 85-237 was approved April 8, 1985. By its terms, it is made applicable only to Mobile County. Hence, when it became law it applied to a political subdivision of the state less than the whole, and thus, it was a local law on the same subject as the previously enacted general law, § 11-3-6; see Constitution of 1901, § 110; <u>Peddycoart</u>, 354 So.2d at 814; and, accordingly, it is unconstitutional under § 105. We cannot, therefore, agree with the defendant that the Mobile County Commission, because of statutory history, has always been, and therefore is still, governed by local law. To approve such a proposition here would run directly counter to the language of our constitution. Surely, it cannot be held that the legislature is proscribed from enacting general laws on subjects already covered by local laws, even if by application such local laws are repealed, when the intent of the legislature is clear-and it is in this case. See <u>Buskey v. Mobile County Board of Registrars</u>, 501 So.2d 447 (Ala.1986).

Request for Reconsideration
January 30, 2007
Page 7

Stokes v. Noonan, 534 So.2d at 238-39 (all alterations in original).

Thus, relying on generally-applicable, race-neutral principles, the Alabama Supreme Court held that Act No. 85-237 violated article IV, § 105 of the Alabama Constitution. Given that holding, the Alabama Supreme Court declined to reach Stokes' argument that the Act also violated Article IV, § 104(29).

Note too that, the Alabama Supreme Court expressly rejected the argument that Act No. 181, 1957 Regular Session of the Alabama Legislature—the local law that created the Mobile County Commission—had any impact on the resolution of this case. Stokes v. Noonan, 534 So.2d at 238 ("We cannot, therefore, agree with the defendant that the Mobile County Commission, because of statutory history, has always been, and therefore is still, governed by local law."). As explained above, Act No. 181 is the only preexisting law that had been considered in the submission of Act No. 85-237 for Section 5 review. The submission had not considered Ala. Code § 11-3-6, which is the generally applicable law calling for gubernatorial appointments, or the Alabama Supreme Court's decisions in Peddycoart v. City of Birmingham, 354 So.2d 808 (Ala.1978) and Buskey v. Mobile County Board of Registrars, 501 So.2d 447 (Ala.1986). In short, the Alabama Supreme Court, upon thoughtful consideration and aided by the briefs of the parties and case law that post-dated the submission of Act No. 85-237 (namely, Buskey), viewed the question entirely differently than the Attorney General had.

**Appointing Samuel L. Jones**

The Alabama Supreme Court's ruling created a vexing issue of State law. Without a valid election, the incumbent, Samuel L. Jones, who is African-American, had no right to hold the office and was vulnerable to a quo warranto action.[4] Then-Governor Guy Hunt solved the problem by exercising his power of appointment, pursuant to the

---

[4]    "Quo warranto" is "[a] common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed." Black's Law Dictionary 1264 (7th ed. 199). Such an action is authorized by statute in Alabama. See Ala. Code § 6-6-591. In pertinent part, Ala. Code § 6-6-591 provides as follows:

> (a) An action may be commenced in the name of the state against the party offending in the following cases:
>
> (1) When any person usurps, intrudes into or unlawfully holds or exercises any public office, civil or military, any franchise, any profession requiring a license, certificate, or other legal authorization within this state or any office in a corporation created by the authority of this state;
>
> . . . .

Ala. Code § 6-6-591(a)(1) (emphasis added). The statute has not been substantively altered since at least 1940.

Request for Reconsideration
January 30, 2007
Page 8

general law then embodied in Ala. Code § 11-3-6 (1989) (amended 2004), to appoint Mr. Jones to the position.

In other words, the only time that a special election was ever conducted to fill a vacancy on the Mobile County Commission, it was conducted under the cloud of litigation. When the litigation was finally resolved, the State's highest court had held the law purporting to authorize the election (Act No. 85-237) unconstitutional. Stokes v. Noonan. Thereafter, reverting to the long-standing general law of gubernatorial appointment, an African-American individual, Mr. Jones, was appointed to fill the vacancy.

Mr. Jones ran for election when his initial term expired and continued to serve on the Mobile County Commission for approximately eighteen years, until 2005.

## Scope of Stokes v. Noonan

Mobile County was not the only county with a local law purporting to authorize a special election to fill a vacancy on a county commission at the time that Stokes v. Noonan was decided. The State is aware of similar local acts in Jefferson County (Act No. 77-784), Randolph County (Act No. 80-291), Houston County (Act No. 86-174), Macon County (Act No. 87-527) and Etowah County (Act No. 88-790). The Macon County law applied only to the election of the Chairman of the County Commission in 1987, so it should be regarded as *sui generis*. While only the Mobile County local law, Act No. 85-237, was at issue in the decision of Stokes v. Noonan, the State believes that, when it was decided, Stokes v. Noonan cast a pall over the other local laws, rendering them vulnerable to the same kind of challenge. That is, each local law was vulnerable to a challenge that it violated article IV, § 105 of the Alabama Constitution because it was a local law purporting to govern a subject—the filling of vacancies on county commissions—subsumed by general law, Ala. Code § 11-3-6.

## Act No. 2004-455: Authorizing Local Laws

In 2004 the Alabama Legislature amended the general law governing vacancies, Ala. Code § 11-3-6, set out above, when it passed Act No. 2004-455. As amended, the statute provides that vacancies on county commissions are to be filled by gubernatorial appointment "[u]nless a local law authorizes a special election." Ala. Code § 11-3-6 (Supp. 2004).[5] Governor Riley signed the law on May 14, 2004.

---

[5]    In its entirety, Ala. Code § 11-3-6 now provides: "Unless a local law authorizes a special election, in the case of a vacancy, it shall be filled by appointment by the Governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he or she is appointed." Ala. Code § 11-3-6 (2006 Supp.).

Request for Reconsideration
January 30, 2007
Page 9

Thereafter, on August 9, 2004, the new Act was submitted for Section 5 review. The submission explained that Act No. 2004-455 "ma[de Ala. Code §11-3-6] more gender-inclusive [and] provide[d] that gubernatorial appointment in case of vacancies in the office of county commissioner applies only where local law does not provide for a special election to fill a vacancy." Submission letter, 1 (August 9, 2004). The submission stated that "Act [No.] 2004-455 affects the entire State of Alabama" and explained that the Act "was adopted to permit local law to provide for special elections to fill vacancies in the office of county commissioner." Id. at 2. The submission made no mention of whether Act No. 2004-455 would apply prospectively or retroactively.

The submission did refer to the Stokes v. Noonan decision. Specifically, the submission stated as follows:

> In Stokes v. Noonan, 534 So. 2d 237, 239 (Ala. 1988), the Supreme Court held unconstitutional a local law providing for a special election to fill vacancies on the Mobile County Commission because the local law conflicted with the general law in section 11-3-6. This amendment will allow local law to provide for special elections to fill vacancies in the office of county commissioner under the holding in Baldwin County v. Jenkins, 494 So. 2d 584, 587 (Ala. 1986).

Submission letter, 2 (August 9, 2004). Still, this says nothing about whether Act No. 2004-455 will validate currently existing local laws, or whether it only authorizes the enactment of new local laws.

By letter dated September 28, 2004, the State was advised that the Attorney General had no objection to the proposed change. See DOJ File No. 2004-3515.

**Samuel L. Jones Vacates His Seat**

A vacancy arose on the Mobile County Commission in September 2005, when Samuel L. Jones, an incumbent commissioner, was elected Mayor of Mobile. Mr. Jones was the very same individual who had been appointed to the Commission after Act No. 85-237 was held unconstitutional and his right to hold the seat pursuant to the special election was threatened.

With the vacancy, the method of filling it became an issue once again. Some contended that the vacancy was to be filled through a special election, pointing to Act 85-237 and arguing that it had been revived by Act No. 2004-455. Others contended that, with the declaration that Act No. 85-237 was unconstitutional in Stokes v. Noonan, the vacancy was to be filled by gubernatorial appointment pursuant to the general law, Ala. Code § 11-3-6.

Request for Reconsideration
January 30, 2007
Page 10

**Riley v. Kennedy: State Court Litigation**

Three plaintiffs, Yvonne Kennedy, James Buskey, and William Clark, filed suit in the Circuit Court of Montgomery County seeking declaratory and injunctive relief. They sought a declaration that the vacancy was due to be filled through a special election and an injunction directing the probate judge of Mobile County to conduct one. Governor Riley was among those named as a defendant. My Office defended the litigation, contending that, with the declaration that Act 85-237 was unconstitutional in Stokes v. Noonan, the Governor was empowered to fill the vacancy by appointment. The Circuit Court ruled in favor of the plaintiffs, and Governor Riley appealed.

Even though the appeal was expedited, the local election officials had to move quickly and asked USDOJ to preclear a special election calendar that included a primary election on November 22, 2005, a run-off election on December 13, 2005, and a general election on January 3, 2006. The local election officials needed the approval of USDOJ in order to start the election machinery. By letter dated October 25, 2005, my Office suggested that USDOJ withhold action on the submittal pending the outcome of the litigation in state court. My Office pointed out that the proceedings in the Supreme Court of Alabama had been expedited and that withholding action was consistent with 28 C.F.R. § 51.22.[6] Disregarding this direction, USDOJ declined to withhold action and interposed no objection to the proposed special election.

On appeal, the Supreme Court of Alabama reversed the judgment of the Circuit Court. Riley v. Kennedy, 928 So.2d 1013 (Ala. 2005). The Court explained the arguments, the holding in Stokes v. Noonan, and its new holding as follows[7]:

---

[6]     28 C.F.R. § 51.22 is entitled "premature submissions." It provides as follows:
        The Attorney General will not consider on the merits:
        (a)  Any proposal for a change affecting voting submitted prior to final enactment or administrative decision or
        (b)  Any proposed change which has a direct bearing on another change affecting voting which has not received section 5 preclearance.
        However, with respect to a change for which approval by referendum, a State or Federal court or a Federal agency is required, the Attorney General may make a determination concerning the change prior to such approval if the change is not subject to alteration in the final approving action and if all other action necessary for approval has been taken.
28 C.F.R. § 51.22.

[7]     Again, given that an objection to the enforcement of Riley v. Kennedy was actually interposed, it is important to demonstrate that the Alabama Supreme Court was relying on generally-applicable, race-neutral principles, and that is best done by reproducing the Court's reasoning.

Governor Riley contends that Act No. 2004-455, Ala. Acts 2004, amending § 11-3-6, Ala. Code 1975, did not revive Act No. 85-237, Ala. Acts 1985, which this Court had held unconstitutional, see Stokes v. Noonan, and that, therefore, the trial court erred in declaring that the vacancy on the Mobile County Commission created by Jones's resignation should be filled by a special election.[FN2]

> [FN2.] We review this issue only as presented by these facts and by the parties' arguments regarding these facts; we do not address any other possible impediments that may exist to the constitutionality or enforceability of Act No. 85-237.

In Stokes, this Court addressed the constitutionality of Act No. 85-237, which provided that vacancies on the Mobile County Commission would be filled by a special election when at least 12 months remained on the unexpired term of any commissioner. The registered voter challenging Act No. 85-237 in Stokes argued that Act No. 85-237, a local act, was subsumed by a general law, § 11-3-6, Ala. Code 1975, and, consequently, was unconstitutional under Art. IV, § 105, Alabama Constitution 1901.

Act No. 85-237 provided:

> " 'Whenever a vacancy occurs in any seat on the Mobile County Commission with twelve months or more remaining on the term of the vacant seat, the judge of probate shall immediately make provisions for a special election to fill such vacancy with such election to be held no sooner than sixty days and no later than ninety days after such seat has become vacant. Such election shall be held in the manner prescribed by law and the person elected to fill such vacancy shall serve for the remainder of the unexpired term.' "

534 So.2d at 238. We held that Act No. 85-237, applicable only to Mobile County, constituted a local law on the same subject as the previously enacted general law. We then considered § 11-3-6, Ala. Code 1975, which appears in Chapter 3, Title 11, of the Alabama Code pertaining to county commissions. It provided at the time we decided Stokes: " 'In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed.' " 534 So.2d at 238. We recognized that § 11-3-6 is clearly a general law, a statewide statute addressing the filling of vacancies on county commissions throughout the State, and that the legislature did not in the language of § 11-3-6, Ala.

Code 1975, manifest an intent to except the local law from the general law. Therefore, we held that Act No. 85-237 was contrary to § 11-3-6, Ala. Code 1975, and, consequently, that it violated Art. IV, § 105, Alabama Constitution 1901, which provides, in pertinent part: "No special, private, or local law . . . shall be enacted in any case which is provided for by a general law." We reasoned that because the legislature did not in § 11-3-6, Ala. Code 1975, manifest an intent to except the local law from the general law, the contrary local law, in that case Act No. 85-237, must defer to the general law, § 11-3-6, Ala. Code 1975, and, consequently, we held, Act No. 85-237 violated Art. IV, § 105, Alabama Constitution 1901.

On May 14, 2004, Governor Riley approved Act No. 2004-455 and it became effective. Act No. 2004-455 amends § 11-3-6, Ala. Code 1975, to read as follows: "Unless a local law authorizes a special election, in case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he or she is appointed."

Kennedy argues that Act No. 2004-455, which amended § 11-3-6, Ala. Code 1975, manifests an intent by the legislature to cure the impediment to the enforceability this Court found as to Act No. 85-237 and to now give effect to that Act and that, consequently, a special election is the proper procedure by which to fill the vacancy created on the Mobile County Commission by Jones's resignation. We cannot agree with that conclusion because the language of Act No. 2004-455 does not clearly so indicate.

This Court has consistently held that

" 'statutes are to be prospective only, unless clearly indicated by the legislature. Retrospective legislation is not favored by the courts, and statutes will not be construed as retrospective unless the language used in the enactment of the statute is so clear that there is no other possible construction. Sutherland Stat. Const., § 41.04 (4th ed 1984).'

"Dennis v. Pendley, 518 So.2d 688, 690 (Ala.1987)."

Gotcher v. Teague, 583 So.2d 267, 268 (Ala.1991). Moreover, although curative statutes are "of necessity" retroactive, Horton v. Carter, 253 Ala. 325, 328, 45 So.2d 10, 12 (1950), even they are subject to the same rule of statutory construction, i.e., they will not be construed as retroactive unless the intent of the legislature that the statute have such retroactive effect is

Request for Reconsideration
January 30, 2007
Page 13

> clearly expressed. The act under consideration in <u>Horton</u> expressly
> provided: "This Act shall be deemed retroactive in its effect upon its
> passage and approval by the Governor or upon its otherwise becoming a
> law." 253 Ala. at 328, 45 So. 2d at 12. On numerous other occasions the
> legislature has demonstrated its ability to provide expressly for retroactive
> effect when enacting curative legislation. See, <u>e.g.</u>, § 34-8-28(h), Ala.
> Code 1975 ("The provisions of this amendatory section are remedial and
> curative and shall be retroactive to January 1, 1998."); § 11-50-16(c), Ala.
> Code 1975 ("The provisions of this section shall be curative and
> retroactive . . . ."); § 11-43-80(d), Ala. Code 1975 ("The provisions of this
> section shall be curative and retroactive . . . ."); and Act No. 2001-891,
> § 5, Ala. Acts 2001 ("It is the intent of the Legislature that this act be
> construed as retroactive and curative.").
>
> Here, the plain language in Act No. 2004-455, amending § 11-3-6,
> Ala. Code 1975, provides for prospective application only, and that
> language must be given effect according to its terms. Nothing in the
> language in Act No. 2004-455 demonstrates an intent by the legislature
> that the amendment of § 11-3-6 apply retroactively. The argument that
> Act No. 2004-455 applies prospectively only is further supported by the
> preamble of the Act, which provides that the purpose of the Act is "[t]o
> amend Section 11-3-6 of the Code of Alabama 1975, relating to county
> commissions, <u>to authorize the Legislature by local law to provide for the
> manner of filling vacancies in the office of the county commission</u>."
> (Emphasis added [by the <u>Riley v. Kennedy</u> Court].) The language "to
> authorize the Legislature . . . to provide" the means by which vacancies on
> the county commission are to be filled further indicates an intention by the
> legislature that the Act is to be prospectively applied. Therefore, we hold
> that Act No. 2004-455 applies prospectively only; consequently, Governor
> Riley is authorized to fill the vacancy on the Mobile County Commission
> by appointment.

<u>Riley v. Kennedy</u>, 928 So.2d 1013, 1015-17 (Ala. 2005).

Thus, relying on generally-applicable, race-neutral principles, the Alabama
Supreme Court held that Act No. 85-237, which had been held unconstitutional in <u>Stokes
v. Noonan</u>, was not revived by Act No. 2004-455, which operated prospectively only.
With that ruling, there was no State law basis for the proposed (and precleared) special
election.

**Appointing Juan Chastang**

Governor Riley proceeded to appoint Juan Chastang to fill the vacancy in the
Mobile County Commission. Mr. Chastang currently serves as the Commissioner for
District 1 and as President of the County Commission. Mr. Chastang is African-
American.

Request for Reconsideration
January 30, 2007
Page 14

**Scope of <u>Riley v. Kennedy</u>**

Again, Mobile County was not the only county with a local law purporting to authorize a special election to fill a vacancy on a county commission that pre-dated the enactment of Act No. 2004-455. The State is aware of similar local acts in Jefferson County, Randolph County, Houston County, Macon County (*sui generis*) and Etowah County. While only the Mobile County local law, Act No. 85-237, was at issue in the decision of <u>Riley v. Kennedy</u>, the State believes that <u>Riley v. Kennedy</u> casts doubt on any argument that the other local laws had been revived or saved by Act No. 2004-455.[8] While Mobile County's local law is distinguishable from the others in that it had actually been declared unconstitutional, and, hence, it was void *ab initio, Ex parte Southern Ry. Co.*, 556 So.2d 1082, 1089-90 (Ala. 1989) (citing cases), the <u>Riley v. Kennedy</u> decision focused entirely on retroactivity. Accordingly, this distinction is not likely to be persuasive to a court in the event that one of the other local laws is challenged.

**Summarizing the History of Appointments to Fill Vacancies on the Mobile County Commission**

To reiterate, Juan Chastang, like Samuel L. Jones before him, was appointed to fill a vacancy on the Mobile County Commission. Since the inception of the Mobile County Commission, there has been only one special election conducted to fill a vacancy on that Commission, and that election was conducted under the cloud of litigation that ultimately resulted in the law purporting to authorize the election (Act No. 85-237) being held unconstitutional. <u>See Stokes v. Noonan</u>. Then-Governor Guy Hunt responded to the Alabama Supreme Court's decision in <u>Stokes v. Noonan</u> by appointing the winner of the special election, Samuel L. Jones, to the seat. Hence, in the 45-year history of the Mobile County Commission, there were only approximately three years during which it was thought, albeit incorrectly, that a special election might be authorized to fill a vacancy on that Commission.[9] The rest of the time, the generally applicable law of gubernatorial appointment applied. When a vacancy arose in 2005, it was filled by appointment.

---

[8]    An Attorney General's opinion that concerns the operation of Act No. 2004-455 as applied to Houston County is clearly marked: "DO NOT CITE – See Riley v. Kennedy, Ala. Sup. Ct., Case No. 1050087 (Nov. 9, 2005)." Opinion to Honorable Steve Clouse, Att'y Gen'l Opn. 2004-215 (Sept. 7, 2004).

[9]    As set out above, the Mobile County Commission came into being in January 1961. At that time, both generally applicable law (now codified at Ala. Code § 11-3-6) and the Act creating the Commission (Act No. 181, 1957 Regular Session of the Alabama Legislature) called for gubernatorial appointment in the event of a vacancy. More than twenty years passed before Act No. 85-237 was enacted and purported to change the method of filling a vacancy on the Mobile County Commission from gubernatorial appointment to special election. The Act was approved April 8, 1985 and the State was informed that the Attorney General had no objection on June 17, 1985. Two years later, in April 1987, Willie H. Stokes filed suit challenging the constitutionality of Act No. 85-

In fact, viewed from this perspective, Riley v. Kennedy did not cause a change at all, at least not in Mobile County.  Stokes v. Noonan had held that Act No. 85-237 was unconstitutional, and, hence, that any vacancy on the Mobile County Commission had to be filled by gubernatorial appointment.  Under Alabama law, an Act that is declared unconstitutional is void *ab initio*. *Ex parte Southern Ry. Co.*, 556 So.2d 1082, 1089-90 (Ala. 1989) (citing cases).  Riley v. Kennedy held that nothing had changed; Act No. 85-237 still could not be enforced.  Outside of Mobile County, Riley v. Kennedy did have more of an impact, in that it cast doubt on any argument that the other local laws had been revived or saved by Act No. 2004-455.  Cf.  Opinion to Honorable Steve Clouse, Att'y Gen'l Opn. 2004-215 (Sept. 7, 2004).

### Kennedy v. Riley: Federal Court Litigation

The Alabama Supreme Court handed down its decision in Riley v. Kennedy on November 9, 2005. By letter dated the next day, my Office wrote to inform USDOJ of the Alabama Supreme Court's decision.  Thereafter, on November 16, 2005, the Riley v. Kennedy plaintiffs filed suit in federal district court.

The new complaint asserted that the Riley v. Kennedy decision wrought a change in existing law. The prayer for relief asked that the court declare that the Governor lacked the authority to appoint Mr. Jones' successor absent preclearance.  The complaint made no mention of Stokes v. Noonan, but did seek to prevent a gubernatorial appointment, or to undermine any appointment that had already occurred.  Subsequent briefing found the plaintiffs arguing that both Stokes v. Noonan and Riley v. Kennedy required preclearance to be enforceable.

My Office vigorously defended the lawsuit on behalf of Governor Riley, the only named defendant.  In our Answer, we asserted that "Governor Riley's power of appointment stems from a [S]tate law that was in effect before November 1, 1964, and that, as subsequently modified and precleared, preserves that power '[u]nless a local law authorizes a special election . . . .' No valid [S]tate law authorizes a special election to fill a vacancy on the Mobile County Commission." Answer, 2 (emphasis added).[10]  We further asserted that "[t]he United States cannot tell a State what [S]tate law is without running afoul of the Tenth Amendment to the United States Constitution." Id. at 3.  We clearly took the position that '[t]he Alabama Supreme Court's decision in Riley v. Kennedy does not effect a change in standard, practice, or procedure with respect to voting." Id.

---

237 on dual grounds.  The Alabama Supreme Court issued its decision holding Act No. 85-237 unconstitutional on September 30, 1988, barely three years after it was approved. Application of Act No. 85-237 had been attempted only once.

[10]    The reference is to Ala. Code § 11-3-6, as modified by Act No. 2004-455.

Request for Reconsideration
January 30, 2007
Page 16

Trial briefs were filed by both parties. In our briefing, we contended that requiring preclearance of decisions made in the course of the ordinary appellate process that invalidated precleared changes were not changes in voting. Instead, any State statute within the scope of Section 5 must be both valid as a matter of State law and precleared if it is to be enforceable. Preclearance <u>does not</u> speak to validity under State law. Moreover, preclearance <u>cannot</u> speak to validity under State law without raising grave constitutional questions. Certainly, preclearance cannot override a State's Constitution to act as a savings clause that requires a law that conflicts with a State's Constitution to, nonetheless, be enforced. In our initial brief, we put it this way:

> Preclearance of a state statute cannot validate an otherwise invalid state law without running afoul of the Tenth Amendment to the United States Constitution. Preclearance is an action by federal authorities that makes a valid state statute enforceable. Without a valid state law, though, a preclearance letter, like the letters relating to Act No. 85-237 and the local election in this case, is null, void, and of no effect. If that were not the case, the Voting Section of the Civil Rights Division of the United States Department of Justice . . . would be making state law.

Trial Brief of Governor Riley, 4-5.

In supplemental briefing, we predicted the exact problem now facing the State. We contended as follows:

> [T]he relief the Kennedy Plaintiffs seek is fraught with constitutional problems. Requiring the State to submit <u>Stokes v. Noonan</u>, or <u>Riley v. Kennedy</u>, for preclearance begs the question what would happen if USDOJ, with or without input from the Kennedy Plaintiffs or their supporters, objected. The State might then be compelled to conduct a special election under a state law that is unconstitutional and cannot be revived retroactively[, namely Act No. 85-237]. In that case, USDOJ would be making state law, and commandeering state officials in violation of the Tenth Amendment. Put differently, Section 5 would be unconstitutional as applied to the facts of this case.

Supplemental Brief of Governor Riley, 5.

Unfortunately, the three-judge court agreed with the plaintiffs and held that the <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u> decisions could not be enforced unless they were precleared. <u>Kennedy v. Riley</u>, 445 F.Supp.2d 1333 (M.D. Ala. 2006). The heart of the court's reasoning was as follows:

> In reviewing the plaintiffs' § 5 claim, we are tasked with the limited purpose of determining "(i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate." <u>City of Lockhart v. United States</u>, 460 U.S. 125, 129 n. 3, 103 S. Ct. 998, 74 L.Ed.2d 863 (1983). Because it is undisputed that <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u> were not precleared, the critical

Request for Reconsideration
January 30, 2007
Page 17

inquiries for this court are whether these decisions brought about a change covered by § 5, and, if so, the appropriate remedy.

In determining whether a change covered by § 5 occurred, we must first determine if there was, in fact, a change. Changes are measured by comparing the new challenged practice with the baseline practice, that is, the most recent practice that is both precleared and in force or effect. Abrams v. Johnson, 521 U.S. 74, 96-97, 117 S. Ct. 1925, 138 L.Ed.2d 285 (1997) (citing 28 CFR § 51.54); Gresham v. Harris, 695 F. Supp. 1179, 1183 (N.D.Ga.1988) (three-judge court), aff'd sub nom. Poole v. Gresham, 495 U.S. 954, 110 S. Ct. 2556, 109 L.Ed.2d 739 (1990).

Here, the parties dispute what constitutes the baseline practice. The plaintiffs argue that the baseline is Act No. 85-237, which provided for the filling of the vacancy on the Mobile County Commission by special election; they maintain that Stokes v. Noonan and Riley v. Kennedy were changes because the former invalidated the Act and the latter still refused to enforce it. The State responds that the baseline could not be Act No. 85-237 because the Alabama Supreme Court declared it unconstitutional; the State posits that Stokes v. Noonan and Riley v. Kennedy did not reflect a change but were rather a mere reaffirmation of the correct scope of the governor's preexisting appointment power under Alabama general law.

We think the plaintiffs have the better argument. Because Act No. 85-237 was the most recent precleared practice put into force and effect with the election of Jones in 1987, it is the baseline against which we must determine if there was a change. To be sure, the Alabama Supreme Court declared Act No. 85-237 unconstitutional under state law; this was, however, after Act No. 85-237 had been put into effect. We are required to determine the baseline "without regard for [its] legality under state law." Lockhart, 460 U.S. at 133, 103 S. Ct. 998 (relying on Perkins v. Matthews, 400 U.S. 379, 394-395, 91 S. Ct. 431, 27 L.Ed.2d 476 (1971)).

We therefore hold that, because Act No. 85-237 is the baseline and because Stokes v. Noonan invalidated Act No. 85-237 and Riley v. Kennedy held that Act No. 85-237 was not rendered enforceable by Act No. 2004-455, the two decisions constituted changes that should have been precleared before they were implemented. In reaching this holding, we emphasize that we are in no way disputing the rulings of the Supreme Court of Alabama, the reasoning underlying the rulings in these two cases, or that the governors acted in accordance with state law in making the appointments. Indeed, this court does not have jurisdiction to address such purely state-law questions. Whether Act No. 85-237 is, in fact, unconstitutional under state law and whether positions on the Mobile County Commission must be filled by special election or gubernatorial

Request for Reconsideration
January 30, 2007
Page 18

> appointment are state-law questions we do not reach and should not be
> understood in any way as reaching; our holding today does not in any way
> undermine these two decisions under state law. We merely hold that
> federal law requires that they be precleared before they are implemented.

Kennedy v. Riley, 445 F.Supp.2d 1333, 1336-37 (M.D. Ala. 2006) (alterations by the
court).

The court allowed the State time to seek preclearance before taking up the issue of
remedy. Originally the State was allowed 90 days to obtain preclearance, Judgment,
dated August 18, 2006, but that time was extended upon an unopposed motion for more
time, Order, dated November 16, 2006. Upon USDOJ's decision to interpose an
objection, the State was granted additional time to seek reconsideration, Order, dated
January 11, 2007; Order, dated January 29, 2007 (denying plaintiffs' request for
reconsideration of the January 11, 2007 order).

**Act No. 2006-342**

While the federal litigation was on-going in Kennedy v. Riley, the Alabama
Legislature passed, and the Governor signed, Act No. 2006-342. That Act was the
legislative response to the Alabama Supreme Court's decision in Riley v. Kennedy: if
Act No. 2004-455 (authorizing local laws) could not revive Act No. 85-237 (Mobile
County's old local law, which had been found unconstitutional in Stokes v. Noonan),
then a new local law was needed. Act No. 2006-342 was that new local law. In pertinent
part, it provided:

> Whenever a vacancy occurs in any seat on the Mobile County
> Commission with 12 months or more remaining on the term of the vacant
> seat, the judge of probate shall immediately make provisions for a special
> election to fill such vacancy with such election no sooner than 60 days and
> no later than 90 days after such seat has become vacant. Such election
> shall be held in the manner prescribed by law and the person elected to fill
> such vacancy shall serve for the remainder of the unexpired term.

Act No. 2006-342.

To the State's knowledge, no declaratory judgment action has been filed to test
the constitutionality of Act No. 2006-342, and no entity has submitted the Act for
preclearance.

The State believes that the proper treatment of Act No. 2006-342 holds the key to
the resolution of this issue. If Act No. 2006-342 is submitted for preclearance and
precleared, it will govern future vacancies on the Mobile County Commission. The
appointment of Juan Chastang, like the special election/ appointment of Samuel L. Jones,
will be a one-time event. Moreover, the decisions of the Supreme Court of Alabama will
be given due respect, the authority of State officials will not be commandeered, and State
officials will not be directed to conduct a special election for which there is no State law
authority. Cf. Printz v. United States, 521 U.S. 898, 117 S. Ct. 2365 (1997).

Request for Reconsideration
January 30, 2007
Page 19

**The Preclearance Submission and Objection**

As a direct result of the three-judge federal court's decision in <u>Kennedy v. Riley</u> and without waiving its objections, the State submitted the Alabama Supreme Court decisions in <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u> for preclearance.[11] The submission was made on November 9, 2006.

While the submission asked for preclearance of the two decisions by the Alabama Supreme Court, it also spoke in terms of filling vacancies on the Mobile County Commission and specifically described the scope of the change as limited solely to that particular Commission. Submission letter, 1-4, 6 (November 9, 2006).

The State's submission also explained the "difficult position" that the federal court's decision put it in: "The State agrees that, when statutes make changes that affect voting, they must be precleared. Nothing, however, immunizes those statutes from challenge under [S]tate law, and the preclearance of a statute cannot pretermit the State's litigation process. This is particularly the case where race-neutral, generally-applicable principles of law are applied." Submission letter, 7 (November 9, 2006).

By letter dated November 28, 2006, counsel for the plaintiffs in the <u>Kennedy v. Riley</u> and <u>Riley v. Kennedy</u> litigation, acting on their behalf, commented on the State's submission. A copy of that comment was provided to the State.

By letter dated January 8, 2007, Assistant Attorney General Wan J. Kim, exercising the authority delegated to him, *see* 28 C.F.R. § 51.3, interposed an objection to the State of Alabama's enforcement of the Alabama Supreme Court's decisions in <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u>.

The objection letter indicated that additional comments may have been submitted without copy to the State. By letter dated January 9, 2007, the State has requested that USDOJ provide it with copies of any additional records concerning this submission. Those records were provided to the State by letters dated January 17, 2007 and January 25, 2007. The records include several documents entitled Memorandum of Telephonic Communication, which have been blacked-out to some extent to protect personal privacy. The vast majority of phone calls focus on the Juan Chastang appointment. Additionally, one of the plaintiffs in the <u>Kennedy v. Riley</u> and <u>Riley v. Kennedy</u> litigation faxed Act No. 2006-342 to USDOJ.

---

[11]    To note the obvious, the Attorney General reviews submissions and interposes an objection to those changes which come within the purview of Section 5 and which are thought to be retrogressive. Were USDOJ to agree with Alabama that the changes submitted are not properly subject to Section 5 review, it would be appropriate for the Attorney General to refrain from interposing an objection.

Request for Reconsideration
January 30, 2007
Page 20

## THE OBJECTION SHOULD BE WITHDRAWN

It is the State's position that the objection should be withdrawn, and that Alabama should be permitted to enforce the decisions in Stokes v. Noonan and Riley v. Kennedy. The State believes that USDOJ has erroneously narrowed the scope of the change submitted for consideration and that this error has contributed to a flawed view of the relevant facts. Moreover, further analysis prompted by the comments of other interested parties and the USDOJ objection letter has caused the State to believe that restating the scope of the change would eliminate confusion and make it clear that the objection should not have been interposed and is due to be withdrawn.

More concretely, the State submitted for review a change to the method of filling vacancies on the Mobile County Commission. Submission letter, 1-4, 6 (November 9, 2006). In contrast, USDOJ reviewed, and objected to, the filling of the District 1 seat vacated in September 2005 by Samuel L. Jones. Properly construed, the change at issue, and the change due to be further considered, concerns the method of filling vacancies on county commissions that have local laws which pre-date Act No. 2004-455 and authorize special elections to fill said vacancies.

### The Norm

It is important to understand that, in Alabama, appointment is the norm for filling vacancies on county commissions. The use of a special election to fill these vacancies is a deviation from the norm. Of Alabama's 67 counties, only six, one of them *sui generis*, have local laws authorizing the filling of vacancies on their county commissions by special election. Appointments date back to the 1852 Code of Alabama, while special election laws, like Act No. 85-237, are of a more recent vintage and have been found to violate the State Constitution.[12] Stokes v. Noonan. This is the perspective from which Alabama's submission should be viewed.

In contrast, the objection letter is apparently premised upon the idea that special elections are the norm and that Alabama is attempting this one time to use an appointment to deny the people their right to vote. The objection letter conveys this idea by focusing on Act No. 85-237 and on Act No. 2006-342, essentially sandwiching the Juan Chastang appointment between these two Acts and insisting that the Acts are enforceable and that Act No. 85-237 has been enforced. See Objection letter, 1-2. A key portion of the letter states:

> Pursuant to Act No. 85-237, a vacancy on the Mobile County
> Commission is to be filled through popular election by the voters within
> the relevant single-member district. That statute was precleared by the

---

[12]    Gubernatorial appointments date back to about 1868. Prior to that, vacancies on the Court of County Commissioners were filled by that Court. Code 1852, § 698; Code 1867, § 826.

Request for Reconsideration
January 30, 2007
Page 21

       Attorney General under Section 5 on June 17, 1985 (File No. 1985-1645), and was first implemented in a 1987 District 1 special election. Pursuant to a decision of the Alabama Supreme Court in <u>Stokes v. Noonan</u>, that method of filling vacancies was changed from election by the voters of the district to appointment by the Governor of Alabama in 1988, and reaffirmed by <u>Riley v. Kennedy</u> in 2005.

       Pursuant to the decision of the three-judge federal panel in <u>Kennedy v. Riley</u>, the State has submitted the changes effected by <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u> for review under Section 5 of the Voting Rights Act. Additionally, we understand that Alabama law has changed, legislatively reversing the decision in these cases and restoring the authority to fill vacancies to the voters themselves in future elections. This is the effect of Act No. 2006-342, which was signed by the Governor on April 12, 2006, and which would govern all future vacancies. The question before us, therefore, is limited to whether the change effected by <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u> will lead to impermissible retrogression, caused by the appointment, rather then election, of an individual to fill a vacancy on the Mobile County Commission for a term expiring in 2008.

   . . .

       Thus, the last precleared procedure for filling vacancies in the Mobile County Commission that was in force or effect was the special election method set forth in Act No. 85-237. <u>Kennedy</u>, 445 F. Supp. 2d at 1336. This Act remains in full force and effect, as it affects voting, was precleared, and was implemented in the 1987 special election cycle. <u>See</u> <u>Young v. Fordice</u>, 520 U.S. 273, 282-83 (1997); <u>Lockhart</u>, 460 U.S. at 132-33. It is therefore the benchmark against which we measure the proposed change to fill vacancies by appointment of the Governor of Alabama.

Objection letter, 1-2. [13]

---

[13]    USDOJ's reliance on <u>Young v Fordice</u> is misplaced. There, the Supreme Court held that a plan that was in effect for only a short time and was abandoned for State law reasons, though it was precleared, had not properly moved the baseline because it was never "in force or effect." 520 U.S. 282-83. In the same way here, Act 85-237 was in effect for only a short time, and the first attempt to use it provoked a legal challenge. While a special election was held, that election was the result of the vagaries of the litigation process; if the Circuit Court had enjoined the election as Plaintiff Stokes wanted, and as the Alabama Supreme Court's decision held it should have, there would have been no election to which to point. In any event, Act 85-237 was abandoned as soon as its unlawfulness became apparent and then-Governor Hunt exercised his power of appointment. Just as in <u>Fordice</u>, Act 85-237 was never truly "in force or effect."

Request for Reconsideration
January 30, 2007
Page 22

The letter fails to acknowledge that gubernatorial appointment was the long-standing norm, prior to the enactment and preclearance of Act No. 85-237. Code 1876, § 740; Code 1886, § 820; Code 1896, § 952; Code 1907, § 3307; Code 1923, § 6749; Code 1940, T. 12, § 6. Before gubernatorial appointments, vacancies on the Court of County Commissioners were filled by that Court. Code 1852, § 698; Code 1867, § 826. Special elections were not the norm.

The letter fails to acknowledge that the Alabama Supreme Court's decisions in Stokes v. Noonan and Riley v. Kennedy were grounded in well-established legal principles. The decisions were neither racially motivated nor based on specious rationales advanced to reach a particular result. The Alabama Supreme Court did not simply decide that it preferred appointments. Rather, it held, based on generally-applicable, race-neutral principles, that Act No. 85-237 was unconstitutional and could not be revived by a later-dated prospective Act.[14]

The letter also fails to acknowledge that the unconstitutionality of Act No. 85-237 impacts its enforceability. The letter further fails to acknowledge that, after the Supreme Court's decision in Stokes v. Noonan was handed down, then-Governor Guy Hunt appointed Samuel L. Jones to the seat he had won during the invalid special election in order to protect Mr. Jones from an action to oust him. Additionally, the letter fails to consider how these actions undermine the assertion that Act No. 85-237 "was first implemented in a 1987 District 1 special election." See Objection letter, 2. And, finally, the letter fails to acknowledge that Samuel L. Jones and Juan Chastang are African-American.

---

[14]    In this way too, the current situation is different from Lockhart, upon which USDOJ relied. In Lockhart, the United States Supreme Court dealt with a situation where a city had not followed State law for approximately 50 years and then sought to invoke non-followed State law in preclearance. City of Lockhart v. United States, 460 U.S. 125, 132-33, 103 S. Ct. 998, 1003 (1982). The Court noted "[w]e doubt that Congress intended to force either [the Attorney General of the United States of the District Court for the District of Columbia] into speculation as to state law." Id. at 133, n.8. Here, the Alabama Supreme Court has clearly explained what State law requires, and it requires gubernatorial appointment.

The Lockhart Court relied on Perkins v. Matthews, 400 U.S. 379, 91 S. Ct. 431 (1971), for its conclusion that the local practice being enforced mattered more than the contradictory State law. Lockhart, 460 U.S. at 132-33. Perkins involved Canton's inexplicable and unexplained failure to follow Mississippi law on Mississippi's "applicable date." Perkins, 400 U.S. at 395. It is, therefore, distinguishable.

Request for Reconsideration
January 30, 2007
Page 23

**Improper Reliance on Act No. 2006-342**

While the letter fails to acknowledge and consider all these things, an equally great error is found in the fact that the letter improperly acknowledges, and firmly relies upon, Act No. 2006-342. That Act has not yet been submitted for preclearance. In fact, I find no mention of its existence in the State's submission.[15] There is a good reason for that. The three-judge court told the State, over its objection, to submit the decisions in Stokes v. Noonan and Riley v. Kennedy. That is what the State did. Moreover, accepting for the sake of argument the three-judge court's determination that these decisions represented a change and required preclearance, Act No. 2006-342 is the next change and needs its own submission. There was no need to submit Act No. 2006-342, and it was not appropriate for USDOJ to consider it, until the decisions in Stokes v. Noonan and Riley v. Kennedy had been considered and precleared.

Further, the State has cause to hesitate before making the submission of Act No. 2006-342. If the federal court decision in Kennedy v. Riley stands, then my Office will have an obligation to assure itself of the constitutionality of a change before submitting that change for preclearance. Otherwise, preclearance of an Act would substitute USDOJ for the State's litigation process and the State's Constitution as the gauge for measuring the validity of that Act under State law. As absurd as such a result appears—that the State may be told to apply an invalid State law because it was precleared—Alabama now finds itself in precisely that position.[16] I would note that this is an uncomfortable role for my Office to have to assume; we are accustomed to defending State statutes, not attacking them to test whether they violate the State Constitution. Moreover, given the case or controversy requirement, there may be no mechanism for this Office to test the constitutionality of statutes before seeking preclearance.

All of which is to say, that I believe USDOJ has erred in assuming that Act No. 2006-342 is valid and enforceable and will "govern all future vacancies." Objection letter, 2. That error is compounded by the fact that the existence of this Act apparently led USDOJ to narrowly construe the change under consideration to the point of considering a single appointment. Stokes v. Noonan and Riley v. Kennedy are not applicable to a single district in a single county in a single year. These decisions cast a

---

[15]     Act No. 2006-342 apparently came to the attention of USDOJ as a result of comments made by other interested parties.

[16]     You will recall that there were two challenges to the constitutionality of Act No. 85-237. While the passage of Act No. 2004-455 eliminates one of the grounds asserted by Plaintiff Stokes, the other has not been so addressed, and additional constitutional concerns might exist. Based on footnote 2 in the Riley v. Kennedy decision, quoted above, it appears this fact has not escaped the attention of the Alabama Supreme Court either.

Request for Reconsideration
January 30, 2007
Page 24

pall on certain local laws existing in five other counties, and the <u>Stokes v. Noonan</u> decision has been the settled law of Alabama for nearly 20 years.

Moreover, this reality illuminates the possibility that a comment by the <u>Kennedy v. Riley</u> plaintiffs led USDOJ to focus on the wrong facts. The plaintiffs commented that "the voters of Mobile County Commission District 1 have different political preferences than Gov. Riley. In the recent gubernatorial election, the voters of District 1 cast only 40% of the [sic] votes for Gov. Riley, while the other two Districts voted 73% for Riley." Comment, 2 (November 28, 2006) (footnote omitted). These facts appear to have influenced USDOJ, as the objection letter stated: "there is no dispute that the change would transfer this electoral power to a state official elected by a statewide constituency whose racial make-up and electoral choices regularly differ from those of the voters of District 1." Objection letter, 3. These facts, however, are irrelevant. Because <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u> are applicable to more than a single district in a single county in a single year, it is entirely irrelevant who currently holds the Office of Governor or how one particular district of the Mobile County Commission voted in the 2006 gubernatorial election.[17]

With all due respect, the existence of Act No. 2006-342 also appears to have confused the analysis. In addition to using the very existence of an un-submitted Act to unilaterally redefine the scope of the change submitted, USDOJ has taken the unusual step of suggesting that Act No. 2006-342 need not be submitted for preclearance, Objection letter, 3, while simultaneously announcing that "[b]ecause the changes pursuant to <u>Stokes</u> and <u>Riley</u> were never precleared, they cannot serve as a benchmark," Objection letter, 2. Alabama has not asked that <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u> be the benchmark; it has asked that they be precleared. Once they are precleared, those Alabama Supreme Court decisions will serve as the benchmark for future submissions. Preclearance of these decisions will more clearly delineate the appropriate benchmark.

In the federal court litigation, the State did dispute what the benchmark should be, but that dispute was over whether Act No. 85-237 could serve as a benchmark when it was unconstitutional. There has never been a dispute over whether <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u> can serve as benchmarks. Such a dispute could only arise if the State had acted to submit Act No. 2006-342 for preclearance before achieving either preclearance of those decisions or a decision from a three-judge federal court that preclearance of the Supreme Court decisions was not needed.

Again, the proper treatment of Act No. 2006-342 is the key. When that Act becomes enforceable, the Legislature's intent can be carried out in a way that does not

---

[17]     If the experiences of the Mobile County Commission alone matters, USDOJ is reminded that both times gubernatorial appointments have been used to fill vacancies on the Mobile County Commission, Republican governors appointed African-American individuals to the positions.

Request for Reconsideration
January 30, 2007
Page 25

involve disrespect for the Supreme Court of Alabama. The decisions in Stokes v.
Noonan and Riley v. Kennedy do not mean that the Legislature is powerless; they mean
that the Legislature must exercise the powers it has consistently with the Constitution of
Alabama and generally applicable law.

**The Proper Benchmark: Young v. Fordice**

With respect to the question of benchmark, the Kennedy v. Riley three judge
court held that: "We are required to determine the baseline 'without regard for [its]
legality under state law.' Lockhart, 460 U.S. at 133, 103 S.Ct. 998 (relying on Perkins v.
Matthews, 400 U.S. 379, 394-395, 91 S. Ct. 431, 27 L.Ed.2d 476 (1971))." (alteration by
the court). Likewise, USDOJ has relied on Lockhart and Perkins, as well as the Supreme
Court's decision in Young v. Fordice, 520 U.S. 273, 117 S. Ct. 1228 (1997). Objection
letter, 2. Alabama takes the position the Supreme Court's unanimous decision in Young
supports the State's position, distinguishing this case from the situations in Lockhart and
Perkins.

Young arose from changes made by Mississippi to its voter registration system.
The Supreme Court spoke in terms of an "Old System," a "Provisional Plan" and a "New
System." Id. at 276-277. Mississippi briefly transitioned from the Old System to the
Provisional Plan in an attempt to comply with the National Voter Registration Act of
1993. Id. at 275-76. State officials began implementing the Provisional Plan under the
assumption that State law would be altered to authorize it. Id. at 277-78. Moreover,
State officials submitted the Provisional Plan for preclearance, which was granted. Id. at
277-79. Thereafter, the Mississippi Legislature failed to authorize the Provisional Plan,
and State officials quickly abandoned it in favor of the New System. Id. at 278-279.
That New System was not submitted for preclearance and litigation ensued. Id. at 280-
81.

The United States Supreme Court concluded that the New System required
preclearance, not because it was a change from the Provisional Plan but because it was a
change from the Old System. Id. at 281-85. The Court's reasoning is instructive, and
highly applicable to Alabama's situation.

The Plaintiffs and USDOJ "argue[d] that the Provisional Plan, because it was
precleared by the Attorney General, became part of the baseline against which to judge
whether a future change must be precleared." Id. at 282. The district court "rejected this
argument on the ground that the Provisional Plan was a misapplication of state law, never
ratified by the State." Id. at 281. The United States Supreme Court agreed: "We, too,
believe that the Provisional Plan, in the statute's words, was never 'in force or effect.' 42
U.S.C. § 1973c." Id. at 282. The Court explained its agreement as follows:

> The District Court rested its conclusion upon the fact that
> Mississippi did not change its state law so as to make the Provisional
> Plan's "unitary" registration system lawful and that neither the Governor

Request for Reconsideration
January 30, 2007
Page 26

nor the legislature nor the state attorney general ratified the Provisional Plan. The appellants argue that the simple fact that a voting practice is unlawful under state law does not show, entirely by itself, that the practice was never "in force or effect." We agree. A State, after all, might maintain in effect for many years a plan that technically, or in one respect or another, violated some provision of state law. Cf. Perkins v. Matthews, 400 U.S. 379, 394-395, 91 S. Ct. 431, 440, 27 L.Ed.2d 476 (1971) (deeming ward system " in fact 'in force or effect' " and requiring change from wards to at-large elections to be precleared even though ward system was illegal and at-large elections were required under state law (emphasis in original)); City of Lockhart v. United States, 460 U.S. 125, 132-133, 103 S. Ct. 998, 1003-1004, 74 L.Ed.2d 863 (1983) (numbered-post election system was "in effect" although it may have been unauthorized by state law). But that is not the situation here.

In this case, those seeking to administer the Provisional Plan did not intend to administer an unlawful plan. They expected it to become lawful. They abandoned the Provisional Plan as soon as its unlawfulness became apparent, i.e., as soon as it became clear that the legislature would not pass the laws needed to make it lawful. Moreover, all these events took place within the space of a few weeks. The plan was used to register voters for only 41 days, and only about a third of the State's voter registration officials had begun to use it. Further, the State held no elections prior to its abandonment of the Provisional Plan, nor were any elections imminent. These circumstances taken together lead us to conclude that the Provisional Plan was not "in force or effect"; hence it did not become part of the baseline against which we are to judge whether future change occurred.

Young, 520 U.S. at 282-83 (emphasis added, except where otherwise noted).

While one special election was conducted pursuant to Act 85-237 (resulting in the election of Mr. Samuel L. Jones), that election was conducted under the cloud of litigation that ultimately resulted in Act No. 85-237 being held unconstitutional. Stokes v. Noonan. Under Alabama law, an Act that is declared unconstitutional is void ab initio. Ex parte Southern Ry. Co., 556 So.2d 1082, 1089-90 (Ala. 1989) (citing cases). Then-Governor Guy responded to the Stokes v. Noonan decision by appointing Mr. Jones to the Commission. Hence, Act No. 85-237 was only very briefly enforced. In this way, it is very different from the situations in Lockhart and Perkins where the covered jurisdictions had a long-standing practice in violation of State law.

While I recognize that Alabama's situation is distinguishable from Young in that an election was conducted, I do not read Young to make the conduct of one election, standing alone, dispositive, especially given that the special election was conducted while litigation challenging Act No. 85-237 was pending. Under Young, USDOJ should not consider whether Stokes v. Noonan and Riley v. Kennedy represent a retrogression from

Request for Reconsideration
January 30, 2007
Page 27

Act No. 85-237, but whether these decisions represent a retrogression from the practice which existed prior to the passage of that Act.   Because these decisions return the State to the prior practice, the answer is "no", and USDOJ should not object.

## Scope of <u>Stokes v. Noonan</u> and <u>Riley v. Kennedy</u>

Mobile County was not the only county with a local law purporting to authorize a special election to fill a vacancy on a county commission at the time that <u>Stokes v. Noonan</u> was decided.  The State is aware of similar local acts in Jefferson County (Act No. 77-784), Randolph County (Act No. 80-291), Houston County (Act No. 86-174), Macon County (Act No. 87-527) and Etowah County (Act No. 88-790).  The Macon County law applied only to the election of the Chairman of the County Commission in 1987, so it should be regarded as *sui generis*.

While only the Mobile County local law, Act No. 85-237, was at issue in the decision of <u>Stokes v. Noonan</u>, the State believes that <u>Stokes v. Noonan</u> casts a pall over the other local laws, rendering them vulnerable to the same kind of challenge.  Likewise, the State believes that the <u>Riley v. Kennedy</u> decision casts doubt on any argument that those local laws are saved by Act No. 2004-455. [18]  While Mobile County's local law is distinguishable from the others in that it had actually been declared unconstitutional, and hence it was void *ab initio, Ex parte Southern Ry. Co.*, 556 So.2d 1082, 1089-90 (Ala. 1989) (citing cases), the <u>Riley v. Kennedy</u> decision focused entirely on retroactivity.  Accordingly, this distinction is not likely to be persuasive to a court in the event that one of the other local laws is challenged.

The objection letter gave some weight to census data for the area contained within District 1 of Mobile County. It is inappropriate to focus solely on the demographics of District 1 of Mobile County when, at a minimum, the changes encompassed by the submission impact all of Mobile County.  Moreover, given the statewide applicability of the Supreme Court's decisions, to the extent that any population data is relevant, it is necessary to consider all of Mobile County and the five other counties known to have similarly vulnerable local laws, and to do it with some sense of the State information.  Based on information currently available from the U.S. Census Bureau website, the data are as follows:

---

[18]     For proof of this, one need look no further than the Opinion to Honorable Steve Clouse, Att'y Gen'l Opn. 2004-215 (Sept. 7, 2004), which concerns the operation of Act No. 2004-455 as applied to Houston County and is clearly marked: "DO NOT CITE – See Riley v. Kennedy, Ala. Sup. Ct., Case No. 1050087 (Nov. 9, 2005)."

Request for Reconsideration
January 30, 2007
Page 28

| Jurisdiction | Population (2005 estimate) | White (2005) | Black (2005) | Other (derived) |
|---|---|---|---|---|
| State of Alabama | 4,557,808 | 71.4 % | 26.4 % | 2.2 % |
| Etowah County | 103,189 | 83.8 % | 14.6 % | 1.6 % |
| Houston County | 94,249 | 72.2 % | 25.9 % | 1.9 % |
| Jefferson County | 657,229 | 56.8 % | 41.2 % | 2.0 % |
| Macon County | 22,810 | 15.7 % | 82.8 % | 1.5 % |
| Mobile County | 401,427 | 62.2 % | 34.5 % | 3.3 % |
| Randolph County | 22,717 | 76.8 % | 22.1 % | 1.1 % |

The November 28, 2006, comment by Plaintiffs' counsel made much of special elections that Plaintiffs contend were held in Houston County and in Etowah County. Comment, 4 (November 28, 2006). As to Houston County, the comment notes the existence of Opinion to the Honorable Steve Clouse, No. 2004-215 (September 7, 2004).[19] That opinion explained the holding of Stokes v. Noonan and that Act No. 2004-455 had been passed but was not yet precleared and, thus, was not yet enforceable. The opinion went on to state that, once the Act has been precleared, a vacancy occurring after the enactment date of Act No. 2004-455 should be filled by special election. While the comment relies on this final statement, it neglects to mention that the opinion has been marked: "DO NOT CITE – See Riley v. Kennedy, Ala. Sup. Ct., Case No. 1050087 (Nov. 9, 2005)." The fact that a special election might have been held in Houston County in reliance on that opinion pales in importance to the reality that any such special election was unauthorized under Stokes v. Noonan and Riley v. Kennedy.

As to Etowah County, the comment hints that an unprecleared special election was held there, and notes that the district voting was majority white, as if that fact were at all relevant or explanatory. First, if the election was held and was not precleared, it was in violation of federal law in addition to being in violation of State law (Stokes v. Noonan). Second, the comment says that the Secretary of State's website revealed that the election was on April 26, 2005. If that is true, then, like any special election held in Houston County, the Etowah County special election predated the Riley v. Kennedy decision.

---

[19]    Attorney General opinions are not binding law, though the courts sometimes find the opinions persuasive. Anderson v. Fayette County Bd. of Educ., 738 So.2d 854, 858 (Ala.1999) (citing cases).

Request for Reconsideration
January 30, 2007
Page 29

The fact that there was some confusion about the interplay between Stokes v. Noonan and Act No. 2004-455, which was clarified in Riley v. Kennedy, should come as no surprise. This is the common law system at work. It is one reason why it can be so very difficult for the State to precisely describe how a changed statute, regulation, or procedure will play out, and, in turn, why the strict requirement that jurisdictions covered by Section 5 do so can be unreasonable. For this reason, to the extent it must be judged, the State should be judged by the pronouncements of its Supreme Court as to what the law of the Alabama is (where they exist), and not by the actions of one or two or three counties. Such a position would be consistent with the Lockhart Court's reluctance to have USDOJ trying to "speculat[e] as to state law." City of Lockhart v. United States, 460 U.S. 125, 133 n.8, 103 S. Ct. 998, 1003 n.8 (1983).

**From An Election to an Appointment**

Another aspect of the objection letter causes me great concern and warrants further consideration. The objection letter evidences a general disapproval of changes from elections to appointments, seemingly in all situations. Such a position, if held by USDOJ, is a further affront to State sovereignty in that it constitutes a grave interference with the State's ability to manage its affairs and make progress for its citizenry. Such a position, if held by USDOJ, likely violates the Tenth Amendment and the principles set out in such decisions as Coyle v. Smith, 221 U.S. 559, 31 S. Ct. 688 (1911) and Printz v. United States, 521 U.S. 898, 117 S. Ct. 2365 (1997). See Coyle, 221 U.S. at 567, 31 S.Ct. at 690 ("'This Union' was and is a union of states, equal in power, dignity, and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself."); Printz, 521 U.S. at 918-19 ("Although the States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty,' The Federalist No. 39, at 245 (J. Madison).").

An example will serve to illustrate my point. Judges are elected in Alabama. While I have publicly supported the continued election of judges in Alabama, others, including the Alabama Bar Association, would like to see merit selection for appellate judges. The Association's website reports that Alabama is one of only seven States that continue to elect judges. Which system is better is a matter on which reasonable people can, and do, disagree. There are policy arguments to be made on both sides. For present purposes, the important point is that the policy discussion should stay in Alabama.

Should Alabama's voters adopt a constitutional amendment altering how judges are selected in this State, it would be egregious for USDOJ to trump that choice simply because the move is from election to appointment. This is especially true given that many other States do not elect their judges, according to the Alabama Bar Association, and given that the policy choice at the federal level calls for appointment. Interposing an objection in that situation would not be enforcing the constitutional rights of minority groups, it would be invading the constitutional rights of sovereign States.

Request for Reconsideration
January 30, 2007
Page 30

To the extent that the objection was interposed in part because of an anti-appointment policy, the State believes the objection should be reconsidered. Such reconsideration must extend beyond the purposes of the Voting Rights Act to a recognition of the limits placed on that important legislation by the United States Constitution. Cf. Reno v. Bossier Parish School Board, 528 U.S. 320, 120 S. Ct. 866 (2000) ("Such a reading would also exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts, perhaps to the extent of raising concerns about § 5's constitutionality.") (internal citation omitted); Presley v. Etowah County Comm'n, 502 U.S. 491, 500-01, 112 S. Ct. 820, 827 (1992) (recognizing that Section 5 is "an extraordinary departure from the traditional course of relations between the States and the Federal Government," though it was constitutionally permissible at the time is was passed as a result of circumstances then prevailing); New York v. United States, 505 U.S. 144, 187-88, 112 S. Ct. 2409, 2434 (1992) ("[T]he Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.").

There is a second point to be made on the issue of moving from election to appointment. We deal here with the limited use of appointment. While substantial space has been devoted to the fact that Stokes v. Noonan and Riley v. Kennedy apply beyond the vacancy in District 1 of the Mobile County Commission in the Fall of 2005, it is equally important keep in mind that these decisions operate only in the case of vacancy. In the normal course of business, county commissioners are elected.

For instance, Samuel L. Jones was appointed to his seat after the invalid special election held in Mobile County in 1987. He was re-elected to subsequent terms that kept him in office until 2005, when he resigned to become the elected Mayor of the City of Mobile. Mr. Jones' departure from office during an elected term created the vacancy to which Juan Chastang was appointed. Mr. Chastang will need to run for election in 2008 to continue to serve as the Commissioner for District 1.

Thus, the decisions in Stokes v. Noonan and Riley v. Kennedy are readily distinguishable from an Act that would permanently change the method of selection of a government official from election to appointment. It is not clear that USDOJ gave due consideration to this distinction. See Objection letter, 3 ("Attorneys General have on at least ten occasions previously interposed objections to changes in the method of selection from election to appointment in Alabama and elsewhere.").

**The Reasons for the Change**

In any event, even were it appropriate for USDOJ to adopt a blanket policy of interposing objections to all changes from elections to appointments, the submission before you would still warrant an exception to that policy. As I have set out above, the reason for the change from special election to appointment in the case of certain vacancies arising on county commissions (*i.e.,* those where there is a local law

Request for Reconsideration
January 30, 2007
Page 31

authorizing the special election that pre-dates Act No. 2004-455), is that decisions of the State's highest court demand it.  Stokes v. Noonan; Riley v. Kennedy. And, again, those decisions were based on generally-applicable, race-neutral principles.

The change was not the result of a policy decision to favor appointments or to favor appointments in certain areas of the State.   An objection that would command a State to ignore the decisions of its Supreme Court and to act in a manner in violation of its governing charter should only, if ever, be interposed in the most unusual and compelling of circumstances.  These are not those circumstances.

The objection letter fails to convey that USDOJ gave any consideration to the fact that Stokes v. Noonan and Riley v. Kennedy are legal decisions of this State's highest court, not policy choices.  The statement that "[i]n the meantime, special elections may be held pursuant to Act No. 85-237", Objection letter, 3, and the cold assessment that Act No. 85-237 is binding, irregardless of its unconstitutionality and solely because it was precleared, id. at 2, represent a disregard for the sovereignty of the State and for the Tenth Amendment to the United States Constitution.  The State ought not be put in this situation, and USDOJ has an obligation to not lightly cause this situation.

### The State's Burden

Alabama understands that it has the burden of demonstrating that any submitted change is not retrogressive, but that burden can only be so heavy and so ill-defined and be constitutional.  Here, the objection letter states that the objection is interposed because USDOJ "ha[s] received no indication that the voters of District 1 would have selected the particular individual selected by the Governor."  Objection letter, 3.  That is, USDOJ is objecting because Alabama has not demonstrated that in the Fall of 2005 the voters of District 1 of Mobile County would have voted for Juan Chastang had a special election been held.  It is not clear how the State could prove such a thing, were it even relevant in light of the change actually submitted for preclearance.[20]

The objection letter relies on 28 C.F.R. § 51.54(a), which provides as follows: "A change affecting voting is considered to have a discriminatory effect under section 5 if it will lead to a retrogression in the position of members of a racial or language minority group (i.e., will make members of such group worse off than they had been before the change) with respect to their opportunity to exercise the electoral franchise effectively. See Beer v. United States, 425 U.S. 130, 140-42 (1976)."  See Objection letter, 1.  Beer

---

[20]        Some of the memoranda summarizing telephone calls between USDOJ and un-identified individuals in Mobile County include speculation about whether those individuals thought Juan Chastang could have been elected to the position he now holds. The identities of the individuals called are unknown to the State; that information has been blacked out of the records we received to protect their privacy.  Likewise unknown is the identity, if any, of Mr. Chastang's fictional opponent.  In our experience, the results in elections frequently turn on the identity of the candidates.

Request for Reconsideration
January 30, 2007
Page 32

was reapportionment case, and thus the issue concerned a redrawing of district lines that would impact whether members of a minority group would have an improved, unchanged, or worse chance to elect the candidates of their choice at each and every election that followed until the lines were redrawn.

To conclude from Beer that USDOJ should interpose an objection to the use of an appointment to fill a vacancy, where appointment is the only method authorized by State law, and where appointment is the long-standing general law of the State, because an unauthorized special election was once held, and because the State is unable to affirmatively prove who would win a special election were it to be held, is remarkable indeed. Such an application of Beer does not appear to me to be what the United States Supreme Court had in mind. Nor does it respect the difficult position in which the State is placed.

**CONCLUSION**

For all of these reasons, I request reconsideration of the decision to interpose an objection to State's enforcement of the Alabama Supreme Court's decisions in Stokes v. Noonan and Riley v. Kennedy. I further request that, as the reconsideration proceeds, if USDOJ needs information, it inform the State of what information it needs to assure itself that the Section 5 does not require an objection to the enforcement of these decisions.

The plaintiffs in the federal litigation are pushing for immediate and invasive relief. Therefore, I also request that the reconsideration proceed as quickly as it responsibly can. Of course, I understand that pursuant to 28 C.F.R. § 51.48 a new 60-day period commences upon your receipt of this request for reconsideration. I also understand that clock could restart in the event that USDOJ does not now have all of the information that it needs to complete its analysis.

Upon further analysis, I urge USDOJ to withdraw this objection. The decision to interpose an objection to the enforcement of Stokes v. Noonan and Riley v. Kennedy in the first place has put the State in a very difficult position. The issue is important enough that, if the objection is not withdrawn, the State could be forced to pursue judicial preclearance. Such a course of action is time-consuming and generally undesirable. I hope it can be avoided, and I look forward to hearing from you.

Sincerely,

Troy King
Attorney General

**Fairbanks, Misty**

| | |
|---|---|
| **From:** | Fairbanks, Misty |
| **Sent:** | Monday, February 05, 2007 2:15 PM |
| **To:** | Preclearance emails (vot1973c@usdoj.gov) |
| **Cc:** | Yvette Rivera (yvette.rivera@usdoj.gov); Park, Jack |

**Subject:** Alabama's January 30, 2007 Request for Reconsideration

To whom it may concern:

By letter dated January 30, 2007, Alabama's Attorney General Troy King has requested reconsideration of the decision to interpose an objection to the Alabama Supreme Court decisions in <u>Stokes v. Noonan</u>, 534 So. 237 (Ala. 1988), and <u>Riley v. Kennedy</u>, 928 So. 2d 1013 (Ala. 2005). I assisted General King in the preparation of this request for reconsideration, and I made a mistake which is reflected in the final document.

Page 29 of the request for reconsideration refers to certain information on the Alabama Bar Association website. I had understood that website to say that only seven States continue to elect judges, and that understanding is reflected in the request for reconsideration. In fact, the website actually indicates that only seven States continue to elect judges "in contested partisan elections."

Misty S. Fairbanks
Constitutional Defense Division
Office of the Attorney General
Alabama State House
11 South Union Street, 3d Floor
Montgomery, AL 36130-0152
Telephone: (334) 353-8674
Facsimile: (334) 353-8440
Email: mfairbanks@ago.state.al.us



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

**MAR 1 2 2007**

Mr. Troy King
Attorney General
Mr. John J. Park, Jr.
Assistant Attorney General
State of Alabama
Alabama State House
11 South Union Street
Montgomery, Alabama 36130

Dear Messrs. King and Park:

This letter refers to your January 30, 2007 request that, under 28 C.F.R. § 51.45, the Attorney General reconsider his objection to the change in method of selection for filling vacancies occurring on the Mobile County Commission from special election to gubernatorial appointment in Mobile County, Alabama, pursuant to decisions of the Alabama Supreme Court in _Stokes v. Noonan_, 534 So. 2d 237 (Ala. 1988), and _Riley v. Kennedy_, 928 So. 2d 1013 (Ala. 2005), submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, as amended. We received your request on January 30, 2007.

We have carefully considered all of the information contained in your reconsideration request. Under Section 5, whether considering an initial submission or a request for reconsideration, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race. _Georgia v. United States_, 411 U.S. 526 (1973). See also _Procedures for the Administration of Section 5 of the Voting Rights Act_, 28 C.F.R. § 51.52. "A change affecting voting is considered to have a discriminatory effect under Section 5 if it will lead to a retrogression in the position of members of a racial or language minority group (_i.e._, will make members of such a group worse off than they had been before the change) with respect to their opportunity to exercise the electoral franchise effectively." 28 C.F.R. § 51.54(a), _citing Beer v. United States_, 425 U.S. 130, 140-42 (1976).

PEI/GAO 800-631-6989

EXHIBIT

J

-2-

As an initial matter, we note that the State's reconsideration request contains no new factual information that impacts the retrogression inquiry. Pursuant to Act No. 85-237, a vacancy on the Mobile County Commission is to be filled through popular election by the voters within the relevant single-member district. Pursuant to decisions of the Alabama Supreme Court in *Stokes v. Noonan* and *Riley v. Kennedy*, that method of filling vacancies was changed from election by the voters of the district to appointment by the Governor of Alabama. The Attorney General interposed his objection because the change in method of filling vacancies from election to appointment, as applied here, has the effect of denying the minority voters of majority-black Mobile County Commission District 1 the ability to elect a candidate of choice when a vacancy occurs.

In your request for reconsideration, you raise six primary arguments to support your contention that the objection was inappropriate: that the use of Act No. 85-237 as a benchmark is incorrect on the grounds that Act No. 85-237 was never "in force or effect"; that the objection is an unjustified intrusion into state sovereignty; that the objection evinces a general disapproval of changes from election to appointment; that *Stokes v. Noonan* and *Riley v. Kennedy* are based on generally applicable, race-neutral principles; that the individual selected by the Governor of Alabama is African-American; that it is impossible to prove that that individual would not have been the candidate of choice of District 1 voters; and that Alabama is now left without a mechanism for filling vacancies on the Mobile County Commission, because Act No. 2006-342 is not immediately enforceable. Each of these arguments has already been dealt with by the three-judge panel of the United States District Court for the Middle District of Alabama that decided *Kennedy v. Riley*, 445 F. Supp. 2d 1333 (M.D. Ala. 2006), by the Attorney General in the January 8, 2007, objection letter, or by both. Nevertheless, for the sake of clarity, we shall address each of your arguments seriatim.

Regarding the use of Act No. 85-237 as the benchmark against which we measure retrogression, the use of a procedure as a benchmark does not depend on the legality of that procedure under state law. The Supreme Court specifically has clarified that a pre-existing procedure that violates state law must still be used as a benchmark. In *Perkins v. Matthews*, 400 U.S. 379 (1971), Canton, Mississippi, was required by a 1962 (pre-Voting Rights Act) state law to change to at-large elections for its city council. Canton illegally continued to use a district system in its (post-Act) 1965 elections. Even though the district system violated state law, the Court held that the district system served as the benchmark because "the procedure in fact 'in force or effect' in Canton on November 1, 1964, was to elect aldermen by wards." *Id.* at 395. Similarly, in *City of Lockhart v. United States*, 460 U.S. 125 (1983), the Supreme Court held that "[t]he proper comparison is between the new system actually in effect on [Section 5 the coverage date] regardless of what state law may have required." *Id.* at 132 (citing *Perkins*).

Following the Supreme Court's guidance, the District Court held that "[c]hanges are measured by comparing the new challenged practice with the baseline practice, that is, the most recent practice that is both precleared and in force or effect." *Kennedy v. Riley*, 445 F. Supp. 2d

-3-

at 1336 (citing *Abrams v. Johnson*, 521 U.S. 74, 96-97 (1997); *Gresham v. Harris*, 695 F. Supp. 1179, 1183 (N.D. Ga. 1988) (three-judge court), *aff'd sub nom. Poole v. Gresham*, 495 U.S. 954 (1990)). It is not contested that Act No. 85-237 was precleared by the Attorney General; what is at issue is whether it was "in force or effect." As the case law indicates, the Act remains in full force and effect because it was implemented in an election cycle. The three-judge panel duly found this fact dispositive, stating that "Act No. 85-237 was . . . put into force and effect with the election of [Samuel] Jones in 1987[.]" *Kennedy v. Riley*, 445 F. Supp. 2d at 1336. Indeed, no other steps could have been taken than were in fact taken to put the election method into force or effect. Accordingly, we see no basis on which we could depart from the determination of the three-judge panel, and of this Department, that Act No. 85-237 was in fact put into force and effect with the election of Mr. Samuel Jones in 1987. Act No. 85-237, therefore, is the proper benchmark for measuring potential retrogression.

We are aware of no court decision, and your letter cites none, in which a court has held that a practice was not "in force or effect" where an election was held under that practice. Your reliance on *Young v. Fordice*, 520 U.S. 273 (1997), is misplaced. *Young* involved a provisional voter registration plan that had not been enacted by a state legislature, that was only in use for forty-one days, and that was only utilized by a third of the state's registrars. Moreover, and critically, no election was conducted or imminent under that voter registration plan. *Young*, 520 U.S. at 282-83. Under those circumstances, the Court held that the plan remained a work in progress and was not in force or effect. *Id.* at 283. In contrast, here, as in both *Perkins* and *Lockhart*, elections had been held under the questioned practices.

Your letter also relies on your assertion that appointment is the longstanding norm in Alabama. This assertion is at odds with many recorded instances in Alabama in which vacancies have been filled by election rather than appointment. In any event, your letter cites no legal authority establishing why such a practice or tradition is important to the legal analysis required in the Voting Rights Act. Indeed, the longstanding and persistent nature of some discriminatory practices was a reason for the enactment of Section 5. The law is clear: under Section 5, once a gain in voting rights is established as a benchmark, retrogression from that benchmark is prohibited. *Beer v. United States*, 425 U.S. 130, 141 (1976).

Your letter also urges that this objection unjustifiably intrudes into Alabama's sovereignty and the role of the Alabama courts, and contends that a "state statute within the scope of Section 5 must be both valid as a matter of state law and precleared if it is to be enforceable." Recons. Req., at 16. You provide no support for this argument other than your trial brief in *Kennedy v. Riley*, which was unanimously rejected by a federal three-judge panel. It is uncontroverted that a Section 5 change may be brought about by seeking to implement state court decisions. *Branch v. Smith*, 538 U.S. 254, 262 (2003). The Supreme Court has ruled on numerous occasions that the authority, pursuant to Section 5, to bar the implementation of a change under state law is an "appropriate means for carrying out Congress' constitutional responsibilities and . . . [is] consonant with all other provisions of the Constitution."

-4-

*South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). "Principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments 'by appropriate legislation.' Those Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *City of Rome v. United States*, 446 U.S. 156, 179 (1980). *See also Katzenbach*, 383 U.S. at 334-35.

As such, the fact that the proposed change would be generally applicable is not legally dispositive. All changes are analyzed under the same fact-intensive, context-specific framework to determine whether they comply with the Section 5 retrogression standard. The Attorney General's objection is based on the State's failure to establish the absence of such an effect.

Your letter also urges that the fact that the individual appointed to the Mobile County Commission District 1 seat is African-American demonstrates a lack of discrimination in the selection. The Voting Rights Act, however, looks to the opportunity of the voters to choose a candidate of their choice, and not to the race of the person chosen. It does not set aside certain positions based on race. "[A] minority preferred candidate may be a non-minority. Conversely, a candidate is not minority-preferred simply because the candidate is a member of the minority." *Ruiz v. City of Santa Maria*, 160 F.3d 543, 551 (9th Cir. 1998) (internal citations omitted).

Our conclusion that the individual appointed by the Governor would not have been the candidate of choice of District 1 voters is supported by interviews with experts on Mobile politics, including officials of both parties, and neutral political scientists whom we have independently contacted. Further, as we explained in our objection letter, the evidence establishes that electoral choices of the voters of Mobile County Commission District 1 regularly differ from the choices of voters in the State of Alabama as a whole, who elect the Governor of Alabama. Your letter presents no information – such as election returns, statements from experts or community leaders, details of the involvement of elected officials or advocates in the selection of an appointee for the position, instances in which a substantially similar constituency has elected this individual to office, or other information – to contradict the evidence adduced during our investigation. Hence, the uncontroverted evidence before us makes clear that the effect of the implementation of *Stokes v. Noonan* and *Riley v. Kennedy* is to lead to a retrogression in the position of the African-American citizens of Mobile County Commission District 1 with respect to their opportunity to elect the candidate of their choice.

In the absence of facts supporting your claim that the instant change would not be retrogressive, your letter states that our objection evinces a policy of blanket disapproval of changes from election to appointment, and that we would never, for example, permit a change in the manner of selecting judges from election to appointment. That is simply incorrect. You will recall our June 29, 2006, letter preclearing Act No. 2006-355, which changed the method of

-5-

filling a new judgeship from the longstanding practice of election to appointment by the Governor. Indeed, in 1999, we precleared precisely the type of change suggested in your reconsideration request, a Florida statute permitting jurisdictions to adopt a "Missouri Plan" system of judicial selection that involved initial appointment and retention elections. We have precleared many changes from election to appointment for judges and other positions. We look at the reality of each change as it affects the opportunity of minority citizens to participate effectively in the political process. "[A]ny assessment of the retrogression of a minority group's effective exercise of the electoral franchise depends on an examination of all the relevant circumstances, such as the ability of minority voters to elect their candidate of choice, the extent of the minority group's opportunity to participate in the political process, and the feasibility of creating a nonretrogressive plan." *Georgia v. Ashcroft*, 539 U.S. 461, 479 (2003). That assessment remains unchanged in this instance.

Under these circumstances, I must, on behalf of the Attorney General, decline to withdraw the January 8, 2007 objection to the change in method of selection for filling vacancies occurring on the Mobile County Commission from special election to gubernatorial appointment in Mobile County, Alabama, pursuant to the *Stokes v. Noonan* and *Riley v. Kennedy* decisions.

As we previously advised, you may seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. We remind you that unless such a judgment is rendered by that court, the objection by the Attorney General remains in effect and the proposed change continues to be legally unenforceable. See *Clark v. Roemer*, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

Finally, we note that you have contended that if the decisions in *Stokes v. Noonan* and *Riley v. Kennedy* are not precleared, you will be left without a mechanism for filling vacancies on the Mobile County Commission that is both precleared and valid as a matter of state law. Both Act No. 85-237 and Act No. 2006-342 provide this authority – Act No. 85-237 because it remains in force in the absence of authority to implement the decisions in *Stokes v. Noonan* and *Riley v. Kennedy* because they have not been precleared, and Act No. 2006-342 inasmuch as it simply reaffirms that special elections are to take place when vacancies occur. Only changes in "voting qualification[s] or prerequisite[s] to voting, or standard[s], practice[s], or procedure[s] with respect to voting" fall within the purview of Section 5. 42 U.S.C. § 1973c(a). Thus, if an enactment has not brought about a change, it need not be submitted for Section 5 review. If Act No. 2006-342 only reaffirms the most recent practice that is both precleared and in force or effect, i.e., Act No. 85-237, it need not be submitted for review under Section 5. If Act No. 2006-342 effects changes, we will be happy to review them under Section 5 on an expedited basis. Meanwhile, the special election provisions of Act No. 85-237 must be used for Commission vacancies.

-6-

If you have any questions, you should call Mr. Robert Lowell (202-514-3539) of our staff. Please refer to File No. 2006-6792 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Wan J. Kim,
Assistant Attorney General



Section 5 Submission is
No. 98-1365

Alberto R. Gonzales
Secretary of State

99 APR -2 PM 3: 21

Elections Division
P.O. Box 12060
Austin, Texas 78711-2060

## Office of the Secretary of State

April 1, 1998

Assistant Attorney General
U.S. Department of Justice                    **EXPEDITED CONSIDERATION REQUESTED**
Civil Rights Division
Voting Section
P.O. Box 66128
Washington, D.C. 20035-6128

Re:    Submission of *State ex rel. Angelini v. Hardberger*, 932
S.W.2d 489 (Tex. 1996) (orig. proceeding)

Dear Sir/Madam:

Please be advised that this submission is being tendered under protest, due solely to the
federal court order described below. In tendering this submission, the State of Texas does
not waive, but expressly reserves, its right to object to the requirement, if any, that judicial
opinions of our State's courts be submitted for preclearance.

In an extraordinary decree, a three-judge panel for the Western District of Texas has
ordered that an 8-1 decision of the Supreme Court of Texas be submitted to you for
preclearance under Section 5 of the Voting Rights Act. 42 U.S.C.A. § 1973c (West 1994).

The court's order is contained in a case styled *LULAC of Tex. v. Texas* ("*LULAC*"), No. SA-
96-930, slip op. at 17 (W.D. Tex. Mar. 3, 1998) (order granting in part and denying in part
preliminary injunction). The opinion that the court ordered submitted is *State ex rel.
Angelini v. Hardberger* ("*Hardberger*"), 932 S.W.2d 489 (Tex. 1996) (orig. proceeding),
rendered by the Supreme Court of Texas.

The *LULAC* court was of the view that, since the result of the decision in *Hardberger*
differed from that in *Texas Democratic Executive Comm. v. Rains* ("*Rains*"), 756 S.W.2d
306 (Tex. 1988) (orig. proceeding), it was a change affecting voting and, therefore,
submissible under Section 5.

Briefly summarized, *Rains* held that a vacancy triggering the electoral process exists after a
judge's written and signed resignation was delivered to the Governor, even though the

---

Come visit our new home on the Internet @ *http://www.sos.state.tx.us/*
(512) 463-5650          1-800-252-VOTE(8683)      FAX (512) 475-2811      TDD 1-800-735-
*The Office of the Secretary of State does not discriminate on the basis of race, color, national origin, sex, religion, age or disability in employment o*

EXHIBIT

K

Assistant Attorney General
Page 2

resignation is not accepted by the Governor. In the following legislative session, Section 201.023 of the Texas Election Code ("Code") was amended to read as follows:

> If an officer submits a resignation, whether to be effective immediately or at a future date, a vacancy occurs on the date the resignation is accepted by the appropriate authority *or on the eighth day after the date of its receipt by the authority, whichever is earlier.* Tex. Elec. Code Ann. § 201.023 (Vernon Supp. 1998) (italicized portion added by legislative amendment).

Section 201.023, as amended, was contained in Senate Bill 546, Chapter 1187, 71st Legislature, 1989, and was precleared on September 8, 1989.

In *Hardberger*, a justice of the Court of Appeals submitted an *in futuro* resignation to the Governor on June 20, 1996. The resignation was to be effective on January 1, 1997. Justice Hardberger claimed that a constructive, though not actual, vacancy existed and that this "vacancy" should be filled by the voters at the November 1996 general election. The Governor argued that an actual vacancy existed the moment Justice Hardberger's letter was accepted. The Texas Supreme Court disagreed with both parties, saying that no vacancy existed because:

> [S]ection 201.023 would violate Article V, Section 28 of the Texas Constitution, which mandates that "[v]acancies shall be filled by the Governor until the next succeeding General Election." Tex. Const. art. V, § 28.

*Hardberger*, 932 S.W.2d at 493.

The court noted that the critical constitutional question in *Hardberger* was :

> [W]hether Section 201.023 unconstitutionally abridges the Governor's appointment power by deeming a vacancy in office for purposes of triggering an election *before* there is an actual vacancy in office. We conclude that it does .... We hold that ... [t]he Constitution grants to the Governor the power to appoint a successor to Justice Hardberger's unexpired term of office when that office becomes vacant on January 1, 1997.

*Id.* at 495 (emphasis in original). We would point out that the decision in *Hardberger* hinged on a judicial interpretation of the Governor's constitutional appointment power. Moreover, the decision in *Rains* hinged on a judicial interpretation of when the acceptance of a state officer's resignation occurs. In both cases, the time when a gubernatorial appointee was to stand for election at the polls was an entirely ancillary matter.

It is also relevant to note that Article V, Section 28 of the Texas Constitution was adopted in 1876 and amended in 1891 and 1958. Tex. Const. art. V, § 28 (amended 1891, 1958). Neither the adoption of, nor any of the amendments to, Article V, Section 28 were subject to preclearance.

Assistant Attorney General
Page 3

I am enclosing copies of the *LULAC, Hardberger*, and *Rains* decisions, as well as copies of Article V, Section 28 of the Texas Constitution and Section 201.023 of the Code, for your reference.

Finally, I would like to emphasize that I strongly disagree with both the court's reasoning and its holding in this matter with respect to the requirement that states should submit judicial decisions for preclearance. However, I do agree with the court's decision that no substantive voting rights violation occurred. In particular, I would direct your attention to two statements contained in *LULAC*: (1) "[W]e have little doubt that this [court decision] will be precleared . . . ." and (2) "[T]he changes in this case *are not clearly discriminatory. On the contrary, . . . we find it difficult to believe that these changes have a racially discriminatory effect.*" *LULAC*, slip op. at 17, 19 (emphasis added) (citing *Perkins v. Matthews*, 400 U.S. 379, 396 (1971)).

Please feel free to contact Ann McGeehan at (512) 463-5650 should you have any questions or comments with regard to this matter.

Sincerely,

ALBERTO R. GONZALES

ARG:AM:AB:id

Enclosures:    *LULAC v. Texas*
               *State ex rel. Angelini v. Hardberger*
               *Texas Democratic Executive Comm. v. Rains*
               Article V, Section 28, Texas Constitution
               Section 201.023, Texas Election Code

cc: (letter only)    The Honorable Fortunato P. Benavides
                     U.S. Circuit Judge
                     903 San Jacinto Boulevard, Room 450
                     Austin, Texas 78701-2449

                     The Honorable D.W. Suttle
                     U.S. Senior District Judge
                     655 East Durango Boulevard
                     San Antonio, Texas 78206

                     The Honorable Sam Sparks
                     U.S. District Judge
                     200 West 8th St., Suite 100
                     Austin, Texas 78701



**Alberto R. Gonzales**
SECRETARY OF STATE
State of Texas

July 6, 1998

Ms. Elizabeth Johnson
Chief, Voting Section
U.S. Department of Justice
P.O. Box 66128
Washington, DC 20035-6128

Dear Ms. Johnson:

We received the request by the Department of Justice ("DOJ") under Section 5 of the Voting Rights Act for additional information pursuant to our submission of the State Supreme Court case, *State ex rel. Angelini v. Hardberger*, 932 S.W. 2d 489 (Tex. 1996). While preparing our response to your request, I feel compelled to express my disappointment by your request for additional information.

As expressed in our submission letter, the State of Texas submitted the *Hardberger* decision under protest. We do not believe that judicial decisions of this nature are subject to Section 5 preclearance. The State of Texas submitted the *Hardberger* ruling only because we were directed to do so by a three judge federal panel in *LULAC of Texas v. Texas ("LULAC")*, No. SA-96-930, slip op. at 17 (W.D. Tex. Mar. 3, 1998). We respectfully disagree with the *LULAC* court that Congress intended for Section 5 to empower non-elected federal employees to overrule our Texas Supreme Court's interpretation of the application of the Texas Constitution in filling certain judicial vacancies. The *LULAC* court recognized the possible state constitutional hazards of its order to submit and made the following observation:

> ...[W]e also recognize the potential state constitutional problems that could arise if the resulting election procedure is not precleared by either the Attorney General or by the United States District Court for the District of Columbia. Although we have little doubt that this statute will be precleared, the VRA is quite clear on the State's duty in such a situation. . .

*LULAC* at 16 and 17.

While acknowledging that it lacks authority to consider the discriminatory purpose or effect of the proposed changes, the *LULAC* court also wrote that the change effectuated by *Hardberger* "*is unlikely to have such a discriminatory effect in any case.*" *LULAC* at 17. The *LULAC* court goes on to say that "*the changes in this case are not clearly discriminatory. On the contrary, after examining the nature of the changes complained of, we find it difficult to believe that these changes have a racially discriminatory effect.*" *LULAC* at 19.

Ms. Elizabeth Johnson
Page 2
July 6, 1998

Your office has now demanded five categories of additional information, including election returns, by voting precinct, since 1988, and information about the Governor's appointment process. I would like to know whether you are required either by rule, policy, procedure or law to solicit this type of information in cases such as this, or whether your office simply has the discretion to solicit this information. If you have discretion, then given the circumstances in this case, I believe your office is acting unreasonably. With all due respect, Ms. Johnson, this information request is unnecessary (with respect to our appointment process), burdensome (with respect to election returns by voting precinct), and an effrontery to the highest civil court of law in this State.

For example, the third paragraph of your June 1, 1998 letter requests a detailed description of the appointment process. The fourth paragraph seeks information regarding the procedures used by the Governor to make an appointment to fill the vacancy on Texas' Fourth Court of Appeals. Under our State Constitution, the Governor has the sole authority to choose whom he wants to appoint on the Fourth Court of Appeals, subject only to Senate confirmation. The appointment process is not mandated by law or formalized by rule. This process can change with every governor. Under the Bush Administration, judicial appointments are based primarily on maturity and experience, legal ability, personal integrity and judicial temperament. I suspect that this is consistent with the practice of previous governors. Given that the appointment process is fairly informal, and that it may change with each administration, how are you going to use this information about appointments in the Bush Administration to determine whether the Texas Supreme Court decision in *Hardberger* has a discriminating effect? More importantly, even if you were to conclude that the manner in which a particular governor makes judicial appointments has a discriminatory effect, would DOJ refuse to preclear the *Hardberger* decision? Would you have the State of Texas ignore its own Constitution?

I trust that the DOJ comprehends the consequences of failing to preclear the Texas Supreme Court decision. In effect, the DOJ will set the stage for a constitutional crisis in our State. The DOJ will place the State in the position of justifying a decision of our Supreme Court, a court **elected** by the citizens of this State. Essentially, the DOJ's intrusive discharge of its duties under Section 5 in this case will render the decision of our highest civil court contingent upon approval by **non-elected** and unaccountable federal officials. The DOJ's application of the Section 5 process has created an infringement, if not an outright violation, of the separation of powers doctrine, and it is inconsistent with our democratic process. In this regard, Justice Black's concurring and dissenting opinion in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), resonates prophetically:

> *Section 5, by providing that some of the States cannot pass state laws or adopt state constitutional amendments without first being compelled to beg federal authorities to approve their policies, so distorts our constitutional structure of government as to render any distinction in the Constitution between state and federal power almost meaningless.*

*Katzenbach* at 358

Ms. Elizabeth Johnson
Page 3
July 6, 1998

I realize that you take the position that Section 5 requires you to ask for this additional information. However, I believe the application of Section 5 to Texas in this particular case once again demonstrates the need to examine the scope of Section 5 and its application by the DOJ to Texas. As you know, my immediate predecessor, Tony Garza, was a vocal critic of Section 5. Like he, I strongly support the protection of voting rights of all minorities, and I concede that at one time, Section 5 was a necessary tool in preventing state action that had the purpose or effect of discriminating against the voting rights of minorities. But when I see its application in this case, I must also conclude that it is time for Congress to examine the application of Section 5 to Texas, to restrict its scope when appropriate, and to limit interference by non-elected and unaccountable federal officials. By copy of this letter, I am advising members of the Texas Congressional delegation of my concerns in this matter, with the hope that they will support changes that will protect the voting rights of minorities while allowing Texans to run Texas.

The *Hardberger* decision by our Texas Supreme Court merely corrected a prior erroneous judicial interpretation of our election laws. There was no discriminatory purpose in the decision. And I submit to you that given our current appointment process, you will have to agree with the *LULAC* court that the *Hardberger* decision does not have a racially discriminatory effect. Accordingly, we respectfully request that the DOJ withdraw its request for additional information and summarily preclear the State's submission letter of April 1, 1998.

If you would like to discuss these issues, please contact me directly at (512) 475-4578 or Ann McGeehan, my Chief Elections Officer, at (512) 463-9871. Thank you for your thoughtful consideration.

Sincerely,

ALBERTO R. GONZALES


c    The Honorable George W. Bush
     Chief Justice Tom Phillips
     Justices Fortunato P. Benavides, Sam Sparks and D.W. Suttle
     Texas Congressional Delegation

10/06/98   09:13   ☎512 475 2781        SOS EXEC                    ☑002/005



**Alberto R. Gonzales**
SECRETARY OF STATE
State of Texas

October 6, 1998

Mr. Bill Lann Lee
Acting Assistant Attorney General
U.S. Department of Justice
Civil Rights Division, Voting Section
P.O. Box 66128
Washington, DC 20035-6128

Re: Submission of *State ex rel. Angelini v. Hardberger*,
932 S.W. 2d 489 (Tex. 1996) (*orig. proceeding*)

Dear Mr. Lee:

We are in receipt of your September 29, 1998, letter wherein the Department of Justice (the "DOJ") objects to our submission under protest of *State ex rel. Angelini v. Hardberger*, 932 S.W. 2d 489 (Tex. 1996) (*orig. proceeding*) ("*Hardberger*"). I respectfully request that the DOJ reconsider and withdraw its objection, pursuant to 28 C.F.R. 51.45, for the following reasons.

The DOJ has objected to the manner in which the Texas Governor exercises his power to fill prospective judicial vacancies by appointment. The judicial appointment power is a discretionary power conferred upon the Governor by our State's Constitution. The constitutional provision granting this power predates the preclearance requirement contained in the Voting Rights Act. Furthermore, this appointment power was neither the issue submitted for preclearance nor a power over which the DOJ has jurisdiction under Section 5 of the Voting Rights Act. The matter Texas submitted to the DOJ for preclearance was the change, if any, in election law brought about by *Hardberger*, which merely corrected an erroneous interpretation of Texas' election law.

Article V, Section 28, of the Texas Constitution provides that judicial vacancies shall be filled by gubernatorial appointment until the next general election. For more than 100 years, the Texas Constitution has required our Governor to fill judicial vacancies in this manner. In *Hardberger*, the Texas Supreme Court held that Section 201.023 of the Texas Election Code unconstitutionally infringed upon the Governor's appointment power to the extent that it called for an election to fill a prospective judicial vacancy. Consequently, the Court declared this section unconstitutional when applied to "prospective" judicial resignations. The federal three-judge panel in *LULAC of Texas v. Texas* ("*LULAC*") No. SA-96-930, slip op. at 17 (W.D. Tex., Mar.

Mr. Bill Lann Lee
Page 2 of 4
October 6, 1998

3, 1998), subsequently concluded that the holding in *Hardberger* constituted a change in voting, and instructed the State to seek preclearance on that issue only. The *LULAC* court did not invite nor empower the DOJ to exercise preclearance authority over the *manner* in which the Governor of Texas makes judicial appointments.

Your letter contains several errors and conclusory statements that simply are not supported by the facts or controlling law. First, you allege that the voters in the Fourth Judicial District will not have an opportunity to participate in the selection of judges under the "new" appointments system engendered by *Hardberger*. You apparently fail to understand that under the relevant provision of our State's Constitution, voters do not participate directly in the Governor's appointment of a judge to fill a vacancy. Now, through this administrative action, you apparently seek to nullify the Texas Supreme Court's decision in *Hardberger*, to amend the Texas Constitution, and to create a new and unprecedented procedure by which our Governor is to fill judicial appointments. You seek to accomplish these ends by reviving a statute that has been declared unlawful by our State's highest Court. On these grounds alone, your objection should be reconsidered.

Second, I respectfully disagree with your conclusion that the Texas judicial appointment process does not allow input by Hispanic (or any other) voters, and that there is no procedure for soliciting the views of the minority community regarding judicial appointees. Hispanics presently comprise a significant portion of the electorate in Texas, and their influence over the Texas electoral process will continue to increase. The Governor certainly is accountable to all the voters of Texas. His judicial appointees must themselves ultimately run for election. Therefore, opportunity exists for Hispanic voters to influence the appointments process each time they vote. Moreover, every appointment made by the Governor is subject to confirmation by the Texas Senate, whose members are similarly accountable to Texas voters. Finally, the Governor often consults with legislators, as well as community and professional leaders from the affected judicial district, when making judicial appointments. It is, therefore, incorrect to say that Hispanics do not have meaningful input in the process, and that there are no adequate safeguards to protect their interests. Your objection substitutes your preference for filling judicial vacancies in place of the process adopted long ago by the voters of Texas.

Third, you conclude that Texas has not met the burden of showing that the change effectuated by the decision in *Hardberger* will not have a discriminatory effect. We respectfully disagree that the change caused retrogression. Your conclusion contradicts the opinion in *LULAC*. The *LULAC* court wrote that the change effectuated by *Hardberger* "*is unlikely to have such a discriminatory effect in any case.*" *LULAC* at 17. Further, the court said "*the changes in this case are not clearly discriminating. On the contrary, after examining the nature of the changes complained of, we find it difficult to believe that these changes have a racially discriminatory effect.*" *LULAC* at 19. Despite the position of three federal judges, the DOJ concludes that the change caused by *Hardberger* negatively impacted minority voting rights. Any change effectuated by *Hardberger*, however, affects all Texas voters equally, if at all.

You claim the Angelini appointment is illustrative of the discriminatory effect the proposed change may have on participation opportunities of Hispanic voters. You also claim that voting in

Mr. Bill Lann Lee
Page 3 of 4
October 6, 1998

Texas is often polarized along racial lines. I believe it is unfair for you to base your objection on conclusory assumptions which, frankly, do not appear to be supported by the record. There is no evidence that minority voters today would reject Justice Angelini based on her race. I note that she succeeded a white male, who was elected by the voters of the Fourth Judicial District, a significant number of whom are minorities. Furthermore, her opponent in the current election campaign, who is the same person she would have opposed in 1996 had there been an election, is a white male. Thus, your use of Justice Angelini as an example of the alleged discriminatory effect the proposed change may have on the participation opportunities of Hispanic voters is misplaced. Justice Angelini was unanimously confirmed by the Texas Senate, a body whose membership is currently 29 percent minority. Moreover, voters will have another opportunity on November 3 to express their opinion about Justice Angelini's performance in the past two years. I am confident their decision will be based not on race, as you apparently believe, but on judicial qualifications and the performance of the candidates.

Finally, you state that the Voting Rights Act does not preclude Texas from adopting a procedure for filling prospective judicial vacancies by gubernatorial appointment. You seek, however, to prescribe the specific procedure. You contend the Voting Rights Act prohibits Texas from filling vacancies by gubernatorial appointment in the very manner historically required by our State's Constitution. The voters of Texas long ago adopted a process for filling judicial vacancies by gubernatorial appointment. Now, you say that process is not legally sufficient, notwithstanding the fact that the process predates the Voting Rights Act's preclearance requirement. You demand that Texas create an entirely new and unprecedented scheme under which our Governor is to exercise his constitutional power of appointment, a scheme never urged by any party or court in this matter, and articulated for the first time by you in your objection letter. Your demand conflicts with basic principles of federalism, with the Voting Rights Act, and with the opinion of three federal judges. Equally disturbing is the fact that your demand would appear to leave Texas as the only state in the country in which the DOJ has through Section 5 arrogated to itself the right to intrude upon the gubernatorial appointments process.

You conclude your letter by warning Texas that to satisfy Section 5, an appointments process must be adopted that includes a new level of minority participation. Adoption of such formal binding procedures would require a constitutional amendment, approved by the voters of Texas. Respectfully, you are not authorized by Section 5 to create or confer constitutional rights upon our State and its citizens. Thus, short of a constitutional amendment, we will oppose your efforts to require the Governor of Texas to seek the permission and blessing of the DOJ each time the Governor makes an appointment pursuant to the authority granted by our State's Constitution.

In my letter of July 6, 1998, to Ms. Elizabeth Johnson of your staff, I expressed concern that the DOJ might not comprehend the consequence of refusing to preclear the *Hardberger* decision. Texas is now confronted by a directive from you, an acting Assistant Attorney General, who is still unconfirmed by the United State Senate, to ignore a decision rendered by our State's highest court. You are directing Texas to comply with a statute that has been declared unlawful under our State's Constitution, and you are attempting to confer and create rights not otherwise existing

Mr. Bill Lann Lee
Page 4 of 4
October 6, 1998

under our State's Constitution. Nothing in the text, history, or precedent of Section 5 of the Voting Rights Act ever contemplated such an extraordinary and overreaching use of the Act.

As a member of a minority class myself, and as the State's chief elections officer with the responsibility and commitment to motivate voters of all ethnic communities, I have a special interest in seeing greater minority participation at the polls. I strongly support the protection of minority voting rights. I have worked closely with Governor Bush for four years and have personally witnessed his decision-making process on numerous issues including appointments. I know Governor Bush shares my commitment to protect the rights of minority voters. As state officials, however, Governor Bush and I are equally passionate about protecting Texas from improper and illegal intrusions by the federal government into the constitutional affairs of our State. We have an obligation and moral responsibility to our respective offices, and to future constitutional officeholders, to protect the constitutional sanctity of our State's laws. It is this very duty that requires my response to your objection.

We respectfully ask that you reconsider and withdraw your objection immediately. Because of your actions, some groups are already calling for the removal of Justice Angelini. Others are calling into question the legality of her rulings from the bench. The federal three-judge panel in *LULAC* has already rejected a request to remove Justice Angelini and order a new election. Nevertheless, the politicized outcry caused by your letter is disrupting the election process in the Fourth Judicial District by confusing the very voters you purport to be trying to protect. For these reasons, we are compelled to move quickly. Pursuant to your request to be informed of our actions, I am advising you that we have begun preparations to file a declaratory judgement action in the United States District Court for the District of Columbia.

To enable us to meet and discharge our responsibilities under the Texas Constitution, I would appreciate your prompt response to this request. If you have any questions, you should call me directly at (512) 475-4578.

Sincerely,

ALBERTO R. GONZALES

c:  Governor George W. Bush
    Attorney General Dan Morales
    Chief Justice Thomas Phillips
    Justice Fortunato P. Benavides, Judge Sam Sparks, and Judge D. W. Suttle
    Texas Congressional Delegation

No. 07-77

In The

## Supreme Court of the United States

———————

Bob Riley, Governor of Alabama,

*Appellant,*

v.

Yvonne Kennedy, et al.,

*Appellees.*

———————

**On Appeal from the
United States District Court for the
Middle District of Alabama**

———————

**BRIEF *AMICI CURIAE* OF FORMER STATE
COURT JUSTICES CHARLES FRIED AND
THOMAS R. PHILLIPS IN SUPPORT OF
APPELLANT**

———————

H. Christopher Bartolomucci
(*Counsel of Record*)
Jake M. Shields
Hogan & Hartson L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5810

*Counsel for Amici Curiae*

EXHIBIT
L

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................... ii

STATEMENT OF INTEREST OF
    *AMICI CURIAE.* ................................................ 1

SUMMARY OF ARGUMENT ................................ 3

ARGUMENT ......................................................... 5

I.   PRINCIPLES OF FEDERALISM
     AND SOVEREIGNTY DEMAND
     RESPECT FOR STATE JUDIC-
     IARIES ........................................................... 5

     A.   The Constitution Creates a
           Governmental Structure of
           Dual Sovereignty. ................................. 5

     B.   State Courts Play a Special
           Role in the Constitutional
           Scheme .................................................. 7

II.  APPLYING THE SECTION 5
     PRE-CLEARANCE REQUIRE-
     MENT TO STATE COURT
     DECISIONS WOULD RAISE
     SIGNIFICANT CONSTITUTION-
     AL QUESTIONS ........................................... 10

III.  UNDER THIS COURT'S CLEAR
     STATEMENT RULE, SECTION 5
     SHOULD NOT BE CONSTRUED
     TO APPLY TO THE ALABAMA
     SUPREME COURT DECISIONS
     AT ISSUE HERE ......................................... 15

CONCLUSION ...................................................... 23

(i)

ii

## TABLE OF AUTHORITIES

Page

*CASES:*

*ABC Bonding Co. v. Montgomery County Sur. Comm'n,* 372 So. 2d 4 (Ala. 1979) ................................. 18, 20

*Alabama* v. *Shelton,* 535 U.S. 654 (2002) ..................................................................... 2

*Alaska Dep't of Envtl. Conserv. v. EPA,* 540 U.S. 461 (2004) ...................................... 21, 22

*Alden* v. *Maine,* 527 U.S. 706 (1999) ........................ 7

*Atascadero State Hosp.* v. *Scanlon,* 473 U.S. 234 (1985) ............................................. 16

*Beer* v. *United States,* 425 U.S. 130 (1976) .................................................................. 12

*Board of Trustees of Univ of Ala.* v. *Garrett,* 531 U.S. 356 (2001) .......................... 15

*Branch* v. *Smith,* 538 U.S. 254 (2003) .............. 14, 17

*Bush* v. *Gore,* 531 U.S. 98 (2000) ........................ 7, 18

*City of Birmingham* v. *Norton,* 50 So. 2d 754 (Ala. 1950) .................................... 21

*City of Boerne* v. *Flores,* 521 U.S. 507 (1997) .................................................................. 15

*City of Rome* v. *United States,* 446 U.S. 156 (1980) ................................. 11, 13, 21

*Coleman* v. *Thompson,* 501 U.S. 722 (1991) .................................................................... 8

iii

## TABLE OF AUTHORITIES—Continued

Page

*Dennis* v. *Pendley*, 518 So. 2d 688 (Ala. 1987) ........................................... 19

*Eastern Enterprises* v. *Apfel*, 524 U.S. 498 (1998) ............................................ 19

*Ellis* v. *Pope,* 709 So. 2d 1161 (Ala. 1997) ........................................... 20

*Erie R. Co.* v. *Tompkins*, 304 U.S. 64 (1938) ................................................... 10

*Fox Film Corp.* v. *Muller*, 296 U.S. 207 (1935) ................................................... 7

*Gonzales* v. *Raich*, 545 U.S. 1 (2005) ......................... 2

*Gregory* v. *Ashcroft*, 501 U.S. 452 (1991) .......................................... *passim*

*Harrison* v. *NAACP*, 360 U.S. 167 (1959) ................................................... 9

*Hathorn* v. *Lovorn*, 457 U.S. 255 (1982) ................................................... 14

*Hibbs* v. *Winn*, 542 U.S. 88 (2004) ........................... 10

*Johnson* v. *City of Fort Payne*, 485 So. 2d 1152 (Ala. 1986) ................................ 20

*Kansas* v. *Marsh*, 126 S. Ct. 2516 (2006) ................................................... 8

*Kiel* v. *Purvis*, 510 So. 2d 190 (Ala. 1987) ........................................... 21

*Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62 (2000) ............................................ 15

iv

## TABLE OF AUTHORITIES—Continued

Page

*Landgraf* v. *USI Film Products,*
 511 U.S. 244 (1994) ............................................ 19

*Lopez* v. *Monterey County,*
 525 U.S. 266 (1999) ...................................... 10, 11

*LULAC of Texas* v. *Texas,*
 995 F. Supp. 719 (W.D. Tex. 1998) ...................... 2

*Medellin* v. *Texas*, No. 06-984 (2007) ........................ 2

*Michigan* v. *Long,* 463 U.S. 1032
 (1983) .................................................................... 8

*Miller* v. *Johnson*, 515 U.S. 900 (1995) ............ 10, 12

*Minnesota* v. *National Tea Co.,*
 309 U.S. 551 (1940) .............................................. 7

*Murdock* v. *City of Memphis,*
 87 U.S. (20 Wall.) 590 (1874) .............................. 7

*New York* v. *United States,*
 505 U.S. 144 (1992) .......................................... 5, 6

*O'Sullivan* v. *Boerckel,* 526 U.S. 838
 (1999) .................................................................. 10

*Pennhurst State Sch. & Hosp.* v.
 *Halderman,* 451 U.S. 1 (1981) ............................ 16

*Presley* v. *Etoway County Comm'n,*
 502 U.S. 491 (1992) ...................................... 11, 18

*Railroad Comm'n of Texas* v.
 *Pullman Co.,* 312 U.S. 496 (1941) ....................... 9

*Rasul* v. *Bush,* 542 U.S. 466 (2004) .......................... 2

v

TABLE OF AUTHORITIES—Continued

Page

*Riley* v. *Kennedy*, 928 So. 2d 1013
(Ala. 2005) ........................................................... 23

*South Carolina* v. *Katzenbach*,
383 U.S. 301 (1966).................................... *passim*

*State Bd. of Health* v. *Greater
Birmingham Ass'n of Home
Builders, Inc.*, 384 So. 2d 1058
(Ala. 1980) ........................................................... 20

*State ex rel. Angelini* v. *Hardberger*,
932 S.W.2d 489 (Tex. 1996) .............................. 2, 3

*State ex. rel. Bozeman* v. *Hester*,
72 So. 2d 61 (Ala. 1954) ..................................... 21

*Stokes* v. *Noonan*, 534 So. 2d 237
(Ala. 1988) ........................................................... 23

*Sumner* v. *Mata*, 449 U.S. 539 (1981)........................ 9

*Tafflin* v. *Levitt*, 493 U.S. 455 (1990) ........................ 5

*Texas* v. *White*, 74 U.S. (7 Wall.) 700
(1869) .................................................................... 7

*United States* v. *Bd. Of Comm'rs of
Sheffield*, 435 U.S. 110 (1978) ..................... 10, 11

*Williams* v. *Taylor*, 529 U.S. 420
(2000) .................................................................... 9

*U.S. CONSTITUTION:*

U.S. Const. amend. XV............................................ 15

vi

## TABLE OF AUTHORITIES—Continued

Page

*FEDERAL STATUTES:*

42 U.S.C. § 1973b(b) ................................................. 18

42 U.S.C. § 1973c ..................................................... 14

42 U.S.C. § 1973c(a) ..................................... 11, 17, 18

Voting Rights Act of 1965, § 5, as
    amended, 42 U.S.C. § 1973c ...................... *passim*

*STATE CONSTITUTIONS:*

Ala. Const. Art. IV, § 105 ......................................... 18

Alaska Const. art. II, § 19 ........................................ 19

Ariz. Const. art. IV, § 19 ......................................... 19

Ark. Const. art. V, § 25 ............................................ 19

Cal. Const. art. IV,  § 16 .......................................... 19

Colo. Const. art. V, § 25 ........................................... 19

Del. Const. art. III, § 18 .......................................... 19

Ill. Const. art. IV, § 13 ............................................ 19

Ind. Const. art. IV, § 23 ........................................... 19

Iowa Const. art. III, § 30 ......................................... 19

Kan. Const. art. II, § 17 ........................................... 19

Md. Const. art. III, § 33 ........................................... 19

Mich. Const. art. IV, § 29 ........................................ 19

Minn. Const. art. IV, § 33 ........................................ 19

Miss. Const. art. IV, § 87 ......................................... 19

Mo. Const. art. III, § 40 ........................................... 19

vii

## TABLE OF AUTHORITIES—Continued

Page

Mont. Const. art. V, § 26 ........................................... 19

N.D. Const. art. II, § 70 ............................................ 19

Neb. Const. art. III, § 18 .......................................... 19

Nev. Const. art. IV, § 21 ........................................... 19

N.J. Const. art. IV, § 7(9) ......................................... 19

N.M. Const. art. IV, § 24 .......................................... 19

N.Y. Const. art. III, § 17 .......................................... 19

Okla. Const. art. V, § 59 .......................................... 19

S.C. Const. art. III, § 34(.9.) ...................................... 19

S.D. Const. art. III, § 23 .......................................... 19

Tex. Const. art. III, § 56 .......................................... 19

Utah Const. art. VI, § 26 .......................................... 19

Va. Const. art. IV, § 15 ............................................ 19

W. Va. Const. art. VI, § 39 ....................................... 19

Wyo. Const. art. III, § 27 .......................................... 19

*RULE:*

S. Ct. Rule 37.6 ........................................................ 1

*LEGISLATIVE MATERIALS:*

H.R. Rep. No. 439, 89th Cong.,
    1st Sess., *reprinted in* 1965
    U.S.C.C.A.N. 2437 (June 1, 1965) .......... 13, 14, 17

viii

## TABLE OF AUTHORITIES—Continued

Page

S. Rep. No. 162, 89th Cong. 1st Sess.,
    *reprinted in* 1965 U.S.C.C.A.N.
    2508 (Apr. 9, 20, 21, 1965) ............................ 13, 14

*OTHER AUTHORITIES:*

2 J. Elliot, DEBATES ON THE FEDERAL
    CONSTITUTION 197 (2d ed. 1863) ......................... 6

2 SUTHERLAND STATUTORY CONSTRUC-
    TION § 40:3 (6th ed. 2000) ............................. 18, 20

73 AM. JUR. 2D STATUTES § 7 ............................ 18, 20

Donald Marritz, *Making Equality
    Matter (Again): The Prohibition
    Against Special Laws In the
    Pennsylvania Constitution,*
    3 WIDENER J. PUB. L. 161 (1993) ........................ 20

NATIONAL MUNICIPAL LEAGUE, MODEL
    STATE CONSTITUTION § 4.11,
    (6TH ED. 1968) ....................................... 19

G. Alan Tarr, *Constitutional Theory
    and State Constitutional Inter-
    pretation,* 22 RUTGERS L.J. 841
    (1991) ............................................... 20

THE FEDERALIST No. 39
    (C. Rossier ed. 1961) ................................. 6

IN THE

## Supreme Court of the United States

No. 07-77

BOB RILEY, GOVERNOR OF ALABAMA,

*Appellant,*

v.

YVONNE KENNEDY, ET AL.,

*Appellees.*

**On Appeal from the
United States District Court for the
Middle District of Alabama**

**BRIEF *AMICI CURIAE* OF FORMER STATE
COURT JUSTICES CHARLES FRIED AND
THOMAS R. PHILLIPS IN SUPPORT OF
APPELLANT**

### STATEMENT OF INTEREST
OF *AMICI CURIAE*

*Amicus* the Honorable Charles Fried served as an
Associate Justice of the Supreme Judicial Court of
Massachusetts from 1995 to 1999.[1] He also served

---

[1] Pursuant to this Court's Rule 37.6, we note that no part of
this brief was authored by counsel for any party, and no person
or entity other than *amici curiae* or their counsel made a
monetary contribution intended to fund the preparation or

2

as the Solicitor General of the United States from 1985 to 1989. He is currently the Beneficial Professor of Law at Harvard Law School, where he teaches Constitutional Law.

Justice Fried has previously participated as *amicus curiae* in *Medellin* v. *Texas*, No. 06-984 (2007), *Gonzales* v. *Raich*, 545 U.S. 1 (2005), *Rasul* v. *Bush*, 542 U.S. 466 (2004), and, by invitation of the Court, *Alabama* v. *Shelton*, 535 U.S. 654 (2002).

*Amicus* the Honorable Thomas R. Phillips served as the Chief Justice of the Supreme Court of Texas from 1988 to 2004. Prior to his service on the Texas Supreme Court, he served as a civil district judge in Harris County, Texas. He is now a partner in the law firm of Baker Botts L.L.P.

Chief Justice Phillips has had first hand experience with the federalism issues presented by this case. During his tenure as Chief Justice, a three-judge federal district court held that the Texas Supreme Court's construction of a state election law in *State ex rel Angelini* v. *Hardberger*, 932 S.W.2d 489 (Tex. 1996), was subject to pre-clearance under Section 5 of the Voting Rights Act before that state law, as authoritatively construed by the Texas Supreme Court, could be enforced. *See LULAC of Texas* v. *Texas*, 995 F. Supp. 719 (W.D. Tex. 1998). Although the federal court "recogniz[ed] the potential state constitutional problems that could arise if the resulting election procedure is not pre-cleared," it dismissed these concerns because it "had little doubt that th[e] statute [as construed by the Texas

---

submission of the brief. The parties have consented to the filing of this brief.

3

Supreme Court in *Hardberger*] will be pre-cleared." *Id.* at 726. Ultimately, a constitutional crisis was averted when the Justice Department granted pre-clearance.

As former members of state courts of last resort, *amici* possess a keen understanding of, and can speak to, the disturbing consequences of a federal rule that would require state supreme court decisions such as those at issue here – *i.e.*, decisions exercising the core function of judicial review based on general and unobjectionable principles of state constitutional law – to be "pre-cleared" by a federal executive branch official pursuant to Section 5 of the Voting Rights Act. In their view, such a rule would upset the federal-state balance struck by the Framers in the system of dual sovereignty. Such a rule would also significantly diminish the authority and dignity of  state judiciaries, which are fully competent and duty-bound to uphold and apply federal law and are the final arbiters of state law matters. Section 5, in *amici*'s view, is not properly construed to impose such an alteration of the federal-state balance and intrusion upon an essential aspect of state sovereignty.

## SUMMARY OF ARGUMENT

This Court has long recognized that the pre-clearance requirements of Section 5 of the Voting Rights Act significantly encroach on the sovereignty of the States. But the Court has held that, in response to the efforts by certain state legislatures and other state officials to deny the right to vote to many individuals on account of their race, Congress was justified in adopting the extreme remedy of requiring certain States to seek pre-clearance of changes to their voting laws. This was necessary to

4

prevent state legislatures and state executive officials, as they had done in the past, from enacting new restrictions on the right to vote in an effort to circumvent federal court rulings striking down prior restrictions that had been found to be unconstitutional or in violation of the federal civil rights laws.

This Court, however, has never affirmatively held that Section 5's pre-clearance requirement applies to the decisions of state courts, much less state court rulings exercising the core function of judicial review and applying long-standing principles of state constitutional law that do not on their face relate to the exercise of the franchise. And it should not do so here. In enacting the Voting Rights Act, Congress made no finding that state courts – in contrast to state legislatures and state executive branch officials – had sought to deny anyone the right to vote, much less sought to circumvent Congress's efforts to enforce the Fifteenth Amendment's guarantee of the franchise.

It is thus far from clear that the Congress that enacted Section 5 intended it to apply to the decisions of state courts; and even if the Congress had such an intention, it is even less clear – considering legislature's lack of findings on the matter – that Congress would have had the constitutional authority to do so. In an effort to avoid the very difficult constitutional questions that applying Section 5 to the decisions of state courts would raise, not to mention the impact that such a ruling would have on the independence of state judiciaries, this Court should apply its "clear statement rule" and hold that because Congress did not clearly state that Section 5 applies to the

5

decisions of state courts (and in fact seemed to suggest just the opposite), state court rulings such as the two Alabama Supreme Court decisions at issue here need not be pre-cleared before being enforced by state officials.

## ARGUMENT

### I. PRINCIPLES OF FEDERALISM AND SOVEREIGNTY DEMAND RESPECT FOR STATE JUDICIARIES.

#### A. The Constitution Creates a Governmental Structure of Dual Sovereignty.

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory* v. *Ashcroft*, 501 U.S. 452, 457 (1991). Thus, "under our federal system the States possess sovereignty concurrent with that of the Federal Government." *Tafflin* v. *Levitt*, 493 U.S. 455, 458 (1990).

Our federalist system of dual sovereignty is not an accident of history, but a product of the Founders' design. As this Court has recounted, "the question whether the Constitution should permit Congress to employ state governments as regulatory agencies was a topic of lively debate among the Framers." *New York* v. *United States*, 505 U.S. 144, 163 (1992). At the Constitutional Convention, the Founders debated two plans for structuring the Government: the Virginia Plan and the New Jersey Plan. *Id.* at 164. The Virginia Plan envisioned a federal model where the national government directly regulated the people. *Id.* The New Jersey Plan envisioned an all-powerful central government under which the states would serve as passive instruments of the national polity. *Id.* at 164-165.

6

"In the end, the Convention opted for a Constitution in which Congress would exercise its legislative authority directly over individuals rather than over States; for a variety of reasons, it rejected the New Jersey Plan in favor of the Virginia Plan." *Id.* at 165. As one founding father explained, " '[t]his Constitution does not attempt to coerce sovereign bodies, states, in their political capacity * * * [b]ut this legal coercion singles out the * * * individual.' " *Id.* (quoting 2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 197 (2d ed. 1863)).

This Court has consistently recognized the importance of the Founders' decision to retain the sovereignty of the States, and has gone to great pains to protect that sovereignty not only because the Founders intended for the States to retain "residuary and inviolable sovereignty," THE FEDERALIST No. 39, at 245 (C. Rossier ed. 1961), but also because the "federalist structure of joint sovereigns * * * ensure[s] the protection of our fundamental liberties." *Gregory,* 501 U.S. at 458; *see id.* ("a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front").

As the Court explained in *Gregory* v. *Ashcroft,* a decentralized government "will be more sensitive to the diverse needs of a heterogeneous society; [will] increase[ ] opportunity for citizen involvement in the democratic process; [will] allow[ ] for more innovation and experimentation in government; and [will] make[ ] government more responsive by putting States in competition for a mobile citizenry." *Id.* Consequently, " 'the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution

7

as the preservation of the Union and the maintenance of the National Government.' " *Id.* at 457 (quoting *Texas* v. *White*, 74 U.S. (7 Wall.) 700, 725 (1868)).

## B. State Courts Play a Special Role in the Constitutional Scheme.

One need not agree with the Court's decision in *Alden* v. *Maine*, 527 U.S. 706 (1999), to agree with the *Alden* Court's recognition of the "special role of state courts in the constitutional design." *Id.* at 757; *see also Murdock* v. *City of Memphis*, 87 U.S. (20 Wall.) 590, 630 (1874) (extolling the virtues of the "independence of the State courts").   Like their federal counterparts, State courts are tasked with interpreting state legislative enactments and state constitutions, and, in a well-functioning government, serve as an important check against the political branches.

Understanding that its obligation to respect the sovereignty of state governments (and particularly state courts) is no less than that of Congress, this Court has recognized that "respect for federalism compel[s] [it] to defer to the decisions of state courts on issues of state law." *Bush* v. *Gore*, 531 U.S. 98, 141 (2000) (Rehnquist, C.J., concurring); *see Minnesota* v. *National Tea Co.*, 309 U.S. 551, 557 (1940) ("It is fundamental that state courts be left free and unfettered * * * in interpreting their state constitutions."); *Murdock*, 87 U.S. at 626 ("[s]tate courts are the appropriate tribunals * * * for the decision of questions arising under their local law"). "That practice reflects [the Court's] understanding that the decisions of state courts are definitive pronouncements of the will of the States." *Bush*, 531 U.S. at 112 (Rehnquist, C.J., concurring).

8

Applying this basic principle, the Court has developed numerous doctrines designed to ensure that the decisions of state courts on state law issues are respected and that the autonomy of state judiciaries is preserved. Chief among those doctrines is this Court's refusal to entertain appeals from state courts on federal law grounds where there is an "adequate and independent state ground" on which a case was decided by the state tribunal. *Michigan* v. *Long*, 463 U.S. 1032, 1040 (1983); s*ee Fox Film Corp.* v. *Muller*, 296 U.S. 207, 210 (1935). The Court has explained that a "[r]espect for the independence of state courts * * * [has] been the cornerstone[ ] of [its] refusal to decide cases where there is an adequate and independent state ground" on which to affirm the state court judgment. *Long*, 463 U.S. at 1040; *see id.* ("[i]t is precisely because of this respect for state courts * * * that we do not wish * * * to decide issues of state law"). *See also Kansas* v. *Marsh*, 126 S. Ct. 2516, 2530-31 (2006) (Scalia, J., concurring) ("When state courts [decide cases] * * * on *state*-law grounds, it is generally none of our business; and our displacing of those judgments would indeed be an intrusion upon state autonomy.") (emphasis in original).

It is this same respect for the independence of state courts and the sovereignty of the States that underlies the Court's "exhaustion doctrine" applicable in federal habeas cases where a prisoner seeks review of a state court conviction. *See Coleman* v. *Thompson*, 501 U.S. 722, 731 (1991) ("The exhaustion doctrine is principally designed to * * * prevent disruption of state judicial proceedings."); *id.* at 726 ("This is a case about federalism. It concerns the respect that federal courts owe the

9

States and the States' procedural rules when reviewing the claims of state prisoners in federal habeas corpus."). *See also Williams* v. *Taylor*, 529 U.S. 420, 436 (2000) (recognizing that "[f]ederal habeas corpus principles must inform and shape the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts").

The "rightful independence of state [courts]" also drives this Court's abstention doctrines. *Harrison* v. *NAACP*, 360 U.S. 167, 176 (1959). "[N]o principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until state courts have been afforded a reasonable opportunity to pass on them." *Id.*; *see Railroad Comm'n of Texas* v. *Pullman Co.*, 312 U.S. 496, 501 (1941) (recognizing "a doctrine of abstention appropriate to our federal system * * * [that reflects a] scrupulous regard for the rightful independence of the state [courts]").

The Court's deference to state tribunals as having "the last word" (*Pullman*, 312 U.S. at 499) on state law issues is founded in a respect, not only for the federal system created by the Founders, but also for state jurists themselves. This Court has always assumed that "the members of [a State's] highest court have done * * * their mortal best to discharge their oath of office." *Sumner* v. *Mata*, 449 U.S. 539, 549 (1981). State court judges, no less than federal jurists, are tasked with protecting the rights of the citizenry and fairly applying the law. And state court judges, no less than Justice Department officials, are fully capable of ensuring, and are duty-bound to ensure, that the application of state law

10

will not interfere with the right to vote guaranteed by the Fifteenth Amendment. *See O'Sullivan* v. *Boerckel*, 526 U.S. 838, 844 (1999) ("State courts * * * are obliged to enforce federal law."); *Hibbs* v. *Winn*, 542 U.S. 88, 113 (2004) (Kennedy, J., dissenting) ("state courts are qualified constitutional arbiters").

The Constitution "recognizes and preserves the autonomy and independence of the States * * * in their * * * judicial departments." *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78-79 (1938). Federal "[s]upervision over * * * the judicial actions of the States is in no case permissible except as to matters by the constitution specifically authorized or delegated by the United States. Any interference [with state courts], except as thus permitted, is an invasion of the authority of the state and, to that extent, a denial of its independence." *Id.* at 79. As explained in the following section, the Congress that enacted Section 5 did not intend the interference sanctioned by the court below.

## II. APPLYING THE SECTION 5 PRE-CLEARANCE REQUIREMENT TO STATE COURT DECISIONS WOULD RAISE SIGNIFICANT CONSTITUTIONAL QUESTIONS.

As this Court has said, certain applications of Section 5 of the Voting Rights Act can raise "serious constitutional concerns." *Miller* v. *Johnson*, 515 U.S. 900, 926 (1995). "By its nature," the Act "intrudes on state sovereignty." *Lopez* v. *Monterey County*, 525 U.S. 266, 284 (1999). "Even the Department of Justice has described it as a 'substantial departure * * * from ordinary concepts of our federal system'; its encroachment on state sovereignty is significant and undeniable." *United States v. Board of Comm'rs of*

11

*Sheffield*, 435 U.S. 110, 141 (1978) (Stevens, J., dissenting) (citation omitted); *see Presley* v. *Etoway County Comm'n*, 502 U.S. 491, 500-501 (1992) (recognizing that "suspension of new voting regulations pending pre-clearance was an extraordinary departure from the traditional course of relations between the States and the Federal Government").

Section 5 provides that a covered jurisdiction that wishes to enact any "standard, practice or procedure with respect to voting different from that in force or in effect on November 1, 1964," must first seek pre-clearance from the Attorney General of the United States or the United States District Court for the District of Columbia. 42 U.S.C. § 1973c(a); *City of Rome v. United States*, 446 U.S. 156, 162-163 (1980); *see Lopez*, 525 U.S. at 269 ("States and political subdivisions are required to obtain federal pre-clearance before giving effect to changes in their voting laws.").

From this Court's very first consideration of the constitutionality of the Voting Rights Act it recognized that Section 5 was "an uncommon exercise of congressional power." *South Carolina* v. *Katzenbach*, 383 U.S. 301, 334 (1966); *see City of Rome*, 446 U.S. at 200 (Powell, J., dissenting) ("The pre-clearance requirement both intrudes on the prerogatives of state and local governments and abridges the voting rights of all citizens in States covered under the Act").

The Court, however, has "upheld § 5 as a necessary and constitutional response to some States' 'extraordinary stratagem[s] of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal

12

court decrees.' " *Miller*, 515 U.S. at 926 (quoting *Katzenbach*, 383 U.S. at 335).

As the Court explained in *Katzenbach*, "Congress had found that case-by-case [enforcement of civil rights laws] was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionists tactics invariably encountered in these lawsuits." *Katzenbach*, 383 U.S. at 328. It thus chose to "shift the advantage of time and inertia from the perpetrators of the evil to its victim by freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory." *Beer* v. *United States*, 425 U.S. 130, 140 (1976) (internal quotation marks and citations omitted).

In concluding that Congress employed a "rational means to effectuate the constitutional prohibition of racial discrimination in voting" by enacting Section 5, the *Katzenbach* Court noted that "[b]efore [adopting] the measure[ ] Congress explored with great care the problem of racial discrimination in voting." *Katzenbach*, 383 U.S. at 308, 324. The legislative record amply demonstrated that state legislatures from the covered states, as well as many state and local executive branch officials, had engaged in a "widespread 'pattern or practice' " of discrimination. *Id.* at 312. This included the enactment by state legislatures of discriminatory laws designed to disenfranchise black voters, as well as the discriminatory enforcement by state officials of otherwise valid laws that were designed to achieve the same unconstitutional result. *See id.* at 309-315.

Ultimately, the *Katzenbach* Court concluded that Congress's extraordinary intrusion on state

13

sovereignty was justified in order to combat the efforts of state legislatures and state officials to deny the franchise and evade the enforcement of federal civil rights law. *See id.* at 334-335. [2] In other words, the harm identified by Congress justified the remedy it chose to address that harm. *See City of Rome*, 446 U.S. at 202 (Powell, J., dissenting) (explaining that Section 5 "like any remedial devise, [was] imposed only in response to [a particular] harm").

Although Congress found ample evidence of discriminatory conduct by state legislatures and state executive officials, it made no such findings with respect to state courts. *See* H.R. Rep. No. 439, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.C.C.A.N. 2437 (June 1, 1965) ("House Report"); S. Rep. No. 162, 89th Cong. 1st Sess., *reprinted in* 1965 U.S.C.C.A.N. 2508 (Apr. 9, 20, 21, 1965) ("Senate Report"). Nor did the *Katzenbach* Court find any evidence that state courts had engaged in tactics designed to deny the right to vote or aid other branches of state governments in their attempts to evade the enforcement of the federal civil rights laws. *See Katzenbach*, 383 U.S. at 301-336.

Rather, as the legislative history makes clear, the problem was with state legislatures and state executive officials. In explaining the purpose of

---

[2] Justice Black dissented. *See Katzenbach*, 383 U.S. at 355 (Black, J., dissenting). Although finding most of the Voting Rights Act's remedial provisions constitutional, he concluded that Section 5's pre-clearance requirement "so distorts our constitutional structure of government as to render any distinction drawn in the Constitution between state and federal power almost meaningless." *Id.* at 358. Justice Black warned that the provision "approaches dangerously near to wiping the States out as useful and effective units in the government of our country." *Id.* at 360.

14

Section 5, the House Report declared that "[t]his section deals with the attempts by a State or political subdivision * * * to alter *by statute* or *administrative acts* voting qualifications and procedures in effect on November 1, 1964." H.R. Rep. No. 439 at 2457-58 (emphasis added); *see* S. Rep. No. 162 at 2562. Opposing the Act, some Members of Congress described Section 5 as requiring that "no new election *law, rule, regulation or resolution* of a State or subdivision thereof may be put into effect without the prior approval of a Federal Court or the Attorney General." H.R. Rep. No. 439 at 2470 (emphasis added).

Neither the legislative history, nor the statute itself, makes any mention of Section 5's applicability to *judicial decisions*.[3] *See* 42 U.S.C. § 1973c. And for good reason. Congress made no findings that

---

[3] *Branch* v. *Smith*, 538 U.S. 254 (2003), did not decide the question. The parties in *Branch* did not "no[t] dispute" that Section 5 applies to "voting changes mandated by order of a state court." *Id.* at 262. *See also Hathorn* v. *Lovorn*, 457 U.S. 255, 265 (1982) ("Respondents do not dispute that the change in election procedures ordered by the Mississippi courts is subject to pre-clearance under § 5."). This Court reserved the question of whether state court decisions having the effect of rewriting state voting laws were subject to Section 5's pre-clearance requirements. *See Branch*, 538 U.S. at 264-265. The District Court in that case had found that pre-clearance was required for the Mississippi Supreme Court's determination that that State's courts had the authority to craft a redistricting plan in absence of legislative action. *Id.* at 263-264. This Court did not address that question, and instead affirmed the lower court's decision on other grounds. *Id.* at 265. It further directed that "[t]he District Court's alternate holding [on the state court rulings was] not to be regarded * * * as binding upon state and federal officials should Mississippi seek in the future to administer a redistricting plan adopted by the Chancery Court." *Id.* at 256-266.

15

state courts were engaging in discriminatory acts designed to disenfranchise voters in violation of the Fifteenth Amendment.

Without such legislative findings, Congress could not justify employing its remedial power under the Fifteenth Amendment to deny state courts the autonomy and independence guaranteed them by their special and sovereign status as the final arbiters of state law. *See Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 368 (2001) (requiring Congress to "identif[y] a history and pattern of unconstitutional employment discrimination by the States" to enact remedial legislation); *Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62, 64-65 (2000) (rejecting remedial legislation because "Congress never identified any pattern of * * * discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation"); *City of Boerne* v. *Flores*, 521 U.S. 507, 520 (1997) (when Congress enacts remedial legislation to enforce constitutional rights "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end").

The application of Section 5 to state court decisions thus would once again put into question the constitutionality of the Voting Rights Act.

### III. UNDER THIS COURT'S CLEAR STATE-MENT RULE, SECTION 5 SHOULD NOT BE CONSTRUED TO APPLY TO THE ALABAMA SUPREME COURT DECI-SIONS AT ISSUE HERE.

Recognizing that Congress's decision to encroach on the sovereign rights of States is a constitutionally significant one that the national legislature does not

16

approach lightly, this Court has required that Congress make its intentions to do so *unmistakably clear*. *See Gregory*, 501 U.S. at 460 (" 'If Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.' ") (quoting *Atascadero State Hosp.* v. *Scanlon*, 473 U.S. 234, 242 (1985)).

"This plain statement rule is nothing more than an acknowledgement that the States retain substantial sovereign powers under our constitutional scheme, power with which Congress does not readily interfere." *Gregory*, 501 U.S. at 461. *See Pennhurst State Sch. & Hosp.* v. *Halderman*, 451 U.S. 1, 16 (1981) ("Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce" constitutional rights).

In addition to protecting the States from unintentional intrusion on their sovereignty, "[a]pplication of the plain statement rule * * * may [also] avoid * * * potential constitutional problem[s]." *Gregory*, 501 U.S. at 464. It would plainly do so here. As explained in the previous section, applying Section 5's pre-clearance requirements to state judicial decisions would raise serious constitutional questions with respect to the provision's validity that have not as of yet been addressed by this Court.

Applying the plain statement rule here, Congress has come far short of clearly stating any intention to impinge the sovereignty of the States with respect to the rulings of state courts by requiring the pre-

17

clearance of state court decisions on state law issues before those rulings may be enforced.

To be sure, Congress plainly intended to limit the sovereignty of covered states with respect to their legislative enactments and executive branch actions that alter "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. 1973c(a). That is clear from the plain language of the statute, *see id.* (referring to States' attempts to "enact or seek to administer" law relating to voting); *see also Branch,* 538 U.S. at 264-265 (explaining that "[a]n 'enactment' is the product of legislation, not adjudication"), as well as the Act's legislative history, which details the misdeeds of state legislatures and state executive officials with respect to denying blacks the right to vote. *See Katzenbach,* 383 U.S. at 301-336 (detailing those findings).

Nowhere in the statute's text or its legislative history does Congress so much as mention state courts, their judicial decisions or evince any intention to extend its unprecedented encroachment of state sovereignty to the realm of state judiciaries. Nor should this Court assume that Congress intended to do so. The Congress that enacted Section 5 understood that the legislation would be subject to constitutional challenge. Anticipating such scrutiny, the House Report dedicated several pages to the task of defending the Act's constitutionality, *see* H.R. Rep. No. 439 at 2448-2551; and many more to developing the factual record that would be needed to justify the statute's extraordinary remedy, *see id.* at 2438-2444.

Mindful of both the impending constitutional challenges, and its limited constitutional mandate, Congress went to great lengths to limit the scope of

18

its remedy to the harm that it sought to address. For example, it did not impose Section 5's pre-clearance requirements on all States, but only those that had a significant history of denying the franchise and seeking to evade the enforcement of the federal civil rights laws. *See* 42 U.S.C. § 1973b(b). Similarly, Congress did not require pre-clearance of all legislative enactments and administrative decisions of covered states, but only those related to voting. *See* 42 U.S.C. 1973c(a); *see also Presley*, 502 U.S. at 502 ("changes subject to § 5 pertain only to voting").

In the same vein, Congress did not impose Section 5's requirements on all governmental entities in the covered States, but only those that had engaged in discriminatory conduct – i.e., the political branches of government. *See* 42 U.S.C. 1973c(a). Congress did not explicitly subject state courts to Section 5.

Importantly, in this case, there is no reason to believe that the Alabama Supreme Court was engaged in the kind of malfeasance that spurred Congress to enact the Voting Rights Act in the first place. The Alabama Supreme Court was engaged in a core judicial function, namely, judicial review of state law for consistency with the state constitution. And the two state law doctrines applied by the Alabama Supreme Court here – 1) the restriction on local law exceptions to general laws, and 2) the non-retroactivity of laws absent clear legislative intent – are ones that are well-grounded in state and federal constitutional jurisprudence. *See* Ala. Const. Art. IV, § 105 (1901); *ABC Bonding Co.* v. *Montgomery County Sur. Comm'n*, 372 So.2d 4, 5 (Ala. 1979); 73 AM. JUR. 2D STATUTES § 7 ("State constitutions generally prohibit the enactment of special laws where general laws can be made applicable."); 2

19

SUTHERLAND STATUTORY CONSTRUCTION § 40:3 (6th ed.) (similar); *see also Eastern Enterprises* v. *Apfel*, 524 U.S. 498, 533 (1998) ("Retroactivity is generally disfavored in the law, in accordance with fundamental notions of justice that have been recognized throughout history.") (citations and quotations marks omitted); *Landgraf* v. *USI Film Products*, 511 U.S. 244, 265 (1994) ("presumption against retroactive legislation is deeply rooted in our jurisprudence"); *Dennis* v. *Pendley*, 518 So.2d 688, 690 (Ala. 1987).

The prohibition on special laws has been enshrined in the constitutions of no fewer than 30 states, [4] and can be found in the National Municipal League's Model State Constitution. [5] "The purpose of [such] constitutional prohibitions * * * is to prevent a legislature from providing benefits or favors to

--------------------------------

[4] *See* Alaska Const. art. II, § 19; Ariz. Const. art. IV, § 19; Ark. Const. art. V, § 25; Cal. Const. art. IV, § 16; Colo. Const. art. V, § 25; Del. Const. art. III, § 18; Ill. Const. art. IV, § 13; Ind. Const. art. IV, § 23; Iowa Const. art. III, § 30; Kan. Const. art. II, § 17; Md. Const. art. III, § 33; Mich. Const. art. IV, § 29; Minn. Const. art. IV, § 33; Miss. Const. art. IV, § 87; Mo. Const. art. III, § 40; Mont. Const. art. V, § 26; N.D. Const. art. II, § 70; Neb. Const. art. III, § 18; Nev. Const. art. IV, § 21; N.J. Const. art. IV, § 7(9); N.M. Const. art. IV, § 24; N.Y. Const. art. III, § 17; Okla. Const. art. V, § 59; S.C. Const. art. III, § 34(.9.); S.D. Const. art. III, § 23; Tex. Const. art. III, § 56; Utah Const. art. VI, § 26; Va. Const. art. IV, § 15; W. Va. Const. art. VI, § 39; Wyo. Const. art. III, § 27.

[5] *See* NATIONAL MUNICIPAL LEAGUE, MODEL STATE CONSTITUTION § 4.11 (6th ed. 1968) ("Special Legislation. The legislature shall pass no special or local act when a general act is or can be made applicable, and whether a general act is or can be made applicable shall be a matter for judicial determination.") (http://texaspolitics.laits.utexas.edu/html/cons /features/0301_02/modelcons.pdf).

20

certain groups or localities." 73 AM. JUR. 2D STATUTES § 7 (2d ed.); *see* Donald Marritz, *Making Equality Matter (Again): The Prohibition Against Special Laws In The Pennsylvania Constitution*, 3 WIDENER J. PUB. L. 161, 168 (1993) (explaining that such provisions "mandate the equal treatment of those who are in similar situations"); G. Alan Tarr, *Constitutional Theory and State Constitutional Interpretation*, 22 RUTGERS L.J. 841, 861 (1991) ("Constitutional prohibitions on special laws and local laws, widely adopted during the nineteenth century, reflected a similar concern [for equality]."). [6]

In Alabama, the rule has been applied to a range of state and local laws that address such diverse topics as "licensing of professional bail agents," *see ABC Bonding Co.* 372 So.2d at 5, "the approval of on-site wastewater disposal systems," *State Bd. of Health* v. *Greater Birmingham Ass'n of Home Builders, Inc.,* 384 So.2d 1058, 1059 (Ala. 1980), "hazardous duty pay" for police officers, *Johnson* v. *City of Fort Payne*, 485 So.2d 1152, 1154 (Ala. 1986), and the procedures for selecting juries, *see Ellis* v. *Pope*, 709 So.2d 1161, 1166 (Ala. 1997).

---

[6] Although numerous state constitutions contain provisions prohibiting special, local, or private laws, the precise scope of such provisions (and the judicial construction of them) varies from State to State. *See* 2 SUTHERLAND STATUTORY CONSTRUCTION § 40:3 (6th ed.). Furthermore, such provisions need not be rigidly applied. *See, e.g.*, 73 AM. JUR. 2D STATUTES § 7 (2d ed.) (legislative "classification will survive special-laws constitutional challenge if it bears a reasonable and substantial relation to the object sought to be accomplished by the legislation").

21

Significantly, the doctrine has also previously been applied in the context of elections. *See Kiel* v. *Purvis*, 510 So.2d 190, 191 (Ala. 1987) (applying doctrine to law governing distribution of "campaign material" at "polling place"); *State ex rel. Bozeman* v. *Hester*, 72 So.2d 61, 64 (Ala. 1954) ("local act changing the method of electing" county official); *City of Birmingham* v. *Norton*, 50 So.2d 754, 757 (Ala. 1950) (law "to provide for elections"). Thus, no one could reasonably conclude that the Alabama Supreme Court was applying this well-established and unobjectionable doctrine in a tortured or even novel way.

Moreover, far from being a tool of a conspiracy of the Alabama political branches to deny black voters the franchise, the two decisions at issue here have instead provided two Alabama governors the opportunity to appoint two black men to public office. Applying Section 5 here thus cannot be justified on the grounds that the rights of black voters will be vindicated. *See City of Rome*, 446 U.S. at 206 (Powell, J., dissenting) ("If there were reason to believe that today's decision would protect the voting rights of minorities in any way, perhaps this case could be viewed as one where the Court's ends justify dubious means."). It will only serve to remove a duly-appointed black official from office.

Finally, the Court should be hesitant to conclude that Section 5's pre-clearance requirements apply to state court decisions because of the role the Justice Department will play in reviewing the state court rulings. The effect of such a holding would be that "decisions by state courts would be subject to being overturned, not just by an[ ] agency, but by an agency established by a different sovereign." *Alaska*

22

*Dep't of Envtl. Conserv.* v. *EPA*, 540 U.S. 461, 512 (2004) (Kennedy, J., dissenting). This is particularly troubling here because federal officials would be tasked with reviewing state court decisions on matters of general state constitutional law that are far afield from the rules and regulations governing voter qualifications that are the principal target of the Voter Rights Act. *See Katzenbach*, 383 U.S. at 312 (recognizing that Congress's principle concern was the "[d]iscriminatory administration of voting qualifications").

In the end, as Justice Kennedy has concluded, "[i]f, by some course of reasoning, state courts must live with the insult that their judgments can be revised by a federal agency, the Court should at least insist upon clear instruction from Congress." *Alaska*, 540 U.S. at 513. There is no such "clear instruction" here. The Court should hold that Section 5's pre-clearance requirement does not apply to the state court decisions at issue in this case.

23

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and hold that the State of Alabama was not required to seek pre-clearance of *Stokes* v. *Noonan*, 534 So.2d 237 (Ala. 1998), and *Riley* v. *Kennedy*, 928 So.2d 1013 (Ala. 2005).

Respectfully submitted,

H. CHRISTOPHER BARTOLOMUCCI
(*Counsel of Record*)
JAKE M. SHIELDS
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5810

*Counsel for Amici Curiae*

JANUARY 2008

1351

pality having the required number of inhabitants and whose corporate boundaries lie partly within said county and partly without said county. Any municipality which adopts a resolution and comes under the provisions of this Act, as herein provided, shall thereafter remain under this Act, and may not repeal or rescind such action either by the adoption of a resolution or otherwise."

**Section 2.** This Act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved May 23, 1977.

Time: 6:00 P.M.

———

Act No. 783                    H. 943—McCluskey, Shoemaker, Dial

AN ACT

To amend Section 2 of Act No. 793, 1975 Regular Session (Acts of 1975, p. 1596), entitled:

"An Act Relating to all counties having populations of not less than 65,000 nor more than 68,000 inhabitants according to the most recent federal decennial census; to provide for an additional secretarial assistant for the office of the district attorney and for the offices of circuit judge of the judicial circuit in which such county lies;" so as to increase the compensation of the secretarial assistants for the office of circuit judge of the judicial circuit in which such county lies.

*Be It Enacted by the Legislature of Alabama:*

**Section 1.** Section 2 of Act No. 793, 1975 Regular Session (Acts of 1975, p. 1596) is hereby amended to read as follows:

"Section 2. The compensation of such secretarial assistants for the circuit judges shall be set by the circuit judge at a sum not exceeding $725.00 per month."

**Section 2.** This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved May 23, 1977.

Time: 6:00 P.M.

———

Act No. 784                    H. 950—Gafford

AN ACT

To provide that when a vacancy occurs on the governing body of

EXHIBIT
m
PENGAD 800-631-6989

Jefferson County, the Election Commission of Jefferson County shall adopt a resolution providing for a special election, with a run-off election, if necessary, to fill such vacancy; to provide how a person shall become a candidate for the office to be filled; to provide that any person elected to fill a vacancy hereunder shall serve the unexpired term which the person occupying said office when the vacancy occurred would have served if the vacancy had not occurred; to provide that the general laws of the State governing elections shall apply to any election held under the Act, except as the Act otherwise provides; to provide that no person shall be appointed to fill such vacancy; and to repeal Section 145, Title 62, Code of Alabama of 1940, and any other laws or parts of laws in conflict with the Act.

*Be It Enacted by the Legislature of Alabama:*

**Section 1.** As herein used, the following terms have the meanings hereby ascribed to them: "the County" means Jefferson County, Alabama; "a vacancy" means a vacancy on the governing body of the County caused by death, resignation, impeachment, or any cause except normal expiration of terms; "first election hereunder" means the first election for which this Act provides to fill a vacancy as distinguished from the run-off election held hereunder, if a run-off election is necessary; "run-off election hereunder" means the run-off election for which this Act provides, if no candidate at the first election hereunder receives a majority of the votes cast; "a County wide election" means any election, whether general, special or primary, including run-off elections, whereat qualified electors throughout the County are entitled to vote and which is held to elect a Federal, State or County officer or to nominate a candidate or candidates, for a Federal, State or County office or offices, to submit one or more questions, including, but not limited to, the question of adopting a proposed amendment to the Constitution of Alabama and the question of whether general obligation bonds, or revenue bonds, of the State or County shall be issued; "a scheduled County wide election" means a County wide election which is scheduled to be held on a date definitely determined when a vacancy occurs; and "the Election Commission" means the Election Commission of the County.

**Section 2.** Within seven days from the occurrence of any vacancy the Election Commission, by a majority vote thereof, shall adopt a resolution stating the dates on which the first election hereunder and the run-off election hereunder, if necessary, will be held. The said dates will be determined as provided for in Sections 3 and 4, below.

**Section 3.** If when a vacancy occurs a County wide election is scheduled to be held more than forty days and not more than 180 days from the date whereon the vacancy occurs, the first election hereunder, to fill such vacancy, shall be held on the County wide election date. If when the vacancy occurs

there is no County wide election scheduled to be held more
than forty days and not more than 180 days after the date
whereon the vacancy occurs the first election hereunder, to
fill the vacancy, shall be held on a date specified by the Election
Commission in the resolution, provided for in Section 2, above,
which date shall be not less than thirty-three days and not more
than forty days from the date on which the resolution is adopted.

Section 4.    If when the resolution, provided for in Section
2, above, is adopted, a County wide election is scheduled to be
held not less than three weeks and not more than eight weeks
from the date on which the resolution provides the first election
hereunder shall be held, to fill said vacancy, the run-off elec-
tion hereunder, if necessary, shall be held on the date on which
said County wide election is scheduled to be held.    If when
the resolution, provided for in Section 2, above, is adopted,
there is no County wide election scheduled to be held not less
than three weeks and not more than eight weeks from the
date on which the resolution provides for the first election here-
under to be held, the resolution shall provide for the run-off
election hereunder, if any run-off election is necessary to be
held three weeks subsequent to the date on which the first
election hereunder will be held to fill the vacancy.

Section 5.    Any person elected to fill a vacancy hereunder
shall serve the unexpired portion of the term which the person
occupying said office when the vacancy occurred would have
served if the vacancy had not occurred.

Section 6.    The first election hereunder and the run-off
election hereunder, if a run-off election is required, shall be
held on the dates provided for in the resolution adopted under
Section 2, above.    The provisions of the election laws govern-
ing the registration of voters, equipment at polling places,
furnishing of supplies, appointment of election officers, voting
and canvassing returns at a general election shall apply to any
election held hereunder, except as herein otherwise provided.

Section 7.    The failure of the Election Commission to pro-
vide for the first election hereunder, or the run-off election
hereunder, within seven days from the occurrence of a vacancy
shall not terminate the jurisdiction and duty of the Election
Commission to provide for such first election or such run-off
election.

Section 8.    No primary election shall be held to nominate
a candidate to fill a vacancy under the provisions of this Act.
At any election held under this act no person's name shall appear
on the ballot as a candidate for the office to be filled at said
election unless such person has filed in the office of the Judge
of Probate of the County within the time and in the forms

1354

prescribed below in this Section 8 his statement of candidacy and the petition signed by at least one hundred qualified electors requesting that such person become a candidate for the said office.

Any person desiring to become a candidate at any election hereunder may become such candidate by filing in the office of the Judge of Probate of the County such person's statement in writing of such candidacy, accompanied by such person's affidavit taken and certified by such Judge of Probate, or by a Notary Public, that such person is duly qualified to hold the office for which the person desires to be a candidate. Such statement shall be filed at least twenty-one days before the date set for such election; and shall be in substantially the following form:

"State of Alabama, Jefferson County.

I, the undersigned, being first duly sworn, depose and say that I am a citizen of Jefferson County in Alabama, residing at ........................................................ in said County, that I desire to become a candidate for the office of ........................................ at the election for said office to be held on the ..... ................ day of ................................................, and that I am duly qualified to hold said office if elected thereto; I hereby request that my name be printed on the official ballot at said election.

Signed..............................  ..................................................

Subscribed and sworn to before me, the undersigned (Probate Judge or Notary Public, as the case may be) on this the ........................... day of ................................................, 19........  .......

............................................  ..................................................
(Judge of Probate or Notary Public as the case may be)"

Said statement shall be accompanied by a petition signed by at least one hundred persons who shall be qualified to vote at said election, requesting that such person become a candidate for said office at said election. The signers to said petition shall set forth their names in full and their residence addresses, and said petition shall be in substantially the following form:

"We, the undersigned, duly qualified electors of Jefferson County, and residing at the places set opposite our respective names, do hereby request that the name of ........................................ be placed upon the official ballot as a candidate for the office of ........................................ at the election for said office to be held in said County on the ................ day of ................................................. We further state that we know that said ........................................ possesses the qualifications necessary for said office, and is in our

1355

judgment a fit and proper person to hold said office.  Witness our hands on this the ……………… day of ……………………………………, 19…………."

No name shall appear upon said ballot as a candidate for election except the names of such persons as have become candidates according to the provisions as set forth above.  If voting machines are used in the County, the names of candidates shall be suitably placed on voting machines.

**Section 9.**  No persons shall be appointed to fill a vacancy. Section 145, Title 62, Code of Alabama of 1940, and all other laws and parts of laws, whether general, local or special in conflict herewith, are hereby repealed to the extent of any such conflict.

**Section 10.**  This Act shall become effective upon its approval by the Governor or its otherwise becoming a law.

Approved May 25, 1977.

Time: 4:30 P.M.

---

Act No. 785                              H. 1023—Shelton, Merrill

## AN ACT

To provide that any public corporation heretofore or hereafter incorporated and existing under the provisions of Act No. 109, H. 148 of the 1961 Regular Session, as amended, [1961 Acts, p. 134; appearing in Code of Alabama 1940, Recompiled 1958, Title 22, Section 204 (41a)], is authorized and empowered to lease any hospital, building or facility constructed and equipped under the provisions of such act to any public corporation or any non-profit corporation. No rights under the terms of any contract shall be abrogated nor shall any security for the fulfillment of any obligation be jeopardized by the provisions of this act.

*Be It Enacted by the Legislature of Alabama:*

**Section 1.**  Any public corporation heretofore or hereafter incorporated and existing under the provisions of Act No. 109, H. 148 of the 1961 Regular Session, as amended, [1961 Acts, p. 134; appearing in Code of Alabama 1940, Recompiled 1958, Title 22, Section 204 (41a)], is hereby authorized and empowered to lease any hospital, building or facility constructed and equipped under the provisions of such act to any public corporation or any non-profit corporation. Nothing herein shall be construed to allow the abrogation of the terms of any contract or to jeopardize any security for the fulfillment of any obligation assumed under the provisions of said Act No. 109.

**Section 2.**  The provisions of this act are severable.  If

ELECTRONICALLY FILED
3/12/2008 4:02 PM
CV-2008-900316.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT FOR THE TENTH JUDICIAL CIRCUIT
## JEFFERSON COUNTY, ALABAMA

| | | |
|---|---|---|
| PATRICIA WORKING, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 08-cv-900316 |
| | ) | |
| JEFFERSON COUNTY ELECTION | ) | |
| COMMISSION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____

| | |
|---|---|
| FRED L. PLUMP, *et al.,* | ) |
| | ) |
| Third-party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| COMMISSIONER GEORGE BOWMAN, | ) |
| | ) |
| Third-party Defendant. | ) |

## GOVERNOR BOB RILEY'S MEMORANDUM OF LAW

The Honorable Bob Riley, in his official capacity as Governor the State of Alabama, respectfully submits this memorandum of law in support of his Complaint in Intervention:

### I.    INTRODUCTION

This case concerns a vacancy that arose on the Jefferson County Commission in November 2007. A general law (applying to the entire State of Alabama) provides that such a vacancy is filled by appointment of the Governor. Ala. Code § 11-3-6 (1989), as amended by Act No. 2004-455. A local law, Act No. 77-784, applies only to Jefferson County and provides that such a vacancy should be filled by special election. However, the Alabama Supreme Court ruled that such local laws violate § 105 of the Alabama Constitution. *See Stokes v. Noonan,* 534



EXHIBIT

N

So. 2d 237 (Ala. 1988); *see also Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005). The local law at issue in *Stokes* and *Riley* (Act 85-237) applied to Mobile County, but in every important way it is exactly like Act No. 77-784: It is a local law providing one means of filling vacancies when a general law provides another. Jefferson County's Act No. 77-784 is therefore just as unconstitutional as Mobile County's Act 85-237.

Under a duty to faithfully execute the laws of Alabama, Governor Riley followed the Alabama Supreme Court rulings and the general law, appointing General George F. Bowman to fill the vacancy. Nonetheless, the Jefferson County Election Commission called and held a special election on February 5, 2008. The Governor and the "Voter Plaintiffs" (Working, Erdemir, and McGinnis) ask this Court to rule that the election was inconsistent with Alabama law and to enter appropriate equitable relief. Intervenor Plump and Defendant Bell, in a third-party claim, ask this Court to rule that the Governor's appointment was invalid and to enter appropriate equitable relief.

It is important to note at the outset that this Court is not required to decide the *best* way to fill vacancies on county commissions. The question before the Court is a pure legal issue: According to established Alabama law, what is the *legal* method of filling a vacancy on the Jefferson County Commission? A simple application of Alabama statutes and binding Supreme Court case law compels one answer: The vacancy can legally be filled only by appointment. The Governor's appointment of Commissioner Bowman was therefore valid, and the February 5 election therefore was *not* valid.

2

## II.    FACTS.

The parties stipulated to the facts set out below.  The paragraph numbers correspond to those on the parties' stipulation.  Not all facts included in the stipulations are relevant to the issues properly before the Court, and Governor Riley includes only pertinent facts here:

1.    Plaintiff, Patricia Working, is an adult residing in Birmingham, Alabama, and is a qualified elector of Jefferson County Commission District 4.

2.    Plaintiff, Rick Erdemir, is an adult residing in Birmingham, Alabama, and is a qualified elector of Jefferson County Commission District 4.

3.    Plaintiff, Floyd McGinnis, is an adult residing in Birmingham, Alabama, and is a qualified elector of Jefferson County Commission District 1.

4.    Intervenor, Fred Plump, is an adult residing in Fairfield, Alabama, and is a qualified elector of Jefferson County Commission District 1.

5.    Defendant, William A. Bell, is an adult residing in Birmingham, Alabama, and is a qualified elector of Jefferson County Commission District 1.

6.    Defendant, the Jefferson County Election Commission consists of Alan King, Probate Judge of Jefferson County; Anne-Marie Adams, Circuit Clerk, Tenth Judicial Circuit of Alabama; and, Mike Hale, Sheriff of Jefferson County, Alabama.

7.    Third-party defendant, George F. Bowman was appointed by the Honorable Bob Riley, Governor of the State of Alabama, to fill the vacancy on the Jefferson County Commission created by the resignation of Larry Langford.  Governor Riley appointed Commissioner Bowman to fill the vacancy on November 21, 2007.

8.     Intervenor, Governor Bob Riley is the chief executive officer of the State of Alabama and is authorized to intervene in this case.

3

* * *

32.    On October 9, 2007, Larry Langford, Jefferson County Commissioner District 1, was elected as Mayor of the City of Birmingham, Alabama.

33.    On October 29, 2007, the Jefferson County Election Commission adopted a resolution calling a Special Election to be held on February 5, 2008, to fill any vacancy which might exist on the Jefferson County Commission upon the assumption by Commissioner Langford of the Office of Mayor.  See Resolution attached as Exhibit Q [to Stipulated Facts].  At the time the Resolution was adopted, there was not yet any vacancy on the Jefferson County Commission, and there was an election contest concerning the mayoral election.

34.    Larry Langford resigned from the Jefferson County Commission and was sworn in as the Mayor of the City of Birmingham, Alabama, on November 13, 2007.  See resignation letter attached as Exhibit R [to Stipulated Facts].

35.    On November 21, 2007, Alabama Governor Bob Riley appointed George F. Bowman to fill the unexpired term of Larry Langford on the Jefferson County Commission.  See appointment letter attached as Exhibit S [to Stipulated Facts].

* * *

37.    Six candidates followed the procedures to qualify to have their names placed on the ballot for the February 5, 2008, special election, which had been called by the Jefferson County Election Commission in reliance on Act No. 77-784 and the legality of which is the subject matter of this litigation.  Those candidates were George F. Bowman, William A. Bell, Fred L. Plump, Orville Ifill, Kamau Afrika, and Eric Major.

38.  Larry Langford, George F. Bowman, William A. Bell, Fred L. Plump, Orville Ifill, Kamau Afrika, and Eric Major are all African-American men.

4

\* \* \*

41.     According to unofficial returns, William A. Bell received more than a majority of the votes cast on February 5, 2008, in the special election that is the subject of this litigation.

42.     The Jefferson County Election Commission was scheduled to meet at 12:00 noon on Friday, February 15, 2008, *see* § 17-12-15, Alabama Code (2006), to certify William A. Bell as the winner of the special election that is the subject of this litigation.

43.     On Thursday, February 14, 2008, the Supreme Court of Alabama enjoined the Jefferson County Election Commission from certifying the results of the February 5, 2008, special election, pending further orders of the Supreme Court of Alabama.

## III.    ARGUMENT

### A. Act 77-784 Is Unconstitutional And Void.

The general law in Alabama has long called for gubernatorial appointments in the event of a vacancy on a county commission. *See* Ala. Code § 11-3-6 (Supp. 2006).[1]  This has been the law for more than one hundred years.[2]  Where there is a general law setting a rule that covers the

---

[1]     The general law was also amended by Act No. 2007-488, which relocated the general law to Ala. Code § 11-3-1(b).  There *may* be a question about the current enforceability of the 2007 amendment, because it has not yet been precleared by the Department of Justice pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.  For purposes of determining the general law, it makes no difference which amendment applies, because in either case the general law provides for commission vacancies to be filled by gubernatorial appointments.

[2]     As to "The Court of County Commissioners," the 1852 Code of Alabama provided that "[i]n case of a vacancy, it is to be filled by the court, and the person so appointed holds office for the remainder of the term of the commissioner in whose place he is appointed."  Code 1852, § 698.  The law was the same when the Revised Code of Alabama was published in 1867.  See Code 1867, § 826.

In an Act dated November 25, 1868, during the apex of reconstruction and Alabama's first Republican and mixed-race legislature, the statute was amended to provide that  the Governor rather that the Court of County Commissioners would make the appointment to fill any vacancy.  *See* Code 1876, § 740 ("In case of a vacancy, it is to be filled by the governor, and the person so appointed holds office for the remainder of the term of the commissioner in whose place he is appointed.").  The Codes of 1886,

entire state, the Legislature may not pass a *local* law setting a different rule for a particular county: Section 105 of the Alabama Constitution provides that "[n]o special, private, or local law . . . shall be enacted in any case which is provided for by a general law." Ala. Const. Art. IV, § 105.

Although there was already a general law dictating the method of filling commission vacancies, the Legislature passed local Act No. 77-784 on May 25, 1977 to provide a different method (special election) for filling county commission vacancies in Jefferson County. Later, the Legislature passed a local law (Act No. 85-237) that similarly provided that vacancies on the Mobile County Commission would be filled by special election if more than one year remained on the term.

On September 30, 1988, the Alabama Supreme Court ruled that Act No. 85-237 was void on grounds that it violated Section 105 of the Constitution of Alabama:

> Act No. 85-237 was approved April 8, 1985. By its terms, it is made applicable only to Mobile County. Hence, when it became law it applied to a political subdivision of the state less than the whole, and thus, it was a local law on the same subject as the previously enacted general law, § 11-3-6; see Constitution of 1901, § 110; *Peddycoart,* 354 So.2d at 814; and, accordingly, it is unconstitutional under § 105.

*Stokes,* 534 So. 2d 237, 238 (Ala. 1988).

It is true that *Stokes* did not discuss the Jefferson County local law, Act No. 77-784. The parties seeking to uphold the election argue that *Stokes* should be limited to the Mobile County local law and that this Court should therefore assume that Act No. 77-784 is good law. To do so, this Court would have to ignore *Stokes*. *Stokes* established a rule of law in this state: There is a

---

1896, 1907, 1923 and 1940 each continued to provide that "[i]n case of a vacancy, it is to be filled by the governor, and the person so appointed holds office for the remainder of the term of the commissioner in whose place he is appointed." Code 1886, § 820; Code 1896, § 952; Code 1907, § 3307; Code 1923, § 6749; Code 1940, T.12, § 6. The general law was recodified as Ala. Code § 11-3-6 when the Code of Alabama 1975 was published.

general law providing that vacancies on county commission be filled by gubernatorial appointment, and thus a local law that attempts to set a different method for a particular county violates § 105. The Court does not have to consider each such local law separately for other state officials to know the law of the State. If the Alabama Supreme Court ruled that Statute X was unconstitutional because it was signed in green ink, and if Statutes Y and Z were likewise signed in green ink, then lower courts, the Legislative Branch, and the Executive Branch should know that Statutes Y and Z are likewise unconstitutional and act accordingly. Therefore, applying *Stokes* here, Act No. 77-784 is unconstitutional. [3]

In sum, under the clear rule established in *Stokes*, Act No. 77-784 is unconstitutional. Because it is unconstitutional, it is void *ab initio*: "'in legal contemplation, as inoperative as

---

[3]    Even though the Jefferson County local law was passed before the Alabama Supreme Court's decision in *Peddycoart v. City of Birmingham*, 354 So. 2d 808 (1978), its fate is no less certain. In *Peddycoart*, the Alabama Supreme Court noted that some of its prior decisions took a more liberal reading of § 105 of the Alabama Constitution, and held as follows:

> Henceforth when at its enactment legislation is local in its application it will be a local act and subject to all of the constitutional qualifications applicable to it. With regard to legislation heretofore enacted, the validity of which is challenged, this Court will apply the rules which it has heretofore applied in similar cases.

*Id.* at 814.

First of all, the subject of the paragraph referenced above was enactments "based upon population classifications" (for example, a statute that applied only to counties with a population greater than a threshold amount). *Id.* The Court had applied different tests at different times to determine whether such an Act was, in fact, a "local" law. The invalid local act at issue in this case was not based on population, and therefore is not subject to any prior test for whether such acts are local laws or general laws. Second, any earlier case approving a similar local act was plainly wrongly decided and misread earlier decisions. In *City Council of Montgomery v. Reese*, 149 Ala. 188, 43 South. 116 (1909), the Alabama Supreme Court held that a local act approving bonds with a 40-year maturity period violated § 105 when there was a general law allowing local jurisdictions to issue bonds with a 30-year maturity period. *Id.* However, that decision was misread in *City of Ensley v. Simpson*, 166 Ala. 366, 52 So. 61, 64 (1910). The *Simpson* court mistakenly assumed that both the local and general laws stipulated 30-year maturity periods, and thus limited the *Reese* decision to cases where the local and general laws were substantially similar. That mis-reading was carried into future cases. *See, e.g., Dunn v. Dean*, 196 Ala. 486, 71 So. 709 (1916). It is unthinkable that today, after *Peddycoart* and *Stokes v. Noonan*, that the Alabama Supreme Court would not condemn the Jefferson County local law and apply the clear language of § 105 as enforced in *Peddycoart, Stokes*, and *City Council of Montgomery v. Reese*.

7

though it had never been passed.'" *Ex parte Southern Railway Co.*, 556 So. 2d 1082, 1090 (Ala. 1989) (quoting *Norton v. Shelby County*, 118 U.S. 425, 442 (1886)). *See also*, *Norwood v. Goldsmith*, 168 Ala. 224, 53 So. 84, 88 (1910) ("An unconstitutional statute or void act is just as if it had never been") (declaring local law an unconstitutional violation of § 105). Because it is unconstitutional and void, the legal method of filling vacancies on the Jefferson County Commission under state law is gubernatorial appointment, the method established by the general law. There was no basis under Alabama law for the February 5, 2008 election.

### B. No Subsequent Act "Revived" Act No. 77-384.

#### 1. Act No. 2004-455

Act No. 2004-455 amended the general law to provide that vacancies on county commissions are to be filled by gubernatorial appointment "[u]nless a local law authorizes a special election." Ala. Code § 11-3-6 (Supp. 2006). In further litigation concerning the same Mobile County local law that was at issue in *Stokes*, Alabama courts had to decide whether the 2004 amendment was meant to validate previously-passed local laws, or only those passed *after* Act No. 2004-455 was enacted. In 2005, the Alabama Supreme Court held that the amendment applied prospectively only, and therefore did not validate previously-passed local laws:

> [T]he plain language in Act No. 2004-455, amending § 11-3-6, Ala.Code 1975, provides for prospective application only, and that language must be given effect according to its terms. Nothing in the language in Act No. 2004-455 demonstrates an intent by the legislature that the amendment of § 11-3-6 apply retroactively.

*See Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005). Thus, Act No. 2004-455 did not alter the rule for filling vacancies in Mobile County, and, by logical extension, Act No. 2004-455 did not alter the rule for filling vacancies in Jefferson County.

The Supreme Court's analysis was straight-forward and correct. First, the Court noted

that Act No. 2004-455 lacked the clear language necessary to demonstrate legislative intent that

the act would apply retroactively:

> [S]tatutes are to be prospective only, unless clearly indicated by the legislature.
> Retrospective legislation is not favored by the courts, and statutes will not be
> construed as retrospective unless the language used in the enactment of the statute
> is *so clear that there is no other possible construction. Sutherland Stat. Const.*,
> § 41.04 (4th ed 1984).

*Id.* at 1016, quoting *Gotcher v. Teague,* 583 So.2d 267, 268 (Ala.1991) (emphasis added). The

Court cited the kind of language that it looks for to demonstrate such an intent:

> *See, e.g.,* § 34-8-28(h), Ala.Code 1975 ("The provisions of this amendatory
> section are *remedial* and *curative* and shall be *retroactive* to January 1, 1998.");
> § 11-50-16(c), Ala.Code 1975 ("The provisions of this section shall be *curative*
> and *retroactive* ...."); § 11-43-80(d), Ala.Code 1975 ("The provisions of this
> section shall be *curative* and *retroactive* ...."); and Act No. 2001-891, § 5, Ala.
> Acts 2001 ("It is the intent of the Legislature that this act be construed as
> *retroactive* and *curative*.").

*Id.* at 1017 (emphasis added). Because Act 2004-455 did not have that kind of language, it

lacked the clear expression of legislative intent to apply retroactively.

Second, the Court noted that other language in Act No. 2004-455 showed a legislative

intent that the statute should apply *prospectively* only:

> The argument that Act No. 2004-455 applies prospectively only is further
> supported by the preamble of the Act, which provides that the purpose of the Act
> is "[t]o amend Section 11-3-6 of the Code of Alabama 1975, relating to county
> commissions, *to authorize the Legislature by local law to provide for the manner
> of filling vacancies in the office of the county commission.*" (Emphasis added.)
> The language "to authorize the Legislature ... to provide" the means by which
> vacancies on the county commission are to be filled further indicates an intention
> by the legislature that the Act is to be prospectively applied. Therefore, we hold
> that Act No. 2004-455 applies prospectively only; consequently, Governor Riley
> is authorized to fill the vacancy on the Mobile County Commission by
> appointment.

*Id.* at 1017.

9

Thus, the Alabama Supreme Court has already determined that Act No. 2004-455 does not give effect to pre-existing local laws such as Act No. 77-784.

### 2.    Act No. 2007-488.

The Election Commission, Bell and Plump argue that a 2007 amendment to the general law revived Act No. 77-784, but like the 2004 amendment, the 2007 amendment can only be read to apply prospectively.  It provides, in language identical to the 2004 Act, as follows: "Unless a local law authorizes a special election," commission vacancies shall be filled by gubernatorial appointment. *See* Act No. 2007-488, moving the provisions of § 11-3-6 to § 11-3-1(b).

This amendment was passed soon after *Riley v. Kennedy* decided, and that was a high-profile opinion where the plaintiffs where all three plaintiffs were members of the House of Representatives.  The Legislature knew what language it would need to add if it intended for the Act to be applied retroactively, but it declined to insert such language:  Nowhere does it say that the 2007 amendment shall be "construed as retroactive and curative," or anything of the sort.

The Election Commission and Plump point to the portion of the 2007 amendment adding § 11-3-1(f).  That provision provides as follows:

> Except as specifically provided in subsections (b) and (c), this section applies in all counties and may not be altered or amended by local law.  Any existing local law or a portion thereof in conflict with this section is specifically repealed to the extent of the conflict effective with the next election following the effective date of the act adding this subsection.  It is the intent of the foregoing that a portion of a local law in direct conflict with this section shall be repealed, and any remaining portions of the local law not in conflict shall remain in full force and effect.

Act 2007-488, adding § 11-3-1(f).  This is not the clear expression of legislative intent required by *Riley v. Kennedy*, and certainly is not "so clear that there is no other possible construction." *Riley*, 928 So. 2d at 1016.

10

A closer look at this provision is necessary, given the arguments made by other parties. The first sentence sets aside subsection (b) (the part dealing with vacancies) and (c), and says that other subsections "may not be altered or amended by local law." Subsections (b) and (c), then, *may be altered or amended* by local law. Like the 2004 Amendment (2004-455), this amendment (2007-488) uses a future tense and suggests a limitation on what the Legislature may and may not do in subsequent legislation, but it says nothing at all about preexisting local laws.

The language in the second and third sentences deal with what is, and what is not, repealed by the 2007 amendment. The second sentence provides: "Any existing local law or a portion thereof in conflict with this section is specifically repealed to the extent of the conflict . . ." This sentence repeals existing local laws (or portions thereof) that conflict with § 11-3-1, as amended by Act No. 2007-488. It says nothing at all about giving effect to pre-existing local legislation.

Finally, in the third sentence, the Legislature explained: "It is the intent of the foregoing that a portion of a local law in direct conflict with this section shall be repealed, and any remaining portions of the local law not in conflict shall remain in full force and effect." This final sentence, on which others rely, is merely limiting which provisions of local laws will be repealed by Act No. 2007-488. It must be read in conjunction with the first sentence, which limits what the Legislature may do in the *future*. It does not say that a pre-existing local law (such as Act No. 77-784) can alter or amend the statute, and it in no way speaks to other legal impediments to the enforceability of local laws. Indeed, speaks only to those local laws that were "in full force and effect" at the time that Act No. 2007-488 became effective. Of course, Act No. 77-784 was not in "full force and effect", because it was unconstitutional under the

Alabama Supreme Court decisions in *Stokes* and *Riley*, and so Act No. 2007-488 does nothing to revive the Jefferson County local law.

A local law can deal with a variety of subjects. There may be local laws on the books with some sections that deal with topics having nothing to do with the subject matter of Act No. 2007-488, and other subjects that run afoul of that Act. If a local law has 9 sections that do not conflict with the new § 11-3-1, and one section that conflicts with (for instance) subsection (a), then only that conflicting section is repealed; the rest of the local law remains in effect, pursuant to subsection (f). Again, though, nothing in subsection (f) states clearly that that local legislation changing the method for filling commission vacancies is revived, in spite of the fact that they are unconstitutional and void *ab initio*.

To paraphrase subsection (f) as we read it, the Legislature is permitted to pass future local laws that alter or amend subsections (b) and (c), but not other subsections. A preexisting local law that would alter or amend one of the other subsections is repealed, but only to the extent that it is conflict with the other subsections. The Legislature has not signaled any intent to revive pre-existing local laws calling for vacancies on county commissions to be filled in any way other than provided for in the general law. Instead, the Legislature has continued the practice initiated in Act No. 2004-455 of prospectively allowing local laws to be passed. Additionally, because Act No. 2007-488 contains many other provisions, the Legislature has provided for a carefully crafted repeal of inconsistent provisions in existing local laws. The Legislature has not, however, revived Act No. 77-784; it remains unconstitutional to this day.

Moreover, even if the Legislature had expressed a clear intent to give effect to Act No. 77-784 with subsequent legislation, that would not have been possible. Because Act No. 77-784 violates § 105, it is void *ab initio*, and "in legal contemplation, as inoperative as though it had

12

never been passed." *Ex parte Southern Railway Co.*, 556 So. 2d at 1090. That being the case, pre-existing local laws that are unconstitutional cannot be resurrected by subsequent legislation.[4]

There is, then, no valid local law providing for a special election to fill commission vacancies in Jefferson County.[5]  Act 77-784 is unconstitutional under *Stokes*; Act 2004-455 is prospective under *Riley v. Kennedy*; and Act 2007-488 is likewise prospective. As a result, there was no basis under state law for the February 5, 2008 election. Conversely, there *was* a basis under state law for the position to be filled gubernatorial appointment: Because the local act is unconstitutional and void *ab initio*, the general law applies, and the general law provides for gubernatorial appointment. Ala. Code § 11-3-6 (Supp. 2006). The Governor is therefore entitled to the relief he requests in his Complaint in Intervention, and Commissioner Bowman is entitled to a judgment in his favor on the third-party *quo warranto* claim raised against him.

### C. Related Federal Litigation Does Not Prevent This Court from Deciding State-law Issues.

The Court asked the parties to address certain questions of federal law and the relationship of this litigation to certain Voting Rights cases filed in federal court. Although a federal court has ruled on matters of federal law with respect to the appointment of Commissioner Bowman, this Court has jurisdiction to decide all state-law issues.

The appointment of General Bowman, and the Alabama Supreme Court decisions that invalidate the local law and therefore require the appointment, were the subject of federal

---

[4] *Riley v. Kennedy* never addressed whether the Legislature could, even if it did express a clear intent that Act No. 2004-455 apply retroactively, revive a law when "in legal contemplation, as inoperative as though it had never been passed." *Ex parte Southern Railway Co.*, 556 So. 2d at 1090.

[5] Governor Riley notes that after *Riley v. Kennedy*, the Legislature passed a new local law, Act No. 2006-342, that provided for special elections to fill commission vacancies in Mobile County. The new law took advantage of the prospective application of Act No. 2004-455. However, the Legislature has taken no such action for purposes of Jefferson County.

litigation. *Plump v. Riley*, Case No. 2:07-cv-1014 (M.D. Ala., pending) (3-judge court). The issue there was whether the appointment was valid under *federal* law – Section 5 of the Voting Rights Act – when *Stokes v. Noonan* and *Riley v. Kennedy* had not been "precleared".

Under Section 5, a "covered" jurisdiction such as Alabama may not implement a change in a voting practice or procedure unless the Department of Justice ("DOJ") or the District Court for the District of Columbia "preclears" the change. The three-judge Court in *Plump* held that there had been a "change" in the procedure for filling vacancies on the county commission in Jefferson County, even if the local law providing for elections was unconstitutional under state law. Governor Riley disagrees with that decision, but nonetheless has given notice that he intends to ask DOJ to preclear the alleged change.[6]

Importantly, the federal court in *Plump* did not decide whether the appointment was valid as a matter of *state* law, and in fact expressly avoided the question:

> The court emphasizes that whether Act No. 77-784 is, in fact, unconstitutional under state law, and whether positions on the Jefferson County Commission must be filled by special election or gubernatorial appointment under state law, are questions we do not reach and this opinion should not be understood in any way as reaching.

*Plump v. Riley*, ___ F.Supp.2d ___, 2008 WL 192826 at *3 (M.D.Ala. Jan. 22, 2008).

It was proper for the federal court to defer to the Alabama Supreme Court on this state-law question. The Alabama Supreme Court is "the ultimate expositor[]" of Alabama law. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, while the federal court ruled on issues of *federal* law, it left to Alabama state courts to decide the proper method of filling vacancies under

---

[6] In a similar action involving the Mobile County local law discussed above, a three-judge court likewise held that *Stokes v. Noonan* and *Riley v. Kennedy* are "changes" that must be precleared. *Kennedy v. Riley*, 445 F.Supp.2d 1333 (M.D.Ala. 2006). Governor Riley appealed that action to the United States Supreme Court, which will hear oral argument on March 24, 2008. *Riley v. Kennedy*, No. 07-77 (United States Supreme Court, pending).

14

*state* law. The federal court ruled only that the federal government must bless the appointment (or the Alabama Supreme Court decisions requiring the appointment), but did not rule that Alabama law authorizes an election or that there must be an election.

Just as the federal court must defer to state courts on questions of state law, this Court is not asked to address questions concerning preclearance or the Voting Rights Act: "[C]ases involving the interpretation of the preclearance requirements of Section 5 of the federal Voting Rights Act are within the exclusive jurisdiction of the federal courts." *Mitchell v. City of Prichard*, 538 So. 2d 1, 2 (Ala. 1988) (quoted in *Singer v. City of Alabaster*, 821 So. 2d 954, 957 (Ala. 2001).[7]

Consequently, this Court can decide that Governor Riley's appointment was valid as a matter of state law, irrespective of its validity under *federal* law. Likewise, this Court can decide that the February 5, 2008 election was invalid as a matter of state law, irrespective of its validity under federal law (as discussed above, the federal court did not address the validity of the election under state law). And, when it comes to issuing appropriate relief, this Court does not decide whether that relief must be precleared under the Voting Rights Act. While state Courts are more than qualified to address those issues, under *Mitchell v. City of Prichard*, *supra*, those questions must be addressed by a federal court.

### D.    Additional Issues.

#### 1.    *The Date of the February Election.*

---

[7] *But see Singer*, 821 So. 2d at 959 ("When a party to a state proceeding asserts that § 5 renders the contemplated relief unenforceable, therefore, the state court must examine the claim and refrain from ordering relief that would violate federal law.") (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 269-70) (1982).

The Voter Plaintiffs (Working, Erdemir, and McGinnis) raise additional arguments in support of their position that the election was invalid. They claim, for instance, that—pursuant to the terms of Act No. 77-784—the election was held on the wrong date. That may (or may not) be true, but Governor Riley takes no position on that argument. The Court need not reach that claim if it holds that Act No. 77-784 is unconstitutional and void. If unconstitutional, then there is *no* proper date for the election.

### 2.    *Request for an Injunction Requiring a November 2008 Election.*

Assuming the governor's appointment is valid under state law (which it is), the Voter Plaintiffs alternatively request an order requiring a November election. Governor Riley opposes this request on grounds that it is premature.

Act No. 2007-488 provides that when a vacancy has been filled by appointment, the appointee serves to the next general election (in this case, November 2008). The prior law, Ala. Code § 11-3-6, as modified by Act 2004-455, provides that the Governor's appointee serves the remainder of the term of the person vacating the office. A bill now pending in the Alabama Legislature, HB110, would amend Ala. Code § 1-3-1(b) and provide that (as before) the Governor's appointee would serve out the remainder of the term of the person vacating the office. (The text of pending legislation, including HB110, and its status may be found at http://alisondb.legislature.state.al.us/acas/ACASLogin.asp.) That bill passed the house by a vote of 79 to 5, with 2 abstentions, and is pending in the Senate. The Governor notes further that a majority of the Jefferson County House Delegation voted in favor of HB110. Thus, it appears that during this legislative session, the prior law may be reinstated.

In any event, even if (at the appropriate time) Alabama law calls for a November 2008 election, there is not yet an indication that appropriate officials will fail to abide by that law. Respectfully, it is not the appropriate time for a court to enter such an injunction.

3.    *Request for an Injunction Requiring County Officials to Seek Preclearance or to Amend Preclearance Submissions.*

The Voter Plaintiffs also request an order that the Court require the Jefferson County Election Commission to seek federal preclearance of provisions permitting a November 2008 election, and to withdraw or correct their request for preclearance of the previous February 5, 2008, election. As to preclearance of a November 2008 election, the Governor notes that Act 2007-488 is a general law, applying to the entire state. The Governor therefore requests that county officials not be ordered to seek preclearance of that Act, to the extent that is part of the Voter Plaintiffs' request for relief. The practice in Alabama is that the Attorney General makes preclearance submissions for such state-wide Acts. Moreover, as discussed above, the Governor respectfully submits that the Alabama Supreme Court has declared it inappropriate for a state court to determine that a matter requires preclearance under the Voting Rights Act and to enter an order requiring that preclearance be sought.

The Governor also contends that seeking preclearance is a discretionary act for the Attorney General and is not a matter appropriate for mandamus relief. Alabama law is clear that courts will not compel an executive officer to perform his discretionary duty in a particular manner. *Piggly Wiggly No. 208, Inc. V. Dutton*, 601 So. 2d 907 (Ala. 1992). In *Finch v. State*, the Alabama Supreme Court held:

> Great care must be exercised by the courts not to usurp the functions of other departments of government. § 43, Constitution 1901. No branch of the government is so responsible for the autonomy of the several governmental units and branches as the judiciary. Accordingly we have held that courts cannot and will not interfere with the discretion vested in other units or branches of

17

government. It must be regarded as settled that the court will not interfere except
in case of fraud, corruption, or bad faith, the equivalent of fraud.

*Finch v. State*, 271 Ala. 499, 503, 124 So.2d 825, 829 (1960). *See also Professional Check
Service, Inc. v. Dutton*, 560 So.2d 755 (Ala.1990) ("mandamus will not lie to direct the manner
of exercising discretion or to compel the performance of a duty in a certain manner where the
performance of that duty rests upon an ascertainment of facts, or the existence of conditions, to
be determined by an officer in his judgment or discretion").

As to the Voter Plaintiffs' request for injunctive relief related to preclearance of the
February 5, 2008 election (which submission was made by county officials), the Governor takes
no position, but does not waive his arguments asserted in the previous paragraphs.

### 4.     *Ala. Code § 17-16-44 Does Not Divest This Court of Jurisdiction.*

Plump argues that plaintiffs should have brought this action as an election contest, and
that their failure to do so divests this Court of jurisdiction. That is incorrect. The parties here do
not challenge the qualifications of any candidate, but instead challenge the legal basis for the
election itself.

In *King v. Campbell*, ___ So. 2d ___, 2007 WL 4216544 (Ala. Nov. 30, 2007), the parties
litigated the validity of an election for Circuit Judge of Talladega County, Alabama. The issue
was whether the statute creating the Circuit Judgeship was fatally flawed. Supporters of the
election argued on appeal that § 17-16-44 divested the courts of jurisdiction because the matter
should have been brought as an election contest. The Alabama Supreme Court disagreed:
"Based upon *Dennis [v. Pranther*, 212 Ala. 449, 103 So. 59 (1925)], we conclude that litigation
challenging the consequences of a void election does not come within the sweep of the limitation
on subject-matter jurisdiction in § 17-16-44." *King v. Campbell*, ___ So. 2d at ___.

18

Like *King v. Campbell*, this case involves the consequences of a void election. It is not the type of case that must be brought as an election contest, and therefore is not barred by § 17-16-44.

## IV.    CONCLUSION

While other parties have couched this case in terms of a voting rights case, it really is not that at all. Rather, it simply is a matter of enforcing Alabama law. As shown above, Alabama law requires that vacant positions on the Jefferson County Commission be filed by appointment. There is no "right" under state law to vote for appointed positions, be it a commission vacancy, the Commissioner of the Department of Corrections, or any other position that is appointed. Governor Riley seeks only the enforcement of the law.

Based upon the foregoing, Governor Riley requests the following relief:

1. A judgment declaring that under *Stokes v. Noonan* and *Riley v. Kennedy*, Act No. 77-784 violates § 105 of the Alabama Constitution and is therefore void *ab initio*.

2. A judgment declaring that Act 2007-488 is prospective only and thus does not give effect to Act No. 77-784, a previously-passed local law.

3. A judgment declaring that the February 5, 2008 special election had no basis under Alabama law and was invalid.

4. An order permanently enjoining the Jefferson County Election Commission from taking any further action as a result of the February 5, 2008, election, including the canvassing or declaring of results.

5. A judgment declaring that the Governor's appointment of General George F. Bowman to the Jefferson County Commission was valid as a matter of state law.

6. A judgment in favor of Commissioner Bowman on the third-party *quo warranto* claim.

Respectfully submitted,

Troy King (KIN047)
Attorney General

s/ James W. Davis
James W. Davis (DAV103)
Margaret L. Fleming (FLE001)
Misty S. Fairbanks (FAI005)
Assistant Attorneys General

11 South Union Street
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Facsimile:  (334) 353-8440
mfleming@ago.state.al.us
jimdavis@ago.state.al.us
mfairbanks@ago.state.al.us

# CERTIFICATE OF SERVICE

I hereby certify that I have this 12th day of March, 2008, electronically filed the foregoing with the Clerk of the Court using the AlaFile electronic filing system, which will send notification of such filing to the following:

Charlie D. Waldrep
Susan Walker
Waldrep, Stewart & Kendrick
2323 2nd Avenue North
Birmingham, AL 35203-3807

Jeffrey M. Sewell
Asst. County Attorney
280 Jefferson County Courthouse
716 R. Arrington Jr. Blvd. N.
Birmingham, AL 35203-0121

Michael K.K. Choy
Haskell, Slaughter, Young & Rediker
1400 Park Place Tower
2001 Park Place N.
Birmingham, AL 35203-2735

Albert L. Jordan
Wallace, Jordan, Ratliff & Brandt, L.L.C.
P.O. Box 530910
Birmingham, AL 35253

James U. Blacksher
P.O. Box 636
Birmingham, AL 35201

Edward Still
Edward Still Law Firm
Suite 201
2112 11th Avenue South
Birmingham, AL 35203-3352

Walter E. Braswell
2101 4th Avenue So., #200
Birmingham, AL 35233

Also, I have served by U.S. mail the following:

Anne-Marie Adams, Clerk
Jefferson County Circuit Court
4th Floor Jeff. County Courthouse
716 R. Arrington Blvd. N.
Birmingham, AL 35203

Commissioner George Bowman
Suite 240
Jefferson County Commission
Jefferson County Courthouse
716 R. Arrington Blvd. N.
Birmingham, AL 35233

s/ James W. Davis
James W. Davis (DAV103)
Assistant Attorney General
11 South Union Street
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Facsimile: (334) 353-8440
jimdavis@ago.state.al.us

21

No. 07-77

In the
## Supreme Court of the United States

HONORABLE BOB RILEY, as Governor of the State
of Alabama,
*Appellant,*

v.

YVONNE KENNEDY, JAMES BUSKEY and WILLIAM
CLARK,
*Appellees.*

On Appeal from the United States District Court
for the Middle District of Alabama

## REPLY BRIEF FOR APPELLANT

TROY KING
*Attorney General*
MARGARET L. FLEMING
JAMES W. DAVIS
MISTY S. FAIRBANKS
*Asst. Attorneys General*
STATE OF ALABAMA
11 South Union Street
Montgomery, AL 36130
(334) 242-7300

KEVIN C. NEWSOM
*Counsel of Record*
MATTHEW H. LEMBKE
JOHN C. NEIMAN, JR.
ANDREW L. BRASHER
BRADLEY ARANT ROSE
& WHITE LLP
1819 Fifth Avenue North
Birmingham, AL 35203
knewsom@bradleyarant.com
(205) 521-8803

*Attorneys for Appellant*

March 11, 2008

EXHIBIT
O
PENGAD 800-631-6989

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................iii

REPLY BRIEF ...................................................1

I.   The Court Has Jurisdiction Over This
     Appeal. ..................................................1

II.  The Alabama Supreme Court's Decisions in
     *Stokes* and *Riley* Were Not Section 5
     "Changes."..............................................2

     A.   The Appellees' Efforts To Recharacterize
          the Case Are Unavailing.........................2

     B.   No Source of Statutory Meaning
          Supports the District Court's
          Interpretation........................................7

          1.   Section 5's text refutes the district
               court's interpretation. .....................7

          2.   Section 5's history and purposes
               undermine the district court's
               interpretation. ................................9

          3.   DOJ's Section 5 regulations cannot
               save the district court's
               interpretation. ...............................11

          4.   This Court's precedent provides no
               support for the district court's
               interpretation. ...............................13

ii

C.  The District Court's Interpretation
    Impermissibly Exacerbates Federalism
    Costs. ........................................................ 16

    1.  Nullification of state-court
        judgments. ........................................ 16

    2.  Commandeering. ............................... 18

    3.  Congruence and proportionality. ........ 19

D.  The District Court's Interpretation Is
    Unworkable and Unnecessary. ...................... 20

III. *Young v. Fordice* Provides an Alternative
     Basis for Reversal. ....................................... 21

CONCLUSION ................................................... 22

iii

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Envtl. Conservation v. EPA*
   540 U.S. 461 (2004) ............................................................. 6

*Berry v. Doles*
   438 U.S. 190 (1978) ............................................................. 1

*Branch v. Smith*
   538 U.S. 254 (2003) ............................................... 13, 14, 15

*City of Boerne v. Flores*
   521 U.S. 507 (1997) ........................................................... 19

*City of Lockhart v. United States*
   460 U.S. 125 (1983) .................................................. 1, 15, 16

*Danforth v. Minnesota*
   128 S. Ct. 1029 (2008) ........................................................ 5

*DeKalb County LP Gas v. Suburban Gas*
   729 So. 2d 270 (Ala. 1998) ................................................. 6

*Eccles v. Gargiulo*
   497 F. Supp. 419 (E.D.N.Y. 1980) ................................... 5

*Gregory v. Ashcroft*
   501 U.S. 452 (1991) ............................................................. 6

*Hathorn v. Lovorn*
   457 U.S. 255 (1982) ............................................... 13, 14, 15

*Hayburn's Case*
   2 U.S. (2 Dall.) 409 (1792) ............................................... 17

iv

*Lopez v. Monterey County*
  519 U.S. 9 (1996) .................................................................. 1

*Marbury v. Madison*
  5 U.S. (1 Cranch) 137 (1803) .......................................... 14

*New York v. United States*
  505 U.S. 144 (1992) ......................................................... 18

*Opinion of the Justices No. 338*
  624 So. 2d 107 (Ala. 1993) ................................................ 3

*Perkins v. Matthews*
  400 U.S. 379 (1971) ............................................... 1, 15, 16

*Reno v. Bossier Parish Sch. Bd.*
  528 U.S. 320 (2000) ..................................................... 6, 16

*Reno v. Condon*
  528 U.S. 141 (2000) ......................................................... 18

*Republican Party v. White*
  536 U.S. 765 (2002) ........................................................... 6

*Riley v. Kennedy*
  928 So. 2d 1013 (Ala. 2005) ..................................... passim

*Shannon v. United States*
  512 U.S. 573 (1994) ......................................................... 11

*Stokes v. Noonan*
  534 So. 2d 237 (Ala. 1988) ....................................... passim

*Supreme Court v. Consumers Union*
  446 U.S. 719 (1980) ......................................................... 10

v

*Webber v. White*
   422 F. Supp. 416 (N.D. Tex. 1976)....................................5

*Williams v. Sclafani*
   444 F. Supp. 895 (S.D.N.Y. 1977).....................................5

*Young v. Fordice*
   520 U.S. 273 (1997).......................................................8, 21

## Constitutions and Statutes

U.S. Const. Art. II, §2..........................................................3

U.S. Const. amend. XIV ....................................................21

U.S. Const. amend. XV .....................................................21

Voting Rights Act of 1965, 42 U.S.C. §1973, *et seq.*

   Section 2
      42 U.S.C. §1973(a).......................................................21

   Section 4
      42 U.S.C. §1973b..........................................................11

   Section 5
      42 U.S.C. §1973c...................................................passim

Ala. Const. Art. IV, §105...................................................10

Ala. Const. Art. VI, §140...................................................22

Ala. Code §11-3-6...............................................................3

Ala. Act No. 85-237......................................................passim

vi

## Regulations

28 C.F.R. §51.2.....................................................................12

28 C.F.R. §51.12............................................................11, 12

46 Fed. Reg. (1981)..............................................................12

52 Fed. Reg. 486 (1987).......................................................12

1

## REPLY BRIEF

### I.  The Court Has Jurisdiction Over This Appeal.

On jurisdiction, the sole remaining dispute is whether the district court's August 2006 order was a final judgment.  As the Government has correctly recognized (U.S. Br. 10–12), it was not.

Rather than respond to the points raised in our opening brief, the appellees have advanced a new argument—namely, that the district court entered a "remedy," and thus "conclusively resolved" the third prong of the coverage analysis under *City of Lockhart v. United States*, 460 U.S. 125, 129 n.3 (1983), when it "afford[ed] Alabama an opportunity to obtain preclearance."  Red Br. 26.  For support, the appellees cite decisions of this Court observing that when an unprecleared change has already been implemented, "it might be appropriate for the district court to afford local officials an opportunity to seek federal approval" before undoing the change. *Lopez v. Monterey County*, 519 U.S. 9, 21 (1996) (citing *Berry v. Doles*, 438 U.S. 190 (1978), and *Perkins v. Matthews*, 400 U.S. 379 (1971)).

Those decisions, though, have nothing to do with finality.  They merely confirm an uncontroversial proposition—that it was "appropriate" for the district court to give the State an opportunity to preclear *Stokes v. Noonan* and *Riley v. Kennedy* before proceeding further with the case.  But the fact that the district court acted *appropriately*—or even that its sensible decision to allow the State time might plausibly be described as a "remedy," Red Br. 27—does not mean that it acted *finally*.  There are all kinds of appropriate remedies that do not finally resolve litigation—orders compelling discovery,

2

transferring cases, etc.  Particularly given that the August 2006 order contemplated "revisit[ing] the issue of remedy" (J.S. App. 9a), that order's allowance of time cannot be deemed a "final" decision requiring immediate appeal.[1]

## II.  The Alabama Supreme Court's Decisions in *Stokes* and *Riley* Were Not Section 5 "Changes."

### A.  The Appellees' Efforts To Recharacterize the Case Are Unavailing.

Before getting into the particulars on the merits, we need to reset the stage briefly.  The appellees seek to sidestep many of the key issues by reframing the case in two significant respects.  The first of these moves mischaracterizes the question presented, and the second mischaracterizes our position.

1.  The appellees first try to recast this as a routine §5 case in which the Alabama Supreme Court was, at most, only incidentally involved.  They repeatedly assert that Governor Riley just "decided"—seemingly on his

---

[1] The appellees' amicus Lawyers' Committee asserts that this case is moot; even if Governor Riley were to prevail, it says, the district court would have no authority to reinstate Juan Chastang to his rightful position.  That is incorrect.  If §5 did not require preclearance of the *Stokes* and *Riley* decisions on which Chastang's appointment was based, then Chastang should never have been removed, there should never have been a special election in October 2007, and Chastang should be serving as a commissioner today.  Reversal here, as the Government has explained, would nullify the district court's judgment and lead to Chastang's "reinstate[ment] to complete his term, which runs through November 2008."  U.S. Br. 5 n.1.  The Lawyers' Committee points to no principle of law or equity that would prevent the district court from remedying the wrong resulting from its own erroneous order.

3

own—to fill the commission vacancy by appointment rather than special election and, therefore, that this case is no different from any other in which a state legislature opts to replace an elected office with an appointed one. *See* Red Br. 1, 2, 15, 33, 35, 47; *accord* U.S. Br. 12.

The strategy behind that move is understandable enough. The notion that a federal executive-branch official might be empowered to veto a state court's exercise of judicial review (as opposed to a legislator's or administrator's policy choice) is what heightens the federalism concerns here and makes this §5 case so different from all that have come before it. But the appellees' recharacterization has no basis in reality. In filling the commission vacancy, Governor Riley was not choosing willy-nilly between appointments and elections. To the contrary, he was obeying the clear mandate of the Alabama Supreme Court, which had definitively held in *Stokes* (and then reconfirmed in *Riley*) that, under applicable Alabama law, vacancies on the Mobile County Commission "*shall* be filled by appointment by the Governor*."* Ala. Code §11-3-6 (J.A. 118) (emphasis added). Governor Riley could not have ignored that court's judgment without violating fundamental state separation-of-powers principles. *See Opinion of the Justices No. 338*, 624 So. 2d 107, 110 (Ala. 1993) (political branches are bound by "an order issued by a court of competent jurisdiction that interprets the constitution"). In the wake of *Stokes* and *Riley*, Governor Riley no more "decided" to fill the commission vacancy by appointment than the President "decides" to fill vacancies on this Court by appointment. *See* U.S. Const. Art. II, §2.

It is thus unsurprising that this case has always been about whether §5 required preclearance of the Alabama

4

Supreme Court's decisions. That is how the appellees argued the case to the district court. *See, e.g.*, Doc. 15, p. 2 ("Decisions of state courts modifying election procedures are 'changes' that must be submitted for preclearance."). That is how the district court decided the case. *See, e.g.*, J.S. App. 1a ("[T]his three-judge court held that two Alabama Supreme Court decisions, *Stokes v. Noonan* and *Riley v. Kennedy*, must be precleared before they can be implemented." (citations omitted)); *id.* at 3a, 4a, 5a, 6a, 7a–8a (all same). And that is how DOJ's Voting Section understood the case, too. *See, e.g.*, M.D.A. App. 3a (The district court "rul[ed] that the State of Alabama submit the two decisions for preclearance under Section 5."). In any event, whatever formalism the appellees might want to introduce now, it is clear that the *effect* of the district court's decision is to require preclearance of *Stokes* and *Riley*.

    2. Having initially mischaracterized the case as having *nothing* to do with state-court decisions, the appellees then mischaracterize our position as seeking to exclude *all* state court decisions—indeed, any alteration in voting practices in which a state court is in any way "involved"—from §5's scope. *See* Red Br. 34–44.

    The appellees are tilting at windmills. We are *not* asking the Court to hold that all state-court orders, no matter the circumstances, fall outside §5's scope. Nor is anyone else, for that matter. The amici States, to be sure, have urged the Court to read §5 so as not to reach "state courts' interpretations of state laws affecting voting"—at least those interpretations resulting from "purely judicial rather than legislative decision-making." States Br. 27–32. That argument has considerable force. It finds support not only in the traditional view (recently

5

reaffirmed by this Court) that courts declare rather than *change* the law, *see Danforth v. Minnesota*, 128 S. Ct. 1029, 1035 (2008), but also in the fact that it was explicitly embraced by a number of courts in the 1970s and thus arguably ratified by Congress when it reenacted §5 in 1982.[2]

But the Court needn't go even that far to decide this particular case. It need only hold, as we have argued, that at the very least, when (as here) a state court exercises *Marbury*-like judicial review to declare a previously-precleared state statute unconstitutional, it does not "change" state law within the meaning of §5 practice so as to require fresh approval. *See* Blue Br. 15, 22–23, 25, 27, 32–33, 34, 38, 41, 43.

That being so, many of the appellees' counterarguments simply evaporate. Most are aimed at their own broad-brush caricature, and do not respond to the more limited argument that we have actually made. Most conspicuous, perhaps, is the appellees' persistent suggestion that the Alabama Supreme Court's decisions in *Stokes* and *Riley* are indistinguishable from a naked "policy choice[]" by one of the political branches. Red Br. 2, 36, 51; *accord* U.S. Br. 32. While some court decrees might be so legislative in character that they could plausibly be described as pure policymaking, a state court's exercise of judicial review—at issue here—is not just politics by

---

[2] *See Williams v. Sclafani*, 444 F. Supp. 895, 904 (S.D.N.Y. 1977) ("[T]he text of §5 and what little legislative history there is seems to indicate that the statute was directed against the legislative and executive branches of state governments, and certainly does not indicate that it was intended to cover state court decrees."); *accord Webber v. White*, 422 F. Supp. 416, 427 (N.D. Tex. 1976) (same); *Eccles v. Gargiulo*, 497 F. Supp. 419, 422 (E.D.N.Y. 1980) (same).

6

some other name. *See DeKalb County LP Gas v. Suburban Gas*, 729 So. 2d 270, 276 (Ala. 1998) ("[I]t is our job to say what the law is, not to say what it should be."); *see also Republican Party v. White*, 536 U.S. 765, 798 (2002) (Stevens, J., dissenting) ("There is a critical difference between the work of the judge and the work of other public officials."). And the fact that Alabama's judges are elected, rather than appointed, does not change that basic truth. *See id.* at 796 (Kennedy, J., concurring).

\* \* \*

So this case *is* about state-court decisions. But it is not about *all* state-court decisions. The question, rather, is whether §5 can reasonably be read to cover *these* state-court decisions. The answer is no. Because extending §5 to require preclearance of *Stokes* and *Riley* would "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts," *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 336 (2000) (citation omitted), and because there is no "clear instruction from Congress" that it actually intended §5 to intrude so deeply into state judicial business, *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 513 (2004) (Kennedy, J., dissenting) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)), the district court's novel interpretation cannot stand.

7

## B. No Source of Statutory Meaning Supports the District Court's Interpretation.

### 1. Section 5's text refutes the district court's interpretation.

The appellees appear, at first glance, to be hawkish on §5's text. "Both the word 'whenever' and the word 'any'" in §5, they say, "show that Congress required preclearance of *all* voting changes made by covered jurisdictions." Red Br. 35; *accord* U.S. Br. 13 (same). But the appellees' hawkishness is selective, for they ignore the balance of what §5 says.

a. The appellees fail even to mention §5's "savings clause," which states that neither administrative nor judicial preclearance "shall bar a subsequent action to enjoin enforcement" of the precleared practice. 42 U.S.C. §1973c(a). As we have explained, DOJ has interpreted that provision to authorize individuals to "'challenge [the precleared] practice under any applicable provision of *state ... law.*'" Blue Br. 28–30 (citations omitted). We argued in our opening brief that "[i]t would be odd indeed" if the very sort of court decision that §5 sanctions—namely, one like *Stokes*, invalidating a precleared statute on a non-§5 ground—"was itself a 'change' that required a fresh approval." Blue Br. 27. In response, the appellees—and their amicus DOJ—have said nothing. Their silence is deafening, and it belies their assertion that we are seeking an "exemption" that Congress "did not bother to write into the statute." Red Br. 42.

b. While trumpeting §5's "plain" and "categorical" language, the appellees likewise repeatedly omit any reference to the fact that, by its terms, the statute requires preclearance of a voting practice "different from that in

8

force or effect on November 1, 1964." *See, e.g.*, Red Br. 2, 22, 32, 35. Here, the appellees don't so much ignore our position as they misstate it. Time and again, they caricature "the Governor's argument" as urging a per se rule "that a change is exempted from the preclearance requirement [if] it returns to a practice in place in 1964." *Id.* at 49; *accord id.* at 44, 46, 47. The appellees are attacking a straw man.

Our contention, as we have already said, is not that the Court needs to rethink prior dicta suggesting that, despite its language, §5 operates like a ratchet to subsume newly-precleared practices into a moveable baseline. *See, e.g.*, *Young v. Fordice*, 520 U.S. 273, 282 (1997) ("Regardless, none of the parties asks us to look further back in time than 1994 ...."). Perhaps in the ordinary course of business—where a legislative or administrative change is at issue—§5's text should be read to embody an unwritten "assumption" that baselines can "advance as voting practices progress[] in covered jurisdictions." U.S. Br. 16. That question is not before the Court, and we take no position on it.

This, though, is no ordinary §5 case. The question here is whether by declaring Act No. 85-237 unconstitutional and void in *Stokes* (and then declining to revive it in *Riley*), the Alabama Supreme Court "changed" state law within the meaning of §5 practice. With respect to that question, we cite the "November 1, 1964" language simply to establish these points:   (1) In deciding this case—which presents new and troubling federalism issues—the Court should consult all relevant textual clues for some clear indication that Congress actually intended §5 to extend so far; and (2) §5's text *cannot* provide that clear indication with respect to *Stokes* and *Riley*, which

9

indisputably reaffirmed the practice (gubernatorial appointment) in place "on November 1, 1964."

### 2.   Section 5's history and purposes undermine the district court's interpretation.

Because the district court's decision cannot be squared with a plain reading of §5's text, one might have expected the appellees to come forward with unambiguous support from §5's legislative history and underlying purposes. They haven't.

Instead, while disregarding the 1965 House and Senate Reports—both of which plainly state that §5 was intended to address changes effected by "'statute or administrative acts,'" Blue Br. 33 (citations omitted)—the appellees cite a handful of Jim-Crow-era episodes in which state judges engaged in blatantly discriminatory behavior. *See* Red Br. 4–7, 42; NAACP Br. *passim.* The point, presumably, is to show that although Congress didn't say so, it must have been motivated by a belief about "the role state courts had played in the exclusion of black citizens" (Red Br. 42) and, accordingly, that an across-the-board "exemption of state court orders" (NAACP Br. 4) would be contrary to the purposes that underlay §5. There are two problems with that line of analysis.

As an initial matter, it responds to an argument we haven't made—namely, that *all* state-court orders, of whatever stripe, fall outside §5's ambit. The cited anecdotes involve conduct that (while engaged in by judges, to be sure) bears no resemblance to the Alabama Supreme Court's decisions in *Stokes* and *Riley.* For instance, in "crafting" and "promulgat[ing]" several literacy tests during the 1950s and 1960s (Red Br. 5–6;

10

NAACP Br. 18–21), the Alabama Supreme Court was not even exercising a judicial function but, rather, was wielding a delegated legislative power. *Cf. Supreme Court v. Consumers Union*, 446 U.S. 719, 731 (1980) (promulgation of a state bar code, even if a "proper function of the Virginia [Supreme] Court," was not a "judicial function" but a "legislative" task). Nor do the instances in which state-court judges issued "extra-jurisdictional decrees and orders" (for instance, to "impound[]" voter-registration records) in an effort to thwart federal investigations have any bearing here. NAACP Br. 21, 23–24; Red Br. 6. Those incidents, in which renegade judges abandoned their judicial roles, shed no light on how Congress would have approached, for example, the Alabama Supreme Court's jurisdictionally-appropriate (and concededly correct) adjudication in *Stokes* that Act No. 85-237 violated a race-neutral, generally-applicable provision of the state constitution.[3]

Moreover, only two of the episodes that the appellees and their amici cite seem to have been mentioned anywhere in the legislative record—and then, only very obliquely. First, the appellees assert that "[b]oth committee reports accompanying the Voting Rights Act" denounced "the Alabama Supreme Court's [literacy] test."

---

[3] The appellees' effort (Red Br. 12 n.8) to deny the race-neutrality of Alabama Constitution §105, which generally prohibits "local law[s]" that conflict with "general law[s]," is baseless. Their historical argument rests on a fundamental misunderstanding of the difference between "home rule" (*i.e.*, the power of municipalities to make their own laws) and local laws (*i.e.*, enactments of the State Legislature pertaining to matters of purely local concern). In fact, "[t]he prohibition on special laws has been enshrined in the constitutions of no fewer than 30 states," and, in Alabama specifically, "the rule has been applied to a range of state and local laws that address ... diverse topics." Fried & Phillips Br. 19–20

11

Red Br. 6. To be sure, the reports condemned southern States' use of literacy tests. And unsurprisingly so; one of the Voting Rights Act's chief objectives— accomplished not by §5 but by §4—was to ban literacy tests outright in covered jurisdictions. But it simply is not a fair characterization of the record to suggest that Congress was in any way focused, in particular, on the Alabama Supreme Court's role in the creation of Alabama's test. Likewise, the appellees' attempt to leverage Attorney General Katzenbach's general introductory remarks "describing the activities of Alabama Circuit Judge James Hare" (Red Br. 42) into a particularized concern about state courts' exercises of judicial review falls well short. In fact, a review of Katzenbach's testimony reveals that it does not mention Hare by name or, for that matter, even use the word "judge" or "court."

In any event, reliance on these generalized references would be a most tenuous basis upon which to fix §5's meaning, in that neither "purport[s] to explain or interpret" §5 specifically. *Shannon v. United States*, 512 U.S. 573, 583 (1994). The legislative history addressing §5's meaning, in particular, confirms that the preclearance requirement does not extend to state-court decisions like *Stokes* and *Riley*. *See* Blue Br. 33-34.

### 3. *DOJ's Section 5 regulations cannot save the district court's interpretation.*

In the face of §5's text and legislative history, the appellees and their amici ask the Court to defer to a DOJ regulation, 28 C.F.R. §51.12. Their reliance is misplaced for two reasons.

First, §51.12 speaks to a question that is not presented here. That regulation states that "[a]ny change

12

affecting voting, even though it ... returns to a prior practice or procedure ... must meet the Section 5 pre-clearance requirement." The appellees and the Government emphasize language in the *Federal Register* indi-cating that §51.12 was intended to clarify that §5 covers a "voting change that returns a jurisdiction to a practice that was previously in effect (*e.g.*, to that in use on No-vember 1, 1964)." 52 Fed. Reg. 486, 488 (1987). But even if the explanation in the *Federal Register* could be deemed dispositive of that question—and, as explained below, there is good reason to think it shouldn't be—it would resolve nothing here. The issue in this case, again, is not whether a legislative or administrative return to a 1964 coverage-date practice automatically precludes §5 scrutiny but, rather, whether a state court's exercise of judicial review to invalidate a previously-precleared statute as unconstitutional is properly understood to be a "change" within the meaning of §5 practice. With re-spect to *that* question, the regulations are intentionally silent: They expressly decline to address "[t]he issue of the status of changes resulting from orders of State courts." 46 Fed. Reg. 870, 872 (1981).

Second, and at any rate, the explanation on which the appellees and the Government rely renders §51.12 internally incoherent. The phrase "change affecting vot-ing," which triggers §51.12's application, is a defined term. Specifically, it is defined to mean a practice "dif-ferent from that in force or effect *on the date used to de-termine coverage*"—which, here, is November 1, 1964. 28 C.F.R. §51.2 (emphasis added). Thus, according to the appellees and the Government, §51.12 should be un-derstood as follows: "Any [practice different from that in force or effect on November 1, 1964], even though it [is the same as that in use on November 1, 1964], must meet

13

the §5 preclearance requirement." The incomprehensibility of that reading is reason enough for refusing deference.

### 4. *This Court's precedent provides no support for the district court's interpretation.*

a. *Branch* and *Hathorn*. The Government contends that *Branch v. Smith*, 538 U.S. 254 (2003), and *Hathorn v. Lovorn*, 457 U.S. 255 (1982), "resolve the question here as a matter of *stare decisis*." U.S. Br. 15. That is incorrect. The Government's argument, like so many of the arguments in the bottom-side briefs, rests on a misunderstanding of our position as urging exclusion of *all* state court decisions from §5's ambit. U.S. Br. 9, 14, 27, 29, 31, 32.

To be sure, dicta in *Branch* and *Hathorn*[4] would seem to require preclearance of a state-court order that enforces an unprecleared legislative (or quasi-legislative) change and thus gives rise to a wholly new voting practice. But that is not what happened in this case. And because the mere "presence of a court decree does not exempt the contested change from §5," *Hathorn*, 457 U.S. at 265 n.16, those cases would likely defeat an argument that *any* "state court[] involvement" (Red Br. 33) magically immunizes a purported change from §5 scrutiny. But that is not our argument. With respect to our much narrower contention, *Branch* and *Hathorn* have little, if any, relevance.

---

[4] The coverage question was not "dispute[d]" in either case. *Branch*, 538 U.S. at 262; *Hathorn*, 457 U.S. at 265. In both, "the controversy pertain[ed]" to a different issue. *Branch*, 538 U.S. at 262.

14

Though the appellees insist otherwise, there is a real and discernible difference between what the Alabama Supreme Court did in *Stokes* and what the Mississippi courts were doing in *Branch* and *Hathorn*. It is the difference between, on the one hand, a court exercising its core judicial "duty" to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and, on the other, a court ordering enforcement of a change that is fundamentally legislative in character. Redistricting, at issue in *Branch*, entails much more than the invalidation of an existing law; it requires a court to draw up a new electoral scheme. Accordingly, this Court has consistently described redistricting as a *legislative* task, even when undertaken by a court. Blue 43–44 (citing cases). And in *Hathorn*, both the petitioner and the Government characterized the court-ordered enforcement of an uncleared election statute as "legislative" change. Br. for Petitioner at 6, *Hathorn*; Br. for U.S. at 11, 17–18 & nn.15–16, *Hathorn*. (When this Court said in *Hathorn* that §5 required preclearance of the "'policy choices of the elected representatives of the people,'" it was referring to the Mississippi *Legislature's* policy choices, not the Mississippi Supreme Court's. 457 U.S. at 265 n.16 (citation omitted).)

There is one final point: The appellees and the Government both quote the statement in *Branch*—as if it resolved this case—that §5 requires preclearance of "*all* voting changes" and "includes voting changes mandated by order of a state court." 538 U.S. at 262. That language, though, doesn't answer the question presented here, but rather invites it. We do not dispute that *when* a state-court order can fairly be deemed a §5 "change," it requires preclearance. The question here, however, is antecedent: *Can* the particular state-court decisions at

15

issue in this case fairly be deemed §5 "changes"? On that question, *Branch* and its predecessor *Hathorn*, which dealt with very different kinds of state-court orders, have no bearing.

b. *Perkins* and *Lockhart*. Both *Perkins v. Matthews*, 400 U.S. 379 (1971), and *City of Lockhart v. United States*, 460 U.S. 125 (1983), addressed the question whether an invalid state practice actually "in ... effect" *on the statutory coverage date* establishes a §5 baseline, and not the textually and analytically different question whether a practice precleared *after the coverage date* remains frozen in place even after a state court has voided it on constitutional grounds. Unable or unwilling to come to grips with that distinction, the appellees simply ignore it. Their quotation from *Perkins* omits the words "on November 1, 1964" from the critical passage, and their quotation from *Lockhart* uses an ellipsis to cover over the words "on November 1, 1972." Red Br. 50.

As we have explained (Blue Br. 41), limiting *Perkins* and *Lockhart* to coverage-date baselines makes textual sense. It follows not only from the words "on November 1, 1964," but also from §5's savings clause, which states that preclearance will not protect a statute against a "subsequent action to enjoin enforcement," including, according to DOJ's own interpretation, an action based on "any applicable provision of state ... law." *See supra* at 7. That clause—which by its terms applies *only* to the post-1964 preclearance regime and not to the pre-1964 coverage-date regime—authorizes state-court decisions (like *Stokes* here) invalidating previously-precleared statutes (like Act No. 85-237) on state-law grounds. Extending *Perkins* and *Lockhart* beyond coverage-date

16

baselines, and reading them to justify ignoring a state court's judgment that a precleared statute violates the state constitution, would unjustifiably circumscribe the savings clause's field of operation.

The appellees likewise have not met our argument that limiting *Perkins* and *Lockhart* to coverage-date baselines makes historical sense. In the years immediately surrounding §5's enactment, Congress was facing a "constantly moving" target (Blue Br. 42) as a result of States' intentional manipulation of voting laws. As the appellant in *Perkins* explained the problem, in that era "[s]udden adherence to previously ignored laws [was] a familiar discriminatory device." Br. for Appellants at 18 n.9, *Perkins*. But the historical warrant for ignoring state law no longer exists. Despite the appellees' speculation, there is no indication that, today, baselines are being "manipulated to discriminatory effect." Red Br. 50 n.25. That is particularly true when, as here, a practice's invalidity under state law has been authoritatively adjudicated by a State's highest court, thus eliminating the risk of gamesmanship.

## C. The District Court's Interpretation Impermissibly Exacerbates Federalism Costs.

Seeking to avoid the rule that §5 should be interpreted so as not to "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts," *Bossier Parish*, 528 U.S. at 336, the appellees insist that the district court's interpretation does not "pose any federalism problem" that does not arise in the typical §5 case. Red Br. 51. We disagree.

1. *Nullification of state-court judgments.* This Court's §5 decisions have never sanctioned the "federal-

17

ism-and-separation-of-powers double-whammy" (Blue Br. 23) that the district court's decision here entails—in which a state court's exercise of judicial review is subject to the veto of a federal executive-branch official. That sort of intrusion has been altogether absent from the mine run of §5 cases, which have asked only whether DOJ can block an ordinary "policy choice" embodied in a state legislative or administrative rule. The district court's interpretation—which would for the first time permit a state court's truly judicial "judgments ... [to be] revised and controuled ... by an officer in the executive department," *Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 n.* (1792)—would represent a quantum expansion of §5's scope.

The appellees have offered no response at all to this point, and the Government's answer exalts form over substance. The district court's interpretation, the Government asserts, doesn't *technically* "subject[] state supreme courts to the 'insult' of having their 'authoritative determinations of state law' reviewed by employees of the federal executive branch" because DOJ doesn't *technically* "review the [state] court's interpretation of state law for correctness." U.S Br. 25. Even if the distinction the Government posits made sense on some theoretical level, it matters none in practice. Regardless of the reason DOJ gave here, the real-world effect of its review was to nullify the Alabama Supreme Court's decision in *Stokes*. The court there had held that Act No. 85-237 violated a race-neutral provision of the Alabama Constitution and was thus void; DOJ, by contrast, decreed that Act No. 85-237 "remain[ed] in full force and effect." M.D.A. App. 5a, 12a. Accordingly, despite having been binding state law for nearly 20 years, the Alabama Supreme Court's judgment in *Stokes* is no longer worth the

18

paper it is printed on. The well-settled doubts about an executive official's authority to countermand a federal-court judgment ought to apply doubly when a state-court judgment is at issue.

2. *Commandeering.* The appellees and the Government seek to avoid the anti-commandeering doctrine by recasting this as a straightforward preemption case—one in which a federal statute merely "'regulate[s] state activities,' rather than 'seek[s] to control or influence the manner in which States regulate private parties.'" *Reno v. Condon*, 528 U.S. 141, 150 (2000) (citation omitted). But the district court did not interpret §5 as setting a substantive *federal* standard requiring special elections. Instead, the district court interpreted §5 as requiring States to maintain and enforce *state* election practices that their own constitutions forbid. This Court has "always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York v. United States*, 505 U.S. 144, 166 (1992).

The appellees' response misses the point. The fact that a State may be forced to maintain a practice "that it would prefer to change" is, they say, "the very essence of Section 5, an essence that this Court has repeatedly reaffirmed." Red Br. 54. But this is not a case about States being made to select among a range of permissible policy "prefer[ences]." This is a case about States being made to act in ways that violate their own organic law. As we have already explained, it is one thing for §5 to require a State (as it often does) to keep in place a law "that it *does not want to have.*" Blue Br. 47. It would be quite another thing if §5 were broadened to force a State "to

19

keep a law that the ultimate arbiter of state law has de-
finitively determined it *cannot constitutionally have*."
*Id.* The district court's interpretation, which the appel-
lees have conceded has that effect (Red Br. 51; M.D.A.
10, 21, 23), turns up the commandeering volume substan-
tially.

    3. *Congruence and proportionality.* This Court's §5
decisions have never steered the statute into contexts in
which the record before Congress established no particu-
larized need for federal intervention—and thus into ar-
eas in which §5, as applied, might not be congruent and
proportional under *City of Boerne v. Flores*, 521 U.S. 507
(1997). The appellees' anecdotal references to the dis-
criminatory conduct of several state-court judges in the
lead-up to the Voting Rights Act's passage do not
pass *Boerne* muster. As we have shown, the several epi-
sodes the appellees now cite (disgraceful though they
were) are not relevant to the question actually presented
in this case. *See supra* at 9-11. And, in any event, no fair
reading of the legislative record could justify the infer-
ence that Congress actually grounded §5 on those epi-
sodes. *Id.* Given the absence of record evidence that
state courts' exercises of judicial review, specifically,
posed a serious threat to voting rights, an interpretation
that stretched §5 so far would raise doubts about its as-
applied constitutionality.

    There is no merit to the suggestion that clear-
statement and constitutional-avoidance arguments are
off-limits here on the ground that the "District Court for
the District of Columbia has exclusive jurisdiction over
challenges to the constitutionality of Section 5." U.S. Br.
24 n.2. This case presents no such challenge, and noth-
ing in the Voting Rights Act precludes this Court from

20

considering, in determining what §5 means, well-established interpretive doctrines.

### D. The District Court's Interpretation Is Unworkable and Unnecessary.

1. In an attempt to argue that this case is simply §5 business as usual, the Government has pointed to evidence that certain state-court orders have, in practice, been submitted for preclearance under §5. Overwhelmingly, however, the sorts of orders to which the Government points are administrative and quasi-legislative court decrees that are well beyond the scope of the question presented here. In particular, the Government refers to state-court orders prescribing the form and content of voter-registration forms, approving annexations, formulating redistricting plans, and setting election schedules. U.S. Br. 29–30. If we were actually arguing here that §5 should be read to entail a categorical exemption for *all* state-court orders, the Government's laundry list might pack a punch. But we aren't, and so it doesn't.

A bit closer to the point, the Government cites two §5 submissions concerning "court decision[s] interpreting state law." *Id.* at 31. But those two submissions cannot overcome the fact that there have surely been scores of such decisions handed down during the last 40+ years that have *not* been submitted for federal approval. (And with good reason; there has been no basis for believing that they *needed* federal approval.) At the end of the day, the point remains that a decision by this Court subjecting state courts' ordinary exercises of judicial review to preclearance would open up a new universe of §5 liti-

21

gation and would dramatically increase the burdens on covered jurisdictions. *See* States Br. 12–19.

2. Nor have the appellees or their amici shown that there is a need for the district court's novel interpretation in light of the "panoply of established remedies for enjoining discriminatory voting practices." Blue Br. 50. The hypotheticals spun by the ACLU prove our point. It claims that our position would allow covered jurisdictions to "revert" to "discriminatory ... system[s] of elections"—and, indeed, to "segregated polling places"—"free and clear of Section 5." ACLU Br. 18. The conclusive rejoinder is that such practices would be immediately remedied under either §2 of the Voting Rights Act, the Fourteenth Amendment, or the Fifteenth Amendment. There is simply nothing to the appellees' assertion that our position would somehow "'open[] a loophole in the statute the size of a mountain.'" Red Br. 42.

## III. *Young v. Fordice* Provides an Alternative Basis for Reversal.

In our opening brief, we urged, as a stand-alone basis for reversal, that even if decisions like *Stokes* and *Riley* could sometimes be deemed §5 changes, *Stokes* and *Riley* themselves cannot be. The reason, we explained, is that under this Court's decision in *Young v. Fordice*, 520 U.S. 273 (1997), Act No. 85-237 was never "in force or effect" because the Alabama Supreme Court voided it at the earliest possible juncture. Blue Br. 51–56. In a conclusory response, the appellees continue to seek to avoid *Young* on grounds that we have already shown do not give rise to valid distinctions—*e.g.*, that the voter-registration plan there "had not been actually enacted into law." Red Br. 51.

22

The Government's answer on *Young* actually makes our case. The Government *admits* that it would be inappropriate to "us[e] a procedure as a relevant baseline for measuring retrogression if that procedure were so obviously unconstitutional that it was immediately enjoined and never went into effect." U.S. Br. 23–24. This case is different, the Government says, because Act No. 85-237 was "approved by a trial court and put into effect by an election." *Id.* at 24. The Government concedes, in other words, that if the trial court in *Stokes* had invalidated Act No. 85-237 and enjoined the 1987 special election—as we now know it should have—the 1985 act would "not constitute a baseline under *Young*." *Id.* But because the trial court erroneously allowed the election to proceed, the argument goes, the 1985 act was frozen in place as a §5 baseline, and the Alabama Supreme Court's correction of the trial court's error constituted a §5 "change." That peculiar view, though, would invert the state-court hierarchy and make the trial court, rather than the Alabama Supreme Court, the ultimate arbiter of state law. *Compare* Ala. Const. Art. VI, §140(a) ("The supreme court shall be the highest court of the state ...."). Surely §5 doesn't require that.

## CONCLUSION

This Court should take jurisdiction and reverse the district court's decision.

Respectfully submitted,

23

TROY KING
*Attorney General*
MARGARET L. FLEMING
JAMES W. DAVIS
MISTY S. FAIRBANKS
*Asst. Attorneys General*
STATE OF ALABAMA
11 South Union Street
Montgomery, AL 36130
(334) 242-7300

KEVIN C. NEWSOM
*Counsel of Record*
MATTHEW H. LEMBKE
JOHN C. NEIMAN, JR.
ANDREW L. BRASHER
BRADLEY ARANT ROSE
  & WHITE LLP
1819 Fifth Avenue North
Birmingham, AL 35203
knewsom@bradleyarant.com
(205) 521-8803

*Attorneys for Appellant*



OFFICE OF THE GOVERNOR
STATE OF ALABAMA

DON SIEGELMAN
GOVERNOR

STATE CAPITOL
600 DEXTER AVENUE, ROOM N-104
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-0937

March 29, 2001

The Reverend Steve Small, Jr.
True Life Baptist Church
True Life Community Development Center
275 Chickasaw Drive
Birmingham, Alabama 35214-3681

Dear Reverend Small:

By this letter, I hereby appoint you to the Jefferson County Commission to fill the vacancy created by the resignation of Chris McNair. Your appointment is effective immediately.

I appreciate your serving in this capacity, and I am confident you will render a valuable service to the citizens of Alabama.

I look forward to working with you.

Sincerely,

Don Siegelman
Governor

DS:JH:oi

cc:    Dannie Shockley
       Karry Fraser

EXHIBIT
P
PENGAD 800-631-6989

OFFICE OF THE GOVERNOR

BOB RILEY
GOVERNOR



STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-0937

### STATE OF ALABAMA

November 21, 2007

General George F. Bowman
1703 Twelve Oaks Drive
Birmingham, Alabama 35215

Dear George:

By this letter, I hereby appoint you to serve on the Jefferson County Commission, District No. 1. Your appointment is effective immediately. You will be filling the unexpired term of former Commissioner Larry Langford.

As one of my appointees, you will be making important decisions that directly affect the citizens of Alabama. I have made honesty and integrity a priority in my Administration, and I know that you will embody these two virtues while serving the people of Alabama. Please plan to attend all meetings within reason, be a good steward of the taxpayers' money, and work hard in your position to instill trust in state government. The responsibility that comes with this appointment is not to be taken lightly. I trust that you will rise to the occasion and set a standard for others to follow.

I appreciate your serving in this capacity, and I am confident you will render a valuable service to the citizens of Alabama.

Sincerely,

Bob Riley
Governor

BR/rdg

cc:    Michele Crawford

EXHIBIT

Q

PENGAD 800-631-6989

(To Print this page, press the "Print" button on your browser. To return to the previous page, press the "Back" button on your browser.)



Office of the Governor

**BOB RILEY**
Governor

STATE OF ALABAMA

Press Office

November 21, 2007

## Governor Riley Appoints Retired General George F. Bowman to Jefferson County Commission

MONTGOMERY – Governor Bob Riley announced Wednesday he has appointed George F. Bowman, a retired U.S. Army general, to fill a vacant seat on the Jefferson County Commission under the authority given to Alabama governors by state law. The appointment is effective immediately. Bowman fills the unexpired term of former commissioner Larry Langford.

"We went out to find the best possible candidate for this important position, and I am very proud to appoint someone of General Bowman's character and experience," said Governor Riley. "He will do an excellent job representing the citizens of Jefferson County. He is a proven leader and a true public servant."

"I am honored to serve as a county commissioner and appreciate the trust and confidence Governor Riley has placed in me. I will work hard to earn the trust and confidence of those I am privileged to represent," Bowman said.

Bowman began his military career as a second lieutenant in the U.S. Army in 1969 and retired in 2005 as a major general serving at the Department of the Army headquarters in the Pentagon. From 1999 to 2003, Bowman was the commanding general of the U.S. Armey's 311th Theater Signal Command at Fort Meade, Maryland. Earlier in his career, Bowman was deputy commander of the U.S. Army Reserve Personnel Center in St. Louis.

In retirement, Bowman served as a consultant to the National Museum of the United States Army and is currently a manager for Liberty National Life Insurance Co. in Birmingham.

Bowman earned a masters degree in public administration from Pennsylvania's Shippensburg University, a bachelors degree from South Carolina State College and completed the senior executive management program at the U.S. Army War College.

For more contact information, visit Governor Bob Riley's Web Site: http://www.governor.alabama.gov/
For videos of Governor Bob Riley visit: http://www.media.alabama.gov/

Alabama State Agency Directory | Alabama State Employee Directory

State of Alabama - Office of Governor Bob Riley - Press Release: Governor Riley Appoi...     Page 1 of 1

(To Print this page, press the "Print" button on your browser. To return to the previous page, press the "Back" button on your browser.)

Office of the Governor

**BOB RILEY**
Governor



STATE OF ALABAMA

Press Office

February 13, 2008

# Governor Riley Appoints Adam Drinkwater to Pike County Commission

MONTGOMERY-Governor Bob Riley on Wednesday appointed Adam Drinkwater, of Troy, to the Pike County Commission. Drinkwater is filling the vacancy created by the death of Commissioner David Carpenter.

"I am pleased to appoint Adam Drinkwater to the Pike County Commission," said Governor Riley. "Commissioner David Carpenter leaves behind a lasting legacy, and it is my belief that Adam will use his business experience and community involvement to continue that legacy."

Drinkwater works as a licensed real estate broker in Troy, and also owns a graphic design business with his wife. He previously worked in the advertising and public relations industry in Nashville, Tennessee.

He serves as the Membership Director of the Troy Rotary Club and is on the Pike County Chamber of Commerce Board of Directors, Leadership Pike Alumni Board, and Covenant Christian School Board. He was named the Pike County Board of Realtors "Realtor of the Year" in 2005.

The appointment is effective immediately.

For more contact information, visit Governor Bob Riley's Web Site: **http://www.governor.alabama.gov/**
For videos of Governor Bob Riley visit: **http://www.media.alabama.gov/**

**Alabama State Agency Directory | Alabama State Employee Directory**

EXHIBIT

R

PENGAD 800-631-6989

## U.S. Census Bureau

State & County QuickFacts

# Jefferson County, Alabama

| People QuickFacts | Jefferson County | Alabama |
|---|---|---|
| Population, 2006 estimate | 656,700 | 4,599,030 |
| Population, percent change, April 1, 2000 to July 1, 2006 | -0.8% | 3.4% |
| Population, 2000 | 662,047 | 4,447,100 |
| Persons under 5 years old, percent, 2006 | 6.9% | 6.5% |
| Persons under 18 years old, percent, 2006 | 24.4% | 24.2% |
| Persons 65 years old and over, percent, 2006 | 13.4% | 13.4% |
| Female persons, percent, 2006 | 52.6% | 51.5% |
| White persons, percent, 2006 (a) | 56.4% | 71.2% |
| Black persons, percent, 2006 (a) | 41.3% | 26.3% |
| American Indian and Alaska Native persons, percent, 2006 (a) | 0.3% | 0.5% |
| Asian persons, percent, 2006 (a) | 1.2% | 0.9% |
| Native Hawaiian and Other Pacific Islander, percent, 2006 (a) | Z | Z |
| Persons reporting two or more races, percent, 2006 | 0.8% | 0.9% |
| Persons of Hispanic or Latino origin, percent, 2006 (b) | 2.6% | 2.5% |
| White persons not Hispanic, percent, 2006 | 54.0% | 69.0% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 56.7% | 57.4% |
| Foreign born persons, percent, 2000 | 2.3% | 2.0% |
| Language other than English spoken at home, pct age 5+, 2000 | 4.6% | 3.9% |
| High school graduates, percent of persons age 25+, 2000 | 80.9% | 75.3% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 24.6% | 19.0% |
| Persons with a disability, age 5+, 2000 | 136,578 | 945,705 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 24.3 | 24.8 |
| Housing units, 2006 | 304,643 | 2,110,154 |
| Homeownership rate, 2000 | 66.5% | 72.5% |
| Housing units in multi-unit structures, percent, 2000 | 25.4% | 15.3% |
| Median value of owner-occupied housing units, 2000 | $90,700 | $85,100 |
| Households, 2000 | 263,265 | 1,737,080 |
| Persons per household, 2000 | 2.45 | 2.49 |
| Median household income, 2004 | $38,520 | $37,062 |
| Per capita money income, 1999 | $20,892 | $18,189 |
| Persons below poverty, percent, 2004 | 15.4% | 16.1% |

| Business QuickFacts | Jefferson County | Alabama |
|---|---|---|
| Private nonfarm establishments, 2005 | 17,490 | 101,976[1] |
| Private nonfarm employment, 2005 | 347,274 | 1,667,526[1] |
| Private nonfarm employment, percent change 2000-2005 | -4.1% | 0.9%[1] |

EXHIBIT

S

PENGAD 800-631-6989

| | | |
|---|---:|---:|
| Nonemployer establishments, 2005 | 40,568 | 282,604 |
| Total number of firms, 2002 | 46,956 | 309,544 |
| Black-owned firms, percent, 2002 | 12.9% | 9.3% |
| American Indian and Alaska Native owned firms, percent, 2002 | 0.4% | 0.9% |
| Asian-owned firms, percent, 2002 | 1.7% | 1.4% |
| Native Hawaiian and Other Pacific Islander owned firms, percent, 2002 | F | 0.0% |
| Hispanic-owned firms, percent, 2002 | 0.8% | 0.8% |
| Women-owned firms, percent, 2002 | 24.9% | 26.4% |
| Manufacturers shipments, 2002 ($1000) | 6,592,912 | 66,686,220 |
| Wholesale trade sales, 2002 ($1000) | 15,660,455 | 43,641,369 |
| Retail sales, 2002 ($1000) | 9,086,766 | 43,784,342 |
| Retail sales per capita, 2002 | $13,781 | $9,771 |
| Accommodation and foodservices sales, 2002 ($1000) | 960,838 | 4,692,297 |
| Building permits, 2006 | 4,548 | 32,034 |
| Federal spending, 2004 ($1000) | 4,987,468 | 39,047,473[1] |

| Geography QuickFacts | Jefferson County | Alabama |
|---|---:|---:|
| Land area, 2000 (square miles) | 1,112.61 | 50,744.00 |
| Persons per square mile, 2000 | 594.8 | 87.6 |
| FIPS Code | 073 | 01 |
| Metropolitan or Micropolitan Statistical Area | Birmingham-Hoover, AL Metro Area | |

1: Includes data not distributed by county.

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

D: Suppressed to avoid disclosure of confidential information
F: Fewer than 100 firms
FN: Footnote on this item for this area in place of data
NA: Not available
S: Suppressed; does not meet publication standards
X: Not applicable
Z: Value greater than zero but less than half unit of measure shown

Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, Census of Population and Housing, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits, Consolidated Federal Funds Report
Last Revised: Wednesday, 02-Jan-2008 15:10:59 EST



**Everything Alabama**

# PRESS-REGISTER

## Gov. Riley defends fundamental principle

Friday, November 23, 2007

IT'S APPROPRIATE that the U.S. Supreme Court will have the final word on the long-running legal battle over Gov. Bob Riley's appointment of Juan Chastang to the Mobile County Commission.

Superficially, it might seem pointless for the governor to continue to pursue the case. The voters in District 1 spoke emphatically in a special election held last month. They chose Merceria Ludgood, a Democrat, over Mr. Chastang, the Republican candidate, by an overwhelming margin.

But something much larger is at stake in this dispute than the political fate of a gubernatorial appointee. Lawyers for the other side in the case argue it's about race and voting rights, but the real issue is the constitutional principle of federalism, which is enshrined in the 10th Amendment.

The 10th Amendment says the federal government does not have unlimited power over the states. Gov. Riley is insisting, as he should, on the state's right to make and interpret its own laws, as long as they don't conflict with the U.S. Constitution.

The governor made it clear Wednesday he will not surrender the power Alabama voters granted him without a constitutional fight in the nation's highest court. Just one day after the Supreme Court agreed to hear the Chastang case, Gov. Riley appointed retired Gen. George F. Bowman, the son of one of the famed Tuskegee Airmen, to fill a vacancy on the Jefferson County Commission.

Democrats immediately attacked the appointment, saying it ignores the federal appeals court ruling that resulted in a special election for the District 1 seat in Mobile County. The governor's office replied with a statement correctly noting that Alabama law "clearly and specifically gives the governor the right to make appointments to any vacancy on a county commission." Two state Supreme Court rulings have upheld that right.

That should be the end of it, but Democrats believe the U.S. Justice Department, under the cover of the 1965 Voting Rights Act, should make the call on elections in majority black districts. At least Democrats believe that when a Republican is in the governor's office and following the standard practice of governors appointing members of their own party to fill unexpired terms. It should be noted, however, that Mr. Bowman says he is not a member of any political party.

In 2005, Gov. Riley appointed Mr. Chastang to serve out the unexpired term of Sam Jones, who left the commission to make a successful run for the mayor's office in Mobile. Several local Democrats went to court and ultimately convinced a three-judge federal panel that the governor violated the Voting Rights Act and disfranchised blacks.

This argument is strained at best; after all, Mr. Chastang himself is black, and he would have had to face the voters at the end of the term in 2008. Unfortunately, however, Alabama is still under the provisions of Section 5 of the Voting Rights Act, despite the great progress the state has made since the law was enacted 42 years ago. Blacks in Alabama now register and vote in greater percentages than blacks in many Northern states not covered by the Voting Rights Act.

No serious person would claim Gov. Riley is trying to turn back the clock on minority voting rights. In filling the District 1 vacancy and, now, the Jefferson County Commission seat, he is acting like a governor.

EXHIBIT

1

PENGAD 800-631-6989

A Republican governor shouldn't have to give up the legitimate powers of his office when a vacancy occurs in a black majority district. The Justice Department has a role to play in protecting voting rights, but that's a bridge too far — a bridge built on partisanship, not voting rights.

A hope is the Supreme Court will agree with the governor's belief, stated in his appeal to the high court, that the Justice Department can't make state law and treat state officials like puppets.

© 2007 Press-Register

© 2007 al.com All Rights Reserved.

**STATE OF ALABAMA)**
**JEFFERSON COUNTY)**

### RESOLUTION TO FILL THE DISTRICT ONE JEFFERSON COUNTY COMMISSION VACANCY, IF THERE IS ONE, BY SPECIAL ELECTION ON FEBRUARY 5, 2008, AND RUN-OFF, IF NEEDED

WHEREAS, District One Jefferson County Commissioner Larry Langford received the highest number of votes in the October 9, 2007, election for Mayor of the City of Birmingham; and

WHEREAS, an election contest has been filed against Commissioner Langford, for which the Jefferson County Election Commission comprised of Probate Judge Alan King, Circuit Clerk Anne Marie Adams and Sheriff Mike Hale take notice; and

WHEREAS, Jefferson County has a local Act No. 784 (1977) that states, "Section 9. No persons shall be appointed to fill a vacancy"; and

WHEREAS, the statutes of the State of Alabama, case law, and Department of Justice clearances in a similar case are at odds with each other on the state of the law and application thereto; and

WHEREAS, there are 45 voting precincts and 66,427 registered voters in District One; and

WHEREAS, local Act No. 784 (1977), sets forth that when a vacancy occurs on the Jefferson County Commission, a resolution shall be adopted providing for a special election by the Jefferson County Election Commission, with a run-off election, if needed, to provide how a person shall become a candidate for the office to be filled, to provide that any person elected to fill a vacancy shall serve the unexpired term which the person occupying said office when the vacancy occurred would have served if the vacancy had not occurred; to provide that the general laws of the State governing elections shall apply; and

WHEREAS, a Special Election shall be held on February 5, 2008, which is the date already set for the statewide Presidential primary; and

WHEREAS, a run-off election shall be set on February 26, 2008, or later, if needed; and

WHEREAS, the Jefferson County Election Commission believes that the voters in District One should have the opportunity to elect their County Commissioner and should not be disenfranchised from the right to elect a Commissioner of their choice; and



EXHIBIT
U

WHEREAS, the RESOLUTION will take immediate effect upon a vacancy being created in the office of the Jefferson County Commissioner, District One.

NOW, THEREFORE, the Jefferson County Election Commission hereby ADOPTS the following:

A. If there is a vacancy in the Jefferson County Commission created by the election of Commissioner Larry Langford to the office of Mayor of the City of Birmingham, a Special Election has been called and approved and will be set for February 5, 2008, with a run-off election, if needed, to be held on February 26, 2008, or at a later date;

B. Inasmuch as it appears that statutes on qualifying have not been pre-cleared by the Department of Justice, local Act No. 784 (1977) would apply, which is attached hereto as Exhibit A;

C. Persons desiring to become a candidate shall file with the Jefferson County Judge of Probate no later than January 15, 2008;

D. The person who is elected to fill the Commission vacancy in the Special Election and run-off, if needed, will serve the unexpired term which the person occupying said office when the vacancy occurred would have served if the vacancy had not occurred; and

E. The general laws of the State governing elections shall apply; and

F. The Election Commission further believes that the voters of District One deserve the right and the opportunity to vote for the candidate of their choice.

G. This Resolution shall take immediate effect upon a vacancy being created in the office of Jefferson County Commissioner, District One.

THIS RESOLUTION IS HEREBY APPROVED this _20th_ day of October, 2007 by the Jefferson County Election Commission.


_____
Judge of Probate


_____
Circuit Clerk


_____
Sheriff

2



1351

pality having the required number of inhabitants and whose corporate boundaries lie partly within said county and partly without said county. Any municipality which adopts a resolution and comes under the provisions of this Act, as herein provided, shall thereafter remain under this Act, and may not repeal or rescind such action either by the adoption of a resolution or otherwise."

Section 2. This Act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved May 23, 1977.

Time: 6:00 P.M.

---

Act No. 783                     H. 943—McCluskey, Shoemaker, Dial

AN ACT

To amend Section 2 of Act No. 793, 1975 Regular Session (Acts of 1975, p. 1596), entitled:

"An Act Relating to all counties having populations of not less than 65,000 nor more than 68,000 inhabitants according to the most recent federal decennial census; to provide for an additional secretarial assistant for the office of the district attorney and for the offices of circuit judge of the judicial circuit in which such county lies;" so as to increase the compensation of the secretarial assistants for the office of circuit judge of the judicial circuit in which such county lies.

Be It Enacted by the Legislature of Alabama:

Section 1. Section 2 of Act No. 793, 1975 Regular Session (Acts of 1975, p. 1596) is hereby amended to read as follows:

"Section 2. The compensation of such secretarial assistants for the circuit judges shall be set by the circuit judge at a sum not exceeding $725.00 per month."

Section 2. This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved May 23, 1977.

Time: 6:00 P.M.

---

Act No. 784                                    H. 950—Gafford

AN ACT

To provide that when a vacancy occurs on the governing body of

1352

Jefferson County, the Election Commission of Jefferson County shall adopt a resolution providing for a special election, with a run-off election, if necessary, to fill such vacancy; to provide how a person shall become a candidate for the office to be filled; to provide that any person elected to fill a vacancy hereunder shall serve the unexpired term which the person occupying said office when the vacancy occurred would have served if the vacancy had not occurred; to provide that the general laws of the State governing elections shall apply to any election held under the Act, except as the Act otherwise provides; to provide that no person shall be appointed to fill such vacancy; and to repeal Section 145, Title 62, Code of Alabama of 1940, and any other laws or parts of laws in conflict with the Act.

*Be It Enacted by the Legislature of Alabama:*

Section 1. As herein used, the following terms have the meanings hereby ascribed to them: "the County" means Jefferson County, Alabama; "a vacancy" means a vacancy on the governing body of the County caused by death, resignation, impeachment, or any cause except normal expiration of terms; "first election hereunder" means the first election for which this Act provides to fill a vacancy as distinguished from the run-off election held hereunder, if a run-off election is necessary; "run-off election hereunder" means the run-off election for which this Act provides, if no candidate at the first election hereunder receives a majority of the votes cast; "a County wide election" means any election, whether general, special or primary, including run-off elections, whereat qualified electors throughout the County are entitled to vote and which is held to elect a Federal, State or County officer or to nominate a candidate or candidates, for a Federal, State or County office or offices, to submit one or more questions, including, but not limited to, the question of adopting a proposed amendment to the Constitution of Alabama and the question of whether general obligation bonds, or revenue bonds, of the State or County shall be issued; "a scheduled County wide election" means a County wide election which is scheduled to be held on a date definitely determined when a vacancy occurs; and "the Election Commission" means the Election Commission of the County.

Section 2. Within seven days from the occurrence of any vacancy the Election Commission, by a majority vote thereof, shall adopt a resolution stating the dates on which the first election hereunder and the run-off election hereunder, if necessary, will be held. The said dates will be determined as provided for in Sections 3 and 4, below.

Section 3. If when a vacancy occurs a County wide election is scheduled to be held more than forty days and not more than 180 days from the date whereon the vacancy occurs, the first election hereunder, to fill such vacancy, shall be held on the County wide election date. If when the vacancy occurs



1353

there is no County wide election scheduled to be held more than forty days and not more than 180 days after the date whereon the vacancy occurs the first election hereunder, to fill the vacancy, shall be held on a date specified by the Election Commission in the resolution, provided for in Section 2, above, which date shall be not less than thirty-three days and not more than forty days from the date on which the resolution is adopted.

Section 4. If when the resolution, provided for in Section 2, above, is adopted, a County wide election is scheduled to be held not less than three weeks and not more than eight weeks from the date on which the resolution provides the first election hereunder shall be held, to fill said vacancy, the run-off election hereunder, if necessary, shall be held on the date on which said County wide election is scheduled to be held. If when the resolution, provided for in Section 2, above, is adopted, there is no County wide election scheduled to be held not less than three weeks and not more than eight weeks from the date on which the resolution provides for the first election hereunder to be held, the resolution shall provide for the run-off election hereunder, if any run-off election is necessary to be held three weeks subsequent to the date on which the first election hereunder will be held to fill the vacancy.

Section 5. Any person elected to fill a vacancy hereunder shall serve the unexpired portion of the term which the person occupying said office when the vacancy occurred would have served if the vacancy had not occurred.

Section 6. The first election hereunder and the run-off election hereunder, if a run-off election is required, shall be held on the dates provided for in the resolution adopted under Section 2, above. The provisions of the election laws governing the registration of voters, equipment at polling places, furnishing of supplies, appointment of election officers, voting and canvassing returns at a general election shall apply to any election held hereunder, except as herein otherwise provided.

Section 7. The failure of the Election Commission to provide for the first election hereunder, or the run-off election hereunder, within seven days from the occurrence of a vacancy shall not terminate the jurisdiction and duty of the Election Commission to provide for such first election or such run-off election.

Section 8. No primary election shall be held to nominate a candidate to fill a vacancy under the provisions of this Act. At any election held under this act no person's name shall appear on the ballot as a candidate for the office to be filled at said election unless such person has filed in the office of the Judge of Probate of the County within the time and in the forms

1354

prescribed below in this Section 8 his statement of candidacy and the petition signed by at least one hundred qualified electors requesting that such person become a candidate for the said office.

Any person desiring to become a candidate at any election hereunder may become such candidate by filing in the office of the Judge of Probate of the County such person's statement in writing of such candidacy, accompanied by such person's affidavit taken and certified by such Judge of Probate, or by a Notary Public, that such person is duly qualified to hold the office for which the person desires to be a candidate. Such statement shall be filed at least twenty-one days before the date set for such election; and shall be in substantially the following form:

"State of Alabama, Jefferson County.

I, the undersigned, being first duly sworn, depose and say that I am a citizen of Jefferson County in Alabama, residing at _____ in said County, that I desire to become a candidate for the office of _____ at the election for said office to be held on the ___ ___ day of _____, and that I am duly qualified to hold said office if elected thereto; I hereby request that my name be printed on the official ballot at said election.

Signed_____

Subscribed and sworn to before me, the undersigned (Probate Judge or Notary Public, as the case may be) on this the _____ day of _____, 19____

_____
(Judge of Probate or Notary Public
as the case may be)"

Said statement shall be accompanied by a petition signed by at least one hundred persons who shall be qualified to vote at said election, requesting that such person become a candidate for said office at said election. The signers to said petition shall set forth their names in full and their residence addresses, and said petition shall be in substantially the following form:

"We, the undersigned, duly qualified electors of Jefferson County, and residing at the places set opposite our respective names, do hereby request that the name of _____ be placed upon the official ballot as a candidate for the office of _____ at the election for said office to be held in said County on the ___ day of _____. We further state that we know that said _____ possesses the qualifications necessary for said office, and is in our



1355

judgment a fit and proper person to hold said office. Witness our hands on this the _____ day of _____, 19___."

No name shall appear upon said ballot as a candidate for election except the names of such persons as have become candidates according to the provisions as set forth above. If voting machines are used in the County, the names of candidates shall be suitably placed on voting machines.

Section 9.  No persons shall be appointed to fill a vacancy. Section 145, Title 62, Code of Alabama of 1940, and all other laws and parts of laws, whether general, local or special in conflict herewith, are hereby repealed to the extent of any such conflict.

Section 10.  This Act shall become effective upon its approval by the Governor or its otherwise becoming a law.

Approved May 25, 1977.

Time: 4:30 P.M.

H. 1023—Shelton, Merrill

Act No. 785

AN ACT

To provide that any public corporation heretofore or hereafter incorporated and existing under the provisions of Act No. 109, H. 148 of the 1961 Regular Session, as amended, [1961 Acts, p. 134; appearing in Code of Alabama 1940, Recompiled 1958, Title 22, Section 204 (41a)], is authorized and empowered to lease any hospital, building or facility constructed and equipped under the provisions of such act to any public corporation or any non-profit corporation.  No rights under the terms of any contract shall be abrogated nor shall any security for the fulfillment of any obligation be jeopardized by the provisions of this act.

*Be It Enacted by the Legislature of Alabama:*

Section 1.  Any public corporation heretofore or hereafter incorporated and existing under the provisions of Act No. 109, H. 148 of the 1961 Regular Session, as amended, [1961 Acts, p. 134; appearing in Code of Alabama 1940, Recompiled 1958, Title 22, Section 204 (41a)], is hereby authorized and empowered to lease any hospital, building or facility constructed and equipped under the provisions of such act to any public corporation or any non-profit corporation.  Nothing herein shall be construed to allow the abrogation of the terms of any contract or to jeopardize any security for the fulfillment of any obligation assumed under the provisions of said Act No. 109.

Section 2.  The provisions of this act are severable.  If

IN THE SUPREME COURT OF ALABAMA
February 14, 2008

07-08/58 <u>EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL</u>

(In re: Patricia Working et al. v. Jefferson County Election
Commission et al.; Jefferson Circuit Court: CV-08-900316)

<u>ORDER</u>

The emergency motion for injunction is granted and
the Jefferson County Election Commission is hereby enjoined
from certifying the results of the February 5, 2008 special
election for District One of the Jefferson County Commission
pending further order of this court.

Lyons, Woodall, Stuart, Smith, Bolin, Parker, and
Murdock, JJ. concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this 14th day of February 2008

*Robert G. Esdale, Sr. 2B*

Clerk, Supreme Court of Alabama

EXHIBIT

√



**Everything Alabama**

# The Birmingham News

## Birmingham Councilman Bell wins Jeffco Commission seat

Wednesday, February 06, 2008
**BARNETT WRIGHT**
**News staff writer**

Birmingham City Councilman William Bell was elected Tuesday to the Jefferson County Commission District 1 seat just months after his third failed bid to become the city's mayor.

Bell's victory in the six-candidate race likely sets up a legal showdown over who will hold the seat. Second-place finisher George Bowman has held the position since November, when he was appointed by Gov. Bob Riley to replace Larry Langford, who was elected mayor of Birmingham.

"Ring that bell," Bell said as he entered the room to shouts from his supporters at his campaign headquarters in Pratt City.

Bell, 58, received 17,373votes, 56 percent of the total.

Bell's election came hours after Riley notified a three-judge federal panel that he will seek federal approval for his appointment of Bowman. That would extend Bowman's term at least to mid-April.

As a result, both Bell, a Birmingham city councilman, and Bowman, a retired two-star general, could stake claims on the commission seat until a court rules which of the two will occupy the seat.

Bell said he plans to take office as soon as the votes are certified, regardless of what the governor says and does. Bowman, who came in second, said he will consider his legal options before deciding what to do next.

Bell maintained after Tuesday's election that he is the legal officeholder and said he has a legal team ready to fight it. "We'll take on any challenge to my having the commission seat," he said.

Speaking from his campaign headquarters on Third Avenue West, Bowman, who received 4,882 votes, 16 percent, said he was disappointed.

"We all campaigned hard; the voters made their choice. As far as what Gov. Riley did today, we'll see where we go from here," he said. "I will find out what my legal options are. I'm glad that the votes were counted because we at least have a mandate from the people, and that's what the democratic process is all about."

Riley's appointment led to lawsuits challenging the governor's authority to fill the seat. The issue could remain unsettled for months.

Eric Major, a former state representative, finished third with 3,176 votes, or 10 percent of those cast. "Who can argue when the people speak?" he said.

This was Bell's second run for the commission. He was defeated in 1994 by Chris McNair.

http://www.al.com/printer/printer.ssf?/base/news/1202289331283100.xml&coll=2

**EXHIBIT**

W

PENGAD 800-631-6989

Bell was 30 years old when he won his first Birmingham City Council race in 1979. In the 1990s, he rose to council president, interim mayor and presumed successor to five-term Mayor Richard Arrington. But he failed to win the mayor's seat in 1999, 2001 and 2005.

"Sometimes when the Lord closes one door, he opens another," Bell said.

Fred "Coach" Plump, who legally challenged Riley's right to appoint a replacement for Langford, placed fourth with 3,139 votes, 10 percent.

Plump said he was surprised by the margin of Bell's victory. He said he wishes the winner well.

"I just pray that he steps up to the plate and serves the citizens well," Plump said by phone.

Orville Ifill, a former Jefferson County Commission public information officer and lobbyist, said he was disappointed in the outcome of the election. Ifill received 1,357 votes, or 4 percent.

"Jefferson County is crying out for change, but the voters apparently were not ready to move ahead with that change," Ifill said by phone. "I must respect that."

Kamau Afrika, a real estate investor, received 1,195 votes, or 4 percent. He said the results show that people with name recognition and money are the ones who win.

"I represented the future and something different, similar to what Barack Obama represents for this country," Afrika said. "And the reality is that the good guys don't win."

At Sun Valley Elementary School in northeast Birmingham, Glenn Crook, a 50-year-old retired postal worker, said he voted for Bell. "We need someone on the commission with a strong voice. Bell has the experience," Crook said.

News staff writers Joseph Bryant, Val Walton, Erin Stock and Sherrel Wheeler Stewart contributed to this report. bwright@bhamnews.com

© 2008 The Birmingham News

© 2008 al.com All Rights Reserved.

**Kamau Afrika: Activist wants to restore public trust in county government**

Posted by rsims January 31, 2008 16:20PM

**By Joseph D. Bryant**
*Birmingham News staff writer*

Over the last decade, Kamau Afrika has stood on the front steps of the Jefferson County Courthouse with protest posters, campaign signs and even a rifle.

But the 51-year-old is also a real estate investor and a single parent.

Now he wants to add Jefferson County commissioner to his list of titles.

Afrika, once recognized by his long dreadlocks, has now adopted a more conventional style as he campaigns on a platform of securing and improving services at Cooper Green Mercy Hospital, using innovation and technology to save taxpayers' money, and restoring public trust in a commission he said was tainted with fiscal irresponsibly and corruption.



KAMAU AFRIKA

Age: 51

Occupation: Real estate investor, activist.

Residence: Smithfield

Family: Widower since 1994; daughter Uche, a college student.

Political background: Unsuccessful runs for state House District 54 in 2006 and Birmingham City



http://blog.al.com/bn/2008/01/kamau_afrika_activist_wants_to/print.html

Council in 1997.

Chief campaign issues: Supporting Cooper Green Mercy Hospital, restoring public trust in county government, introducing innovative ideas to solve long-held problems.

"When you look at the fraud, waste and abuse, it's deplorable," Afrika said. "I'm going to come in there with no political baggage."

Afrika said he will donate 75 percent of his commissioner's salary to causes that benefit the county his first year in office. Each commissioner makes $66,000 and has a $10,000 expense account.

"That shows I'm not in it for the money," he said. "I don't think a stronger statement can be made."

Afrika's activism and political campaigning has stirred debate in years past. He's run for the Birmingham City Council twice and also ran for the Alabama House District 54 seat in 2006. Afrika was also a vocal critic of the transfer of assets of the Birmingham Water Works from the city to the independent Water Works Board.

In 2001, Afrika stood on the steps of the Jefferson County Courthouse with a rifle as a hearing went on inside about the Water Works and its assets. He left when told it was illegal to have a firearm in a public demonstration.

Afrika, who was born Marlon Walker, legally changed his name in 1985 to Kamau, Kenyan for "quiet warrior." He said the change reflected his new-found African cultural awareness. He grew up in west Birmingham and attended prep school in Maryland and graduated from Birmingham-Southern College.

Afrika said his life is proof he's not afraid of challenges. When his wife died in 1994, he rejected offers from others to raise his young daughter. Instead, he created a regimented program that included athletics and chess, and worked extra jobs to send her to private school. His daughter is now in college.

He also earned both support and detractors for his support for Patricia Todd later in the House District 54 race and Patrick Cooper in last year's mayoral race. Todd won in the bitter contest to become the only white Democrat in Jefferson County's delegation. Her district is majority black.

Cooper came in second to Larry Langford, who was elected mayor without a runoff.

Afrika's irreverent activism will alienate some voters, said Digambar Mishra, chairman of political science and public administration at Miles College. However, Mishra said Afrika still has time to appeal to voters and present himself as a moderate leader who can work in a mainstream political climate.

"He's a talented fellow, but he has to strike a compromise. He must build bridges," Mishra said. "This is an age and a moment of compromise."

Afrika said that's a challenge he's ready to meet.

"I'm going to overcome people who have an aversion to me by being the hardest worker and the most competent commissioner with the hardest working team and highest level of integrity," he said. "I'm not perfect, but look at what I'm doing."

In addition, Afrika said he understands the challenges of going to a commission divided by political

party, with a Republican majority. But the Democrat said he will not let politics stymie cooperation on major issues.

"I will always be for doing things that are going to bring progress to the county as a whole, beyond party, beyond personal interest," he said.

Afrika said the commission must find alternatives to solve long-held problems, including operating Cooper Green Mercy Hospital. As one revenue generator, Afrika said, he'd create a special fee for illegal immigrants who use the hospital. While no one can be denied care, Afrika said, the new fee would help supplement services at the overburdened hospital.

"I cannot go to Mexico and get this quality of health care so easily, and when you look around the county and what this inundation of illegal immigration has done to health care, we have to do something now."

Afrika said he knows some will see his stance as discriminatory, but he won't back down.

"My duty and responsibility is to the citizens of Jefferson County first, U.S. citizens first."

jbryant@bhamnews.com

Categories:

**Comments**

Footer



• Complete Forecast | Homepage | Site Index | RSS Feeds | About Us | Contact Us | Advertise


Everything Alabama

SEARCH: Enter Keyword(s)   GO! ☞

Sponsored By:
JIM BURKE
HYUNDAI


NEWS    SPORTS    FORUMS    BLOGS    CITIES    ENTERTAINMENT    TRAVEL    LIFE & HOME    JOBS    AUTOS    REAL ESTATE    CLASSIFIEDS

## Special The Birmingham News


Sponsored By:
BRETT ROBINSON

- About The Author
- RSS

**Latest Posts**

- William Bell: Touts his experience in seeking Jeffco commission seat
- George Bowman: Plan redirects sales tax to sewer debt
- Orville Ifill: Cites knowledge of how system works
- Fred Plump: Wants better schools, improved public transportation
- Eric Major: Believes past association with officials would help county

**Categories**

- amazingdads (RSS)
- Business Outlook (RSS)
- College07 (RSS)
- Crossroads (RSS)
- Documents (RSS)
- Graphics (RSS)
- home (RSS)
- Madness (RSS)
- multimedia (RSS)
- Reports (RSS)
- SEC75 (RSS)
- soldierstones (RSS)
- War Widows (RSS)

**Favorite Links**

**Archived Posts**



### William Bell: Touts his experience in seeking Jeffco commission seat
Posted by Birmingham News January 31, 2008 4:20 PM

By Joseph D. Bryant
Birmingham News staff

After nearly 30 years in Birmingham politics, William Bell said he's come to a new realization. Times have changed at City Hall and, for him to remain effective, Bell said he needs to leave the place with which he's most familiar.

If he's successful, the move won't be far. But Bell said it would mean his abilities would once again be tapped.


Age: 58

Occupation: Birmingham City Councilman, District 5.

Residence: College Hills.

Family: Wife, Sharon; two adult children.

Political background: Birmingham City Council, 2005-present, 1979-2001; served twice as council president, interim mayor, three months in 1999. Unsuccessful run for mayor, 2007, 2003 and 1999; for City Council, 2001; for Jefferson County Commission, 1994.

Chief campaign issues: Securing and upgrading services at Cooper Green Mercy Hospital and senior services, examining county finances, improving mass transit.

expand and improve mass transit.

"The best thing for William Bell is to seek new challenges and new goals," he said. "It's obvious my colleagues look at me as just an almanac sitting on a shelf full of knowledge and information, but it is not as fulfilling as taking ideas I have and putting them into action for the betterment of the citizens."

Just months after his third failed bid to become Birmingham's mayor, Bell, 58, is seeking the District 1 Jefferson County Commission seat vacated by Larry Langford, the man who beat him for the post he has long sought.

"I still feel I have a lot to contribute," Bell said. "It's not just a matter of finding a higher office, but finding something you can be more effective in."

As commissioner, Bell said, he'd work to protect Cooper Green Mercy Hospital and prevent attempts to sell it. In addition, he named stabilizing the county's finances and protecting senior citizen services, including the Rehab Center, commonly known as the county home, as priorities.

"If we don't have a strong, viable Cooper Green, then our senior citizens as well our young poor won't have basic health care," he said. "I'll be able to find ways to improve the quality of life for our senior citizens in this county."

Bell said his experience at City Hall would help build a stronger relationship between the county and city on certain projects. For example, the county should join in the city's efforts to

"The new mayor and the council have demonstrated their commitment to transit, and we need to find ways get other municipalities and the county to see that same view," he said.

FROM OUR ADVERTISERS
• See under the skin of the Human Body!
• Click Search over 260 New and Used vehicles
• Quality education close to home. Click here for info.
• Win a free trip to Auburn Tigers Reball Game



ANTIQUES AND GARDEN SHOW OF NASHVILLE
Brava Italia!

EXPLORE GLOBAL TREASURES & ITALIAN GARDENS IN MUSIC CITY THIS FEBRUARY.

BOOK ROOMS & PACKAGES NOW.


Nashville MUSIC CITY
1-800-657-6910

Bell, a Democrat, said he knows most of the current commissioners and has the ability to communicate with them and get beyond partisan feuding in the Republican-dominated group.

Bell said many voters who didn't support him for mayor said they would support him as a commissioner. At a crowded Southside restaurant recently, several people approached him as he sat for lunch.

"You'll be good on that end," one man told Bell, referring to his effort to move from City Hall across Linn Park to the Courthouse. "At least you know what you're doing."

Bell smiled as the man walked away.

"I'm hearing that all over the place," he said.

Bell was 30 when he won his first Birmingham City Council race in 1979. In the 1990s he rose to council president, interim mayor and presumed successor to five-term Mayor Richard Arrington. But Bell was defeated by Bernard Kincaid in the 1999 mayor's race, then he lost his long-held council seat in 2001. He lost a second run for mayor in 2003. Bell returned, winning back a spot on the council in 2005. But his ultimate goal — the mayor's office — had remained elusive after his third consecutive run in October.

This is Bell's second run for the commission. He was defeated in 1994 by former Commissioner Chris McNair.

As a politician, Bell says he has learned to lose, win and lead.

While he touts his experience as an asset, the changed political climate presents new challenges for this veteran, said Larry Powell a political pollster and UAB political communications professor.

Powell said Birmingham voters' rejection of all sitting city leaders, including the incumbent, in the mayor's race, dealt a severe blow to the city's political establishment.

"Obviously there was a strong momentum of change in the mayor's race that worked against him," Powell said. "To what extent does that play in the commission race, I'm not sure."

Powell still called Bell a strong candidate who could overcome the trend.

But Bell must win his latest race to remain politically viable, said Digambar Mishra, chairman of political science and public administration at Miles College.

"He's a very talented candidate, but the only problem is people might not perceive it that way," Mishra said. "Once you lose one time, two times and three times, the voters don't pay much attention. The voters are turned off because of a track record of too many losses."

Bell dismissed predictions that another defeat would be his political obituary.

"Seven years ago they said that is was over for William Bell," he said recalling his council district defeat. "Until they throw dirt in my face, life always has opportunities."

jbryant@bhamnews.com

🖶 | Permalink (Learn More)
Share: Reddit | Digg | del.icio.us | Google | Yahoo | What is this?

**COMMENTS (0)**      Post a comment

Username (Don't Have a Username? Sign up here):

Password:

☐ Remember Me  [ Login ]  [ Reset ]

Use of this site constitutes acceptance of our User Agreement. Please read our Privacy Policy.

Community Rules apply to all content you upload or otherwise submit to this site. Contact interactivity management.

© 2008 al.com. All Rights Reserved. RSS Feeds | Complete Index

George Bowman: Plan redirects sales tax to sewer debt - Reports from The Birmingham ...    Page 1 of 2



· Complete Forecast | Homepage | Site Index | RSS Feeds | About Us | Contact Us | Advertise

 SEARCH: Enter Keyword(s) [GO!▷]

Sponsored By:
JIM BURKE
CHRYSLER

NEWS    SPORTS    FORUMS    BLOGS    CITIES    ENTERTAINMENT    TRAVEL    LIFE & HOME    JOBS    AUTOS    REAL ESTATE    CLASSIFIEDS

## Special  The Birmingham News

Sponsored By:
BRETT/& ROBINSON

- About The Author
- RSS

**Latest Posts**
- George Bowman: Plan redirects sales tax to sewer debt
- Orville Ifill: Cites knowledge of how system works
- Fred Plump: Wants better schools, improved public transportation
- Eric Major: Believes past association with officials would help county
- In her own voice: Why soldiers crave some home-cooked food (with a recipe)

**Categories**
- amazingdads (RSS)
- Business Outlook (RSS)
- College07 (RSS)
- Crossroads (RSS)
- Documents (RSS)
- Graphics (RSS)
- home (RSS)
- Madness (RSS)
- multimedia (RSS)
- Reports (RSS)
- SEC75 (RSS)
- soldiersstones (RSS)
- War Widows (RSS)

**Favorite Links**

**Archived Posts**

### George Bowman: Plan redirects sales tax to sewer debt
Posted by Birmingham News January 31, 2008 4:20 PM

**By Barnett Wright**
*Birmingham News staff writer*

Jefferson County Commissioner George Bowman said he has a plan to bring relief to sewer ratepayers who have seen their bills quadruple over the past decade.

"I propose to redirect one half of the 1 cent sales tax for Jefferson County that is going to education," said Bowman, who is running in a special election Feb. 5 for the District 1 seat.

"Currently, this tax produces approximately $100 million per year. I propose that we redirect $50 million annually and apply it toward the principal on the sewer debt. Once the education debt is retired then the total $100 million can be applied to the sewer debt."

The county commission voted in 2004 to borrow $1 billion for school construction in Jefferson County, including $350 million for Birmingham. Money produced by a 1 cent county sales tax is paying for the bonds that were issued.

Bowman, a retired two-star general, was appointed to the seat by Gov. Bob Riley in December. Riley said last week he likely will appeal a ruling by a panel of three federal judges that said the governor needed approval from the U.S. Justice Department to appoint Bowman to the commission, approval he did not seek.

The education money cannot be used for sewer debt, according to agreements signed by the county and bondholders.

Bowman is undeterred. "I realize that it will require a change to the binding indentures. It is an existing revenue source that can be redirected without adding new taxes or raising existing taxes," he said. "It will require a change and also legal review. The bottom line is we need another revenue source to attack this debt."

Larry Powell, a UAB political communications professor, said Bowman has advantages and disadvantages in the race.

Bowman doesn't have the name recognition of Birmingham City Councilman William Bell or former state Representative Eric Major, but Bowman does have the "legitimacy" of being appointed by Riley, Powell said.

"He can use it to get more press coverage and he can use it to raise money,"



Age: 59

Hometown: Sumter, S.C.

Residence: Northeast Birmingham

Education: Bachelor of Arts, South Carolina State University 1969; master's degree, public administration, Shippensburg University, 1985

Professional Background: major general, U.S. Army, 35 years service

Political Background: Appointed commissioner, District 1, first political office

Bowman plan redirects sales tax to sewer debt



Click here to check out our Free Night Specials!

**FROM OUR ADVERTISERS**
· A relaxing beach vacation in a click away!
· Shopping for a Chevy? Click Here!
· Auburn University Car Tags - Click NOW!
· #1 Mazda Certified Pre-owned Dealership in the USA



Blow-dry your hair: 5¢

Powell said.

During his two months in office, Bowman, a Center Point area resident, has not been shy about his ideas for reducing the debt.

He has also proposed using a county sewer department reserve fund of $400 million to pay down the county's massive debt, among the highest for a local government in the nation. That, he contends, will help lower sewer rates.

Increasing sewer rates are of particular interest to him because a majority of people who use sewer are in District 1, which he represents, and District 2, he said.

"These are the people who are least able to pay ever-increasing sewer and water bills," he said. "The current plan shows that rates will increase every year from 4.4 to 7.7 percent from now to perpetuity."

Bowman, 59, has also dealt with a pair of controversial decisions.

Shortly after being appointed, Bowman voted with a majority of the commission to rename the Private George Watson Criminal Justice Center, a moniker established by the commission in 2005. He shifted his position and introduced a resolution to reinstate the name of an Alabama war hero on the new Bessemer courthouse. The resolution failed.

He voted to give $15,000 to the Eagle Forum, an organization founded by Phyllis Schlafly, a longtime conservative political activist.

The commissioner said none of his district funds went to the group.

"I respected the right of a commissioner to spend his or her district funds on the charities of their choice as long as it met the existing guidelines set by the county," he said. "I expect the same respect from them when I recommend District 1 funds to go to charities or schools of my choice as long as they meet existing county guidelines."

Bowman, who has responsibility for Cooper Green Mercy Hospital, said he'll focus on several issues in the race including support for the continued operation of Cooper Green for the indigent poor in Jefferson County; support for law enforcement officials; and working with the school boards in the region to minimize the number of school closings in District 1.

Bowman's father, Lt. Leroy Bowman, was a Tuskegee Airman. His grandfather, Brooks Bowman, was a decorated Army private in World War I.

bwright@bhamnews.com

☐ | Permalink (Learn More)
Share: Reddit | Digg | del.icio.us | Google | Yahoo | What is this?

**COMMENTS (0)**    Post a comment

Username (Don't Have a Username? Sign up here):

Password:

☐ Remember Me  [ Login ]  [ Reset ]

Use of this site constitutes acceptance of our User Agreement. Please read our Privacy Policy.

Community Rules apply to all content you upload or otherwise submit to this site. Contact interactivity management.

© 2008 al.com. All Rights Reserved. RSS Feeds | Complete Index



• Complete Forecast | Homepage | Site Index | RSS Feeds | About Us | Contact Us | Advertise



SEARCH: Enter Keyword(s)    GO!

Everything Alabama

| NEWS | SPORTS | FORUMS | BLOGS | CITIES | ENTERTAINMENT | TRAVEL | LIFE & HOME | JOBS | AUTOS | REAL ESTATE | CLASSIFIEDS |

## Special The Birmingham News

**Sponsored By:**


■ About The Author
■ RSS

**Latest Posts**

■ Orville Ifill: Cites knowledge of how system works
■ Fred Plump: Wants better schools, improved public transportation
■ Eric Major: Believes past association with officials would help county
■ In her own voice: Why soldiers crave some home-cooked food (with a recipe)
■ Text of President Bush's final State of the Union address

**Categories**

■ amazingdads (RSS)
■ Business Outlook (RSS)
■ College07 (RSS)
■ Crossroads (RSS)
■ Documents (RSS)
■ Graphics (RSS)
■ home (RSS)
■ Madness (RSS)
■ multimedia (RSS)
■ Reports (RSS)
■ SEC75 (RSS)
■ soldierstones (RSS)
■ War Widows (RSS)

**Favorite Links**

**Archived Posts**



### Orville Ifill: Cites knowledge of how system works
Posted by Birmingham News January 31, 2008 4:20 PM

**By Barnett Wright**
*Birmingham News staff writer*

Birmingham resident Orville Ifill is no stranger to the Jefferson County courthouse.

The former Jefferson County Commission public information officer is running in a special election Feb. 5 for the District 1 seat.

"I don't need on-the-job training," Ifill said. "I'm one who thoroughly knows, who understands how the commission functions and who knows how to build consensus, I understand the system and how it works."

Ifill, 56, who spent 12 years as the county's PIO and lobbyist, said he knows more than just how the commission works. As governmental liaison for Storm Water Management Authority Inc. (SWMA), the local agency created to administer the regional storm water program, Ifill said he met with state, county and local government officials.

"I have already established a positive working relationship with the current commissioners through my work with the County Commission, the Jefferson County Legislative Delegation, and my role at the Storm Water Management Authority," Ifill said. "I also think that it will be vital to improve the public's perception of the County Commission, and that will be accomplished by working cooperatively together."

Ifill said he lobbied on behalf of the county as part of his duties as public information officer.

"I handled the legislation for Jefferson County," Ifill said. "I wasn't a lobbyist in the true sense of the word. I registered, but did not have to pay a registration fee. I was a governmental employee. Anybody who is a government employee doesn't have to pay a registration fee."

Ifill said he left the county position in 2005 to join SWMA.



Age 56

Residence: College Hills.

Education: Holy Family Elementary and High School, Howard University, Washington, D.C. B.A. in political science.

Professional background: Storm Water Management Authority governmental liaison. Public information officer Jefferson County Commission.

Political background: Unsuccessful bid for Birmingham City Council 1985.

Political observers such as Steven Haeberle, chairman of the Department of Government at the University of Alabama at Birmingham, and Larry Powell, UAB political communications professor say Ifill faces an uphill battle because he lacks name recognition in a race with Birmingham City Councilman William Bell and Eric Major, former state representative.

Ifill sees it differently.





**FROM OUR ADVERTISERS**
• Let Fred Smith find the home for you! A New Orleans Experience - Family Style!
• Small Classes, Personal Attention. Jeff State. Click for info.
• Home of the Nice Guys

ALABAMA SYMPHONY ORCHESTRA
Red Diamond Family Concerts
Music for Living
ALYS STEPHENS CENTER - JEMISON HALL
BOX OFFICE: 205.251.7727

WINNIE the POOH
Jan 12 - Feb 24
ASF
Music by Allan J. Friedman

"I have the knowledge, I have the integrity, and I have spent my life serving and volunteering in roles that make Jefferson County a better place for the people who live here," Ifill said. "The winner of this race will be the person who is perceived as knowledgeable, honest, and 'for the people.'"

The lifelong Birmingham resident said he has an ambitious plan for the district.

"I will focus my efforts on creating government accountability and stability by holding evening meetings and public hearings in each district," he said. "I will reduce wasteful government spending, encourage economic growth and development by focusing on small and existing business."

Ifill said the person filling the seat would face a number of challenges, starting with sewer rates that have quadrupled over the past decade to pay down a $3.3 billion debt.

"As a result of past decisions, the county has amassed a large debt," Ifill said. "The debt has to be addressed without adding a burden to the citizens, and if possible, in a manner that will lighten the citizens' load without eliminating essential or mandated services."

The College Hills resident said he has been involved in government as a public servant for more than 25 years — 15 with the County Commission and related agencies, but still brings a fresh face to the office.

"Politics is not meant to be a career, it's meant to be a service," he said. "Most of these other guys have run for other offices in the last two years. I ran last 25 years ago (unsuccessfully for Birmingham City Council). Some people folks weren't even born then can vote now."

Ifill said his other goals include:

Providing quality health care by expanding existing medical partnerships and making sure the county properly funds and provides assistance for indigent care, which is currently provided by Cooper Mercy Green Mercy Hospital.

Government accountability and stability — conserving natural resources by creating and enhancing parks, greenways and recreational areas.

Economic growth and development.

bwright@bhamnews.com

🖨 | Permalink (Learn More)
Share: Reddit | Digg | del.icio.us | Google | Yahoo | What is this?

**COMMENTS (0)**      Post a comment

Username (Don't Have a Username? Sign up here):

Password:

☐ Remember Me  Login    Reset

Use of this site constitutes acceptance of our User Agreement. Please read our Privacy Policy.

Community Rules apply to all content you upload or otherwise submit to this site. Contact interactivity management.

© 2008 al.com. All Rights Reserved. RSS Feeds | Complete Index



UNISHIPPERS
THE SHIPPING COMPANY THAT WORKS FOR YOU®

• Complete Forecast | Homepage | Site Index | RSS Feeds | About Us | Contact Us | Advertise



SEARCH: Enter Keyword(s)    GO! ➭

Sponsored By:
JIM BURKE
GMC


| NEWS | SPORTS | FORUMS | BLOGS | CITIES | ENTERTAINMENT | TRAVEL | LIFE & HOME | JOBS | AUTOS | REAL ESTATE | CLASSIFIEDS |

# Special The Birmingham News

Sponsored By:
BRETT ROBINSON

■ About The Author
■ RSS

**Latest Posts**

■ Eric Major: Believes past association with officials would help county
■ In her own voice: Why soldiers crave some home-cooked food (with a recipe)
■ Text of President Bush's final State of the Union address
■ The history: Bryce Hospital
■ Kamau Afrika: Activist wants to restore public trust in county government

**Categories**

■ amazingdads (RSS)
■ Business Outlook (RSS)
■ College07 (RSS)
■ Crossroads (RSS)
■ Documents (RSS)
■ Graphics (RSS)
■ home (RSS)
■ Madness (RSS)
■ multimedia (RSS)
■ Reports (RSS)
■ SEC75 (RSS)
■ soldierstories (RSS)
■ War Widows (RSS)

**Favorite Links**

**Archived Posts**

## Eric Major: Believes past association with officials would help county

Posted by Birmingham News January 31, 2008 3:40 PM

**By Barnett Wright**
*Birmingham News staff writer*

Two former state representatives already are seated on the Jefferson County Commission and Eric Major said he wants to make it three.

Major, who served in the House from 1998 to 2006, is running in a special election Feb. 5 for the District 1 seat. He said familiarity with current commissioners will help the county.



Age 39

Residence: Fairfield

Education: Bachelor's degree from UAB.

Professional background: Marketing director for Global Development Group; consultant for small businesses.

Political background: Served in state House of Representatives, 1998-2006; ran unsuccessfully for the House, 1994; was aide to former U.S. Reps. Earl Hilliard and Glen Browder; has been chairman of the Jefferson County Citizens Coalition since January, 2006; former 7th District youth coordinator for the Alabama Democratic Conference.

Bobby Humphryes, who represents District 3 and Jim Carns, who represents District 5 served two terms together with Major in the House.

"The fact that I have served with Commissioners Jim Carns and Bobby Humphryes will make it a lot easier to get things accomplished in the county," Major said. "I have had to work with them in the past and find common ground to get things accomplished. They know that my word is good and even if we disagree about how to resolve a problem that I will not engage in personal attacks."

Major, a Fairfield resident, said a number of problems plague the county that must be addressed.

"Jefferson County has become addicted to wasteful use of hard earned taxpayer dollars and someone has to stop them," he said. "I have a history of standing up for accountability in county and state government and will make ethical decisions about county spending."

Major said the District 1 commissioner has responsibility for Cooper Green Mercy Hospital and that's an industry he knows well, he said.

"Cooper Green has been under attack and under utilized," he said. "I was on the health committee in the Alabama legislature and I know that there are monies available that can help Cooper Green thrive and prosper but, it will take action from the Commission to make it happen. The Commission and the legislature have to work together and having been in the legislature I know what it will take to get the legislature on board with county government."

Steven Haeberle, chairman of the Department of Government at the University of


Visit your local Lexus Dealer

FROM OUR ADVERTISERS
• Be Oyster Aware!
• More for Less with Charter. Save BIG!
• Escape to Music City for the weekend!
• Ready to Move. Click Here.


ANTIQUES AND GARDEN SHOW OF NASHVILLE
Brava Italia!

EXPLORE
GLOBAL TREASURES
&
ITALIAN GARDENS
IN MUSIC CITY
THIS FEBRUARY.

BOOK
ROOMS & PACKAGES
NOW.


Nashville MUSIC CITY
1-800-657-6910

Alabama at Birmingham, said Major can run in the district on name recognition —
like Birmingham City Councilman William Bell — but Major could face skepticism
because of his loss in 2006 to Rod Scott in the District 55 race for the Alabama
Legislature.

"Usually after being defeated it's hard to get elected to something else," Haeberle
said. "That's not universally true but in this case Major lost a legislative election
which is a much smaller district than is a district that takes in one-fifth of Jefferson
County. Not only is he running for something else but he is running for something
else where he represents more people. That might work against him."

Last fall, Major won a $500,000 civil jury award against the City of Birmingham
stemming from his 2004 arrest and acquittal on charges that he physically attacked
his ex-fiancee.

Post trial motions to set aside the verdict have been by filed by the City of
Birmingham.

That verdict was the second in Major's favor in the case. In March 2006, a Jefferson
County District Court jury found him not guilty of a misdemeanor criminal charge of
domestic violence.

Major has claimed that his arrest was part of a political vendetta against him by his
accuser — a former chief of staff to County Commissioner Shelia Smoot — and
Birmingham and county officials.

**Trial preceded contest**

The criminal trial took place a week before he qualified to seek re-election for the
District 55 seat, which he lost in a primary runoff.

Major was arrested after his former fiancee, Shamanda Joseph, told a Birmingham
police officer that Major had hit and choked her after an April 29, 2004 concert.
After he was acquitted on the criminal charge, Major filed a civil lawsuit against
Joseph, arresting officer Al Anger and the city of Birmingham.

In a trial in the courtroom of Circuit Judge Tom King Jr., the jury ruled in Anger's
favor. Joseph was dismissed as a defendant at the beginning of the trial.

The jury, however, agreed with Major's claim that his civil rights had been violated.

Major, 39, said the case has no bearing on his ability to work with Smoot or anyone
else on the commission because they've worked together in the past.

"I worked with Commissioner Sheila Smoot when she was a reporter to resolve the
problems in the cemetery industry which were causing problems at Shadow Lawn
cemetery," he said. "Bobby and Jim helped me with that legislation, so in a way I
have already brought three of the four commissioners together."

Major said other main issues in the race include accountability, economic
development and restoring public trust and he has plans to address each one.

bwright@bhamnews.com

🖶 | Permalink (Learn More)
Share: Reddit | Digg | del.icio.us | Google | Yahoo | What is this?

**COMMENTS (0)**    Post a comment

Username (Don't Have a Username? Sign up here):

Password:

☐ Remember Me  [Login]  [Reset]

Use of this site constitutes acceptance of our User Agreement. Please read our Privacy Policy.

Community Rules apply to all content you upload or otherwise submit to this site. Contact interactivity management.

© 2008 al.com. All Rights Reserved. RSS Feeds | Complete Index



ALABAMA SYMPHONY POPS!
At the Copa -
The Best of Barry Manilow
FEBRUARY 8 | BJCC CONCERT HALL | 8 PM

ALABAMA
SYMPHONY
ORCHESTRA
AN ANNIVERSARY SEASON

• Complete Forecast | Homepage | Site Index | RSS Feeds | About Us | Contact Us | Advertise


Everything Alabama

🔍 SEARCH: Enter Keyword(s)    GO! ▸

Sponsored By:
JIM BURKE
GMC

NEWS    SPORTS    FORUMS    BLOGS    CITIES    ENTERTAINMENT    TRAVEL    LIFE & HOME    JOBS    AUTOS    REAL ESTATE    CLASSIFIEDS

## Special  The Birmingham News



Red Diamond Family Concerts
Music for Living
ALYS STEPHENS CENTER - JEMISON HALL
BOX OFFICE: 205.351.7727
FEB 10 | 2:30 PM
PRE-CONCERT ACTIVITIES 1:30PM

Sponsored By:

BRETT & ROBINSON

■ About The Author
■ RSS

**Latest Posts**

■ Fred Plump: Wants better
  schools, improved public
  transportation
■ Eric Major: Believes past
  association with officials
  would help county
■ In her own voice: Why
  soldiers crave some home-
  cooked food (with a recipe)
■ Text of President Bush's
  final State of the Union
  address
■ The history: Bryce Hospital

**Categories**

■ amazingdads (RSS)
■ Business Outlook (RSS)
■ College07 (RSS)
■ Crossroads (RSS)
■ Documents (RSS)
■ Graphics (RSS)
■ home (RSS)
■ Madness (RSS)
■ multimedia (RSS)
■ Reports (RSS)
■ SEC75 (RSS)
■ soldierstories (RSS)
■ War Widows (RSS)

**Favorite Links**

**Archived Posts**

### Fred Plump: Wants better schools, improved public transportation

Posted by Birmingham News January 31, 2008 4:11 PM

**By Erin Stock**
*Birmingham News staff writer*

Fred "Coach" Plump said he had no intention of running for the District 1 seat on the Jefferson County Commission when he legally challenged Gov. Bob Riley's right to appoint someone to the post.

"I was just trying to stop the appointment and give the citizens an opportunity to go to the polls and vote and elect the person they wanted to serve," said Plump, a retired Birmingham firefighter who is recognized in community youth sports as a coach and director.



Age 60

Residence: Fairfield

Education: Lawson State Community
College, associate degree in business
administration; University of Alabama-
Birmingham, emergency medical
technology certification; Alabama Fire
College; Alabama Military Academy

Professional background: Part-time
case manager with Jefferson County
Conservator's Office; volunteer
director and coach for youth sports
leagues; retired firefighter

Political background: Unsuccessful
run for state House District 57 in
2006; elected to Alabama Democratic
Executive Committee in 2006

At the urging of friends and others, Plump decided to run for the District 1 seat about two weeks after he filed the suit against the governor, he said.

Plump said he was motivated by a desire to restore public trust and bring integrity to the Commission.

"I've always been one to work with our politicians, someone who's honest, sincere about serving and bringing things back to the district or back to the city," he said. "It seems that we're falling away from that, and that's what got me involved. Without corruption, you can really move the city."

A three-judge federal panel ruled in favor of Plump earlier this month, concluding that Riley should have sought approval from the U.S. Department of Justice before appointing George Bowman, a retired general, as commissioner. The judges did not settle whether the vacancy should have been filled by appointment or through election, however, and the county's Election Commission is proceeding with an election on Feb. 5.

Plump said he doesn't consider himself a politician. For nearly 40 years, he has volunteered as a coach and director for youth programs. He founded the Piper Davis Youth Baseball League and serves as president of it and the Magic City Youth Football League.

"I always looked at myself as being a servant, someone who was serving communities," the 60-year-old said.

Before joining the Birmingham Fire Department, Plump was drafted into the Army and served in Vietnam for a year. He then served 37 years in the Alabama National Guard.

FROM OUR
ADVERTISERS
• Come Be Our Guest
  In Gulf Shores
• Visit the Coast!
• Click Here for Your
  Place in the Sun
• Camelot, Starring
  Lou Diamond Phillips



Do you
know the
10
Essential
Items
to be
prepared
for an
emergency?

After he was passed over for a job with the Birmingham Fire Department, Plump sued for racial discrimination in 1972 and won. Plump sued the department again about a decade later to promote a one-for-one hiring practice of blacks and whites.

"It doesn't matter who it is. If I see you are being mistreated, I will stand and fight for you," said Plump, who retired as a lieutenant in 2004 after 30 years with the department, including about 22 years working in District 1.

In 2006 Plump made an unsuccessful bid for the Alabama House District 57 seat. That same year, he was elected to the State Democratic Executive Committee.

Plump's key issues include economic development through affordable housing, better public transit and improved schools. He said he would "fight until the last breath" to keep Cooper Green Mercy Hospital open and seek to reduce dropout rates, in part by meeting with the city and county schools superintendents to bolster vocational education. Plump said he would work to ensure the county-run nursing home in Ketona is adequately staffed so seniors can be better served.

He said he and his wife intend to commit a percentage of his pay as commissioner to start a fund to help senior citizens pay for their utilities. Each commissioner makes $66,000 and has a $10,000 expense account.

"I'm not running for that seat because I need a paycheck," said Plump, a father of five and grandfather of three. "I'm running for that seat because I want to serve."

Natalie Davis, a political science professor at Birmingham-Southern College, said Plump is at a disadvantage because he's competing against candidates with greater name recognition. Birmingham City Councilman William Bell and former state representative Eric Major are among the six contenders.

"I think Plump will have a difficult time," Davis said. "He's going to be the least well-known."

But Davis and Larry Powell, a communications professor at the University of Alabama at Birmingham, said Plump's bid could be boosted by the lawsuit he filed.

"He won that essentially, and that's to his advantage," Powell said. "Whether or not it's enough of an advantage, I have no way of knowing. ,e,e. He will have to get that message out for it to have any impact."

Plump said hard work and selling himself to the public are most important in determining the outcome of the election.

As a resident of District 1 for all of his adult life, Plump said, he has a love for the community that makes him the best candidate for commissioner.

"I travel through the district just about every day and see the needs of the district, and I have worked within the district and volunteered service for the last 39 years," he said. "I would say my heart's in the district."

estock@bhamnews.com

📧 | Permalink (Learn More)
Share: Reddit | Digg | del.icio.us | Google | Yahoo | What is this?

**COMMENTS (0)**        Post a comment

Username (Don't Have a Username? Sign up here):

Password:

☐ Remember Me  [Login]  [Reset]

Use of this site constitutes acceptance of our User Agreement. Please read our Privacy Policy.

Community Rules apply to all content you upload or otherwise submit to this site. Contact interactivity management.

© 2008 al.com. All Rights Reserved. RSS Feeds | Complete Index

ELECTRONICALLY FILED
3/18/2008 9:20 AM
CV-2008-900316.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
## CIVIL DIVISION

| | | |
|---|---|---|
| PATRICIA WORKING, RICK ERDEMIR and FLOYD McGINNIS, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | **CIVIL ACTION NO.** |
| v. | ) | **CV 08-900316 JSV** |
| | ) | |
| JEFFERSON COUNTY ELECTION COMMISSION, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## and
## FINAL JUDGMENT

This case is before the court on an order of remand from the Supreme Court of Alabama issued on February 20, 2008. That Order kept in effect an injunction in which the Supreme Court enjoined the Jefferson County Election Commission from certifying the results of the February 5, 2008 election for District One of the Jefferson County Commission. That Court stated, "it further appearing to the Court that any potential statutory jurisdictional requirements have been met; it is ordered that this case is remanded to the trial court for a ruling on the merits."

In response to that mandate, this court issued a Scheduling Order on February 21, 2008, setting the case for arguments and submissions on March 14, 2008. Through the cooperation of counsel for all parties in the case, the material facts are before the court by stipulation. A copy of the stipulated facts is attached hereto.

1

PENGAD 800-631-6989

EXHIBIT

Y

On November 13, 2007, Larry Langford, resigned his position on the Jefferson County Commission, District Number One, after being elected mayor of the City of Birmingham. This dispute is about how Mr. Langford's replacement on the Jefferson County Commission will be selected.

The important legal issue to be addressed in this case sounds simple: should a vacancy on the Jefferson County Commission be filled through an appointment by the Governor of Alabama or by a vote of the people who live in the District? One would think that the law would provide a ready and clear answer to such a fundamental question. Unfortunately, that is not the case. In seeking the correct answers to the issues presented, the courts are bound by the Alabama Constitution of 1901, the statutes enacted by the Alabama Legislature, and the appellate court decisions which have interpreted those provisions and laws. The wisdom of these laws is not an issue for the courts. The courts must address the law as it is and not as we wish it to be.

This case was commenced by the filing of a verified complaint on January 31, 2008. There were two plaintiffs, Patricia Working and Rick Erdemir, and they named as defendants the Jefferson County Election Commission and its individual members, Probate Judge Alan King, Sheriff Mike Hale and Circuit Clerk Anne-Marie Adams.

The complaint invoked this Court's jurisdiction under various sections of the Alabama Code and in their prayer for relief plaintiffs sought, among other things, a declaration that the Election Commission was not authorized to hold an election to fill the vacancy on the Jefferson County Commission on February 5, 2008. They alleged that Alabama Act Number 77-784 is unconstitutional because it violates Article IV, § 105, of the Alabama Constitution of 1901. They

2

further contend that the Act was misinterpreted by the Election Commission when it set the election for February 5, 2008. They asked the court to issue a temporary restraining order, enjoining the Election Commission from conducting the election or from canvassing or announcing the results of the election.

This court conducted an expedited hearing on the day after the complaint was filed and issued an order on February 1, 2008, concluding that unless the Attorney General and other interested parties were served or named as parties to the action, the court had no jurisdiction to grant the relief sought by the plaintiff, citing Ala. Code (1975) § 6-6-227. On February 4, 2008, the plaintiffs served notice of their action upon the Attorney General.

The election proceeded on February 5, 2008, along with the Presidential Preferential Primaries. On the same day, the plaintiffs filed a Petition for Writ of Mandamus in the Supreme Court of Alabama, asking that court to issue an emergency injunction barring the Election Commission from declaring the results of the election. Alabama's Attorney General filed an *amicus* brief in support of the plaintiffs' Petition.

On February 6, 2008, Fred L. Plump, one of the candidates for the District One seat on the Jefferson County Commission, filed a Motion to Intervene in this case and on February 12, 2008, the plaintiffs amended their complaint to add another plaintiff, Floyd McGinnis. The plaintiffs also added William Bell as a party defendant. Mr. Bell was also a candidate for the District One seat on the Commission and, according to unofficial tallies, he won a majority (56%) of the votes cast among the six candidates for the Commission seat.

3

Another candidate for the position was George F. Bowman, who was added to the case as a third-party defendant by Mr. Plump. General Bowman was appointed by Governor Riley to fill the vacancy on the Jefferson County Commission on November 21, 2007, and he continues in that office.

The third-party claim by Mr. Plump and Mr. Bell against General Bowman was brought under Ala. Code (1975) § 6-6-590 *et seq*. This statute is said to furnish "a remedy coextensive in scope with the common-law information in the nature of quo warranto." *State v. Birmingham Waterworks Co.*, 185 Ala. 388, 64 So. 23 (1913). In his prayer for relief under the *quo warranto* statute, Mr. Plump asks the court to rule that General Bowman unlawfully holds the Commission seat and seeks a declaration that Mr. Bell is the person entitled to hold the office. The Attorney General has filed an answer to the *quo warranto* proceeding on behalf of Governor Riley.

The court will refer to Patricia Working, Rick Ertemir, Floyd McGinnis, Governor Riley and George Bowman as plaintiffs since they are united in their challenge of the February 5, 2008 election. The court will refer to the Jefferson County Election Commission and its members, Judge Alan King, Circuit Clerk Anne-Marie Adams, Sheriff Mike Hale, along with Fred L. Plump and William Bell, as defendants since they are united in seeking to uphold the results of the election.

Despite the complicated procedural posture of the case, there are three legal issues which must be addressed by the court under the Supreme Court's mandate to address the merits of the various claims. Those questions are:

1. Do the named plaintiffs have standing to bring this action?

2. Is Alabama Act Number 77-784 constitutional?

3. If the Act is valid, did the Election Commission correctly schedule the February 5, 2008 special election.

The first question presented by the parties deals with the legal standing of the named plaintiffs to bring this action. The parties do not agree as to whether this issue was considered by the Supreme Court when it stated in the order of February 20, 2008, that any "potential statutory jurisdictional requirements have been met." The question of standing is jurisdictional. This court's initial ruling with regard to jurisdiction was based upon the plaintiffs' failure to serve notice of their constitutional challenge on the Attorney General and the failure to name certain other necessary parties. The issue of the plaintiffs' legal standing has not previously been addressed by this court.

## I.
## PLAINTIFFS' LEGAL STANDING

When the action was commenced Patricia Working and Rick Erdemir were the only named plaintiffs. They alleged under oath that they, "reside within the geographic boundaries of Jefferson County Commission District One." As it turns out, the allegation of residency was not true. (Joint Stipulation of Undisputed Fact, Numbers One and Two). Plaintiffs' counsel argues that the plaintiffs made a simple mistake and did not know that they lived in District Four, not District One. Be that as it may, the other plaintiff, Floyd McGinnis, was added by amendment while the case was before the Supreme Court, and he lives within the boundaries of District One.

Standing turns on whether the parties have been injured in fact and whether such injury is to a legally protected right. *State v. Property at 2018 Rainbow Drive*, 740 So.2d 1025, 1027 (Ala. 1999).

5

> "'A party establishes standing to bring a challenge on constitutional
> grounds when it demonstrates the existence of (1) an actual, concrete
> and particularized "injury in fact"; (2) a "causal connection between
> the injury and the conduct complained of"; and (3) a likelihood that
> the injury will be "redressed by a favorable decision."'"

*Town of Cedar Bluff v. Citizens Caring For Children*, 904 So. 2d 1253, 1256-57 (Ala. 2004),

In *Town of Cedar Bluff*, the plaintiffs contended that they had a "'universally accepted' and legally protected right to valid elections," and that they "suffer an injury when an invalid election is held as the result of an unconstitutional statute." The Alabama Supreme Court held that "this allegation, without more, is insufficient to establish an injury because [the plaintiffs] have failed to state with 'particularity' in what respect they were injured by the fact that the election was held- they have merely made the conclusory allegation that the election caused an injury because it was allegedly unconstitutional." 904 So. 2d at 1257.

Since neither Ms. Working nor Mr. Erdemir lives or votes in District One, they lack standing to challenge an election to elect a County Commissioner from District One. Because neither Ms. Working nor Mr. Erdemir is eligible to vote in District One elections, it is difficult to see how they have suffered a legal injury as a result of the February 5, 2008 election regardless of when the election is held.

Although Mr. McGinnis lives in District One and is a qualified elector, he still must establish his standing to bring an action challenging the constitutionality of Act No. 77-784. In this action, his complaint fails to establish that he is a "proper party to bring the action. To be a proper party, the person must have a real, tangible legal interest in the subject matter of the lawsuit." *Doremus*

6

*v. Business Council of Alabama Workers' Comp. Self-Insurers Fund*, 686 So. 2d 252, 253 (Ala. 1996).

The verified complaint alleges no injury suffered by McGinnis by the canvassing or certifying of the votes. In the Application for a T.R.O., McGinnis asserted that he would be injured because he has "the right to vote at any election scheduled for selecting the person to occupy the office of commissioner for District One of the Jefferson County Commission," and that "[t]he conduction of an election not authorized by law is a useless act and waste of public resources, and a proper subject of injunctive relief." This assertion of injury differs only in semantics from the allegation rejected by the Court in *Town of Cedar Bluff*. Thus, Mr. McGinnis has not stated or shown with particularity the injury in fact necessary to grant him standing to challenge the constitutionality of Act No. 77-784.

Specifically, the Alabama Supreme Court has held:

"When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction. *Barshop v. Medina County Underground Water Conservation District*, 925 S.W.2d 618, 626 (Tex. 1996) ('Standing is a necessary component of subject matter jurisdiction'). See also *Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ('"standing 'is perhaps the most important of [the jurisdictional] doctrines'"'); *National Organization for Women, Inc., v. Scheidler*, 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed. 2d 99 (1994) ('Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.'); *Romer v. Board of County Comm'rs of the County of Pueblo, supra*, 956 P.2d at 585 ('standing is a jurisdictional prerequisite to every case and may be raised at any stage of the proceedings') (Martinez, J., dissenting); *Cotton v. Steele*, 255 Neb. 892, 587 N.W.2d 693 (1999). But see *Hertzberg v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 554 Pa. 249, 721 A.2d 43 (1998) (standing is not jurisdictional).

7

"Because '[t]he lack of standing [is] a jurisdictional defect,' the defect 'cannot be cured nunc pro tunc back to the date when the original complaint was filed.' *Tyler House Apartments, Ltd., v. United States*, 38 Fed. Cl. 1, 7(Fed. Cl. 1997). In other words, a pleading purporting to amend a complaint, which complaint was filed by a party without standing, cannot relate back to the filing of the original complaint, because there is nothing 'back' to which to relate. See *GAIA Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 779 (Fed. Cir. 1996) (assignment to Gaia Technologies, Inc., of patent and trademark rights purporting to operate nunc pro tunc to a date 'prior to Gaia's filing of the ... suit' was ineffective to cure the jurisdictional defect created by Gaia's lack of standing on the date of commencement of the action), amended on rehearing on other grounds, 104 F.3d 1298 (Fed. Cir. 1996); *Reynolds v. United States*, 748 F.2d 291, 292 (5th Cir. 1984) (a complaint filed pursuant to the Federal Tort Claims Act ('FTC') before the 'final denial' of the plaintiff's claim by the 'appropriate Federal agency' as required by the FTC was due to be dismissed for lack of subject-matter jurisdiction, and an amended complaint filed after the 'final denial' was also due to be dismissed because it could relate back only to a date on which the trial court lacked subject-matter jurisdiction).

"Because the City had no standing to commence or prosecute this action, the complaint it filed on April 23, 1996, failed to invest the trial court with subject-matter jurisdiction. Therefore, the purported amendment filed on July 30, 1997, could relate back only to a time when the trial court had no jurisdiction. The trial court's order of December 30, 1997, dismissing this action was correct."

*State v. Property at 2018 Rainbow Drive*, supra at 1028 (Ala. 1999).

"Lacking subject matter jurisdiction [a court] may take no action other than to exercise its power to dismiss the action . . . . Any other action taken by a court lacking subject matter jurisdiction is null and void." *Ex parte Alabama Dep't of Transportation*, 2007 WL 2070347 (Ala. 2007) (quoting *Ex parte Blankenship*, 893 So. 2d 303, 307 (Ala. 2004) in turn quoting *Property at 2018 Rainbow Drive*, supra at 1028).

This Court finds that it lacked subject matter jurisdiction at the time of the filing of the original action on January 31, 2008, because neither Ms. Working nor Mr. Erdemir had standing to initiate this action. Because this Court lacked subject matter jurisdiction at the time this action was

8

commenced, the amendment adding Mr. McGinnis as a plaintiff "cannot relate back to the filing of the original complaint, because there is nothing 'back' to which to relate." *Property at 2018 Rainbow Drive*, supra at 1028.

This court concludes that the named plaintiffs have no legal standing to bring this action and their claims are due to be dismissed. They have suffered no particular injury in fact. However, because the Supreme Court has ordered this court to rule "on the merits," it will proceed to do so.

## II.
## CONSTITUTIONALITY OF ALABAMA
## ACT NUMBER 77-784.

Plaintiffs contend that Alabama Act Number 77-784 is unconstitutional because is conflicts with Article IV, § 105 of the Alabama Constitution of 1901.

> **"Sec. 105. Special, private or local laws -- Prohibited in cases provided for by general law; exception as to time of holding courts; partial repeal of general laws.**
> No special, private, or local law, except a law fixing the time of holding courts, shall be enacted in any case which is provided for by a general law, or when the relief sought can be given by any court of this state; and the courts, and not the legislature, shall judge as to whether the matter of said law is provided for by a general law, and as to whether the relief sought can be given by any court; nor shall the legislature indirectly enact any such special, private, or local law by the partial repeal of a general law."

The general law of Alabama on the subject of filling a vacancy occurring on a County Commission is found at Ala. Code (1975) §11-3-1. This general law was amended by Alabama Act No. 2004-455 which was signed into law by the Governor on May 14, 2004, after having been pre-cleared by the United States Justice Department. The statute provides for the Governor to appoint

9

a commissioner when there is a vacancy on a county commission unless there is a local law to the

contrary. The emphasized words in the statute were added by the 2004 amendment.

> "(b) *Unless a local law authorizes a special election*, any vacancy on the county commission shall be filled by appointment by the Governor. If the appointment occurs at least 30 days before the closing of party qualifying as provided in Section 17-13-5, the person appointed to the vacated office shall only serve until seven days after the next general election following the appointment as provided herein. The person so appointed to fill the vacancy shall meet the residency requirements in subsection (a), and shall hold office from the date of appointment until the eighth day following the next general election. If the original term in which the vacancy occurred would not have expired on the eighth day following the next general election after the appointment, the person elected at the election required by operation of this subsection shall serve for a period of time equal to the remainder of the term in which the vacancy was created. Thereafter, election for the county commission seat shall be as otherwise provided by law."
>
> (f) Except as specifically provided in subsections (b) and © this section applies in all counties and may not be altered or amended by local law. Any existing local law or portion thereof in conflict with this section is specifically repealed to the extent of the conflict effective with the next election following September 1, 2007. *It is the intent of the foregoing that a portion of a local law in direct conflict with this section shall be repealed, and any remaining portions of the local law not in conflict shall remain in full force and effect*. (Emphasis added.)

Alabama Act 77-784 is a local act in that it applies only to Jefferson County. It provides in

pertinent part:

> "Section 1.  As herein used the following terms have the meaning hereby ascribed to them: "the County" means Jefferson County, Alabama; "a vacancy" means a vacancy on the governing body of the County caused by death, resignation, impeachment, or any cause except normal expiration of terms; "first election hereunder" means the first election for which this Act provides to fill a vacancy as distinguished from the run-off election held hereunder, if a run-off election is necessary; "run-off election hereunder" means the run-off election for which this Act provides, if no candidate at the first election hereunder receives a majority of the votes cast; "a County wide election" means any election, whether general, special or primary, including run-off elections, whereat qualified electors throughout the county are entitled to vote and which is held to elect a Federal,  State or County officer, or to nominate a candidate or candidates, for a Federal, State or County office or offices,

to submit one or more questions, including but not limited to, the question of adopting a proposed amendment to the Constitution of Alabama and the question of whether general obligation bonds, or revenue bonds, of the State or County shall be issued; "a scheduled County wide election" means a "County wide election" which is scheduled to be held on a date definitely determined when a vacancy occurs; and "the Election Commission" means the Election Commission of the County.

Section 2.  Within seven days from the occurrence of any vacancy the Election Commission, by a majority vote thereof, shall adopt a resolution stating the dates on which the first election hereunder and the run-off election hereunder, if necessary, will be held.  The said dates will be determined as provided for in Sections 3 and 4, below.

Section 3.  If when a vacancy occurs a County wide election is scheduled to be held more than forty days and not more than 180 days from the date whereon the vacancy occurs, the first election hereunder, to fill such vacancy, shall be held on the County wide election date.  If when the vacancy occurs there is no County wide election scheduled to be held more than forty days and not more than 180 days after the date whereon the vacancy occurs, the first election hereunder, to fill the vacancy shall be held on a date specified by the Election Commission in the resolution, provided for in Section 2, above, which date shall be not less than thirty-three days and not more than forty days from the date on which the resolution is adopted."

In *Baldwin County v. Jenkins*, 494 So. 2d 584 (Ala. 1986), the Alabama Supreme Court was

confronted with a statute and a local act addressing the election and terms of office of county

commissioners.  The Supreme Court held that the general statute, Ala. Code (1975) § 11-3-1, as

amended, containing the words, "unless otherwise provided by local law," evidenced the legislature's

intent that the subject with which it dealt was not subsumed within it:

"A situation completely opposite and contrary to the one presented here was contemplated and prohibited by the constitutional framers, which is to say that the legislature, by enacting a general law containing no such provision or exception for contrary local laws, thereby intended that general law to be primary and the subject subsumed entirely by the general law.  In that situation, § 105 does operate to prohibit the enactment of contrary local laws.  Such is not the case with respect to § 11-3-1 and Act No. 84-639.  Because the language of the statute provides for the existence of and prevailing effect of contrary local laws, it must be that the legislature did not intend the subject to be 'subsumed' exclusively within § 11-3-1.  That being

11

the case, the co-existence of the general law (§ 11-3-1) and the contrary local law (Act No. 84-639) deferred to in the general law, cannot be said to be repugnant to § 105 because the 'constitutional framers have [only] prohibited the enactment of a local law when the subject [as intended by the legislature] is already subsumed by the general statute.' *Peddycoart v. City of Birmingham*, 354 So. 2d 808, 813 (Ala. 1978). *Baldwin County v. Jenkins*, 494 So. 2d at 587.

The language "unless otherwise provided by local law," is also present in Ala. Code (1975) § 11-3-1(b) and is addressed in § 11-3-1(f).

Act No. 77-784 is not "in direct conflict with" § 11-3-1, but rather, pursuant to *Baldwin County v. Jenkins,* § 11-3-1 defers to Act No. 77-784.

Plaintiffs rely on *Riley v. Kennedy*, 928 So.2d 1013 (Ala. 2005). The facts in that case are remarkably similar to the facts in the case before this court. In *Riley v. Kennedy,* the relevant local act was Act No. 85-2327, which addressed the process for filling vacancies on the Mobile County Commission. The decision in that case concluded that Governor Riley was authorized to fill the vacancy by appointment. However, the fact that distinguishes the Mobile case from the one before this court is that the Mobile Act, Act No. 85-2327, had been declared unconstitutional by the Supreme Court in the case of *Stokes v. Noonan,* 534 So.2d 237 (Ala. 1988). The Supreme Court held that since the Mobile Act had been declared unconstitutional, it was not revived by the subsequent enactment of Act No. 04-455.

Act No. 77-784 has never been declared unconstitutional by any court. (Joint Stipulation of Fact Number 11). Because the Jefferson County Act has never been declared unconstitutional, it is still applicable to the dispute before the court. The Jefferson County statute did not need to be revived because it had never been declared unconstitutional before the enactment of Act No. 04-455.

12

Plaintiffs contend that, pursuant to *Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005), the Alabama Supreme Court has implicitly held Act No. 77-784 to be unconstitutional. It is well settled law in Alabama that the repeal of a statute by implication is not favored. *Willis v. Kincaid*, 2007 WL 2687392 (Ala. 2007); *Shiv-Ram, Inc. v. McCaleb*, 892 So. 2d 299 (Ala. 2003); *Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass'n*, 294 Ala. 173, 314 So. 2d 51 (1975); *State v. Bay Towing & Dredging Co.*, 265 Ala. 282, 90 So. 2d 743 (1956).

Repeal by implication is only permitted when two statutes are so repugnant to each other that they become irreconcilable. *Hurley v. Marshall County*, 614 So. 2d 427 (Ala. 1993). Act No.04-455, as incorporated into § 11-3-1, contains nothing that is repugnant to Act No. 77-784. Instead, Act 04-455 opens the door to Act No. 77-784. Reading Act No. 04-455 to repeal the very local acts to which it opens the door would result in the statute having no field of operation and would result in Act No. 04-455 being futile and meaningless. This Court must presume that the legislature does not enact vain, meaningless or futile statutes. *Watley v. Transamerica Fin. Services, Inc.*, 708 So. 2d 890 (Ala. 1997).

The Alabama Legislature, through Act No.07-488 and Act No. 04-455 incorporated Act No. 77-784 into Ala. Code (1975) § 11-3-1(b) by adding the words, "Unless a local law authorizes a special election." In line with *Baldwin County v. Jenkins*, 494 So.2d 587 (Ala. 1986), the addition of those words removes any possible conflict between Act No. 77-784 and Article IV, § 105 of the Alabama Constitution. It also resolves any claim of repeal by implication.

Therefore, this court concludes that Act No. 77-784 is valid law and controls this dispute over Mr. Langford's replacement on the Jefferson County Commission.

13

## III.
## DID THE VOTING COMMISSION CORRECTLY CALL FOR A SPECIAL ELECTION ON FEBRUARY 5, 2008?

The Election Commission's interpretation of Act No. 77-784 and its calling of the Special Election on February 5, 2008, was not a misinterpretation of the law for several reasons. On November 13, 2007, the date of Mr. Langford's resignation, there was a "scheduled County wide election" that was scheduled to be held on a date definitely determined, the February 5, 2008, Presidential Preference Primary. That "scheduled County wide election" was more than 40 days and not more than 180 days from the date the vacancy occurred. Therefore, the plain and usual meaning of the words "a scheduled County wide election," as defined in Section One of Act No. 77-784, required that the Special Election must be held on February 5, 2008. The scheduled election was called for a time plainly set forth in the Act.

The definition of the term "County wide election" in Section One of Act No. 77-784 plainly states that a "County wide election" includes "*any* election including *any* primary to nominate a candidate for a federal office or *any* election where *one or more questions,*" are submitted to all of the qualified voters of Jefferson County.

The broad language to submit to the voters "one or more questions, including but not limited to," would encompass the questions: "Who do you prefer to be a party's nominee for President?", and/or "Who do you prefer to be a party's delegate?" Therefore, *any* election where qualified electors throughout the County are asked *any* question satisfies the definition of the term "County

14

wide election." The February 5, 2008, Presidential Preference Primary was a "County wide election" as defined in Section One of Act No. 77-784.

The term "County wide election" is defined at Section One of Act 77-784 to include any election "to nominate a candidate for a federal ... office." The Presidential Preference Primary is the method for the citizens of Alabama to engage in the process of nominating a candidate for the Office of President of the United States of America. The object and result of a Presidential Preference Primary is to nominate each political party's candidate for the office of President.

In construing a statute, a Court is required to give the words of the statute the plain and usual meaning of those words and is prohibited from ignoring such plain and usual meaning of words. *Adams v. Mathis*, 350 So. 2d 381, 384 (Ala. 1977), citing *Morgan County Commission v. Powell*, 292 Ala. 300, 293 So. 2d 830 (1974).The plain and usual meaning of the words used to define a "County wide election" in Act 77-784 clearly encompasses the February 5, 2008 Presidential Preference Primary.

## IV.
## FINAL JUDGMENT

In construing a statute, a Court is required to give effect to the intent of the legislature. *Perry v. City of Birmingham*, 906 So. 2d 174 (Ala. 2005). It is clear from the plain language of the statute, Act No. 77-784, that the legislature intended that (1) a vacancy on the Jefferson County Commission be filled by a Special Election of the voters and not by appointment of the Governor and (2) the Special Election be scheduled to occur *at the same time* as an election already scheduled in which all of the qualified voters of Jefferson County are entitled to vote, provided that election

15

does not occur sooner than 40 days or more than 180 days from the date of the vacancy. The Court must give effect to, rather than frustrate, that legislative intention.

Wherefore premises considered, it is **Ordered and Adjudged** as follows:

1. The plaintiffs have no standing to bring this action and it is due to be dismissed for lack of jurisdiction.

2. Alabama Act. No. 77-784 is constitutional and does not violate Article IV, § 105, of the Alabama Constitution of 1901. Therefore the Governor's appointment of George F. Bowman to the Jefferson County Commission was unauthorized.

3. The Special Election scheduled and held on February 5, 2008 was held at the time required by Act No. 77-784 and the Jefferson County Election Commission did not err in scheduling the election.

4. When the final results of the election of February 5, 2008 are certified by the Election Commission, the winner of the election will be entitled to be the Jefferson County Commissioner for District Number One.

5. Costs are taxed as paid.

6. The Supreme Court of Alabama retains jurisdiction over this case. That court's order enjoining the Election Commission from certifying the result of the election remains in force and effect. Therefore, the terms of this judgment are stayed until that Court has reviewed this Judgment.

**Done and ordered, this the 18th day of March, 2008.**

_____
**J. SCOTT VOWELL, PRESIDING JUDGE**

16



## IN THE CIRCUIT COURT FOR JEFFERSON COUNTY, ALABAMA

PATRICIA WORKING, RICK ERDEMIR, and
FLOYD MCGINNIS,

State of Alabama ex FLOYD MCGINNIS,

     Plaintiffs

vs.

JEFFERSON COUNTY ELECTION COMMISSION,
ALAN KING, MIKE HALE, ANNE-MARIE
ADAMS, WILLIAM A. BELL, SR.,

     Defendants,

FRED L. PLUMP,

     Defendant-Intervenor.

Civil Action No. CV-2008-900316

STATE OF ALABAMA EX REL. FRED L. PLUMP

     Third-Party Plaintiff,

vs.

GEORGE BOWMAN,

     Third-Party Defendant.

## JOINT STIPULATION OF UNDISPUTED FACTS

Come now the parties in this case, on their own behalf or by and through the undersigned counsel of record, as designated below, and hereby stipulate and agree that the

1

Exhibit 1

following facts are true and undisputed:

1.    Plaintiff, Patricia Working, is an adult residing in Birmingham, Alabama, and is a qualified elector of Jefferson County Commission District 4.    Working has, in the past, paid Alabama real property tax on real property in Jefferson County.

2.    Plaintiff, Rick Erdemir, is an adult residing in Birmingham, Alabama, and is a qualified elector of Jefferson County Commission District 4.    Erdemir has, in the past, paid Alabama real property tax on real property in Jefferson County.    Erdemir pays a license tax to Jefferson County as a result of engaging in an occupation, and earning wages, within Jefferson County.

3.    Plaintiff, Floyd McGinnis, is an adult residing in Birmingham, Alabama, and is a qualified elector of Jefferson County Commission District 1.    McGinnis paid 2007 Alabama real property tax on real property in Jefferson County.

4.    Intervenor, Fred Plump, is an adult residing in

2

Fairfield, Alabama, and is a qualified elector of Jefferson County Commission District 1. Plump has paid 2007 Alabama real property tax on real property in Jefferson County. Further, Plump qualified as a candidate and his name appeared on the ballot in the Special Election which occurred on February 5, 2008, to fill a vacancy on the Jefferson County Commission.

5. Defendant, William A. Bell, is an adult residing in Birmingham, Alabama, and is a qualified elector of Jefferson County Commission District 1. Bell has paid 2007 Alabama real property tax on real property in Jefferson County.

6. Defendant, the Jefferson County Election Commission consists of Alan King, Probate Judge of Jefferson County; Anne-Marie Adams, Circuit Clerk, Tenth Judicial Circuit of Alabama; and, Mike Hale, Sheriff of Jefferson County, Alabama.

7. Third-party defendant, George F. Bowman was appointed by the Honorable Bob Riley, Governor of the State of Alabama, to fill the vacancy on the Jefferson County

3

Commission created by the resignation of Larry Langford. Governor Riley appointed Commissioner Bowman to fill the vacancy on November 21, 2007.

8.    Intervenor, Governor Bob Riley is the chief executive officer of the State of Alabama and is authorized to intervene in this case.

9.    Alabama Act 77-784 was enacted by the Legislature and approved by the Governor on May 25, 1977.  See Act 77-784 attached as Exhibit A.  Act No. 77-784 is a local law, in that it applies only to Jefferson County.

10.    At the time that Act No. 77-784 was enacted, the general law provided:  "In case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he is appointed."  Ala. Code § 11-3-6 (1989).

11.  No court has issued a judgment which expressly declares Alabama Act 77-784 to be unconstitutional.

12.    In *Stokes v. Noonan*, 534 So.2d 237 (Ala. 1988), the Alabama Supreme Court ruled that a Mobile County local

4

law, namely Act No. 85-237, violated § 105 of the Alabama
Constitution because it set out a local law for filling
vacancies on the Mobile County Commission when there was
already a general law on the same subject.

13. Alabama Act 77-784 was submitted to the United
States Department of Justice for pre-clearance under
Section 5 of the Voting Rights Act of 1965, 42 U.S.C.
§ 1973c, on or about June 22, 1977. See submission letter
attached as Exhibit B.

14. The United States Department of Justice issued a
"no objection" letter to Act 77-784 on August 11, 1977.
See letter attached as Exhibit C.

15. On January 15, 1982, the President of the
Jefferson County Commission, Tom Gloor, resigned from
office. See newspaper articles attached as Exhibit D.

16. Pursuant to Act 77-784, the Jefferson County
Election Commission called a Special Election for March 2,
1982. See Exhibit D.

17. March 2, 1982, was selected as the date for the
Special Election pursuant to the first sentence of Section

3, Act 77-784, since there was a county-wide election scheduled for that date to submit to the voters three (3) proposed amendments to the Alabama Constitution. See Certification of Results of Election, Exhibit E.

18. On March 2, 1982, a Special Election was held pursuant to Act 77-784, to fill Tom Gloor's unexpired term. Chriss Doss was certified as the winner of the March 2, 1982, Special Election by the Jefferson County Election Commission on March 4, 1982, and took office as President of the Jefferson County Commission on March 4, 1982. See Certification of Election attached as Exhibit F.

19. The election of Chriss Doss as President of the Jefferson County Commission resulted in a vacancy in the position Associate Commissioner No. 1 on the Jefferson County Commission.

20. On April 13, 1982, a Special Election was held pursuant to Act 77-784, to fill Chriss Doss's unexpired term as Associate Commissioner No. 1 on the Jefferson County Commission. The date of that Special Election was set pursuant to the second sentence of Section 3, Act 77-

784, as there was no scheduled county-wide election.

21. That Special Election required a runoff which occurred on May 4, 1982. See Certification of Election, attached as Exhibit H. Ray Moore was certified by the Jefferson County Election Commission as the winner of the runoff election on May 5, 1982 and took office on May 5, 1982. See Certification of Election attached as Exhibit I.

22. The Special Election dates to fill commissioner vacancies in 1982 were neither submitted to, nor approved by, the U.S. Attorney General or the U.S. District Court for the District of Columbia.

23. The form of the governing body of Jefferson County, Alabama, changed from a three member Commission which was elected at large to a five member Commission which is elected from five, single member districts. This change resulted from a Consent Decree entered by the United States District Court for the Northern District of Alabama, Southern Division, in a case styled *Michael Taylor, et al. v. The Jefferson County Commission, et al.*, Civil Action No. 84-C-1730-S.

7

24. In 1997, the changed form of government was enacted as an Alabama statute by the Alabama legislature in Act No. 1997-147. That statute created and established in Jefferson County a single-member district governing body.

25. On March 29, 2001, Chris McNair resigned from the position of Commissioner, District 2, on the Jefferson County Commission.   See resignation letter attached as Exhibit L.

26. On March 29, 2001, the Reverend Steve Small was appointed to fill Chris McNair's unexpired term by then Governor of Alabama, Don Siegelman.   See appointment letter attached as Exhibit M.

27. No preclearance submission concerning Governor Siegelman's appointment of Reverend Small has been made as of this time.

28. Alabama Act 2004-455 was enacted by the Legislature and approved by the Governor of Alabama on May 14, 2004.   That Act amended § 11-3-6, Code of Alabama, to provide as follows:

8

"<u>Unless a local law authorizes a special election,</u> in case of a vacancy, it shall be filled by appointment by the governor, and the person so appointed shall hold office for the remainder of the term of the commissioner in whose place he or she is appointed."

The underlined language is the new language added by Act 2004-455. See Act 2004-455 attached as Exhibit N.

29. Act No. 2004-376 was enacted by the Alabama legislature and approved by the Governor on May 3, 2004. Act No. 2004-376 was submitted to the U.S. Dept. of Justice for preclearance on January 12, 2005. The submission is attached as Exhibit W. The U.S. Dept. of Justice issued a "no objection" letter to Act No. 2004-376 on March 11, 2005. See Exhibit X.

30. Act 2004-455 was submitted to the United States Department of Justice for preclearance on August 9, 2004, by the Attorney General of Alabama. See submission letter attached as Exhibit O.

31. The United States Department of Justice issued a "no objection" letter to Act 2004-455 on September 28, 2004. See letter attached as Exhibit P.

32. On October 9, 2007, Larry Langford, Jefferson

9

County Commissioner District 1, was elected as Mayor of the City of Birmingham, Alabama.

33.  On October 29, 2007, the Jefferson County Election Commission adopted a resolution calling a Special Election to be held on February 5, 2008, to fill any vacancy which might exist on the Jefferson County Commission upon the assumption by Commissioner Langford of the Office of Mayor. See Resolution attached as Exhibit Q.  At the time the Resolution was adopted, there was not yet any vacancy on the Jefferson County Commission, and there was an election contest concerning the mayoral election.

34.  Larry Langford resigned from the Jefferson County Commission and was sworn in as the Mayor of the City of Birmingham, Alabama, on November 13, 2007.  See resignation letter attached as Exhibit R.

35.  On November 21, 2007, Alabama Governor Bob Riley appointed George F. Bowman to fill the unexpired term of Larry Langford on the Jefferson County Commission.   See appointment letter attached as Exhibit S.

36.  No  preclearance  submission  concerning  Governor

10

Riley's appointment of George Bowman has been submitted to the United States Department of Justice at this time, however, Governor Riley has informed the federal court in *Plump v. Riley*, Case No. 2:07cv1014 (M.D. Ala. pending), that a submission will be made.

37. Six candidates followed the procedures to qualify to have their names placed on the ballot for the February 5, 2008, special election, which had been called by the Jefferson County Election Commission in reliance on Act No. 77-784 and the legality of which is the subject matter of this litigation. Those candidates were George F. Bowman, William A. Bell, Fred L. Plump, Orville Ifill, Kamau Afrika, and Eric Major.

38. Larry Langford, George F. Bowman, William A. Bell, Fred L. Plump, Orville Ifill, Kamau Afrika, and Eric Major are all African-American men.

39. On November 27, 2007, a preclearance submission was made to the United States Department of Justice concerning the special election that is the subject of this litigation.

11

40. The United States Department of Justice issued a "no objection" letter concerning the special election that is the subject of this litigation on January 17, 2008. See letter attached as Exhibit U.

41. According to unofficial returns, William A. Bell received more than a majority of the votes cast on February 5, 2008, in the special election that is the subject of this litigation.

42. The Jefferson County Election Commission was scheduled to meet at 12:00 noon on Friday, February 15, 2008, *see* § 17-12-15, Alabama Code (2006), to certify William A. Bell as the winner of the special election that is the subject of this litigation.

43. On Thursday, February 14, 2008, the Supreme Court of Alabama enjoined the Jefferson County Election Commission from certifying the results of the February 5, 2008, special election, pending further orders of the Supreme Court of Alabama.

44. A portion of Alabama real property tax collected on real property located within Jefferson County, Alabama,

12

is distributed to the Jefferson County General Fund.

45. A portion of the Jefferson County license tax paid for engaging in an occupation and earning wages within Jefferson County is paid to the Jefferson County General Fund.

46. Jefferson County's General Fund is used to pay persons to administer elections at the direction of the Jefferson County Election Commission, including the February 5, 2008, presidential preference primary election. As a result of the Election Commission's resolving to conduct an election, monies appropriated from Jefferson County's General Fund pay for the printing of ballots, including the ballots used during the February 5, 2008, presidential preference primary election.

47. The ballots used during the February 5, 2008, presidential preference primary election included a space to vote for the position of Jefferson County Commission, District One commissioner. A copy of the ballot is attached as Exhibit V.

13

48. There has never been a previous occasion in Jefferson County when a county commissioner position vacancy had been filled by a special election held the same day as a presidential preference primary.

49. A primary election to nominate persons to be candidates for federal, state or county office is scheduled for the first Tuesday in June 2008. That election is conducted on a countywide basis. A general election for voters to choose between nominees for the federal, state or county office is scheduled for November 2008.

50. By stipulating to these facts, the parties do not necessarily agree that each fact is relevant or necessary to a decision in this case.

51. These stipulations are made for the purpose of this litigation only and are not to be used for any other purpose.

Dated this 6th day of March, 2008.

14

All parties having explicitly agreed to these
stipulations, they are hereby submitted by,

James U. Blacksher
P O Box 636
Birmingham AL 35201
 phone: 205-591-7238
 fax: 866-845-4395
 email: jblacksher@ns.sympatico.ca

/s/ Edward Still
Edward Still (STI009)
2112 11th Avenue South
Suite 201
Birmingham AL 35205-2844
 phone: 205-320-2882
 fax: 877-264-5513
 email: Still@votelaw.com

### CERTIFICATE OF SERVICE

  I certify that on 6 March 2008 I electronically filed the foregoing with the
Clerk of the Court using the AlaFile system which will send notification of such
filing to the following attorneys:

| | |
|---|---|
| Walter E. Braswell, Esq.<br>2101 4th Ave S, # 200<br>Birmingham, AL 35233 | Jeffrey M. Sewell, Esq.<br>Assistant County Attorney<br>Jefferson County<br>280 Jefferson County Courthouse<br>716 Richard Arrington Jr. Blvd. North<br>Birmingham, AL 35203 |
| Albert L. Jordan, Esq.<br>Wallace, Jordan, Ratliff & Brandt, LLC<br>P O Box 530910<br>Birmingham, AL 35253-0910 | Charlie D Waldrep, Esq.<br>Susan Walker, Esq.<br>Waldrep Stewart & Kendrick LLC<br>2323 2nd Avenue North<br>Birmingham, AL 35203 |
| Michael K. K. Choy, Esq.<br>Margaret Mary Fullmer, Esq.<br>Haskell Slaughter Young & Rediker, LLC<br>1400 Park Place Tower<br>2001 Park Place N.<br>Birmingham, AL 35203-2735 | James W. Davis, Esq.<br>Assistant Attorney General<br>Office of the Attorney<br>11 South Union Street<br>Montgomery, AL 36130-0152 |

| Hon. George Bowman<br>Suite 240 Courthouse<br>716 Richard Arrington Bvld. North<br>Birmingham, AL 35203<br>(served by email) | |

/s/ Edward Still

# Jefferson County Commission



**Return to the Department Directory**

# G E N E R A L Information

The Commission is the governing body of Jefferson County. The five Commissioners are elected from five districts within the County for four-year terms. The major responsibilities of the Commission are:

- Administer the County's finances
- Serve as custodians of all of the County's property
- Collect taxes as set by state law
- Allocate resources for the construction of buildings, roads and other public facilities
- Provide for the delivery of services that by law are the County's responsibility (such as sewer service and law enforcement)
- Make appointments to various governmental boards and agencies

Commission Districts Map

# M O R E Information



**Bettye Fine Collins- President**
Commissioner of Finance and General Services
collinsbfine@jccal.org





**Bobby Humphryes**
Commissioner of Roads and Transportation
humphryesb@jccal.org



EXHIBIT
𝒵



**Jim Carns**
Commissioner of Environmental Services
carnsj@jccal.org





**George Bowman**
Commissioner of Health and Human Services
bowmang@jccal.org





**Shelia Smoot**
Commissioner of Information Technology
smoots@jccal.org





**Jefferson County Commission**
Jefferson County Courthouse
716 Richard Arrington Jr Blvd North
Birmingham, AL 35203





**Birmingham Courthouse**



# Jefferson County Commission

Commissioner of Finance and General Services
Bettye Fine Collins



Return to the
County
Commission

## G E N E R A L  Information

Commissioner Collins oversees the operations of the
Department of Finance and General Services. This
department is responsible for the administration of the
financial affairs of Jefferson County, the management of the
County's public buildings and maintenance of the County's
accounting records. The department also supervises the
operations of the Jefferson County Revenue Department,
which collects a number of state and local taxes (such as
sales and use taxes and other excise taxes). Commissioner
Collins serves as President of the Jefferson County
Commission.



Bettye Fine
Collins

## Address

**Suite 220**
**Jefferson County Commission**
Jefferson County Courthouse
716 Richard Arrington Jr Blvd North
Birmingham, AL 35203

## P H O N E  Numbers

Phone: (205) 325-5070
Fax: (205) 325-4881

## M O R E  Information

Bettye Fine Collins Bulletin Board

Get
Information

# Jefferson County Commission

Commissioner of Roads and Transportation
Bobby Humphryes



**Return to the County Commission**

## G E N E R A L Information

Commissioner Humphryes oversees Roads and Transportation. This includes the following Departments:

- Highway Administration
- Highway Design
- Highway Right of Way
- Highway Engineering & Construction
- Camp Bessemer
- Camp Ketona
- Traffic Engineering
- Fleet Management
- Land Development
- Inspection Services
- EMA



**Bobby Humphryes**

## Address

**Suite 210**
**Jefferson County Commission**
Jefferson County Courthouse
716 Richard Arrington Jr Blvd North
Birmingham, AL 35203

## P H O N E Numbers

Phone: (205) 325-5555
Fax: (205 325-4860

## M O R E Information

# Jefferson County Commission
Commissioner of Environmental Services
Jim Carns



**Return**

**Return to the County Commission**

**Jim Carns**

## G E N E R A L Information

Commissioner Carns oversees the Department of Environmental Services, Economic Development, Community Development, and Board of Registrars.

Current Speeches

**Biography**

Jim Carns served Alabama in the Alabama House of Representatives since 1990 and now represents District 5 on the Jefferson County Commission. Jim is a successful businessman as well as a conservative politician. He recently sold his manufacturing business, and he knows what it takes to grow a business, create jobs, and meet a payroll. He knows how hard you work to pay the bills and raise your family and that you pay enough in taxes, sending over $6 billion annually to Montgomery. He believes we need tax reform and better government, not more taxes and bigger government.

Jim's leadership abilities always put him on the front lines earning the respect of his colleagues who have noted his wisdom and understanding of the issues and his ability to tackle tough issues and ask direct questions. Jim is past chairman of the House Republican Caucus and served as the House Minority Leader. He serves on the Rules Committee, Ways and Means Committee, and is Vice-Chairman of Commerce. He was past chairman of the former Industrial Development and Economic Growth Committee. He has been elected by his peers for 3 of his 4 terms to co-chair the 18-member Jefferson County Legislative Delegation. Jim passed landmark legislation that set up the Holocaust Commission and also serves on it. He has consistently fought all forms of gambling and he requested the opinion of the Alabama Supreme Court that removed video gambling machines from the state. He has always been a champion in pro-family legislation, education issues, tort reform, voter fraud and welfare reform.

Under Jim's leadership as Chairman of Alabama's Welfare Reform Commission, Alabama is consistently ranked in the top five states in the nation in implementing welfare reform.

Jim drafted, sponsored, and saw through to passage welfare reform legislation in Alabama. He represented Alabama at regional and national conferences on welfare reform.

Jim has remained steadfast in writing, sponsoring and getting strong and effective Voter ID legislation passed for 7 years, finally persevering and seeing it become law in 2003.

Jim promotes expanding and improving our educational system by advocating sensible, responsible, and accountable administration of our tax dollars by removing waste and putting dollars into the classroom. Jim wrote and passed landmark drug intervention legislation requiring strong anti-drug education in every public school.

Jim communicates and works well with other lawmakers and is State Chairman of the conservative American Legislative Exchange Council (ALEC). He also serves on the Energy Council and the Children, Families & Health Committee of the Assembly on State Issues in the National Conference of State Legislatures (NCSL). He serves on the Commission on Manufacturing Economic Stimulus and Free and Fair Trade. Jim is a conservative leader with a global vision and a local focus. He sees Alabama as a state of opportunity and his expertise in economic development has taken him to several countries representing the State of Alabama's interests.

Jim is a member of numerous organizations including The Federalist Society, Heritage Foundation and Americans United for Life. He has received honor and appreciation from the Alabama Libraries, the Eagle Award from Eagle Forum and garnered a 100% voting record with the Christian Coalition. He is active in the community and serves as an Elder in his church (Briarwood Presbyterian).

Jim, a Birmingham native, graduated from Woodlawn High School. He was selected to be in his high school's Hall of Fame for Outstanding Achievement in Business. He was President of his social fraternity in college and obtained his Bachelor of Science Degree in Engineering from the University of Alabama in 1962.

Jim enjoys golf, jogging, snow skiing, and is a pilot. Jim's tireless and unfailing commitment to the preservation of the family in America stems from his devotion to his own family. He has been married to his wife, Judy, for 42 years and they have three adult children and four grandchildren.



**Suite 230**
**Jefferson County Commission**
Jefferson County Courthouse
716 Richard Arrington Jr Blvd North
Birmingham, AL 35203

# PHONE Numbers

Phone: (205) 325-5503
Fax: (205) 325-5960

# MORE Information

# Jefferson County Commission

Commissioner of Health and Human Services
George Bowman

**Return**

**Return to the County Commission**



George Bowman

# G E N E R A L Information

Commissioner Bowman oversees the Department of Health
and Human Services. This department includes:

- OSCS - Office of Senior Citizens Services
- County Home
- Coroner
- Central Laundry

## Biography

Commissioner Bowman was born in Sumter, SC on
February 16, 1948, the son of Leroy and Mittie Bowman. He
grew up in Sumter, Orangeburg and Columbia where he
graduated from C.A. Johnson High School in 1965.

Commissioner Bowman was commissioned a Second
Lieutenant in the Army in May 1969 upon graduation from
S.C. State College and ordered to active duty in July 1969.
After completing the Signal Officer Basic Course and the
Communications Equipment Maintenance and Repair
Course, he served as the Radio Relay Officer, Signal
Center Platoon Leader, Communications Security
Custodian and Commander, HHC for the 16th Signal
Battalion, Butzbach, Germany, from 1970 to 1972. In 1973
he was transferred to Korea. While at Camp Stanley, he
was assigned as the Communications Officer, 1st Battalion,
38th Field Artillery; and the Division Artillery
Communications Officer, HHB, 2d Infantry Division Artillery;
and at Camp Casey he was the Division Race
Relations/Equal Opportunity Officer, HHC, 2d Infantry
Division. In March 1974, he served as a Race
Relations/Equal Opportunity Officer, 35th Engineer Group,
Fort Bragg, NC. In the Army Reserve from March 1978 to
December 1985, he held various positions which include
Radio Officer, HHC, 35th Signal Group; Operations Officer,
MOB Plans Director of Reserve Components; Maintenance
Officer, HHB, 4th Battalion, 17th Field Artillery;
Controller/Evaluator, Atlanta Detachment, 2d Maneuver
Training Command; Personnel Staff Officer and Plans
Officer, 3d Army. In 1986, he was again ordered to active
duty in the Army Active Guard/Reserve serving in a variety

of command and staff positions which include Operations and Plans Officer, 3d Army; Personnel Management Officer and Branch Chief, Signal Branch, ARPERCEN; Program Manager, Retirement Points Accounting System, ARPERCEN; Chief, Retired Activities Division, ARPERCEN; USAR Advisor, Joint Plans/MOB Officer, FORSCOM; Chief, Plans Division and Signal Support Division Chief, 335th Signal Command; Deputy Commander, ARPERCEN. On 7 May 1997 he was selected to be the Deputy Commander, 311th Theater Signal Command, Fort George G. Meade, Maryland and was promoted to Brigadier General on April 9, 1998. On October 17, 1999 he was selected to be the Commanding General, 311th Theater Signal Command and was promoted to Major General on October 6, 2000. He has served as a consultant to the National Museum of the United States Army. His last assignment on Active Duty was Assistant G-3, Mobilization and Reserve Affairs, Headquarters, Department of the Army, Pentagon, Washington, DC. He retired from the US Army and served as a Strategic Planner for the National Museum of the United States Army. In Birmingham he served as a Branch Manager for Liberty National Life Insurance Company at the home office in Birmingham, AL.

He is married to Yolanda Young Bowman and makes his home in Birmingham, AL.

**DECORATIONS AND AWARDS** : Legion of Merit, Meritorious Service Medal W/4th OLC, Army Commendation Medal W/2d OLC, Army Achievement Medal, Army Superior Unit Award, Army Reserve Components Achievement Medal, National Defense Service Medal W/Service Star, Army Forces Expeditionary Medal, Armed Forces Reserve Medal W/Hourglass Device, Army Service Ribbon, Overseas Service Ribbon, Army Reserve Component Overseas Training Ribbon.

**SCHOOLS** : Shippensburg University, Masters Degree in Public Administration; South Carolina State College, BA in History; Signal Officer Basic Course; Signal Equipment Maintenance and Repair Course; Race Relations Discussion Leader Course; Signal Officer Advanced Course; Air Ground Operations - Battlestaff Course; Command and General Staff College; Reserve Components National Security Officer Course; United States Army War College.

**CIVIC AFFILIATIONS** : Charter Member of Pi Gamma Lambda Chapter of Alpha Phi Alpha Fraternity; Charter

Senior Warden of William H. Scott Military Lodge No. 182
PHA; Member of Sixth Avenue Baptist Church.

## Address

**Suite 240**
**Jefferson County Commission**
Jefferson County Courthouse
716 Richard Arrington Jr Blvd North
Birmingham, AL 35203

## PHONE Numbers

Phone: (205) 325-5504
Fax: (205) 325-5950

## MORE Information



# Jefferson County Commission
Commissioner of Information Technology
Shelia Smoot



**Return to the County Commission**

# G E N E R A L  Information

Commissioner Smoot oversees the Departments of
Information Technology and Environmental Protection.

### DISTRICT 2 NEWS

### BIOGRAPHY



**Shelia Smoot**

Commissioner Shelia Smoot is the first African-
American female and the youngest person to ever
serve on the five-member Jefferson County
Commission. The Commissioner currently oversees
the Department of Information Technology where
she and her staff continue to champion projects that
reinforce her belief in Proverbs 31: 8-9
"Speak up for those who cannot speak for
themselves, for the rights of all who are destitute.
Speak up and judge fairly: defend the rights of the
poor and needy."

In her first term, Commissioner Smoot oversaw the
Roads and Transportation Department, along with
the county's Community, Economic and Workforce
Development Department. She was at the helm in
establishing a county film commission and the
Jefferson County Greenway Commission.

She also created the team that established Jefferson
County's first major Brownfield – the
Titusville Redevelopment Project. She was
instrumental in attracting Wachovia Bank's $400
million data center to Jefferson County, also.
Commissioner Smoot is an advocate for affordable
senior housing in her community. These and more
earned Commissioner Smoot the National Black
County Official of the Year Award in 2006.

The Commissioner currently serves on boards both
nationally and locally, but is most proud of her

Jefferson County Commission

volunteer service with Boy Scouts of America, the Southern Christian Leadership Conference, the NAACP, The Urban League and the Jaycees in both Michigan and Alabama. She is also a member of the Alpha Kappa Alpha Sorority.

She serves as Second Vice Chairperson of the Alabama Democratic Conference and she is on the Executive Committee of the Alabama Democratic Party. The Commissioner is a graduate of Leadership Birmingham (2000) and Leadership Alabama (2004).

In 2004, she served as a delegate to the Democratic National Convention. Additionally, she serves on the Legislative Committee of the Alabama County Commission Association. She is the former Southern Regional Director for the National Association of Black County Officials and currently the Second Vice President of that organization.

Before entering politics, Commissioner Smoot worked as an award-winning anchor and investigative journalist known for her hard-hitting "Six on Your Side" investigative reports. She hosted her own weekly statewide program, "Know Your Rights with Shelia Smoot." Commissioner Smoot currently hosts a radio show on WAGG called "Shelia Smoot on Your Side."

The Commissioner is a former Alabama Associated Press board member, former Regional Director for the National Association of Black Journalists, and former president of the Birmingham Association of Black Journalists. She also served as a Minority Fellow for the Investigative Reporters and Editors.

Commissioner Smoot holds a bachelor's Degree in Telecommunications and a Minor in Political Science from Michigan State University in Lansing, Michigan. She was born in Flint Michigan. Her parents are Alabama natives who left their home state to work in the auto industry.



**Suite 250**
**Jefferson County Commission**

Jefferson County Courthouse
716 Richard Arrington Jr Blvd North
Birmingham, AL 35203

## P H O N E  Numbers

Phone: (205) 325-5074
Fax: (205) 325-4878

## M O R E  Information